**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| WEST PALM BEACH FIREFIGHTERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>ALTISOURCE PORTFOLIO SOLUTIONS SA, WILLIAM C. ERBEY, WILLIAM B. SHEPRO, and MICHELLE ESTERMAN, )<br><br>Defendants. | CIVIL ACTION NO.<br><br>CLASS ACTION<br><br><u>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**</u><br><br>JURY TRIAL DEMANDED |

Plaintiff West Palm Beach Firefighters' Pension Fund ("WPB Fire" or "Plaintiff") brings this securities class action pursuant to §§ 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of all investors who purchased or otherwise acquired the common stock of Altisource Portfolio Solution S.A. ("Altisource," "ASPS," or the "Company"), between July 25, 2013 and August 4, 2014, inclusive (the "Class Period"). The allegations herein are based upon Plaintiff's knowledge with respect to Plaintiff, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents and press releases, Altisource's public filings with the United States Securities and Exchange Commission ("SEC"), wire and media reports published regarding Altisource, securities analysts' reports and advisories about the Company, transcripts of Altisource investor conference calls, and information posted on

Altisource's website.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.     This action arises out of Defendants' fraudulent scheme to artificially inflate Altisource's stock price.  As a result of the fraud described below, the Company has lost a substantial portion of its value.

2.     Altisource, together with its subsidiaries, is a marketplace and transaction solutions provider for the real estate, mortgage and consumer debt industries offering both distribution and content. The Company leverages proprietary business process, vendor and electronic payment management software and behavioral science based analytics to improve outcomes for marketplace participants.  Altisource's operations are conducted through three reporting segments: (i) Mortgage Services, (ii) Financial Services, and (iii) Technology Services.

3.     Plaintiff alleges that Defendants have fraudulently inflated Altisource's stock price during the Class Period by disseminating materially false and misleading statements, and failing to disclose material information, concerning the Company's true financial condition and business prospects.

4.     Specifically, Defendants made false and/or misleading statements and/or failed to disclose a myriad of material information regarding the Company's improper business and operational practices including, among other things, the fact that Ocwen Financial Corporation ("Ocwen"), a financial services holding company of which Defendant William C. Erbey is Chairman of the Board, was funneling as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work; and that Erbey, who owns

2

approximately 27% of Altisource's shares outstanding, was directly involved in approving Altisource's conflicted transactions with Ocwen.

5.      Accordingly, Defendants issued materially false and misleading statements and omitted material information from Altisource's public disclosures, which failed to disclose, among other things, that: (i) Altisource was charging exorbitant fees to Ocwen to enable Defendants to funnel as much as $65 million in questionable fees; (ii) despite public representations to the contrary, Defendant Erbey was personally involved in approving conflicted transactions with Altisource and other related entities which he controlled; (iii) the Company's financial statements during the Class Period were artificially inflated and did not provide a fair presentation of the Company's finances and operations; (iv) the Company lacked adequate internal and financial controls; and (v) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

6.      On February 26, 2014, the Company's illicit practices in connection with its relationship with Ocwen were first revealed.  An article by *Bloomberg* titled, "Lawsky[1] Cites Ocwen Conflicts as He Reviews Wells Fargo Deal,"[2] exposed Ocwen's deficient operational practices and disclosed that the New York Department of Financial Services ("NY Department of Financial Services" or "NYDFS") issued a letter[3] to the Company expressing concerns regarding Ocwen's business transactions with Altisource and other related companies and Defendant Erbey's and other officers' and directors' involvement in approving transactions with said affiliated companies.  Specifically, the February 26, 2014 NYDFS letter to Ocwen stated that "Altisource Portfolio's Chief Risk Officer was removed as a result of the Monitor's review"

---

[1] "Lawsky" refers to Benjamin M. Lawsky, Superintendent of Financial Services at NYDFS.

[2] Available at: http://www.bloomberg.com/news/2014-02-26/lawsky-cites-ocwen-conflicts-as-he-reviews-wells-fargo-deal.html

[3] Available at: http://www.housingwire.com/ext/resources/files/Editorial/pr140226-letter.pdf

and that "Ocwen's Chief Risk Officer also served as the Chief Risk Officer of Altisource Portfolio, and reported directly to Mr. Erbey in both capacities."  The letter goes on to state that the Chief Risk Officer "*seemed not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer*."[4]

7.      On April 21, 2014, NYDFS raised additional concerns about potential "*self-dealing*" between Ocwen and Altisource, in regards to Altisource's subsidiary, Hubzu, which Ocwen uses as its principal online auction site for the sale of its borrowers' homes facing foreclosure and investor-owned properties following foreclosure.  The April 21, 2014 letter[5] alleged that Hubzu appeared to be "charging auction fees on Ocwen-serviced properties that are *up to three times* the fees charged to non-Ocwen customers."  The concern is that inflated fees "*through conflicted business relationships*" are being charged at the expense of mortgage investors and strapped homeowners.

8.      On August 4, 2014, the NY Department of Financial Services issued another letter[6] to Ocwen stating that it was reviewing what it called "a troubling transaction" with Altisource relating to the provision of force-placed insurance which is "*designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work.*"  The August 4, 2014 letter went on to question the "*the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement*" despite

---

[4] All emphasis is added unless otherwise indicated.

[5] Available at: http://www.housingwire.com/ext/resources/files/Editorial/Lawsky-Letter-to-Ocwen-RE-Altisource-Hubzu.pdf

[6] Available at: http://www.dfs.ny.gov/about/press2014/pr140804-ocwen-letter.pdf

"Altisource's public claims—including in SEC filings—that he recuses himself from decisions involving related companies."[7]

9.      As a result of this disclosure, Altisource's stock price declined approximately 13%, with the Company's stock price opening at $103.65 and closing at $88.65, on high trading volume.  From July 30, 2014 to August 5, 2014, Altisource's stock price declined an astonishing $34.64 per share, or nearly 30%, from $118.69 per share to $84.05 per share, on higher than average trading volume.

10.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## II.      JURISDICTION AND VENUE

11.      The claims asserted arise under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and § 27 of the Exchange Act.

12.      Venue is proper pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b). Altisource has operations in this District, false statements were made in this District, and acts giving rise to the violations complained of occurred in this District.

13.      In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

---

[7] On August 18, 2014, Ocwen announced that it received a subpoena in June from the Securities and Exchange Commission ("SEC") over its close relationships with Altisource and other affiliated companies.

### III.   PARTIES

14.   Plaintiff acquired Altisource common stock at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

15.   Defendant Altisource, a process management solutions provider to the mortgage and financial services industries, is based and incorporated in Luxembourg.  The Company maintains offices throughout the United States, including in this District.  Defendant Altisource is traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol "ASPS."

16.   Defendant William C. Erbey ("Erbey") served as Chairman of the Board of Directors for Altisource since July 2009.  Defendant Erbey has also served as the Executive Chairman of the Board of Directors of Ocwen since September 1996, as the Chief Executive Officer of Ocwen from January 1988 to October 2010 and as the President of Ocwen from January 1988 to May 1998.  He has served as Chairman of the Board of Directors of Altisource Residential Corporation since July 2012 and as Chairman of the Board of Directors of Altisource Asset Management Corporation since March 2012.  Defendant Erbey holds 27% of Altisource's shares outstanding.

17.   Defendant William B. Shepro ("Shepro") is the Chief Executive Officer ("CEO") of the Company and has served in that role since August 2009.  He has served as a director of Altisource since August 2009.  Defendant Shepro previously served as the President and Chief Operating Officer of Ocwen Solutions at Ocwen.  In addition, Shepro previously served as President of Global Servicing Solutions, LLC, a joint venture between Ocwen and Merrill Lynch, from 2003 until 2009. Defendant Shepro also held the positions of Senior Vice President of Ocwen Recovery Group and Senior Vice President, Director and Senior Manager of Commercial Servicing at Ocwen.  Defendant Shepro had joined Ocwen in 1997.

18.     Defendant Michelle Esterman ("Esterman") has served as the Chief Financial Officer ("CFO") at Altisource since March 12, 2012 and serves as the Company's Principal Accounting Officer.  Defendant Esterman gained previous experience in transaction support (acquisitions, divestitures, restructuring and capital markets), complex accounting, SEC reporting, GAAP, Sarbanes Oxley compliance, audit efficiency and risk management while at Deloitte & Touche, LLP for fifteen years.

19.     Defendants Shepro, Esterman, and Erbey are sometimes referred to herein as the "Individual Defendants."

20.     Altisource and the Individual Defendants are sometimes referred to herein as "Defendants."

21.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Altisource, were privy to confidential, proprietary and material adverse non-public information concerning Altisource's operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

22.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the

unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Altisource's business.

23.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

24.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Altisource's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Altisource's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Altisource's publicly traded

securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## IV.   BACKGROUND OF ALTISOURCE

26.   Altisource operates as a marketplace and transaction solutions provider for the real estate, mortgage, and consumer debt industries in the United States.  The Company serves sub-prime servicers, utility companies, commercial banks, servicers, mortgage bankers, financial service companies, and hedge funds, as well as a government-sponsored enterprise. Altisource was incorporated in 1999, is headquartered in Luxembourg and maintains offices in this District. Altisource became a public company on August 10, 2009.  Prior to August 10, 2009, Altisource was a consolidated subsidiary of Ocwen.

27.   The Company states that its Mortgage Services segment offers services that span the mortgage and real estate lifecycle for loan servicers, originators, and investors in single family homes.  The Company's Financial Services segment offers collection and customer relationship management services.  Altisource's Technology Services segment offers software products that are used a la carte or together as an end-to-end solution, as well as information technology infrastructure services.

28.   Altisource provides various mortgage and technology services to Ocwen under master service agreements and amendments with terms extending through August 2025.

29.   In the Company's Form 10-K filed with the SEC on February 13, 2014, Altisource provided the following assurances regarding the fairness of rates charged to Ocwen for services provided to Ocwen:

> We record revenue we earn from Ocwen and its subsidiaries under various long-term servicing contracts at rates *we believe to be market rates as they are consistent with one or more of the following: the fees we charge to other*

*customers for comparable services; the fees Ocwen pays to other service providers; and fees charged by our competitors*.

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

30.     Throughout the Class Period, in regular press releases, conference calls and filings with the SEC, Altisource and the Individual Defendants repeatedly made false and misleading statements and omissions concerning the Company's business practices, including the propriety of rates charged by Altisource for services provided to Ocwen, along with false statements and omissions regarding Defendant Erbey's involvement in approving conflicted transactions with Altisource.   In addition, the Company also issued false and misleading financial statements.   These false and misleading statements created a false impression concerning Altisource's financial and operational status and future growth prospects.

31.     The Class Period begins on July 25, 2013, when Altisource issued a press release announcing financial results for the second quarter of 2013.   The press release stated in pertinent part as follows:

> Altisource Portfolio Solutions S.A. ("Altisource") (Nasdaq:ASPS) today reported record service revenue of $161.7 million for the quarter ended June 30, 2013, an increase of 37% when compared to the quarter ended June 30, 2012. Net income attributable to Altisource was a record $30.9 million or $1.25 per diluted share for the quarter ended June 30, 2013, an increase of 10% and 11%, respectively, compared to the quarter ended June 30, 2012.
>
> The growth in revenue is primarily from the initial referrals on the Homeward non-Government Sponsored Enterprise ("non-GSE") loans that Ocwen Financial Corporation ("Ocwen") boarded onto the REALServicing® platform in the first quarter and the expansion of the Financial Services segment which is gaining traction. Altisource generally begins receiving referrals once portfolios are boarded onto the REALServicing platform. During the second quarter of 2013, the Mortgage and Technology Services segments recognized virtually no benefit from the Residential Capital, LLC ("ResCap") non-GSE portfolio that is expected to board on REALServicing in the third quarter of 2013. Including Ocwen's recently announced agreement to purchase $78 billion of mortgage servicing

10

rights from OneWest Bank, FSB ("OneWest"), the number of non-GSE loans on which Altisource earns revenue is expected to be 65% higher in the fourth quarter of 2013 compared to the second quarter of 2013.

Net income increased in the second quarter of 2013 over the same period in the prior year from service revenue growth, partially offset by interest expense on the $400 million Senior Secured Term Loan ($200 million was funded in the fourth quarter of 2012 and $200 million was funded in the second quarter of 2013), intangible asset amortization expense in connection with the Homeward and ResCap fee-based business transactions and increased technology expenditures to support our growth. In addition, the Mortgage Services segment was almost fully staffed to meet the anticipated 65% higher non-GSE loan count on REALServicing in the fourth quarter of 2013 (compared to the second quarter of 2013). This 65% increase in loans with very little increase in compensation and benefits will be the major contributor to our goal of improving default related margins by seven percent by the end of this year compared to 2012.

"We are encouraged by Ocwen's recently announced agreement to purchase mortgage servicing rights from OneWest which, along with the ResCap portfolio, will drive meaningful default and technology related revenue growth to Altisource. Given the traction we see in our strategic initiatives along with Ocwen's ability to acquire additional mortgage servicing rights, Altisource's long term growth prospects are very bright," said Chairman William Erbey.

William Shepro, Chief Executive Officer, further commented "We expect earnings for the second half of 2013 and full year 2014 to be very strong as we begin to benefit from the ResCap and OneWest non-GSE servicing portfolio referrals and the higher margin Homeward referrals. We also remain intensely focused on margin improvement and believe we are making good progress toward accomplishing the seven percent margin improvement in our default related businesses by the end of the year."

32.     On the same day, the Company filed its quarterly report for the period ended June 30, 2013 on Form 10-Q with the SEC that was signed by Defendants Shepro and Esterman.  In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Shepro and Esterman, stating that the financial information contained in the Form 10-Q was accurate and disclosed all material changes to the Company's internal controls over financial reporting.  Moreover, in addition to repeating the Company's false and misleading financial results from the press release, the Form 10-Q stated the following:

We record revenue we earn from Ocwen under various long-term servicing contracts at rates we believe to be market rates as they are consistent with one or more of the following: the fees we charge to other customers for comparable services, the fees Ocwen pays to other service providers, fees commensurate with market surveys prepared by unaffiliated firms and fees charged by our competitors.

33.    On October 24, 2013, Altisource issued its third quarter 2013 financial results press release, stating in pertinent part as follows:

Altisource Portfolio Solutions S.A. ("Altisource") (Nasdaq:ASPS) today reported record third quarter 2013 service revenue of $180.4 million and net income attributable to shareholders of $36.0 million, or $1.42 per diluted share. Service revenue for the third quarter 2013 increased by 52% compared to the third quarter 2012 and 12% compared to the second quarter 2013. Net income attributable to Altisource for the third quarter 2013 increased 33% compared to the third quarter 2012 and 16% compared to the second quarter 2013.

The growth in service revenue and earnings is primarily driven by the Homeward Residential, Inc. ("Homeward") and Residential Capital, LLC ("ResCap") loans that Ocwen Financial Corporation ("Ocwen") boarded onto the REALServicing[®] platform during 2013 and growth in the mortgage charge-off collections business and customer relationship management business.

Third quarter highlights include:

•      The average number of loans serviced by Ocwen on REALServicing totaled 1.2 million loans in the third quarter 2013 compared to 0.8 million loans in the third quarter 2012;

•      Cash flows from operating activities totaled $67.2 million, or 37% of service revenue, in the third quarter 2013 compared to $43.1 million, or 36% of service revenue, in the third quarter 2012;

•      On August 21, 2013, Altisource announced the acquisition of Equator, LLC, a national leader in mortgage and real estate related business process management solutions at an initial price of $70.0 million plus contingent earn-out consideration of up to an additional $80.0 million over three years, subject to Equator, LLC achieving annual performance targets;

•      Altisource Residential ("Residential"), the company we provide rental management services to under a 15-year services agreement, increased its loan and REO portfolio from 1,372 at June 30, 2013 to 6,234 on September 30, 2013 (including announced acquisitions closed in October 2013); and

•      Altisource acquired 266,300 shares of its common stock during the third quarter 2013 at an average price of $134.86 per share.

"We are very pleased with our third quarter results and our execution against plan. With our focus on developing marketplaces for the very large real estate and mortgage spaces, we believe that we have exciting growth prospects," said Chairman William Erbey.

William Shepro, Chief Executive Officer, further commented "Our strong service revenue, net income and cash flow

34.     On the same day, the Company filed its quarterly report on Form 10-Q for the quarter ended September 30, 2013.  The Company's Form 10-Q also contained signed SOX certifications that Defendants Shepro and Esterman personally designed and evaluated the effectiveness of the Company's internal controls, and reiterated the Company's financial results announced that day.

35.     On February 13, 2014, the Company announced its fourth quarter and full year results for 2013.  The press release stated in pertinent part as follows:

Altisource Portfolio Solutions S.A. ("Altisource") (Nasdaq:ASPS) today reported record fourth quarter and full year service revenue and record full year net income attributable to shareholders. The growth in service revenue and net income was primarily driven by the continued growth of our largest customer, Ocwen Financial Corporation ("Ocwen"), and growth of the Financial Services' mortgage charge-off and customer relationship management businesses.

Full Year 2013 Results Compared to 2012:

- Service revenue of $662.1 million, a 42% increase
- Net income attributable to Altisource of $130.0 million, a 17% increase
- Diluted earnings per share of $5.19, a 17% increase
- Cash from operations of $185.5 million, a 59% increase
- Return on equity of 78%, compared to 58% in 2012

Fourth Quarter 2013 Results Compared to Fourth Quarter 2012:

- Service revenue of $192.4 million, a 58% increase
- Net income attributable to Altisource of $35.5 million, a 17% increase
- Diluted earnings per share of $1.42, an 18% increase
- Cash from operations of $50.8 million, a 162% increase

"2013 was a very strong year for Altisource, growing both organically as well as through strategic acquisitions. Earnings growth was slower than revenue as we continued to invest in the business to support our future growth. We are well

13

positioned with our core business and our growth initiatives for an even better 2014. Further, we intend to continue our aggressive share repurchase program[1]," said Chairman William Erbey.

Full year and fourth quarter 2013 highlights include:

- The average number of loans serviced by Ocwen on REALServicing® totaled 1.2 million in 2013 and 1.5 million in the fourth quarter of 2013
- On November 15, 2013, we acquired Equator, LLC ("Equator"), a national leader in mortgage and real estate related business process management solutions, for an initial purchase price of $63.4 million plus contingent earn-out consideration of up to an additional $80 million over three years, subject to Equator achieving annual performance targets
- On March 29, 2013, we completed the acquisition of the Homeward Residential, Inc. fee-based businesses from Ocwen for an aggregate purchase price of $75.8 million
- On April 12, 2013, we completed the Residential Capital, LLC fee-based business transaction with Ocwen for an aggregate purchase price of $128.8 million
- On May 7, 2013, we increased borrowings under our senior secured term loan agreement to $400 million. Furthermore, on December 9, 2013, we refinanced the senior secured term loan which, among other changes, lowered the interest rate of the term loan
- We repurchased 1.2 million shares of our common stock under our stock repurchase program during 2013 at an average price of $116.99 per share

William Shepro, Chief Executive Officer, further commented, "***During 2013, we focused on providing high quality services to our largest customer, Ocwen,*** improving our margins in our default related services businesses and developing our growth engines. With the progress made in 2013, we believe we are on track to achieve pre-tax income as a percentage of service revenue of 47% in our default related services businesses by the end of the first quarter of 2014. Further, we continue to make good progress on our growth initiatives and are optimistic that they will serve as an important longer term component of our revenue and customer diversification strategy."

36.     Also on February 13, 2014, the Company filed with the SEC its annual report on Form 10-K, for the fiscal year ended December 31, 2013. The Company's fiscal year 2013 Form 10-K was signed by Defendants Shepro and Esterman and reiterated the financial results announced on that day.

37.     The statements set forth above were materially false and misleading and/or omitted material facts regarding the Company's business, operations, financial results and mortgage servicing practices, including that: (i) Altisource was charging exorbitant fees to Ocwen to enable Defendants to funnel as much as $65 million in questionable fees; (ii) Defendant Erbey's personal involvement in approving conflicted transactions with Altisource and other related entities; (iii) the Company's financial statements during the Class Period were artificially inflated and did not provide a fair presentation of the Company's finances and operations; (iv) that the Company lacked adequate internal and financial controls; and (v) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.  As such, Defendants' statements discussed above during the Class Period lacked in any reasonable basis when made.

## VI.     The Truth Slowly Emerges

38.     On February 26, 2014, the Company's illicit practices in connection with its relationship with Ocwen were first revealed.  The letter focused on "potential conflicts of interest," including Altisource's Chief Risk Officer, stating the following:

> The Department's ongoing review of Ocwen's mortgage servicing practices has *uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated*. Indeed, the facts our review has uncovered to date *cast serious doubts on recent public statements made by the company that Ocwen has a "strictly arms-length business relationship" with those companies*. We are also concerned that this *tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure.* As such, we are demanding additional information on these issues as part of our review.
>
> Pursuant to the December 4, 2012 Consent Order between Ocwen and the Department, we have engaged an independent on-site compliance monitor at Ocwen to conduct a comprehensive review of Ocwen's servicing operations. It is in the course of the monitorship that *we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd.* (together, the "affiliated

companies"), all of which are chaired by *William C. Erbey, who is also the largest shareholder of each* and the Executive Chairman of Ocwen.

As you recall, *Altisource Portfolio's Chief Risk Officer was removed as a result of the Monitor's review. During its review, the Monitor discovered that Ocwen's Chief Risk Officer also served as the Chief Risk Officer of Altisource Portfolio, and reported directly to Mr. Erbey in both capacities.*

*This individual seemed not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer.*

He told the Monitor that *Ocwen paid his entire salary*, but he did not know and had apparently never asked which company paid his risk management staff.

*Indeed, it remains unclear whether Altisource Portfolio paid any compensation for the Chief Risk Officer's services.*

*Although he has since been removed as Altisource Portfolio' s Chief Risk Officer, his and Ocwen's failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination.*

Presently, Ocwen's management owns stock or stock options in the affiliated companies. This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen *that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result.*

39.    Lawsky's letter to Ocwen was noted in a *Bloomberg* article dated February 26,

2014 titled, "Lawsky Cites Ocwen Conflicts as He Reviews Wells Fargo Deal":

New York's top bank regulator asked Ocwen Financial Corp. for information about potential conflicts of interest between the firm and its vendors as it seeks to buy $39 billion of home loans from Wells Fargo & Co. Ocwen shares tumbled 7 percent.

Ocwen Chairman William Erbey is the largest shareholder in companies that provide mortgage-management services to Ocwen, Benjamin Lawsky, superintendent of New York's Department of Financial Services, said today in a letter to the Atlanta-based firm.

*Erbey's stakes in Ocwen affiliates "cast serious doubts on recent public statements made by the company that Ocwen has a 'strictly arms-length business relationship' with those companies," Lawsky said in the letter.*

16

Wells Fargo's planned sale of mortgage-servicing rights to Ocwen was halted by
Lawsky, who's concerned that the company will struggle to properly administer
the loans, a person briefed on the matter said earlier this month. Ocwen agreed to
"put an indefinite hold" on the deal with San Francisco-based Wells Fargo, the
biggest U.S. home lender.

Ocwen dropped to $36.76 in New York, the worst performer in the 228-company
Russell 1000 Financial Services Index. The stock is down 34 percent this year.

Stock Options

*"Ocwen's management owns stock or stock options in the affiliated
companies," Lawsky said in the letter. "This raises the possibility that
management has the opportunity and incentive to make decisions concerning
Ocwen that are intended to benefit the share price of affiliated companies,
resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a
result."*

Lawsky's review of Ocwen's operations also revealed that the company's chief
risk officer served in the same role for Altisource Portfolio Solutions, one of
Ocwen's vendors, and "reported directly to Mr. Erbey in both capacities," the
regulator wrote. The officer was removed as a result of the review.

Lawsky asked that Ocwen provide detailed information about the financial
interests of Ocwen officers, directors and employees in several affiliated
companies, and documentation showing the nature and extent of business
relationships between Ocwen and those firms.

40.     Despite this partial disclosure of Defendants' fraud, the Company's common

stock remained inflated due to Defendants' continued false and misleading statements and

omissions.

41.     On April 21, 2014, the NYDFS raised additional concerns about potential "*self-*

*dealing*" between Ocwen and Altisource, in regards to Altisource's subsidiary, Hubzu, which

Ocwen uses as its principal online auction site for the sale of its borrowers' homes facing

foreclosure and investor-owned properties following foreclosure.  The letter stated the following,

in pertinent part:

As you know, the Department has been reviewing business relationships between
Ocwen Financial Corporation and its affiliated companies, including Altisource

Portfolio Solutions S.A. ("Altisource Portfolio"). Our review has *raised concerns surrounding conflicted business relationships between Ocwen and Altisource Portfolio. One particularly troubling issue is the relationship between Ocwen and Altisource Portfolio's subsidiary, Hubzu,* which Ocwen uses as its principal online auction site for the sale of its borrowers' homes facing foreclosure, as well as investor-owned properties following foreclosure.

Hubzu appears to be charging auction fees on Ocwen-serviced properties that are up to three times the fees charged to non-Ocwen customers. In other words, when Ocwen selects its affiliate Hubzu to host foreclosure or short sale auctions on behalf of mortgage investors and borrowers*, the Hubzu auction fee is 4.5%; when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%.* These higher fees, of course, *ultimately get passed on to the investors and struggling borrowers* who are typically trying to mitigate their losses and are not involved in the selection of Hubzu as the host site.

*The relationship between Ocwen, Altisource Portfolio, and Hubzu raises significant concerns regarding self-dealing. In particular, it creates questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors.* Alternatively, if the lower fees are necessary to attract non-Ocwen business on the open market, it raises concerns about whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs. As such, we are seeking certain information about Ocwen's use of Hubzu, about the fees charged in connection with Hubzu auctions, and about the value that Hubzu's "customers" gain in exchange for those fees:

42.    Despite this partial disclosure of Defendants' fraud, the Company's common stock remained inflated due to Defendants' continued false and misleading statements and omissions.

43.    On April 24, 2014, the Company released its First Quarter 2014 results, stating the following in a press release:

Altisource Portfolio Solutions S.A. ("Altisource") (Nasdaq:ASPS) today reported record service revenue, net income attributable to shareholders and diluted earnings per share. The quarter over quarter growth in service revenue and net income was primarily driven by the higher number of loans that were boarded on REALServicing in 2013 and the inclusion of a full quarter of Equator, LLC operations.

First Quarter 2014 Results Compared to First Quarter 2013:

- Service revenue of $210.0 million, a 65% increase

18

- Net income attributable to Altisource of $39.6 million, a 44% increase
- Diluted earnings per share of $1.61, a 46% increase
- Cash from operations of $36.3 million, a 280% increase

"Altisource had a very strong quarter, marking the 12th straight quarter of sequential service revenue growth. To maintain this trend, we remain focused on executing against our strategic plan," said Chairman William Erbey.

William Shepro, Chief Executive Officer, further commented, "We are focused on providing high quality, compliant services to our customers while diligently executing on our 2014 strategic initiatives to diversify our customer base and grow our revenue and earnings. Our strong cash flow generation provides us the ability to invest in our next generation technologies, acquire businesses that advance our strategic objectives and repurchase our common stock."

First quarter 2014 highlights include:

- Gross profit as a percentage of service revenue was 44% for the quarter, an increase from 41% for the same quarter in 2013 driven by margin expansion in all of the Company's operating segments
- The average number of delinquent non-Government Sponsored Enterprise loans serviced by Ocwen on REALServicing totaled 369 thousand for the three months ended March 31, 2014, an increase of 57% compared to the three months ended March 31, 2013
- We repurchased 0.3 million shares of our common stock under our stock repurchase program at an average price of $109.97 per share during the three months ended March 31, 2014

44.    On the same day, the Company filed its false and misleading quarterly report for the quarterly period ended March 31, 2014 on Form 10-Q with the SEC that was signed by, among others, Defendants Shepro and Esterman.  In addition to repeating the Company's false and misleading financial results from the press release, the Form 10-Q stated as follows:

*We record revenue we earn from Ocwen and its subsidiaries under various long-term services contracts at rates we believe to be market rates as we believe they are consistent with one or more of the following: the fees we charge to other customers for comparable services, the fees Ocwen pays to other service providers and fees charged by our competitors.*

19

45.    On July 24, 2014, the Company announced its second quarter 2014 financial results, stating the following in its press release:

> Altisource Portfolio Solutions S.A. ("Altisource") (Nasdaq:ASPS) today reported record second quarter service revenue, net income attributable to shareholders and diluted earnings per share.
>
> Second Quarter 2014 Results Compared to Second Quarter 2013:
>
> - Service revenue of $263.2 million, a 63% increase
> - Net income attributable to Altisource of $54.1 million, a 75% increase
> - Diluted earnings per share of $2.24, a 79% increase
> - Cash from operations of $75.2 million, a 30% increase
>
> "Next month marks our five year anniversary as a stand-alone public company. During this five year period, we have had 43% cumulative annual service revenue growth, 47% cumulative annual earnings growth and have focused on providing best-in-class services, developing new services, driving down costs through efficiency initiatives and investing in our future. This is exactly what we set out to do five years ago," said Chairman William Erbey.
>
> William Shepro, Chief Executive Officer, further commented, "We believe our strategic initiatives, coupled with our strong revenue, earnings and operating cash flow, position us for attractive growth in the next five years and beyond. We plan to continue to invest in our next generation technology, develop our newer services and pursue potential acquisitions, in line with our marketplace strategy. We also plan to continue our share repurchase program when the stock is trading at attractive prices."
>
> Second quarter 2014 highlights include:
>
> - The average number of loans serviced by Ocwen on REALServicing was 2.3 million for the second quarter of 2014, an increase of 118% compared to the second quarter of 2013
> - The average number of delinquent non-Government-Sponsored Enterprise loans serviced by Ocwen on REALServicing was 352 thousand for the second quarter of 2014, an increase of 24% compared to the second quarter of 2013
> - We repurchased 0.4 million shares of our common stock under our stock repurchase program at an average price of $108.24 per share during the second quarter of 2014
> - Altisource Residential Corporation, the company we provide rental management services to, increased its non-performing loan and real estate owned portfolio from 12,405 at March 31, 2014 to 14,907 at June 30, 2014

46.     On July 29, 2014, the Company filed its quarterly report for the period ended June

30, 2014 on Form 10-Q with the SEC that was signed and certified by Defendant Shepro and

Esterman.  In addition to repeating the Company's false and misleading financial results from the

July 24, 2014 press release, the Form 10-Q stated the following:

> In accordance with Accounting Standards Codification ("ASC") Topic 250, *Accounting Changes and Error Corrections* , the Company evaluated the effect of the disclosure and presentation errors on its previously issued annual and quarterly financial statements, both qualitatively and quantitatively, and concluded that the related party disclosures in the Company's previously issued annual and quarterly financial statements are not materially misstated.
>
> * * *
>
> *We record revenue we earn from Ocwen under the Service Agreements at rates we believe to be market rates as we believe they are consistent with the fees we charge to other customers for comparable services and /or fees charged by our competitors.*

47.     On August 4, 2014, the NYDFS issued its third letter to Ocwen.  The letter

expressed concern regarding the Company's "troubling" arrangement with related company

Altisource in connection with the provision of force-placed insurance to customers.  The letter

also questioned the role of Defendant Erbey in approving the arrangement, given the Company's

public statements wherein it represented that Defendant Erbey recused himself from such

involvement.  The NYDFS letter stated in pertinent part as follows:

> *As part of the Department's ongoing examination of Ocwen's mortgage servicing practices, we are reviewing a troubling transaction involving Ocwen's related company, Altisource Portfolio Solutions, S.A. ("Altisource"), and the provision of force-placed insurance. Indeed, this complex arrangement appears designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work. Additionally, the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement appears to be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings.*
>
> ***
>
> As you know, the Department has previously expressed concerns about Ocwen's use of related companies to provide fee-based services such as property

inspections, online auction sites, foreclosure sales, real estate brokers, debt collection, and many others. ***Because mortgage servicing presents the extraordinary circumstance where there is effectively no customer to select a vendor for ancillary services, Ocwen's use of related companies to provide such services raises concerns about whether such transactions are priced fairly and conducted at arms-length.***

The Department now seeks additional information about Ocwen's provision of force-placed insurance through related companies. As you are aware, the Department's recent investigation into force-placed insurance revealed that mortgage servicers were setting up affiliated insurance agencies to collect commissions on force-placed insurance, and funneling all of their borrowers' force-placed business through their own agencies, in violation of New York Insurance Law section 2324's anti-inducement provisions. The Department discovered that servicers' own insurance agencies had an incentive to purchase force-placed insurance with high premiums because the higher the premiums, the higher the commissions kicked back by insurers to the servicers or their affiliates. The extra expense of higher premiums, in turn, can push already struggling families over the foreclosure cliff. In light of this investigation, the Department last year imposed further prohibitions on these kickbacks to servicers or their affiliates.

However, as part of our broader review of ancillary services provided by non-bank mortgage servicers, we are concerned that certain non-bank mortgage servicers are seeking to side-step those borrower protections through complex arrangements with subsidiaries and affiliated companies. Indeed, in recent weeks, we halted one such arrangement at another non-bank mortgage servicing company.

**Agreements with SWBC and Altisource**

***Based on its investigation and through the Monitor's work, the Department understands that Ocwen's force-placed arrangement with Altisource features the use of an unaffiliated insurance agent, Southwest Business Corporation ("SWBC"), apparently as a pass-through so that Ocwen and Altisource are not directly contracting with each other, but Altisource can still receive insurance commissions and certain fees seemingly for doing very little work.***

These are the facts established by documents Ocwen provided to the Monitor: In August 2013, Ocwen appointed an Altisource subsidiary called Beltline Road Insurance Agency, Inc. ("Beltline") as its exclusive insurance representative, purportedly to negotiate and place a new force-placed insurance program for Ocwen. Ocwen's existing force-placed arrangement with the insurer Assurant was set to expire in March 2014, and Beltline's stated task was to find an alternative arrangement. In January 2014, Altisource provided a memo to the Credit Committee of Ocwen Mortgage Servicing, Inc., recommending, among other

things, replacing Assurant with SWBC as Ocwen's managing general agent. SWBC would then be charged with managing Ocwen's force-placed insurance program, including negotiating premiums with insurers. As part of this arrangement, Altisource recommended itself to provide fee-based services to SWBC.

In emails dated January 15 and 16, 2014, the transaction was approved by the three members of the Credit Committee: William Erbey, Duo Zhang, and Richard Cooperstein. The Credit Committee did not meet to discuss this proposal, no minutes were taken of the Credit Committee's consideration of this proposed transaction, and the proposed transaction apparently was not presented for review or approval to any member of the Ocwen Board of Directors except Mr. Erbey, as Mr. Zhang and Mr. Cooperstein are not members of the Ocwen Board of Directors.

*Just one month after this Credit Committee approval, on February 26, 2014, the company received the Department's letter raising concerns about potential conflicts of interest between Ocwen and its related public companies. In that letter, we identified facts that "cast serious doubts on recent public statements made by the company that Ocwen has a 'strictly arms-length business relationship' with those companies," and we specifically referenced the multiple roles played by Mr. Erbey as an area of concern.*

*Disregarding the concerns raised in our letter, Ocwen proceeded to execute contracts formalizing this new force-placed arrangement, apparently without further consideration by any Board member other than Mr. Erbey. Those contracts, dated as of June 1, 2014, indicate that Altisource will generate significant revenue from Ocwen's new force-placed arrangement while apparently doing very little work. Indeed, a careful review of these and other documents suggests that Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself.*

*First, Altisource will reap enormous insurance commissions for having recommended that Ocwen hire SWBC. Under the contracts, Ocwen promises to give its force-placed insurance business to SWBC. SWBC does the work of negotiating premiums, preparing policies, and handling renewals and cancellations. For these services, SWBC receives commissions from insurers. SWBC then passes on a portion of those commissions, constituting 15% of net written premium on the policies, to Altisource subsidiary Beltline, for "insurance placement services." Documents indicate that Ocwen expects to force-place policies on its borrowers in excess of $400 million net written premium per year; a 15% commission on $400 million would be $60 million per year. It is unclear what insurance placement services, if any, Altisource is providing to justify these commissions.*

*Second, Altisource will be paid a substantial annual fee for providing technology support that it appears to be already obligated to provide.* This fee relates to monitoring services, whereby Ocwen pays a company to monitor whether its borrowers' insurance remains in effect. Such monitoring is necessary to establish which borrowers have lapsed on their payments and need to have insurance force-placed upon them. *Prior to 2014, Ocwen was paying ten cents per loan per month to Assurant for monitoring. In this new arrangement, however, Ocwen agrees to pay double the prior amount – twenty cents per loan per month now paid to SWBC, for each of the approximately 2.8 million borrowers serviced by Ocwen. SWBC, in turn, agrees to pass on fifteen out of that twenty cents to Altisource, or an estimated $5 million per year. Altisource provides only one service in exchange for this fee: granting SWBC access to Ocwen's loan files.* Altisource, of course, only has access to Ocwen's loan files through its own separate services agreements with Ocwen, which appear to contractually obligate Altisource to provide this access to business users designated by Ocwen to receive such access.

Third, the contracts require SWBC to use Altisource to provide loss draft management services for Ocwen borrowers; to pay Altisource $75 per loss draft for these services; and to pay Altisource an additional $10,000 per month for certain other services.

\*\*\*

**Ocwen's Public Statements Concerning Transactions with Related Companies**

*In addition to the issues raised above, the Department has serious concerns about the apparently conflicted role played by Ocwen Executive Chairman William Erbey and potentially other Ocwen officers and directors in directing profits to Altisource,* which is "related" to Ocwen but is formally a separate, publicly-traded company. As you know, Mr. Erbey is Ocwen's largest shareholder and is also the Chairman of and largest shareholder in Altisource. In fact, Mr. Erbey's stake in Altisource is nearly double his stake in Ocwen: 29 percent versus 15 percent. *Thus, for every dollar Ocwen makes, Mr. Erbey's share is 15 cents, but for every dollar Altisource makes, his share is 29 cents.*

*The Department and its Monitor have uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies, despite Ocwen's and Altisource's public claims – including in SEC filings – that he recuses himself from decisions involving related companies. Mr. Erbey's approval of this force-placed insurance arrangement as described above appears to be a gross violation of this supposed recusal policy.*

\*\*\*

*Finally, Ocwen and Altisource state in their public filings that rates charged under agreements with related companies are market rate, but Ocwen has not*

24

*been able to provide the Monitor with any analysis to support this assertion.*
(emphasis added)

48.    An August 6, 2014 article by *The Palm Beach Post* titled, "N.Y. probe of Ocwen

widened; Focus centers on $65 million in fees to a spinoff company" additionally highlighted

Altisource's illicit scheme with Ocwen, citing to the NYDFS August 4, 2014 letter.   The article

states as follows:

> New York's Department of Financial Services deepened its investigation this
> week of West Palm Beach-based Ocwen Financial Corp. with a letter questioning
> an arrangement that *"appears designed to funnel as much as $65 million in fees
> annually from already distressed homeowners" to a spinoff company doing
> minimal work.*
>
> In the Monday letter to Ocwen General Counsel Timothy Hayes, New York
> Superintendent of Financial Services Benjamin Lawsky *asks for more
> information regarding the mortgage servicing firm's involvement with "related
> company" Altisource Portfolio Solutions regarding forced-placed insurance*.
>
> Forced-placed insurance, which can cost five to 10 times more than what a
> homeowner can get independently, has been charged to borrowers whose policies
> lapse as they fall behind on mortgage payments.
>
> Banks, including HSBC, JPMorgan Chase and Wells Fargo, have paid hundreds
> of millions of dollars to settle complaints that they took kickbacks or otherwise
> colluded with forced-placed insurance companies to collect commissions on
> policies.
>
> In a statement, Ocwen said it will "continue to cooperate with the New York
> Department of Financial Services and provide the information requested, as we
> have done with all previous requests from the department."
>
> Lawsky said in his letter that New York has taken steps to minimize abuses of
> forced-placed insurance but is concerned that non- bank mortgage servicers may
> be side-stepping borrower safeguards through arrangements with subsidiaries and
> related companies.
>
> *According to Lawsky,   Ocwen and Altisource are using an unaffiliated
> insurance agent, Southwest Business Corp. , "apparently" as a pass-through so
> that the two companies are not directly contracting with each other and
> Altisource can still receive insurance commissions and certain fees seemingly
> for doing "very little work."*

Lawsky's letter also calls out Ocwen Executive Chairman William C. Erbey's role in the arrangement. Erbey, *according to the letter, may have engaged in "gross violation" of claims made publicly by Ocwen that Erbey recuses himself from decisions concerning related companies.*

*Erbey is Ocwen's largest shareholder, and is also the chairman of and largest shareholder in Altisource, according to Lawsky.*

49.     As a result of this disclosure, Altisource's stock price declined more than 13% in intraday trading. Altisource's stock opened at $103.65 on August 4, 2014 and closed that day at $88.65. From July 30, 2014 to August 5, 2014, Altisource's stock price declined an astonishing $34.64 per share, or nearly 30%, from $118.69 per share to $84.05 per share, on higher than average trading volume.

## VII.     <u>UNDISCLOSED ADVERSE INFORMATION</u>

50.     The market for Altisource's securities was an open, well-developed and efficient market at all relevant times. As a result of the materially false and misleading statements and failures to disclose described herein, Altisource's securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Altisource's securities relying upon the integrity of the market price of Altisource's securities and market information related to Altisource's, and have been damaged thereby.

51.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Altisource's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

52.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Altisource's business, prospects and operations.

53.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Altisource's and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

VIII.     **SCIENTER ALLEGATIONS**

54.     As alleged herein, the Defendants acted with scienter in that the Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

55.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Altisource, their control over, receipt and/or modification of Altisource's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Altisource, participated in the fraudulent scheme alleged herein.

56.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## IX.     STATUTORY SAFE HARBOR

57.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected."  Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

58.     Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements were made, Defendants knew the forward-looking statements were false and the forward-looking statements were authorized and/or approved by an executive officer of Altisource who knew that such statement was false when made.

## X.     LOSS CAUSATION

59.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Altisource's securities and operated as a fraud or deceit on Class Period purchasers of Altisource's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Altisource's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a

result of their purchases of Altisource's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

60.     By failing to disclose the true state of the Company's business prospects and growth strategy, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Altisource's business and prospects. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Altisource to conceal the truth.

61.     Defendants' false and misleading statements had the intended effect and caused Altisource's common stock to trade at artificially inflated levels throughout the Class Period. However, as a direct result of the Company's problems coming to light, Altisource's common stock price fell approximately 13 percent immediately following the disclosure of the Company's true relationship with Ocwen. This drop removed the inflation from the price of Altisource's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

62.     The decline in the price of Altisource's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Altisource's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Altisource's securities and the subsequent decline in the value of Altisource's

securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

63.    At all relevant times, the market for Altisource stock was an efficient market for the following reasons, among others:

a.    Altisource securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b.    As a regulated issuer, Altisource filed periodic public reports with the SEC and NASDAQ;

c.    Altisource securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d.    Altisource regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

64.    As a result, the market for Altisource securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Altisource's stock price.  Under these circumstances, all purchasers of Altisource's securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

**XII.    CLASS ACTION ALLEGATIONS**

65.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired

Altisource securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Altisource's and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

66.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, Altisource securities were actively traded on the NASDAQ (an open and efficient market) under the symbol "ASPS."  As of July 19, 2014, Altisource had approximately 21.8 million shares outstanding.  Record owners and other Class members may be identified from records kept by Altisource and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.      whether Defendants participated in and pursued the common course of conduct complained of herein;

c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period, misrepresented material facts about the business, finances, financial condition and prospects of Altisource;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Altisource;

e.      whether the market price of Altisource common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

70.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

**XIII.      COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT**

**COUNT I**
**For Violations Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against Defendants**

71.      Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against Defendants.

72.      During the Class Period, Altisource and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Altisource common stock; and (iii) cause Plaintiff and other members of the Class to purchase Altisource stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, and each of them, took the actions set forth herein.

73.      These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Altisource securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  The Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.   The Individual Defendants are also sued herein as controlling persons of Altisource, as alleged herein.

74.      In addition to the duties of full disclosure imposed on the Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly

33

disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

75.     Altisource and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Altisource as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Altisource's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Altisource and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Altisource's securities during the Class Period.

76.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual

34

Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

77.    These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Altisource's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

78.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Altisource securities were artificially inflated during the Class Period.  In ignorance of the fact that the market price of

Altisource shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Altisource securities during the Class Period at artificially inflated high prices and were damaged thereby.

79.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Altisource, which were not disclosed by the Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Altisource securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

80.     By virtue of the foregoing, Altisource and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

81.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

82.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

83.     The Individual Defendants were and acted as controlling persons of Altisource within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

84.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

85.     As set forth above, Altisource and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other

members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)      Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)      Awarding such other relief as this Court deems appropriate.

## XV.    **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: September 8, 2014                      Respectfully submitted,

By: _____
Lester R. Hooker

**SAXENA WHITE P.A.**
Joseph E. White, III (FL Bar No. 621064)
Lester R. Hooker (FL Bar No. 32242)
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
561-394-3399 Telephone
561-394-3382 Facsimile
Email: jwhite@saxenawhite.com
Email: lhooker@saxenawhite.com

***Counsel for Plaintiff***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 8, 2014, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system.

Lester R. Hooker

39