**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

In re: Altisource Portfolio Solutions, S.A.
Securities Litigation

Case 14-81156 CIV-WPD

**JURY TRIAL DEMANDED**

**AMENDED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.    OVERVIEW OF THE CASE ................................................................................ 2

II.   JURISDICTION AND VENUE ......................................................................... 9

III.  THE PARTIES.................................................................................................. 10

    A.    Lead Plaintiffs ......................................................................................... 10

    B.    Defendants ............................................................................................... 10

        1.    The Altisource Defendants ........................................................... 10

        2.    Ocwen ........................................................................................... 12

IV.   BACKGROUND AND NATURE OF THE FRAUD AT ALTISOURCE..................... 13

    A.    Ocwen Spins Off Altisource  And Becomes Its Primary Customer ................... 13

    B.    The Spin-Off Creates Potential Conflicts of Interest For Erbey,
        Altisource And Ocwen.......................................................................... 19

    C.    Ocwen's Ability To Acquire New Servicing Rights Is Material To
        Investors And Is Essential To Altisource's Success ............................................. 21

    D.    Ocwen's Growth Attracts Regulators' Scrutiny And Compels Both
        Ocwen And Altisource To Comply With Specific Mortgage
        Servicing Guidelines And Practices........................................................ 25

    E.    Throughout The Class Period, Defendants Falsely Represented
        That Altisource Controlled Against Conflicted Transactions And
        Provided Compliant Products And Services To Ocwen ...................................... 27

        1.    Defendants Exploited Rather Than Managed Their
            Conflicts Of Interest............................................................... 28

        2.    Altisource's REALServicing Platform Was Ineffective And
            Incapable Of Processing Ocwen's Mortgage Servicing
            Portfolio In Compliance With The Law ................................ 42

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
    OMISSIONS OF MATERIAL FACTS........................................................... 48

    A.    False and Misleading Statements And Omissions Concerning The
        Adequacy Of Controls For Managing Transactions With Ocwen
        And Avoiding Conflicts Of Interest......................................................... 49

    B.    False and Misleading Statements And Omissions Concerning The
        "Market Rates" Charged For Services Provided Under Altisource's
        Exclusive Arrangements With Ocwen............................................... 56

C.      Statements Concerning The Effectiveness Of REALServicing And Its Ability To Comply With The Law...............................................................60

D.      Statements Concerning Altisource's Revenues From Related Party Transactions With Ocwen..................................................................66

E.      Shepro And Esterman Falsely Certify The Contents Of Altisource's SEC Filings.................................................................................69

VI.     The Truth Begins To Emerge ...................................................................69

A.      The NY DFS Suspends Ocwen's Acquisition Of New Mortgage Servicing Rights Due To Concerns About REALServicing.................................70

B.      The February 26 DFS Letter Raises Concerns Over Serious Conflicts of Interest Between Altisource And Ocwen.......................................72

C.      The April 21 DFS Letter Raises Concerns That Altisource Regularly Overcharges Ocwen Customers ...........................................73

D.      The NY DFS Addresses The Risks That Altisource And Its Relationship With Ocwen Pose To Homeowners On May 20, 2014 ..................75

E.      The August 4 DFS Letter Raises Concerns That Defendants Lied About Erbey's Recusal From Conflicted Transactions And Engaged In A Kickback Arrangement ....................................................76

F.      The October 21 DFS Letter Raises "Serious Issues" With REALServicing........................................................................................77

G.      Altisource Concedes The Impropriety of Its Force-Placed Insurance Contract On November 12, 2014 .......................................79

H.      Ocwen Admits That "Widespread Conflicts of Interest" With Altisource And The "Inadequate and Ineffective" REALServicing Platform Harmed Borrowers on December 22, 2014 ...........................80

I.      Post-Class Period Events ..........................................................................82

VII.    ALLEGATIONS CONFIRMING DEFENDANTS' SCIENTER ...................................85

VIII.   LOSS CAUSATION....................................................................................96

IX.     THE PRESUMPTION OF RELIANCE ..........................................................98

X.      CLASS ACTION ALLEGATIONS ...............................................................99

XI.     CAUSES OF ACTION ...............................................................................101

XII.    PRAYER FOR RELIEF ...............................................................................112

XIII.   JURY DEMAND .......................................................................................112

ii

1.      Lead Plaintiffs the Pension Fund for the International Union of Painters and Allied Trades District Council 35 and the Annuity Fund for the International Union of Painters and Allied Trades District Council 35 ("Lead Plaintiffs"), by their undersigned counsel, hereby bring this action on behalf of themselves and all persons or entities who purchased or otherwise acquired the common stock of Altisource Portfolio Solutions, S.A. ("Altisource" or the "Company") during the period from April 25, 2013 through December 21, 2014 inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants Altisource, Ocwen Financial Corporation ("Ocwen"), William C. Erbey ("Erbey"), Altisource Chief Executive Officer ("CEO") William Shepro ("Shepro") and Altisource Chief Financial Officer ("CFO") Michelle Esterman ("Esterman"), present or former executive officers of Altisource or Ocwen, and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)). As explained further below, Lead Plaintiffs seek to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on, *inter alia,* the independent investigation of their counsel. This investigation included, but was not limited to, a review and analysis of: (i) Altisource's and Ocwen's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Altisource's and Ocwen's earnings conference calls and industry conferences; (iv) publicly available presentations by Altisource and Ocwen; (v) Altisource's and Ocwen's press releases and media reports; (vi) economic analyses of Altisource's securities movement and pricing data; (vii) consultations with relevant experts; (viii) information obtained from former Altisource and Ocwen employees throughout the course of counsel's investigation; and (ix) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants or are exclusively

1

within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.   <u>OVERVIEW OF THE CASE</u>

3.     This is a federal securities class action against Altisource, a provider of support and technology services for mortgage loan servicing, and Ocwen, the largest nonbank mortgage servicer in the country with a specialty in servicing distressed loans.  Altisource was spun-off from Ocwen in 2009 in an effort to capture all revenue associated with the servicing of mortgage loans, including from defaults, short sales and foreclosures – events that are in conflict with Ocwen's purported goals of loan modifications and keeping borrowers in their homes.  This action arises from Defendants' fraudulent misrepresentations regarding the true nature of the companies' relationship, business dealings, loan servicing capabilities and legal compliance. Ultimately, a two year investigation by one of its primary regulators forced Ocwen to enter into a Consent Order in which it <u>admitted</u> to the misconduct underlying the fraudulent conduct at issue here.

4.     Throughout the Class Period, Defendants emphasized to the market that Altisource's revenues from its related party transactions with Ocwen – Altisource's lifeblood – were sustainable, free of self-dealing or other conflicts, and subject to strict internal controls. These assurances extended to related party transactions and potential conflicts of interests involving Defendant William Erbey, the founder, majority shareholder, and Chairman of both companies until government regulators recently forced him to resign.

5.     Having such strong controls in place was absolutely critical given the companies' close affiliation, exclusivity agreements, and the intense regulatory environment facing the mortgage servicing industry in the wake of the financial crisis.  The collapse of the U.S. residential housing and subprime markets exposed rampant abuses in the servicing of loans by large commercial banks, including a variety of predatory behavior that saddled struggling and

captive borrowers with excessive fees and unnecessary services.  All of the Defendants – Altisource, Ocwen, Erbey and Altisource's CEO and CFO – emphasized that Ocwen and Altisource were different than these commercial banks, that the companies prioritized compliance and operated strictly at arm's length to prevent Altisource's foreclosure-driven business from harming Ocwen-serviced borrowers seeking to stay in their homes.  Defendants specifically highlighted the companies' "sound corporate governance" and "robust" "policies, practices and procedures" for managing related party transactions and avoiding potential conflicts of interest.  Chief among these policies was the representation that Erbey recused himself from all transactions between Ocwen and Altisource, given his substantial financial interest in, and leadership of, both companies.  Defendants further assured investors that the companies were "independent," maintained "separate management," and that all of Altisource's services to Ocwen were provided at "market rates."

6.     In addition, Defendants touted the superior quality and regulatory compliance of Altisource's mortgage servicing technologies.  Defendants repeatedly emphasized that Altisource's REALServicing platform, the technology backbone of Ocwen's loan servicing business, could service loans in an "efficient," "effective," "low-cost" and legally compliant manner.  Defendants emphasized the platform's ability to "ensure compliance" with newly-imposed regulations through a "robust, world class compliance management system" that was highly scalable and fully capable of processing millions of loans.  Even in the face of heightened regulatory scrutiny, Defendants continued to assure investors that "[o]ur first initiative and primary focus is providing high quality compliant services to Ocwen's servicing portfolio."

7.     Defendants' assurances about REALServicing's capabilities and legal compliance were particularly important in light of Ocwen's and Altisource's tremendous growth in the years leading up to, and at the start of the Class Period.  Between August 10, 2009 – the date of Altisource's spin-off from Ocwen – and the end of 2013, Ocwen grew its mortgage servicing rights portfolio at an astronomical rate, from approximately 351,000 loans with an aggregate unpaid principal balance ("UPB") of $50 billion, to approximately <u>2.9 million loans with an</u>

aggregate UPB of over $465 billion, making Ocwen the largest non-bank servicer in the United States.  Given the size and rapid growth of Ocwen's mortgage servicing portfolio, the critical functions of REALServicing in Ocwen's core servicing business, and the intense regulatory environment, it was critical that the platform was highly scalable and able to comply with all laws and regulations.

8.      Altisource grew alongside Ocwen.  Altisource earned income for each and every mortgage servicing right acquired by Ocwen, and its revenues increased over 700% between 2009 and 2013, from $103 million in 2009 to $768 million in 2013.  The price of Altisource stock followed suit, rising from approximately $21 per share at the end of 2009 to a Class Period high of just over $170 per share on December 3, 2013, a whopping 1,600% increase.  The market understood that Altisource's value was inextricably linked to Ocwen's acquisitions of mortgage servicing rights.  This was a point made again and again by analysts who followed Altisource and who reacted positively to Ocwen's serial acquisitions and even attempted to directly quantify the correlation between Ocwen's mortgage servicing rights portfolio acquisitions and Altisource's profits and share price.  Defendant Erbey – who personally owns approximately 29% of Altisource and 14% of Ocwen – saw his wealth balloon to nearly ***$2.3 billion*** during the Class Period based on his substantial personal holdings in the companies.

9.      In order to continue to grow the companies – and thereby increase Erbey's wealth – Ocwen and Altisource agreed to comply with the State of New York's mortgage loan servicing rules and regulations, among other state and federal mortgage servicing laws implemented to protect homeowners from predatory servicing behavior.  By the start of the Class Period, the New York State Department of Financial Services (the "NY DFS"), one of Ocwen's primary regulators, and other regulators had the authority to suspend future acquisitions by Ocwen, revoke Ocwen's license to do business in certain states, and impose significant fines on Ocwen, all of which would have an immediate and material negative effect on Altisource's business and growth prospects.  Thus, it was critical for Defendants to assure Altisource investors that Ocwen and Altisource: (i) could service the millions of new loans in a manner that was not only cost-

4

effective and revenue-accretive, but complied with all applicable laws, rules and regulations; and (ii) were not engaging in self-dealing, conflicted business transactions with each other that maximized Erbey's and Altisource's wealth at the direct expense of Ocwen's captive and financially struggling borrowers.

10.     Unfortunately for investors and borrowers alike, those assurances were false.  In a series of partial disclosures stemming from a two year-long investigation by the NY DFS, the truth was exposed about Altisource's conflicted relationship with Ocwen, Erbey's failure to recuse himself from related party transactions, and the serious deficiencies with REALServicing.

11.     Defendants' fraudulent scheme began to unravel on February 6, 2014, when the NY DFS placed an indefinite suspension on Ocwen's massive acquisition of mortgage servicing rights from Wells Fargo due to "concerns about Ocwen's servicing portfolio growth."  In a series of letters that followed on February 26 (the "February 26 DFS Letter"), April 21 (the "April 21 DFS Letter"), August 4 (the "August 4 DFS Letter"), and October 21 (the "October 21 DFS Letter") (collectively, the "DFS Letters"), the NY DFS gradually revealed to the market that Defendants' repeated assurances about the Company's purported controls on related party transactions and conflicts of interest, and the ability of  REALServicing to process mortgage loans effectively and in compliance with the applicable laws and regulations, were highly dubious if not demonstrably false.

12.     For example, the February 26 DFS Letter noted that, contrary to Defendants' public representations, the NY DFS had "uncovered a number of potential conflicts of interest between Ocwen and [Altisource]" that "cast serious doubt on recent public statements . . . that Ocwen has a 'strictly arms-length business relationship' with those companies."  Two months later, the April 21 DFS Letter raised additional "significant concerns" that Altisource and Ocwen were engaged in "self-dealing" through Altisource's over-charging of Ocwen customers. Shortly thereafter, the August 4 DFS Letter raised further concerns regarding a "troubling transaction" between Ocwen and Altisource and approved by Erbey, which "appear[ed] designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for

minimal work." Finally, the October 21 DFS Letter described "serious issues with Ocwen's systems and processes" for mortgage loan servicing, including Ocwen's practice of "backdating [] potentially hundreds of thousands of letters to borrowers, likely causing significant harm." The NY DFS expressed concern that "[t]he existence and pervasiveness of these issues raise critical questions about Ocwen's ability to perform its core function of servicing loans."

13.     In response to each of these revelations, the market reacted swiftly and caused Altisource's stock price to suffer significant and immediate declines, erasing a total of over **$1 billion** in shareholder market capitalization.

14.     Ultimately, on December 22, 2014, Ocwen was forced to enter into a Consent Order with the NY DFS (the "2014 Consent Order") in which it <u>admitted</u> to the details of the Defendants' fraudulent conduct. As set forth in the 2014 Consent Order, the NY DFS found, and Ocwen "agreed," that Ocwen's business dealings with Altisource constituted "numerous and significant violations" of New York State laws and regulations. Specifically, the 2014 Consent Order revealed that, during the Class Period, Altisource, Ocwen and Erbey improperly operated with "widespread conflicts of interests" and engaged in self-dealing transactions designed to enrich Erbey (and other senior Altisource and Ocwen executives) by, among other things, requiring Ocwen's captive borrowers to use, and ultimately pay for loan services performed by Altisource at above market rates. The 2014 Consent Order also revealed that Ocwen's "technology systems" and "core servicing functions," which were provided exclusively by Altisource, were "inadequate and ineffective" and failed to comply with the law, also to the detriment of Ocwen's struggling borrowers. These revelations caused Altisource's shares to plummet by over **33%** in a single trading day.

15.     One of the most glaring undisclosed conflicts of interest that Ocwen admitted in the 2014 Consent Order was that, contrary to Defendants' statements that Altisource and Ocwen had completely "separate management," the two companies shared several executive officers, including the same Chief Risk Officer. As Chief Risk Officer, this individual was tasked with, among other things, the critical duty of ensuring that REALServicing complied with Ocwen's

regulatory guidelines.   Moreover, former employees of both Altisource and Ocwen have confirmed that, in addition to sharing a common Chief Risk Officer – a "clear conflict of interest" for which many Ocwen and Altisource employees "expressed concern" to Defendants and other high-level executives – other executives and managers also worked for both companies during the Class Period.

16.     Moreover, numerous former Ocwen and Altisource employees all provide the same account of how after the spin-off, there was "no separation at all" and managers and other employees would swing like a "pendulum" between positions at Altisource and Ocwen while remaining in the very same offices, with Defendant Erbey serving as the "eyes behind the curtain."   In short, according to a former director of valuations at Altisource, while Altisource may have technically been a separate entity, the separation was fictional and said "with a wink." As this former employee explained, "we basically worked for Ocwen," but were told not to "say it out loud or write it in an e-mail."

17.     The Consent Order and DFS Letters also revealed that Defendant Erbey, Altisource's and Ocwen's Chairman and leader who, by all accounts, "ha[d] the last word on all important decisions," lied about his recusal from conflicted transactions.   Specifically, the August 4 DFS Letter expressed concerns that Erbey refused to "recuse[] himself from approvals of several transactions" between Ocwen and Altisource, and provided details showing that Erbey's approval of a "pass through" agreement for force-placed insurance services caused struggling borrowers to pay Altisource $65 million per year for little or no work.   Significantly, under scrutiny from the NY DFS and just a few weeks prior to the 2014 Consent Order, Altisource announced that it would discontinue its entire force-placed insurance line of business.

18.     Altisource's admittedly conflicted dealings with Ocwen are also evidenced through the relationship between Ocwen and Hubzu, an Altisource subsidiary that Ocwen uses as its principal online auction site for the sale of its borrowers' homes facing foreclosure, as well as investor-owned properties following foreclosure.   Contrary to Defendants' representations that Altisource charged Ocwen customers "market rates," the conflicted business relationship

between the companies allowed Altisource to charge auction fees for Hubzu "that are up to three times the fees charged to non-Ocwen customers."  Hubzu was not the only Altisource service charging above-market rates to Ocwen and its customers.  Ocwen and Altisource former employees have confirmed that Altisource regularly charged above market rates to Ocwen customers for other services as well, including real estate appraisals.

19.     Moreover, as has now been admitted, Defendants knew that the much-touted REALServicing platform was entirely incapable of integrating, processing and servicing Ocwen's loan portfolio that had increased from a few hundred thousand loans to nearly three million loans.  This fact, which was concealed from investors during the Class Period, has now been confirmed not only by numerous former employees but admitted by Ocwen in the 2014 Consent Order.  The Consent Order describes in great detail how a morass of thousands of user codes to service each loan prevented accurate recordkeeping of a loan's status, unduly minimized human interaction with borrowers and led directly to the backdating of up to "hundreds of thousands" of letters that denied borrowers an opportunity to appeal denials of their loan modification requests, forcing many borrowers into foreclosure.

20.     The ramifications of the 2014 Consent Order have had, and will continue to have, a significant impact on Altisource's revenue and future earnings. Under the terms of the Consent Order, the NY DFS required, among other things, that: (i) the February 2014 ban imposed on Ocwen's acquisition of additional mortgage servicing rights be extended indefinitely; (ii) Defendant Erbey, the conflicted Chairman of Altisource, Ocwen and the three other related companies, resign his Chairman positions and promise that he "will have no directorial, management, oversight, consulting, or other role at Ocwen or any related party"; (iii) Ocwen would undergo a thorough review of REALServicing and other information technology systems, as well as all related party contracts, and fees charged to Ocwen borrowers by Ocwen or Altisource; and (iv) there would be no overlap among Altisource and Ocwen employees with any "risk, internal audit, or vendor oversight."

21.     In response to the DFS Letters, the 2014 Consent Order, and other corrective disclosures discussed herein, Altisource's stock price crashed from a Class Period high of $170 per share, to close at just $31 per share on December 22, 2014, a staggering decline of 76%. This action seeks to hold Defendants accountable for their fraudulent misrepresentations to Altisource investors and massive destruction of shareholder wealth in violation of the federal securities laws.

## II.     <u>JURISDICTION AND VENUE</u>

22.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

23.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

24.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.   In addition, Ocwen is incorporated in the State of Florida, and both Ocwen and Altisource have substantial business operations in West Palm Beach, Florida.

25.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## III.    THE PARTIES

### A.    Lead Plaintiffs

26.    Lead Plaintiffs the Pension Fund of the International Union of Painters and Allied Trades District Council 35 and the Annuity Fund of the International Union of Painters and Allied Trades District Council 35 were appointed by the Court as Lead Plaintiffs by Order dated December 5, 2014.  Lead Plaintiffs are pension funds that manage pension and other assets on behalf of more than 4,000 union members in Massachusetts, Maine, New Hampshire, Vermont, and Rhode Island who have actively participated in "Finishing Trades" as industrial and commercial painters, drywall finishers, wall coverers, glaziers, glass workers, floor covering installers, sign makers, display workers, convention and, *inter alia*, show decorators.  As set forth in the certifications attached hereto as Exhibit A, Lead Plaintiffs collectively purchased 1,100 shares of Altisource common stock on the NASDAQ at artificially inflated prices during the Class Period and suffered losses from their Class Period purchases of Altisource common stock.

### B.    Defendants

#### 1.    The Altisource Defendants

27.    Defendant Altisource provides back-office mortgage processing and servicing technology to mortgage loan servicing providers.  Its primary client is its former parent Defendant Ocwen.  Altisource was spun-off into a standalone publicly traded company from Defendant Ocwen in August 2009, and from that time, has derived the majority of its revenue from providing services to Ocwen.  Altisource is incorporated in the Grand Duchy of Luxembourg, which allows the Company to benefit from a global effective tax rate of 6%, a significantly lower rate than Ocwen's 11.9% effective tax rate for 2013 and 29.7% tax rate for 2012.  The Company maintains offices throughout the United States, including in this District. In addition, according to the Company's Form 10-K for the year ended December 31, 2013, at least three Altisource subsidiaries are incorporated and maintain their principal offices in Florida.

Defendant Altisource is traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol "ASPS."

28.     Defendant Erbey served as Chairman of the Board of Directors for Altisource from August 2009 through January 16, 2015 when he was forced to resign under the terms of the 2014 Consent Order with the NY DFS.  Erbey also served as the Executive Chairman of the Board of Directors of Ocwen since 1996, the CEO of Ocwen from 1988 through October 2010, and as President of Ocwen from 1988 through May 1998.  Defendant Erbey is Altisource's and Ocwen's single largest shareholder, and owned or controlled 29% of Altisource's shares and 14% of Ocwen's shares outstanding as of September 30, 2014.  Erbey spoke on behalf of Altisource and Ocwen on analyst and investor conference calls and to the press, and signed Forms 10-K filed with the SEC by both Ocwen and Altisource.

29.      At all relevant times during the Class Period, Erbey also served as the Chairman for three other Ocwen-affiliated companies: Altisource Residential Corporation ("Residential"), Altisource Asset Management Corporation ("AAMC"), and Home Loan Servicing Solutions ("HLSS").

30.     Under the terms of the 2014 Consent Order, Erbey was forced to resign his position as Chairman of the Boards of Ocwen, Altisource, Residential, AAMC and HLSS.  Erbey is also prohibited under the 2014 Consent Order from serving as a director, officer or employee of these or any other Ocwen-related company.  As of September 29, 2014, Defendant Erbey owned or controlled 28% of the common stock of AAMC, 4% of the common stock of Residential, and 1% of the common stock of HLSS.

31.     Defendant Shepro is the CEO of Altisource and has served in that role since August 2009.  Shepro has also served as a Director of Altisource since August 2009 and sits on the Board's Executive Committee.  Prior to Altisource's spinoff, Shepro served as the President and Chief Operating Officer of its predecessor, Ocwen Solutions.  Shepro made statements to investors and analysts during conference calls throughout the Class Period and also signed Altisource's Forms 10-K and 10-Q filed with the SEC.  Specifically, Shepro signed Altisource's

Form 10-Q dated April 25, 2013 and the Forms 10-K for 2012 and 2013, dated February 13, 2013 and February 13, 2014, respectively.   Defendant Shepro signed the Sarbanes-Oxley certifications contained in each of Altisource's Forms 10-Q and 10-K that are discussed below.

32.     Defendant Esterman has served as the CFO of Altisource since March 12, 2012. Defendant Esterman previously worked at Deloitte & Touche, LLP.   Defendant Esterman made statements to investors and analysts during conference calls throughout the Class Period and also signed Altisource's financial statements filed with the SEC.   Specifically, Esterman signed all of Altisource's Forms 10-Q during the Class Period except for the April 25, 2013 Form 10-Q; and the Forms 10-K for 2012 and 2013, dated February 13, 2013 and February 13, 2014, respectively.   Esterman signed the Sarbanes-Oxley certifications contained in each of Altisource's Forms 10-Q and 10-K that are discussed below, with the exception of the August 25, 2013 Form 10-Q.

33.     Defendants Erbey, Shepro, and Esterman are sometimes referred to herein as the "Individual Defendants."

34.     Altisource and the Individual Defendants are sometimes referred to herein as "the Altisource Defendants."

### 2.     Ocwen

35.     Defendant Ocwen is Altisource's former parent and has remained its largest customer since the August 2009 spin off.   Ocwen originates and services mortgage loans and specializes in servicing subprime and delinquent loans.   To service its loans, Ocwen uses Altisource's REALServicing technology platform and employs Altisource to provide Ocwen borrowers with all ancillary services.   Ocwen is incorporated in Florida with offices in West Palm Beach and Orlando, and headquartered in Atlanta, Georgia. It maintained during the Class Period executive offices in St. Croix, U.S.V.I. and West Palm Beach, Florida. Throughout the Class Period, Ocwen made statements to the market concerning its strategic relationship with

Altisource and its use of REALServicing in presentations to investors and in filings with the SEC. Defendant Ocwen is traded on the New York Stock Exchange under the symbol "OCN."

## IV. BACKGROUND AND NATURE OF THE FRAUD AT ALTISOURCE

### A. Ocwen Spins Off Altisource And Becomes Its Primary Customer

36. Altisource's primary source of revenue is generated from the provision of mortgage servicing support to its former parent company Ocwen. Because so much of Altisource's revenue and revenue growth derives from Ocwen, in order to understand the nature of Altisource's business, as well as the fraud inflicted upon Altisource shareholders by Altisource and Ocwen, it is necessary to understand the nature of Ocwen's business.

37. Ocwen was founded by Defendant Erbey in 1988. Ocwen was one of the first non-bank residential mortgage servicers to acquire "mortgage servicing rights," which allowed Ocwen to service loans for a fee on behalf of third parties. Ocwen specializes in servicing subprime or delinquent home loans, and places a major emphasis on resolving delinquency through loss mitigation or foreclosure.

38. Mortgage loan servicing became a big business along with the rise of loan securitization and the issuance of residential mortgage-backed securities ("RMBS"). In the typical scenario, a bank or other financial institution would either itself originate mortgage loans or would purchase pools of mortgage loans from bulk loan sellers. Then, the bank would pool and securitize the loans as RMBS or more exotic securities, and sell the securities to investors. During the height of the mortgage securitization boom, banks that originated and/or securitized mortgage loans often retained for themselves the rights to service the loans. As the securitization boom neared its peak, the servicing of distressed loans had grown to become a particularly large and lucrative business.

39. By 2009, in the face of mounting regulations, costs, and heightened scrutiny, large commercial banks that had once dominated the servicing industry began an exodus from the

mortgage loan servicing business, opening up an opportunity for Ocwen to acquire billions of dollars of mortgage loan servicing rights. Ocwen capitalized on this opportunity and bought huge portfolios of loans from large banks like Goldman Sachs, Morgan Stanley and JP Morgan. In 2009, Ocwen had a portfolio of approximately 350,000 residential loans. By the end of 2013, Ocwen had grown its portfolio to nearly three million residential loans. These acquisitions transformed Ocwen from the 12th largest servicer in the United States into the 4th largest servicer and the largest non-bank servicer in the United States.

40. Ocwen earns set fees for servicing mortgage loans until a loan is either paid off or defaults and enters foreclosure. The amount of fees earned by Ocwen depends on the unpaid principal balance or "UPB" of its total portfolio. As loans are paid off or are otherwise disposed, the UPB of Ocwen's portfolio declines. Therefore, Ocwen must continuously replenish its portfolio in order to keep its revenues steady, and acquire an ever-increasing number of mortgage servicing rights to grow its revenues.

41. Ocwen relies on Altisource to service the mortgages in its portfolio through Altisource's provision of a variety of technology and ancillary services for loans in various stages of default, delinquency, and foreclosure. All of Altisource's technology and ancillary services generate lucrative fees above and beyond the set mortgage servicing fees earned by Ocwen. Indeed, although Ocwen ceases to generate any fees from a loan that defaults and enters foreclosure, Altisource makes the bulk of its revenue through the provision of default administration services including services related to foreclosures and short sales.

42. Altisource has provided mortgage servicing support to Ocwen since its inception. Prior to August 2009, Altisource operated as Ocwen Solutions, a wholly-owned division of Ocwen that was created in 2008. However, Defendant Erbey, who was at the time the CEO and Executive Chairman of Ocwen, felt that the market did not properly value the worth of the services provided by Ocwen Solutions and would not properly value so long as it was part of Ocwen. Thus, under Erbey's direction, on August 10, 2009, Ocwen spun off Ocwen Solutions to create Altisource as a standalone publicly-traded company to capture and be valued for the

adjacent revenue it garnered from its ancillary mortgage servicing services, including lucrative services that Ocwen was barred from providing itself under applicable law and regulations. Following the spin-off, Erbey appointed himself Chairman of Altisource but also retained his position as Executive Chairman of Ocwen.

43.     Altisource and Ocwen have remained inextricably linked since the spin-off.   In addition to sharing Defendant Erbey as Chairman, the companies entered into several long-term services agreements pursuant to which Altisource is the exclusive provider of numerous ancillary services to Ocwen or its borrowers.   According to Altisource, these mortgage services include, but are not limited to, "residential property valuation, real estate asset management and sales, trustee management services, property inspection and preservation, insurance services, charge-off mortgage collections, IT infrastructure management, services and software applications including our REALSuite of software products."   Under its exclusive contracts with Ocwen, Altisource was able to reap significant fees for ancillary mortgage services and Ocwen was required to use Altisource as the exclusive provider of all of the mortgage services for Ocwen borrowers.

44.     Altisource's business after the spinoff remained essentially the same as when it was officially a part of Ocwen, and Ocwen remained and continued to expand as Altisource's primary customer and source of revenue.   At all relevant times, Altisource's business consisted of three distinct business lines:  (i) Mortgage Services; (ii) Technology Services; and (iii) Financial Services.   As discussed below, Altisource's Mortgage Services and Technology Services, the two largest business lines by revenue, are of primary relevance to the allegations herein.

## Business Overview



| Mortgage Services | Financial Services | Technology Services |
|---|---|---|
| ▪ Services to the real estate and mortgage marketplaces that are typically outsourced by loan servicers, originators and home owners | ▪ Accounts receivable management and customer relationship management services | ▪ Business process management solutions and distribution solutions to enable the real estate and mortgage marketplaces and infrastructure support |

The majority of these services are utilized only after a loan is deemed delinquent, in default or entering foreclosure, and include services relevant to the wrongdoing alleged herein:  (i) the facilitation of short sales and foreclosure sales of distressed properties through Hubzu, Altisource's online auction web portal; (ii) the provision of insurance services, including "brokerage services" for force-placed insurance (mandatory insurance taken out by the servicer and charged to the homeowner at generally high rates); and (iii) property valuation services including appraisals.  Altisource repeatedly touted to investors that these services "span the mortgage and real estate lifecycle" and were provided by Altisource "primarily for loan portfolios serviced by Ocwen."  In fact, as set forth in the chart below, Altisource derived between 64% and nearly 73% of its Mortgage Services revenue each year from Ocwen:

| Mortgage Services (MS) Revenues (in millions) | | | | | | |
|---|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013** | **Q1-Q3 2014** |
| **MS Revenue from Ocwen** | $74 M | $136 M | $223 M | $307 M | $424 M | $144 M |
| **Total MS Revenue** | $103 M | $187 M | $311 M | $453 M | $662 M | $210 M |
| **Ocwen MS Revenue as % of Total MS Revenue** | 71.8% | 72.7% | 71.7% | 67.7% | 64.0% | 68.5% |

46.     Technology Services provides technology products to handle loan servicing.  In particular, Altisource owned, operated and then leased back to Ocwen its REALServicing platform, a mortgage loan servicing product that provided Ocwen with the technology to process and service the loans in its portfolio through the life of the loan.  Ocwen relied exclusively on REALServicing, a proprietary product that it had previously owned and developed, to process and service its loans.  Altisource earned revenue for each Ocwen loan "boarded" on the REALServicing platform, which was recorded under "Technology Services."

47.     REALServicing was a significant source of continued growth for Altisource because the Company earned more fees as Ocwen grew its loan portfolio and boarded these loans onto the REALServicing platform.  Indeed, in its 2013 Form 10-K, the Company attributed increased revenue in 2013 to "Ocwen's growth as loans from its servicing platform acquisitions are boarded on REALServicing."

48.     Altisource generated highly lucrative fees by providing these services to Ocwen and Ocwen-serviced borrowers both prior to and during the Class Period.  As demonstrated in the table below, Altisource's Ocwen-derived and total revenue climbed in tandem with Ocwen's growing portfolio from 2009 through 2013, rising over 500%, from $95 million in Ocwen-

derived revenue in 2009 to $502 million in 2013, and $503 million for the first three quarters of 2014:

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 (Q1-Q3) |
|---|---|---|---|---|---|---|
| **Related Party Revenue** | $95M | $155M | $245M | $338M | $502M | $503M |
| **Total Consolidated Revenue** | $203M | $301M | $424M | $568M | $768M | $823M |
| **Related Party Revenue as % of Total** | 47% | 51% | 58% | 60% | 65% | 61% |

49.     Altisource's total revenues became increasingly dependent on Ocwen as a percentage of its total revenue.  As the below chart indicates, while slightly less than half of Altisource's revenue was derived from the provision of Ocwen services at the end of 2009, that figure increased to 67% by the end of 2013:



50.     As discussed below, Altisource was able to generate these large and increasing revenue streams as a result of Ocwen's acquisitions of massive numbers of mortgage servicing rights.

**B.     The Spin-Off Creates Potential Conflicts of Interest For Erbey, Altisource And Ocwen**

51.     Altisource's spin-off was the brainchild of Erbey, Ocwen's founder and, at the time, Ocwen's CEO and Chairman, who saw great growth opportunities for non-bank residential mortgage servicers in the wake of the housing crisis. Whereas Ocwen's loan servicing revenue is capped by fees set by the mortgage investors who pay for servicing through the RMBS, the fees charged by Altisource, then doing business as Ocwen Solutions, to Ocwen – that were generally passed on to Ocwen borrowers – were not so capped.  Erbey and Ocwen realized that the fees charged by wholly-owned subsidiary Ocwen Solutions, even if not technically capped, would be scrutinized for conflicts with Ocwen.  This was because Ocwen Solutions' lucrative, higher margin business could incentivize Ocwen to foreclose on loans rather than find a way to modify loans and keep a borrower living in his or her home.

52.     Erbey's decision to spin off Altisource from Ocwen directly benefited Erbey, among other Ocwen and Altisource executives.  In August 2009, the initial shares of Altisource were distributed to existing Ocwen shareholders in the spin-off such that every Ocwen shareholder became an Altisource shareholder.  Defendant Erbey stood to gain the most from a successful spin-off by claiming a significant stake in Altisource such that, as of September 30, 2014, Erbey owned 29% of Altisource, more than double his 14% ownership interest in Ocwen.  Thus, for every dollar that Altisource makes, Defendant Erbey's share is 29 cents, but for every dollar that Ocwen makes, his share is 14 cents.

53.     The Altisource spinoff paid off tremendously for Defendant Erbey.  As the chart below demonstrates, Defendant Erbey's stake in Altisource increased 1,600% from $72 million to nearly $1.2 billion between the August 2009 spin-off and December 3, 2013, the day that Altisource stock peaked at $170 shortly before, as discussed below, the truth of Defendants' wrongdoing began to emerge, without any significant increase in the number of shares he owned:

|  | Date and Share Closing Price | No. of Altisource Shares Owned | Total Value |
|---|---|---|---|
| **Spin-Off (8/10/2009)** | $12.20 | 6,292,670 | $72 Million |
| **1st Day of the Class Period (4/25/2013)** | $80.08 | 6,780,071 | $542 Million |
| **Class Period High (12/3/2013)** | $170.19 | 6,809,683 | $1.16 Billion |

54.     Defendant Erbey played an unusually prominent role in both Altisource's and Ocwen's day to day operations.  Erbey was the keynote speaker at every quarterly earnings analyst call for both companies.  Indeed, it was Erbey – and not Altisource's CEO, Defendant Shepro – who was generally recognized as the leader and key decision-maker for Altisource, as well as for the other affiliated companies.  An October 30, 2013 profile of Erbey in *The Street.com* noted that Erbey "is arguably the leading figure in the rise of an industry known as non-bank mortgage servicing," reporting that "[w]hile Erbey is chairman of five companies and CEO of none, followers of the five companies say he has the last word on all important decisions."

55.     Former employees confirmed that Defendant Erbey was involved in all aspects of both Altisource's and Ocwen's business.  Confidential Witness ("CW") 1, the Director of Valuations at Altisource's Coppell, Texas office from February 2013 through December 2013, explained that, Erbey was involved in even the most minute Company decisions.  For example, CW1 described how it was surprising to see that Erbey was regularly copied "on e-mails of simple reporting numbers (daily execution numbers and valuations)," and thought "my God, this guy is the [Chairman] of Ocwen and he's getting this down in the weeds on this kind of thing – it was just odd."

56.     CW2, a former Vice President in Default Servicing in Ocwen's West Palm Beach office from August 2011 through September 2012, confirmed that Erbey was a "micromanager" who "knows everything that goes on" in Ocwen and Altisource.  CW2 described how Defendant

Erbey was "the shepherd" in weekly Leadership Meetings during which top senior executives from both Altisource and Ocwen (including Defendant Shepro) attended telephonically and discussed important aspects of each company's business.  CW3, who served as Vice President, Loan Servicing with Ocwen from February 2011 to December 2012, and who was also involved in aspects of these regular intercompany Leadership Meetings led by Erbey, declared that "There's not an issue that goes on in an Erbey company that Erbey is not aware of."

57.     Erbey's hands-on leadership of and financial interests in both Ocwen and Altisource, together with the codependency of these companies, created the potential for massive conflicts of interest between Ocwen and Altisource.  Such conflicts of interest could materially harm the millions of borrowers with Ocwen-serviced loans that were being provided ancillary services by Altisource, as well as the shareholders of either company.

58.     In order to withstand regulatory scrutiny and dispel concerns of conflicted transactions, Altisource and Ocwen needed to assure borrowers, investors and regulators alike that those conflicts would not lead to predatory business practices that favored Altisource or Ocwen at the expense of the captive borrowers.  To do so, the Altisource Defendants and Ocwen made repeated statements in SEC filings, conference calls and interviews promising that the two entities were "strategic allies," and not affiliates, that maintained "separate management;" that Erbey, as Chairman and acknowledged leader of both companies, recused himself from any role in negotiating or approving contracts between the two entities; and that Altisource took great efforts to ensure that it charged Ocwen and Ocwen borrowers "market rates."

### C.     Ocwen's Ability To Acquire New Servicing Rights Is Material To Investors And Is Essential To Altisource's Success

59.     Despite the legal separation of Altisource and Ocwen in 2009, investors continued to directly tie Altisource's performance and growth potential to Ocwen.  The reason for this was clear.  Ocwen was Altisource's primary customer, and Altisource's revenue was increasingly dependent on the services it provided to Ocwen and Ocwen's borrowers.  Indeed, Altisource's

Ocwen-derived revenue grew from 47% of Altisource's total revenue in 2009 to 65% of Altisource's total revenue in 2013.  In Altisource's Form 10-K for 2013, filed with the SEC on February 13, 2014, the Company stated that it was "dependent" on its "key customer relationship" with Ocwen, and warned investors that "If Ocwen does not continue to acquire mortgage servicing rights or does not grow its mortgage origination business, our business and results of operations could be negatively impacted."

60.    Altisource stock was positively impacted when Ocwen announced new acquisitions of mortgage servicing rights.  Under Altisource's long-term, exclusive dealing agreements with Ocwen, the addition of those mortgage servicing rights directly translated to increased revenue for Altisource through the boarding of loans on REALServicing and the contractually-guaranteed provision of ancillary services to struggling borrowers.  Statements, therefore, made by Ocwen about its ability to acquire additional mortgage servicing rights and the ability of Altisource's REALServicing platform to board and process those acquisitions were highly material to Altisource investors.  The market understood the connection between the businesses of Altisource and Ocwen, and viewed Ocwen's acquisition of mortgage servicing rights as a bellwether of Altisource's financial health and performance.

61.    Indeed, prior to and throughout the Class Period, analysts from Piper Jaffray, Stephens, Compass Point and Stern Agee repeatedly identified Ocwen's failure to increase its mortgage servicing rights portfolio as a key risk to Altisource's outlook and continued growth, and reacted positively to new acquisitions announced by Ocwen.  Analysts from Piper Jaffray attempted to directly quantify the correlation between Ocwen's mortgage servicing rights portfolio acquisitions and Altisource's profits and share price, estimating on March 6, 2012 that Altisource increased its share value by over $10 per share with every $30 billion addition to Ocwen's servicing portfolio.  The analysts concluded that "[a]s investors can see, new business wins for [Ocwen] are very meaningful to [Altisource]."

62.    Ocwen's statements concerning new acquisitions, REALServicing and, as discussed above, its relationship with Altisource and their management of conflicts of interest,

were therefore relevant to Altisource investors.   These representations were communicated to Altisource investors through their dissemination to the market generally and discussion of them in analyst and news reports covering Altisource.   Indeed, Lead Plaintiffs' counsel has not been able to locate a single substantive equity analyst report covering Altisource that does not discuss Ocwen in the analyst's assessments of the Company's risks, value and performance.   Moreover, there was significant overlap between Altisource investors and Ocwen investors by virtue of, among things, the spin-off.   A review of Forms 13-F filed by Altisource reveals that, as of the start of the Class Period, more than half of Ocwen's top 10 investors by dollar value were also top 10 Altisource investors by dollar value.   Additionally, over half of Ocwen's top 10, top 25, top 50, and top 100 investors were also top 100 investors of Altisource.

63.     The market's appreciation of Altisource's dependence on Ocwen's portfolio growth is demonstrated by Altisource's stock price reaction to major Ocwen transactions. Between December 31, 2009 and December 31, 2013, while Ocwen's mortgage servicing rights portfolio grew from $50 billion UPB to $465 billion UPB, Altisource's Ocwen-derived revenue increased 500% from nearly $100 million to just over $500 million.   During this same period, Altisource's stock price increased nearly 800%, skyrocketing from just $21 per share to nearly $159 per share.   This incredible performance was inextricably tied to Altisource's unfettered contractual right to provide valuable services for every one of the nearly 2.9 million loans serviced by Ocwen.   The below chart plots the relative returns of $100 invested in Altisource and Ocwen on the day of the spin-off, with comparisons to the S&P and NASDAQ, and demonstrates how investors in each company closely tracked each other and often reacted to the same news:



64.     By the end of the second quarter of 2012, Ocwen had nearly doubled its mortgage servicing portfolio in just one year, and Altisource had more than doubled its Mortgage Services and Technology Services revenue in that same period.  Analysts predicted that Ocwen and Altisource would continue to grow in the next few years, and Piper Jaffray analysts in a July 26, 2012 report stated that "The outlook for [Altisource] remains strong as [Ocwen's] pipeline is robust and banks continue to sell servicing."  [Altisource] analysts continued to predict Ocwen-based growth during the Class Period.

65.     In the months leading up to the start of the Class Period, Ocwen and Altisource grew dramatically.  On October 3, 2012, Altisource shares rocketed up nearly 17%, trading at $102.69 per share from a previous day's close of $88.05 per share, in direct reaction to Ocwen's announcement of a $750 million acquisition of Homeward Residential Holdings, Inc. ("Homeward"), a transaction that would add 422,000 loans representing approximately $77 billion of unpaid principal balance.  News and investment commentary immediately emphasized how the transaction would directly benefit Altisource.  For example, analysts from Piper Jaffray stated on October 3, 2012 that: "Based on a sum of the parts valuation, we are raising our price

24

target to $114 from $95. [Altisource's] core business remains leveraged to growth in [Ocwen's] portfolio such that [Ocwen's] acquisition is a clear positive for [Altisource]."

66.    Less than one month later, on October 24, 2012, Altisource's stock price once again shot up, growing over 13% in just one day from an October 23, 2012 closing price of 109.76 per share, to an October 24, 2012 closing price of $124.33 per share, upon news of Ocwen's submission of a winning $3 billion bid on Residential Capital's ("ResCap") (formerly GMAC) loan servicing platform, a deal that would bring in mortgage servicing rights assets totaling more than $272 billion in unpaid principal balance.

### D.    Ocwen's Growth Attracts Regulators' Scrutiny And Compels Both Ocwen And Altisource To Comply With Specific Mortgage Servicing Guidelines And Practices

67.    Ocwen's rapid and extreme growth attracted the scrutiny of regulators eager to confirm Ocwen's ability to "effectively handle the increased servicing volume" before taking on the servicing of millions of at-risk borrowers' loans.  Without such confirmation, the NY DFS and other regulators had the ability to threaten Ocwen with suspension of its acquisitions and even revocation of its license to do business in particular states.  In exchange for the ability to continue its acquisition strategy, Ocwen agreed to comply with – and ensure that Altisource complied with – various regulatory guidelines and practices including but limited to those established by the NY DFS in its "Mortgage Servicing Practices" and by the 49 state attorneys general and federal agencies that drafted the "National Mortgage Settlement."

68.    In September 2011, Ocwen agreed to comply with the NY DFS's Mortgage Servicing Practices in exchange for the NY DFS's approval of a planned acquisition (the "DFS Agreement").  Included in these Mortgage Servicing Practices was an express prohibition against Ocwen's purchase of a force-placed insurance policy from any Ocwen affiliate (*i.e.*, Altisource).  Significantly, the Mortgage Servicing Practices' reforms and guidelines compelled Altisource's compliance as an Ocwen affiliate that provided services to Ocwen borrowers.

69.     The NY DFS continued to scrutinize Ocwen's acquisitions and adherence to the DFS Agreement throughout 2012.   By the end of 2012, the NY DFS determined that Ocwen had not yet complied and on December 5, 2012 imposed a Consent Order to ensure Ocwen's compliance with the DFS Agreement (the "2012 Consent Order").   The 2012 Consent Order required Ocwen to submit to an onsite independent compliance monitor to "conduct a comprehensive review . . . of Ocwen's servicing operations, including its compliance program and operational policies and procedures" that would include, among things, consideration of "the robustness of Ocwen's established policies and procedures" and "the fairness of servicing fees and foreclosure charges."

70.     At all relevant times, in addition to scrutiny by the NY DFS, Altisource and Ocwen were also bound by the terms of the National Mortgage Settlement, an agreement that created heightened servicing standards, provided for relief to distressed homeowners and provided funding for state and federal governments.   In connection with the National Mortgage Settlement, Ocwen signed a Consent Judgment and submitted to the authority of the National Mortgage Settlement Monitor (Joseph Smith), who had the authority to levy significant fines in the case of noncompliance.

71.     Ocwen's public agreement to adhere to all governing laws and regulations in the NY DFS Mortgage Servicing Practices and the National Mortgage Settlement gave comfort to investors that Ocwen took seriously the need to protect homeowners and abide by the operative regulations in order to continue its acquisition plans and stay clear of regulatory scrutiny.   This assurance was critical to Altisource shareholders because the Company's growth and future viability depended on Ocwen's continued operation and ability to grow, both of which would be in serious jeopardy in the event of noncompliance.   Indeed, as Altisource itself warned the market in its SEC filings, a failure by Ocwen to grow and to abide by the law could "negatively impact[]" Altisource's business.

### E.   Throughout The Class Period, Defendants Falsely Represented That Altisource Controlled Against Conflicted Transactions And Provided Compliant Products And Services To Ocwen

72.     By no later than the first quarter of 2013 (the start of the Class Period), Defendants needed to comply with all of the regulations discussed above in order to continue its growth strategy.   Because many of the new regulations imposed a heightened obligation for Altisource and Ocwen to manage the potential conflicts of interest that had only intensified with the companies' growth, it was important to investors that, throughout the Class Period, Altisource and Ocwen had sufficient systems in place to manage potential conflicts of interest.

73.     Indeed, Defendants took great pains to convince the market that there were "robust" controls in place to prevent abusive servicing practices thus attract the attention of regulators.   Specifically, throughout the Class Period, the Altisource Defendants and Ocwen trumpeted the companies' "sound corporate governance" policies in place to avoid the conflicts of interest from negatively affecting borrowers and homeowners.   These policies included (i) "Robust Related Party Transaction Approval Policies," including, specifically, Erbey's representation that he recused himself from any decisions involving transactions between Altisource and Ocwen; (ii) the insistence that the two companies have (except for Erbey) "separate management;" and (iii) "[t]ransparency in intercompany relationships," including the representation that Altisource charged Ocwen and Ocwen's borrowers competitive "market rates."

74.     Defendants also made great efforts to convince the market that the companies had the ability and technology – through Altisource's REALServicing – to integrate the millions of new loans coming in from Ocwen's ResCap and Homeward acquisitions.   Defendants assured the market that REALServicing was cost-effective, scalable and able to comply with all applicable laws and regulations.   These assurances conveyed to the market the impression that Ocwen and Altisource were operating in a manner that would allow them to continue their growth.

75.     Unfortunately for investors and borrowers, these assurances were false.  After conducting an extensive investigation, the NY DFS revealed serious and pervasive misconduct at Ocwen and Altisource.  The DFS Letters and the 2014 Consent Order – the facts of which Ocwen admitted – provide detailed information regarding the widespread conflicts of interest and compliance deficiencies that existed throughout the Class Period.  For example, the 2014 Consent Order and DFS Letters specifically describe internal emails, documents and loan file records, including direct communications with Defendant Erbey, which demonstrate, among other things, Erbey's involvement in conflicted related party transactions.  In addition, the NY DFS investigation relied on an onsite monitor located in Ocwen's offices who had direct access to Ocwen and Altisource employees and officers, including shared Chief Risk Officer Ravi, who reported to Erbey.  The NY DFS investigation was specifically focused on the "business relationships between Ocwen Financial Corporation and its affiliated companies, including Altisource," as well as Ocwen's mortgage servicing practices and systems including Altisource's REALServicing platform.

76.     Through this investigation, the NY DFS determined that Ocwen and Altisource (i) shared high-level executive management, (ii) allowed Defendant Erbey to direct and approve related party transactions, (iii) engaged in self-dealing transactions that improperly overcharged Ocwen customers and funneled kickbacks to Altisource; and (iv) could not rely on REALServicing as it was "inadequate and ineffective."  These admitted "widespread conflicts of interest with related parties" created ill-gotten revenue for Erbey and artificially inflated Altisource's stock price throughout the Class Period and misrepresented the sustainability of Altisource's projected growth.

      **1.**      **Defendants Exploited Rather Than Managed<br>Their Conflicts Of Interest**

              **a.**      **Defendants Tout The Companies' Independent<br>And Separate Management To Deflect Concerns<br>Over Conflicts Of Interest**

77.     In light of the amplified regulatory risks posed by the affiliated companies' tangled relationship, Defendants went to great lengths to continue to assure the market that there were sufficient controls in place to manage the many potential conflicts of interest inherent to Altisource's and Erbey's relationship with Ocwen.  Both companies repeatedly emphasized their separation and independence, and detailed their "policies, procedures and practices to avoid potential conflicts with respect to [their] dealings" with the related companies.

78.     Defendants highlighted and emphasized these controls during a unique December 3, 2013 Investor Day joint presentation to <u>both</u> Ocwen's and Altisource's analysts and investors (the "December 2013 Investor Day Conference").  On that day, Altisource and Ocwen jointly hosted a two-day event during which the Individual Defendants along with other key executives from Ocwen, Altisource and other related entities, presented on the purported independence of the affiliated entities, as well as on their services, performance and goals.  In fact, Defendant Erbey spoke directly to Altisource and Ocwen investors during the December 2013 Investor Day Conference and "<u>stress[ed]</u> . . . that [Altisource and Ocwen] are not affiliates, that they are <u>independent companies</u> . . . [that] have <u>independent boards</u> and they have <u>[independent]</u> <u>management teams</u>."  Altisource and Ocwen further emphasized this point with a slide presentation that highlighted the safeguards put in place to ensure that the companies were independent and had "<u>sound Corporate Governance</u>," that included an insistence on "<u>separate</u> <u>Boards with separate management</u>".

79.     As has now been revealed and admitted in the 2014 Consent Order, Defendants' public representations that the two purported "strategic allies" were "<u>independent companies</u>" that had "<u>sound corporate governance with separate boards and separate management</u>" were false. Altisource and Ocwen improperly and secretly co-employed several high level officers, including but not limited to their joint Chief Risk Officer, S.P. Ravi.  Moreover, former employees detail how the top executives of both companies ran the two companies as one enterprise.

80.     While Ocwen did not publicly disclose the name of its Chief Risk Officer, Altisource reported that its Chief Risk Officer was an individual named S.P. Ravi.  As set forth in an April 25, 2013 Form 8-K, Altisource explained that Ravi "previously [and not currently] served as VP for Ocwen Financial Corp."  This statement was consistent with similar statements made in 2009 at the time of the companies' separation.  However, as Ocwen has now admitted in the 2014 Consent Order, Altisource's Chief Risk Officer Ravi was simultaneously serving as Ocwen's Chief Risk Officer and "reported directly to Mr. Erbey in both capacities" throughout most of the Class Period.

81.     A company's "chief risk officer" is generally tasked with identifying, analyzing, and mitigating circumstances that can threaten a company.  A chief risk officer must work to (i) ensure that a company is in compliance with, among other things, government regulations and (ii) develop internal controls to identify and prevent areas of risk, including compliance and regulatory issues.  For example, as set forth in January and May reports, Standard & Poor's ("S&P") described the critical responsibilities held by Ocwen's Chief Risk Officer (who was unnamed in the report).  S&P stated that the Ocwen Chief Risk Officer oversaw the internal audit, quality assurance and information security divisions of Ocwen's risk management group, and met bimonthly with "key [Ocwen Loan Servicing] management" along with the director of internal audit and general counsel "to discuss audit activities and areas of risk."  Thus, the role played by Ocwen's Chief Risk Officer – to protect against areas of risk and ensure the quality of Ocwen's systems (i.e., REALServicing) – created a serious conflict of interests with Altisource.

82.     The serious conflicts of interest created by Ravi's dual role was first raised by the NY DFS in the February 26 DFS Letter.  In that letter, the DFS stated that it had recently forced Altisource to remove Ravi as its Chief Risk Officer, and had significant concerns that Ravi – the officer responsible for ensuring that both companies' risk was managed – did not even "appreciate the potential conflicts of interest posed by this dual role."  Moreover, the NY DFS reported that not only did Ocwen pay Ravi his salary – despite Altisource reporting he was its Chief Risk Officer – but that Ravi "did not know and had apparently never asked which

company paid his risk management staff," which also provided services for both companies.  The NY DFS concluded in the February 26 DFS Letter that the "failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination."  Ultimately, as part of the 2014 Consent Order, Ocwen admitted to the impropriety of, unbeknownst to investors, employing Ravi as its Chief Risk Officer while he also served as Altisource's Chief Risk Officer.  Ocwen also agreed that it "will not share any common officers or employees with any related party," indicating that Ravi's co-employment had not been an isolated incident.

83.    Former Ocwen and Altisource employees confirmed that Altisource and Ocwen shared the same Chief Risk Officer as well as other key executives, contrary to their public statements.  For example, CW1, the former Director of Valuations at Altisource during the Class Period, explained that all of the "C" level executives at both Ocwen and Altisource – the CEO, CFO and others – ran the two companies jointly.  CW1 stated that "everybody in the C suite were running things together" regardless of official company assignations.

84.    CW3, a former Vice President of Loan Servicing in Ocwen's West Palm Beach office, regularly attended staff meetings with members of both Ocwen and Altisource.  CW3 confirmed that Ravi "sat on both companies" and "reported to [Defendant] Erbey on both sides of the house."  Likewise, CW2, a former Vice President in Default Servicing in Ocwen's West Palm Beach office, confirmed that Ravi worked for both companies as Chief Risk Officer and that this posed a "clear cut conflict of interest."  CW2 explained that concerns over Ravi's "clear cut conflict of interest" were discussed regularly at weekly "Leadership Meetings" that were attended in person or over the phone by Defendants Erbey and Shepro and Ocwen CEO Faris, along with Ravi and other Ocwen and Altisource executives.  These meetings generally lasted 90 minutes and were led by Defendant Erbey who was "the shepherd in those meetings."  CW2 recalled how attendees at the weekly Leadership Meetings "expressed concern" about Ravi and his roles within the two companies to Defendants and other high level executives.

85.     CW2 recalled situations where Ravi, in direct violation of the responsibilities he had as a chief risk officer, "would choose between Ocwen and Altisource who would lose money."  For example, CW2 explained how "there were times when [the companies] were rewriting contracts for existing services or new services."  At that time, "you would want the [risk departments of the] two entities to look at it differently [from each other to make sure it was good for their company]," but Ravi would review it from a risk perspective on behalf of <u>both</u> companies and therefore could not effectively determine "if this deal is good for Ocwen or good for Altisource."

86.     Similarly, CW4, who worked as a Supervisor within Ocwen's Texas-based Internal Review Group between February 2013 and March 2014, described how, as Ocwen's Chief Risk Officer, Ravi was the leader of the "Internal Review Group" that was charged with ensuring that Altisource's REALServicing platform was in compliance with governing laws and regulations, including the NY DFS and National Mortgage Settlement rules and regulations.

87.     Like the conflicts present in connection with writing contracts between the two companies, the conflicts posed by this role are abundantly clear.  Ravi simply could not effectively protect both companies from risk without causing harm to the other.  For example, should Ravi have determined that Altisource's REALServicing platform used by Ocwen was inferior to other available platforms and should be replaced – something that, as discussed below, had been communicated to him – he could not make that decision on behalf of Ocwen without causing harm to Altisource.

88.     Despite the fact that, according to CW2, Ravi's position in both companies was "a clear cut conflict of interest" that was communicated to Defendants Erbey and Shepro and other high level executives on a regular basis, and contrary to Defendants' public statements, nothing was ever done to address the many concerns raised in the leadership meetings and Ravi remained entrenched in both companies until his forced removal by the NY DFS shortly before February 26, 2014.

89.     Former Ocwen and Altisource employees have identified additional executives employed by both Altisource and Ocwen.  For example, CW5, a Senior Compliance Analyst at Ocwen from January 2012 to September 2014, stated that Altisource and Ocwen co-employed other employees, including a former Director of Quality Assurance who reported directly to Ravi, a Senior Manager in the Relationship Manager Department whose "reports would handle calls for both Ocwen and Altisource," and a Senior Vice President of Risk Management.  CW5 stated that there was little distinction between the companies because "you worked for Bill Erbey, bottom line."

90.     Former Altisource employees have exposed that, in reality, Altisource was not independent and, in fact, there was simply no separation between Altisource and Ocwen – an open secret within Altisource that the companies took great pains to conceal.  CW1 reported directly to Kevin Raney, the Vice President of Valuation.  CW1 stated Altisource employees "basically worked for Ocwen."  CW1 explained that while the companies were technically separated (acknowledged "with a wink"), they operated as one entity.  While this was common knowledge within Altisource, Altisource employees were strictly forbidden from telling anyone that they worked for Ocwen, and were even instructed not to say out loud or write in an e-mail that they worked for Ocwen.  CW1 explained how his superior, Raney, "met frequently" with Defendants Erbey and Shepro and Ocwen CEO Faris – and was "very particular about being careful with the language of how you talked about Ocwen in an e-mail."

91.     Additional former Altisource employees also recounted how there was little physical separation or employee independence between Altisource and Ocwen.  CW6, a Senior Manager in Altisource's Texas office from December 2012 through September 2014 described how managers and other employees would swing like a "pendulum" between positions at Altisource and Ocwen because they were all "part of the same team" with Defendant Erbey serving as "the eyes behind the curtain."  Moreover, CW7, a former Director of Real Estate Owned Asset Management in Altisource's Florida offices who had worked at Ocwen for 16 years until the spin-off, and then with Altisource from August 2009 until February 2013, described

how after the spin-off, Altisource remained in the same offices with Ocwen and that there was "no separation at all."

**b.    Altisource Over-Charged
Ocwen Borrowers For Its Services**

92.    Contrary to Altisource's and Ocwen's repeated public statements emphasizing the "[t]ransparency in intercompany relationships" as evidenced by Altisource's commitment to charging Ocwen and Ocwen borrowers "market rates," the 2014 Consent Order demonstrates, and former employees confirm, that these statements were false.

93.    Indeed, throughout the Class Period, Altisource and Owen repeatedly made assurances that Ocwen borrowers were not being subjected to unfair pricing through their forced use of Altisource's services.  For example, in its SEC filings, Altisource said: "the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers."  Similarly, in its April 7, 2014 Proxy Statement, Altisource stated that "[t]he Company provides all services [to Ocwen] at rates it believes to be comparable to market rates."  Significantly, Ocwen made identical statements regarding Altisource's guarantee of "market rates" in its Class Period SEC filings, thereby reinforcing to the market that the contracts and service agreements between Altisource and Ocwen were fair, proper and conducted at arm's length.

94.    Given long-term agreements that required Ocwen and its borrowers to use and pay for Altisource's services, as well as Defendant Erbey's position and ownership interests in both companies, both Altisource and Ocwen could - and, unbeknownst to investors, did – create improper incentives in the fees Altisource charged Ocwen, these statements were critical to assure the market and borrowers that there was no secret self-dealing going on.  Further, by assuring the market that Altisource was charging only "market rates" for its services and not taking advantage of captive Ocwen borrowers, Altisource communicated a false picture that its

mortgage products and services provided revenue that was sustainable even without Ocwen's business.

95.     In reality, these assurances were false and misleading.  As the NY DFS found when investigating the "conflicted business relationships" between Ocwen and Altisource, and Ocwen admitted in the 2014 Consent Order, Altisource overcharged Ocwen for certain services. For instance, Altisource's online auction site Hubzu charged Ocwen an above market fee of up to three times for listing on its auction website.  As detailed by the NY DFS in the Consent Order and the April 21 DFS Letter, Altisource, through Hubzu, had been charging Ocwen customers inflated fees that were "up to three times the fees charged to non-Ocwen customers."  Ocwen's own internal documents demonstrated that "when Ocwen selects its affiliate Hubzu to host foreclosure or short sale auctions on behalf of mortgage investors and borrowers, the Hubzu auction fee is 4.5%."  Ocwen's internal documents further demonstrate that "when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%."  Altisource's and Ocwen's overcharging of Ocwen customers was so entrenched in the Company's practices that the underlying HTML code for Hubzu's website actually queries whether Ocwen is the seller of the property being listed on Hubzu and, if so, automatically charges higher fees.

96.     This overcharging of Ocwen-serviced businesses on Hubzu had a significant impact.  These higher fees were passed on to struggling borrowers who were, according to the NY DFS, "trying to mitigate losses and are not involved in the selection of Hubzu as the host site."  Thus, because Ocwen used Hubzu as its principal online portal for selling borrowers' homes facing foreclosure and the majority of properties listed on Hubzu were being serviced by Ocwen, this self-dealing arrangement benefited Altisource and Erbey at the direct expense of numerous Ocwen-serviced borrowers.

97.     Significantly, Ocwen admitted this over-charging in the 2014 Consent Order, stating: "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen then to other customers - charges which are then passed on to borrowers and investors."

98.     Ocwen also admitted that another Altisource subsidiary, REALHome Services and Solutions, Inc. ("REALHome"), which Ocwen used as its "default real estate agency for short sales and investor-owned properties," overcharged borrowers.   Specifically, REALHome provided inferior agency services because it "principally employs out-of-state agents who do not perform the onsite work that local agents perform," but charged borrowers as if the agents were local agents performing on-site work.

99.     Former employees confirm that Altisource's undisclosed practice of overcharging captive Ocwen customers was widespread and not limited to the Hubzu and REALHome arrangements.   CW1 stated that Altisource regularly overcharged borrowers by misrepresenting that quality of the services being provided.   In this regard, CW1 described a practice whereby Altisource charged Ocwen borrowers a standard rate for a home valuation but, in reality, provided "a really cheap version" of that valuation that was of far lesser quality.

100.    CW8, Altisource's former Chief Appraiser for Default Valuation from April 2013 through July 2014, who worked in Ocwen's Coppell, Texas offices and had previously been employed by Ocwen, provided additional information about Altisource's practice of overcharging for appraisal services.   CW8 described how Altisource significantly overcharged Ocwen investors for appraisals while pocketing all of the excess charges.   CW8 stated that Ocwen's "entire [valuation] operation was completely delegated to Altisource."   In this regard, CW8 explained that Altisource was responsible for choosing the form of appraisal and would then pass on the cost of the appraisal to borrowers through Ocwen.   According to CW8, Altisource, with Ocwen's knowledge, regularly overcharged borrowers for appraisals and pocketed the difference.

101.    CW8 explained that the costs of an appraisal are passed through Altisource to Ocwen, and then Ocwen collects fees for the appraisal from the borrower or investor.   CW8 provided an example of a typical situation whereby Altisource pays $80 for a broker price opinion ("BPO") - a type of property valuation metric - and then charges Ocwen, and by extension Ocwen borrowers, nearly double, or $150 for that service.   CW8 described this

36

overcharging as "the business model of Altisource . . . [charging] substantially above market rate for the [appraisal]."   Based on CW8's observations and experience, Altisource charged "substantially above market rate for the BPO and then Ocwen guaranteed that Altisource was the source for the BPO - they were exclusive."

102.    In addition to inflating revenue through the imposition of non-market rates to Ocwen customers, Altisource also charged Ocwen above-market rates for its Technology Services.  CW2 described how Ocwen's Chief Investment Officer, Parveen Aery, was tasked with comparing Ocwen's technology charges against those charged to competitors Litton and Homeward.  According to CW2, Aery discovered that Altisource charged Ocwen <u>three to five times</u> what other vendors had been charging Ocwen's competitors.

**c.      Erbey Participated In Conflicted Transactions
That Improperly Funneled Money To Altisource
At Borrowers' Expense**

103.    At the center of the alleged fraud is Defendant Erbey, who until his termination on January 16, 2015, led and served as Chairman of both Ocwen and Altisource (as well as three other related companies).  Throughout the Class Period, Altisource, Ocwen and Erbey repeatedly assured investors in SEC filings and in a joint presentation and conference call on December 3, 2013 that they followed specific "[r]obust [r]elated [p]arty [t]ransaction" "policies, procedures and practices" to "avoid potential conflicts" that "may arise . . . because of [Altisource's] ongoing agreements with Ocwen," "the nature of [Altisource's] respective business" and Erbey's "substantial investments" in Altisource and the other related companies.  Most prominent among these purportedly followed "policies, procedures and practices" was the representation that Erbey "<u>recus[ed] himself from negotiations regarding, and approvals of, transactions</u>" between Altisource and Ocwen.

104.    In reality, Defendants failed to follow these policies, practices and procedures.  Specifically, Ocwen admitted in the 2014 DFS Consent Order that Erbey knowingly <u>failed to recuse himself in "a number of transactions between the two companies or from which</u>

37

<u>Altisource received some benefit</u>, including the renewal of Ocwen's force-placed insurance program in early 2014."

105.   The NY DFS first raised concerns about Erbey's refusal to recuse himself – and the harm suffered by Ocwen homeowners as a result of that failure – in the August 4 DFS Letter where the NY DFS stated that this failure appeared to be "<u>a gross violation of [Altisource's and Ocwen's] supposed recusal policy</u>."

106.   Specifically, the August 4 DFS Letter detailed an example of how Defendant Erbey involved himself and played a primary role in negotiating and approving a sweetheart deal between Ocwen, Altisource and a third-party insurance agent, SWBC, that would improperly funnel $65 million annually – close to 10% of the Company's total revenue and nearly 50% of the Company's net income for 2013 – to Altisource in exchange for minimal work, while concealing Altisource's role in the provision of the insurance.

107.   In the letter, the NY DFS raised "serious concerns about the apparently conflicted role played by Ocwen Executive Chairman William Erbey and potentially other Ocwen officers and directors in directing profits to Altisource, which is related to Ocwen but is formally a separate, publicly-traded company."  The NY DFS suggested that Erbey orchestrated the force-placed insurance transaction to directly enrich himself, given his greater ownership interest in Altisource:

> As you know, Mr. Erbey is Ocwen's largest shareholder and is also the Chairman of and largest shareholder in Altisource. In fact, Mr. Erbey's stake in Altisource is nearly double his stake in Ocwen: 29 percent versus 15 percent. <u>Thus, for every dollar Ocwen makes, Mr. Erbey's share is 15 cents, but for every dollar Altisource makes, his share is 29 cents</u>.

108.   Force-placed insurance, which Altisource referred to in public filings as "lender placed insurance," is insurance forced on a borrower by a loan servicer when the borrower fails to maintain his own or sufficient homeowners insurance.  It is typically a more expensive alternative to homeowners' insurance, costing sometimes two to ten times as much as a borrower

would pay for insurance taken out voluntarily, and can result in large increases in borrowers' monthly payments. In fact, in certain circumstances, the extra expense of higher premiums "can push already struggling families over the foreclosure cliff," according to the NY DFS. Additionally, if mortgage borrowers refuse to pay for the newly purchased insurance, a servicer may be entitled to foreclose on their homes.

109.    As force-placed insurance is usually only required when there is effectively no customer to select an insurance provider, there is significant potential for conflicts of interest, kickbacks and self-dealing. In particular, the NY DFS noted in the August 4, 2014 Letter that in a recent investigation, it had uncovered evidence suggesting that "mortgage servicers were setting up affiliated insurance agencies to collect commissions on force-placed insurance, and funneling all of their borrowers' force-placed business through their own agencies." These agencies "had an incentive to purchase force-placed insurance with higher premiums because the higher the premiums, the higher the commissions kicked back by insurers to the servicers or their affiliates."

110.    The NY DFS has been focused on Ocwen's use of force-placed insurance for years. To start, in September 2011, the NY DFS required Ocwen to agree that "[i]n no event shall [Ocwen] purchase a master hazard insurance policy from an affiliated entity" such as Altisource. Then, two years later, in September 2013, the NY DFS continued to crack down on force-placed insurance and announced heavier prohibitions on kickbacks to servicers and their affiliates. The prohibitions included forbidding force-placed insurers to (i) "pay commissions to a bank or servicer or a person or entity affiliated with a bank or servicer on force-placed insurance policies obtained by the servicer;" or (ii) "make any payments, including but not limited to the payment of expenses, to servicers, lenders, or their affiliates in connection with securing business."

111.    In direct violation of these regulations and the companies' purported recusal policies, Ocwen and Altisource devised a lucrative force-placed insurance sweetheart deal for Altisource through a series of pass-through transactions directly approved by Erbey in January

2014. According to the NY DFS, Altisource's force-placed insurance program was no inadvertent mistake; rather, it was the result of an elaborate year-long scheme designed to circumvent regulations and borrowers' protections implemented by the NY DFS and other regulators in order to funnel money to Altisource from homeowners saddled with force-placed insurance.

112. The scheme arose out of Ocwen's December 27, 2012 acquisition of the Homeward servicing portfolio and ancillary businesses. On January 31, 2013, Ocwen sold certain of Homeward's fee-based businesses, including its insurance division subsidiary Beltline Road Insurance Agency Inc. ("Beltline"), to Altisource.

113. Thereafter Ocwen appointed Beltline, now an Altisource subsidiary, as its "exclusive insurance representative" tasked with finding an insurance company to provide Ocwen with force-placed insurance, as its existing force-placed arrangement was set to expire. The NY DFS concluded from its analysis of internal documents that, in reality, Ocwen hired Beltline to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself and to Erbey.

114. Beltline devised a pass through arrangement whereby Altisource contracted with an unaffiliated insurance agent, Southwest Business Corporation ("SWBC"), in exchange for certain fee-based services. SWBC simultaneously contracted with Ocwen to provide force-placed insurance to Ocwen borrowers. This "pass through" arrangement made it appear as if Ocwen and Altisource had not entered into the same transaction.

115. The agreement with SWBC was intentionally designed to funnel commissions and fees to Altisource without the exchange of meaningful work. First, as detailed in the August 4 DFS Letter, Altisource would "reap enormous [15%] insurance commissions for having recommended that Ocwen hire SWBC." The NY DFS concluded that Altisource would receive $60 million annually based on "Ocwen['s] expect[ation] to force-place policies on its borrowers in excess of $400 million net written premium per year." Second, Altisource would be paid 75% of SWBC's total per loan monitoring fee – valued at $5 million per year based on Ocwen's loan

portfolio – in exchange for providing technology support to SWBC for its monitoring services, support that it was already contractually obligated to provide through Altisource's existing services agreements with Ocwen. Significantly, Ocwen paid SWBC double for its monitoring services than it had paid to its prior insurance provider – 20 cents per loan as opposed to 10 cents per loan – just so the $5 million in kickbacks could be transferred to Altisource.

116.   Internal Ocwen documents demonstrate Erbey's direct involvement in this deal. Specifically, in January 2014, Altisource sent a memo to Ocwen's Credit Committee (on which Erbey sat), recommending SWBC as the manager of Ocwen's force-placed insurance program, and recommending itself to provide fee-based services to SWBC.   Internal documents demonstrate that Defendant Erbey and two other members of Ocwen's Credit Committee approved this transaction on January 15 and 16, 2014.  With respect to the January 2014 vote, the NY DFS determined that "the Credit Committee did not meet to discuss this proposal, no minutes were taken of the Credit Committee's consideration of this proposed transaction, and the proposed transaction apparently was not presented for review or approval to any member of [Ocwen or Altisource's] Board of Directors except Erbey."  Thus, far from recusing himself as both Altisource and Ocwen claimed occurred, Erbey was the decision maker.  On June 1, 2014, Ocwen and Altisource executed contracts formalizing this new force-placed arrangement based on Erbey's January approval and "apparently without the further consideration of any Board member other than Mr. Erbey."  Once again, contrary to Altisource's and Ocwen's public representations throughout the Class Period, Erbey actively participated in the improper related party transaction.

117.   The NY DFS concluded the August 4 DFS Letter with a request for Ocwen to provide "every instance where Mr. Erbey has approved a transaction involving a related company notwithstanding Ocwen's statements to the contrary" because:

> The Department and its Monitor have uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies, despite Ocwen's and Altisource's public claims – including in SEC filings – that he recuses himself

<u>from decisions involving related companies</u>. Mr. Erbey's approval
of this force-placed insurance arrangement as described above
appears to be <u>a gross violation of this supposed recusal policy</u>.

118.    Ultimately, in the 2014 Consent Order, Ocwen admitted that "Mr. Erbey, who
owns approximately 15% of Ocwen's stock, and nearly double that percentage of the stock of
Altisource Portfolio, has participated in the approval of a number of transactions between the
two companies or from which Altisource received some benefit, including the renewal of
Ocwen's forced placed insurance program in early 2014."

**2.    Altisource's REALServicing Platform Was
Ineffective And Incapable Of Processing
Ocwen's Mortgage Servicing Portfolio In
<u>Compliance With The Law</u>**

119.    As set forth above, Altisource owns and operates REALServicing, Ocwen's core
servicing technology platform.  Given the millions of loans that Ocwen had acquired leading up
to the start of the Class Period and the millions of additional loans that the market anticipated
Ocwen would acquire in 2013 and 2014, it was critical that Altisource's REALServicing
platform could effectively service all of Ocwen's loans in compliance with the governing laws
and regulations, including the NY DFS's Mortgage Servicing Practices, and the reforms set forth
in the National Mortgage Settlement.  This was especially true in light of the regulator's strict
scrutiny of Ocwen, because, as the market understood, the failure to provide legally compliant
loan servicing would result in Altisource losing its primary source of revenue as a result of
Ocwen losing its ability to acquire additional mortgage servicing rights.

120.    Thus, throughout the Class Period, both Altisource and Ocwen assured investors
that Altisource's REALServicing platform was "effective," "scalable" - *i.e.*, able to handle an
ever-increasing amount of loans - and in "compliance" with the law.  For example, in its Class
Period SEC filings, Altisource described REALServicing as "an efficient and effective platform
for loan servicing including default administration," and touted the REALServicing platform as
an "[e]xtensible, scalable and secure technology platform [that] drives services delivery and

innovation for the real estate and mortgage marketplaces."   Ocwen also touted the high quality and cost effective benefits of using REALServicing, stating in its SEC filings that Altisource's REALServicing platform provided Ocwen with a "Highly Scalable Platform with Lowest Operating Cost" and a "70% cost advantage" compared to its competitors.

121.   Defendants specifically assured the market that REALServicing was able to process all of Ocwen's present and future loans in compliance with the law.   For example, on April 24, 2014, Defendant Erbey spoke to investors about Altisource's "world-class compliance management system" and Altisource's "continue[d] [] focus on providing high-quality compliant services to enhance [Ocwen's] competitive position."   Defendant Shepro echoed these sentiments when he described that Altisource's "primary focus is providing compliant services to Ocwen servicing portfolio" through the boarding of loans on REALServicing.   Ocwen similarly touted REALServicing's ability to comply with regulations, representing in its 2013 Form 10-K that Altisource's REALServicing "platform enable[d] [Ocwen] to operate in a compliant manner in an increasingly complex and highly regulated environment."

122.   In reality, however, Altisource's REALServicing platform was not "effective," "efficient" or "compliant," and was entirely unable to manage Ocwen's portfolio during the Class Period.   Indeed, Ocwen has now admitted in the 2014 Consent Order that its "core servicing functions rel[ied] on its inadequate systems [*i.e.*, REALServicing]" and "resulted in Ocwen's failure to fulfill its legal obligations."   The specific failings of Altisource's REALServicing platform were known at all relevant times to Altisource and Ocwen management, who refused to fix REALServicing or seek out a better platform – even when one was readily available to them.   As the NY DFS concluded, the REALServicing platform "regularly" caused Ocwen to "give[] borrowers incorrect or outdated information, send[] borrowers backdated letters, unreliably track[] data for investors, and maintain[] inaccurate records."   In sum, REALServicing, as run by Altisource and Ocwen, had "insufficient controls in place – either manual or automated – to catch all of these errors and resolve them."   Moreover,

43

once these errors were detected, the NY DFS concluded and Ocwen admitted that no "adequate steps" were taken to fix the problems.

123.    REALServicing was inadequate, ineffective and noncompliant in numerous ways. First, REALServicing caused widespread and unlawful backdating of loan modification letters. The NY DFS identified that, "potentially hundreds of thousands" of loan modification denial letters generated by "Ocwen's systems and processes" were "[back]dated more than 30 days prior to the date that Ocwen mailed the letter."   These backdated letters were in violation of Ocwen's obligation to provide borrowers with 30 days to appeal any denials of requests for loan modifications.  As a result, by the time that the borrower received the denial letter the mandatory thirty day appeal period had expired.   REALServicing similarly issued backdated letters to borrowers that were facing foreclosure, informing them of the date by which they needed to cure their default in order to avoid foreclosure when the cure date had expired months earlier.   Former employees of Altisource and Ocwen confirmed that REALServicing caused the backdating.   For instance, Altisource former employee CW1 confirmed that REALServicing was the Altisource platform that Ocwen used to generate the backdated letters to borrowers.   Similarly, former Ocwen employee CW4 confirmed that REALServicing processed the backdated letters, stating that CW4 had witnessed the issuance of many improperly backdated letters caused by errors with REALServicing.

124.    The NY DFS provided specific examples of backdating by REALServicing, including the following:

- A pre-foreclosure notice was sent to an Ocwen borrower that was dated May 23, 2013.  However, Ocwen's internal records demonstrated that the letter was created nearly one year later, on April 9, 2014.

- A letter informing a borrower that it would be in danger of foreclosure if it failed to make a payment by August 7, 2013. However, internal Ocwen records demonstrated the letter was dated October 29, 2013, nearly three months after the payment deadline.

125.    The NY DFS determined that "Ocwen's systems have been backdating letters for years," that Ocwen "failed to identify and remedy" these serious errors, and noted that "given the issues with Ocwen's systems" – *i.e.*, REALServicing – it may be impossible to determine the scope of Ocwen's non-compliance."   Significantly, during the course of the NY DFS investigation into the backdating, Ocwen admitted that it had become aware of the issue months earlier.   Ocwen admitted that in November 2013, an employee informed senior management, including the Company's Vice President of Compliance, of the backdating issue. Yet upon learning about the serious backdating issue, Ocwen and its Vice President of Compliance did nothing.   Even as of the date of the 2014 Consent Order, Ocwen and Altisource had failed to fully resolve the issue.

126.    <u>Second</u>, the NY DFS revealed in the Consent Order that the heart of REALServicing's known deficiencies and "inadequate and ineffective technology" relied on an unwieldy and poorly understood morass of <u>thousands</u> of "comment codes entered either manually or automatically to service [Ocwen's] portfolio."  As explained by the NY DFS, "each code initiates a process, such as sending a delinquency letter to a borrower, or referring a loan to foreclosure counsel."   The NY DFS explained how the deficiencies in REALServicing's comment code system contributed directly to the backdating described above, and resulted in other gross servicing errors that directly and negatively affected homeowners in violation of applicable laws, leading in some cases to unwarranted foreclosures:

> <u>With Ocwen's rapid growth and acquisitions of other servicers, the number of Ocwen's comment codes has ballooned to more than 8,400 such codes.</u> Often, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function. <u>The result is an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative.</u>

127.    Numerous former employees of Altisource and Ocwen that were directly responsible with ensuring the effectiveness and compliance of REALServicing have confirmed

its failings, including but not limited to the coding and backdating deficiencies highlighted by the NY DFS.  Moreover, former employees of the companies have recounted how Ocwen had the opportunity to use a far superior and legally compliant mortgage processing platform called FiServ that was available to Ocwen by the start of the Class Period through the Homeward and ResCap acquisitions, but deliberately chose not to do so despite their knowledge of REALServicing's deficiencies.

128.     For example, CW4, a Supervisor within Ocwen's Internal Review Group between February 2013 and March 2014, was responsible for overseeing the transfer of data associated with the loans acquired through the ResCap acquisition from the Fiserv system to REALServicing.  In that role, CW4 tested the effectiveness of the REALServicing platform to ensure that the loans were being serviced in compliance with the National Mortgage Settlement and other regulations.  CW4's manager reported directly to Altisource's and Ocwen's Chief Risk Officer Ravi who, in turn, reported directly to Erbey.  Ravi oversaw Ocwen's Internal Review Group and was supposed to ensure REALServicing's compliance with all applicable laws and regulations.    According to CW4, Ravi was specifically responsible for REALServicing's compliance with the NY DFS Agreement and Mortgage Servicing Practices.

129.     CW4 confirmed the NY DFS's conclusions (and Ocwen's admissions) that REALServicing's "unnecessarily complex" "system of comment codes" created the serious letter backdating issue.  CW4 described how, following the acquisition of the servicing rights for over $270 billion worth of ResCap mortgage loans, the decision was made to transfer all of the over 1.5 million loan files from ResCap's FiServ platform to Altisource's REALServicing platform. Having worked on the FiServ platform since 2008, CW4 knew that "REALServicing was just inferior" and "didn't give us the capability that FiServ did, especially for filtering certain information by date which made it difficult to work efficiently" because the regulations were "very timeline driven."

130.     CW4 described how the transfer of loans from the Fiserv platform to the REALServicing platform created immediate and significant problems, most of which were due

to the coding errors identified in the 2014 Consent Order.  Whereas Fiserv – a platform that had adequately and capably processed mortgage loans for years – had a finite set of a few hundred codes that were carefully approved and utilized, REALServicing had thousands of codes, most of which meant exactly the same thing.  Given that confusion, "there was no way you could keep up and feel sure that when someone sent in a package for modification that it was being [serviced] effectively."

131.   CW4 described another situation that CW4 uncovered and reported to supervisors (in addition to the letter backdating) that demonstrated how REALServicing's failure to effectively manage or have any control over its thousands of codes negatively impacted borrowers.  CW4 detailed an incident where a large number of mortgage loans for condominium units had been saddled with improper payments for force-placed insurance simply because they had been coded incorrectly in Altisource's vast and confusing system.  CW4 explained that typically, homeowners' insurance policies for condominium owners are covered by the condominium owners' association and such properties should be coded to reflect this situation. However, at Ocwen, CW4 was asked to review a sample of condominium loans in which CW4 determined that somewhere between 20% percent and 40% percent of those loans had been improperly charged with force-placed insurance, noting that "almost every loan that we tried to review, that issue came up on it."  While CW4 noted that the force-placed insurance fees on the sample of loans CW4 reviewed were removed and refunded, the errors were egregious enough that Ocwen failed to meet the required National Mortgage Settlement regulatory benchmarks that quarter.

132.   CW4 further explained how the Internal Review Group Team that CW4 supervised provided "constant feedback" to high level executives, including but not limited to Ocwen's CEO Ronald Faris and Chief Risk Officer Ravi, who reported directly to Erbey regarding the serious deficiencies in REALServicing.

133.   CW9 also confirmed the deficiencies with REALServicing.  CW9, a former Compliance and Default Timeline Supervisor who worked at ResCap since July 2008 and

switched over to Ocwen in early 2013 following the ResCap acquisition, was responsible for ensuring that borrowers were not in the foreclosure process while simultaneously trying to save their home, a banned practice known as dual-tracking. CW9 stated that the compliance team CW9 headed discovered problems, gaps, and excessive and misapplied codes "pretty quickly," leading the group to realize that "[w]e aren't going to be in compliance with this setup" because there were no systems in place for the team to catch and fix errors.  CW9 notified CW9's immediate supervisors about the serious problems with REALServicing.  CW9 explained that because of the number of codes and flags in REALServicing – at least four times more than contained in the competing Fiserv system – it was impossible to ensure that loans were not being dual-tracked because the thousands of codes were so unmanageable that "[b]y the time [someone] learned [of the dual tracking] we'[d] be getting fined and behind in compliance." CW1 reiterated CW9's concerns over REALServicing's ability to handle Ocwen's growing mortgage servicing rights portfolio, stating that CW9 thought that Altisource was not ready during the Class Period.

134.    Similarly, CW10, a Loan Servicing Foreclosure Specialist at Ocwen from February 2013 through February 2014, who previously worked at ResCap from 2006 until the Ocwen acquisition also stated that there were problems with REALServicing.  CW10 worked with both FiServ and REALServicing, and confirmed that there were issues with REALServicing because "it was more complicated and wasn't as detailed" as FiServ, was overly reliant on a unwieldy code-based system that "was difficult to learn and constantly changing," and varied department to department.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

135.    Throughout the Class Period, Defendants carried out a scheme to mislead the market through a series of materially false and misleading statements and omissions about the controls Altisource and Ocwen had in place to protect borrowers from conflicted related party transactions; the quality, effectiveness and regulatory compliance of Altisource's REALServicing

platform, and the sustainability of Altisource's revenues from related party transactions with Ocwen.  Even as regulatory scrutiny increased, beginning in February 2014 when the NY DFS investigation raised concerns about deficiencies in each of these areas, Defendants continued to make false and misleading statements about these topics.

136.    In regular press releases, conference calls, investor presentations, and filings with the SEC, Defendants made materially false and misleading statements and omissions concerning, among other things: (i) the Company's "robust" "policies, practices and procedures" in place for ensuring that the potential conflicts of interests posed by the relationship between Ocwen and Altisource (and by Erbey's position and ownership interests in both Altisource and Ocwen) were effectively managed; (ii) the purported "market rates" charged under the Company's long-term service agreements with Ocwen, including for homes sold through Hubzu; (iii) the ability of Altisource's REALServicing to effectively and properly service the millions of loans on its platform, while continuing to comply with the laws and regulations enforced by the NY DFS and other state and national regulators by the start of the Class Period; and (iv) the source and sustainability of Altisource's Ocwen-derived revenue as a result of the wrongdoing.  Defendants' statements and omissions are set forth below, organized topically, along with explanations for their falsity.  The statements made by Ocwen that are identified below concern its relationship with Altisource and its use of Altisource services.   These statements, which reinforce the Altisource Defendants' statements, were communicated to the market and were relevant and material to Altisource investors.

**A.    False and Misleading Statements And Omissions Concerning The Adequacy Of Controls For Managing Transactions With Ocwen And Avoiding Conflicts Of Interest**

137.    From the beginning of the Class Period, the Altisource and Ocwen Defendants represented that both companies had sufficient policies and procedures in place for the "review, approval and monitoring" of actual or potential conflicts of interests between Altisource and Ocwen, including, specifically, the guarantee that Erbey recused himself from any negotiations

or approval of transactions between Altisource and Ocwen and that, aside from Erbey (whose conflicts were purportedly managed through his recusal and "independent" Board oversight), the companies had completely "separate management," such that no executive officers overlapped.

138.    On April 25, 2013, the first day of the Class Period, Altisource filed a Form 8-K with the SEC (the "April 25, 2013 8-K") attaching a slide presentation made during a meeting with the Company's lenders.  That presentation contained a slide titled "Seasoned Management Team" and identified various members of Altisource's senior management, including S.P. Ravi, Altisource's Chief Risk Officer who "[p]reviously served as VP for Ocwen Financial Corp." This statement was false because S.P. Ravi never left his position as Chief Risk Officer of Ocwen, and concurrently served as Chief Risk Officer of both Ocwen and Altisource until sometime just prior to the issuance of the February DFS Letter, and "reported directly to Mr. Erbey in both capacities."

139.    Also on April 25, 2013, Altisource filed with the SEC a Form 10-Q for the first quarter of 2013 (the "Altisource 2013 Q1 10-Q"), which was signed by Defendant Shepro.  The Altisource 2013 Q1 10-Q incorporated by reference the Risk Factors set forth under Item 1A of Altisource's annual report on Form 10-K for the year ended December 31, 2012, filed with the SEC on February 13, 2013 (the "Altisource 2012 Form 10-K") and signed by each of the Individual Defendants.  The Altisource 2012 Form 10-K Risk Factors concerning "Risks Related to our Employees" (the "Employees Risk Factor") informed investors that Altisource "could have conflicts with Ocwen . . .  and the Chairman [Erbey] or other members of our Board of Directors could have conflicts of interest due to his or their relationship with Ocwen."  The Company disclosed that it would "manage these potential conflicts through," *inter alia*, "other provisions of [Altisource's] agreements with Ocwen . . . and through oversight by independent members of our Board of Directors," which was chaired by Defendant Erbey.  Specifically, it stated:

> Conflicts may arise between Ocwen, HLSS, Residential or AAMC and us as a result of our ongoing agreements and the nature of our

respective businesses. Our Chairman is also the Chairman of
Ocwen, HLSS, Residential and AAMC. As a result, he has
obligations to us as well as to these other entities and may have
conflicts of interest with respect to matters potentially or actually
involving or affecting us and Ocwen, HLSS, Residential or
AAMC, as the case may be.

We will also seek to manage these potential conflicts through
dispute resolution and other provisions of our agreements with
Ocwen, HLSS, Residential or AAMC and through oversight by
independent members of our Board of Directors.

140.    Altisource's Forms 10-Q for the second and third quarters of 2013, dated July 25,
2013 and October 24, 2013, respectively, were all signed by Defendant Esterman, and
incorporated the same Employees Risk Factor from the Altisource 2012 Form 10-K identified
above in ¶139, above.

141.    Ocwen made similar statements regarding conflicts of interest and Erbey's recusal
in Risk Factors set forth in Ocwen's Form 10-Q for the first quarter of 2013, filed with the SEC
on May 8, 2013 and signed by Ocwen's CFO John V. Britti ("Britti") (the "Ocwen 2013 Q1 10-
Q").  The Ocwen 2013 Q1 10-Q incorporated by reference the "Risks Relating to the Separation
of Altisource" Risk Factor set forth in its 10-K for the year ended December 31, 2012, filed with
the SEC on March 1, 2013 (the "Ocwen 2012 Form 10-K").  This Form 10-K was signed by
Defendant Erbey.   Ocwen's Risk Factor relating to its business with Altisource provided specific
details to investors about the companies' steps taken to control conflicts of interest.  It stated:

Matters that could give rise to conflicts between Ocwen and
Altisource include, among other things:

- any competitive actions by Altisource;

- the quality and pricing of services that Altisource has
  agreed to provide to us or that we have agreed to provide to
  Altisource; and

- our ongoing and future relationships with Altisource,
  including related party agreements and other arrangements
  with respect to the administration of tax matters, employee
  benefits, indemnification and other matters.

> We have adopted policies, procedures and practices to avoid potential conflicts involving significant transactions with related parties such as Altisource, <u>including Mr. Erbey's recusal from negotiations regarding and credit committee and board approvals of such transactions</u>.

142.    Ocwen's Forms 10-Q for the second and third quarters of 2013, dated August 6, 2013 and November 5, 2013, respectively, and signed by Britti, incorporated the same business Risk Factors from the Ocwen 2012 Form 10-K, including the Risks Relating to the Separation of Altisource.  Ocwen's Form 10-K for the year ended December 31, 2013, filed with the SEC on March 3, 2014 (the "Ocwen 2013 Form 10-K"), similarly represented that Erbey recused himself in order to avoid potential conflicts.   In particular, it stated:   "We have adopted policies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource, HLSS, AAMC and Residential, including our Executive Chairmen recusing himself from negotiations regarding, and approvals of, transactions with these entities."  Ocwen's Forms 10-Q for the first, second and third quarters of 2014, dated May 2, 2014, August 18, 2014 and October 31, 2014, respectively, all signed by Britti, incorporated the same Risk Factors from the Ocwen 2013 Form 10-K.

143.    On December 3 and December 4, 2013, Altisource hosted an Investor Day together with Ocwen and their three other related companies Residential, AAMC and HLSS, during which the Individual Defendants along with other top executives from Ocwen and Altisource made presentations to analysts and investors and held a conference call (the "December 2013 Investor Day Conference").  On December 3, 2013, Altisource filed a Form 8-K with the SEC that was signed by Defendant Esterman and attached a slide presentation from the December 2013 Investor Day Conference titled "Welcome and Opening Remarks Presentation" that was co-authored by Ocwen, Altisource, Residential, AAMC and HLSS (the "December 3 2013 Related Companies Presentation"). Ocwen also filed a Form 8-K that same day attaching the December 3 2013 Related Companies Presentation.  The lead presentation for the conference emphasized the strategic – yet purportedly arm's-length – relationship between

Altisource and Ocwen.  In particular, the presentation explained that Altisource and Ocwen did not operate as affiliated entities but as "strategic allies."  The presentation touted the "<u>Strategic Allies have sound Corporate Governance,</u>" and represented to investors that the following three conditions contributed to this "Sound Corporate Governance":

- "[S]eparate [M]anagement"

- "<u>Robust Related Party Transaction Approval Policies</u>"

- "<u>Transparency in inter company relationships through public company disclosures</u>"

144.    During the conference, Defendant Erbey emphasized Altisource's and Ocwen's corporate governance policies and affirmed that, in accordance with the companies' policies, practices and procedures, with respect to "<u>[a]ny related party transactions between [Altisource and Ocwen] I actually recuse myself from that decision</u>."  Defendant Erbey also underscored to investors that "<u>[o]ne of the things that I like to stress again is that the strategic allies are not affiliates</u>, that each company has its own separate Board of Directors, the majority of whom are independent, and <u>we have robust related party transaction approval process</u>."  Erbey "<u>stress[ed]</u> . . . that these companies are not affiliates, that they are <u>independent companies</u> . . . [that] have <u>independent boards</u> and they have [<u>independent</u>] <u>management teams</u>."

145.    On February 13, 2014, Altisource filed with the SEC its Annual Report on Form 10-K for 2013 (the "Altisource 2013 Form 10-K"), which was signed by the Individual Defendants.  The Altisource 2013 Form 10-K expanded upon the Employees Risk Factor contained in the Altisource 2012 Form 10-K, but renamed to "Risks Related to Our Relationhships (the "Relationship Risk Factor") and explained that the Company's "policies, procedures, and practices" for avoiding conflicts of interest with, *inter alia*, Defendants Ocwen and Erbey included having Defendant Erbey recuse himself from transactions with related parties.  It stated:

> We follow policies, procedures and practices to avoid potential conflicts with respect to our dealings with Ocwen, HLSS, AAMC and Residential, including our Chairman recusing himself from negotiations regarding, and approvals of, transactions with these entities. We also manage potential conflicts of interest through oversight by independent members of our Board of Directors (independent directors constitute a majority of our Board of Directors), and we will also seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Ocwen, HLSS, Residential and AAMC….

146.    Altisource's Forms 10-Q for the first, second and third quarters of 2014, filed on April 24, 2014; July 29, 2014; and October 23, 2014, respectively, were all signed by Defendant Esterman, and incorporated the same Relationship Risk Factor from the Altisource 2013 Form 10-K identified in ¶145, above.

147.    Ocwen also assured the market that conflicts of interest were managed by the companies and that the related party transactions were negotiated at arm's length.  Specifically, on February 27, 2014, Ocwen held an earnings conference call the day following the release of the February 26 DFS Letter that raised serious concerns regarding potential conflicts of interest between Altisource and Ocwen (the "February 27, 2014 Ocwen Call").   During this call, Erbey directly addressed the February 26 DFS Letter and assured the market that the companies' agreements are on an arm's-length basis and thus, that the allegations made by the DFS were inaccurate:

> [Ocwen] received a letter yesterday from the DFS asking about our relationships with four related companies, independent companies. I would note that the agreements among the companies are fully disclosed in our public SEC filings and we believe them to be on an arm's-length basis. We look forward to addressing the matters raised by DFS and will fully cooperate.

148.    During the question and answer session of the February 27, 2014 Ocwen Call, Erbey was asked to explain the manner in which the companies addressed potential conflicts of interest.  In response, Erbey deflected the question and responded that the companies had been "very complete and open about what [the related party] relationships are" and had provided "full

<u>disclosure</u>" about the business relationships between Ocwen, Altisource and the other related companies. Ocwen's CEO expanded on Erbey's response, explaining that Ocwen's purported "full disclosures" about the related party agreements were material to investors, noting that the disclosures "are an important element of the investors' decisions to be reached."

149.    Defendants' statements about managing potential related party conflicts of interest were false and misleading.  Contrary to Defendants' statements that they maintained "robust related party transaction approvals" and that Erbey recused himself from related party transactions, as Erbey failed to recuse himself from a number of such transactions.  The companies statements about managing potential conflicts of interest were also false and misleading because the companies had overlapping senior management.

150.    Specifically, the above statements in ¶¶138-149 concerning Altisource's "sound Corporate Governance," "separate management," "transparency in inter company relationships," and Erbey's recusal from all negotiations and approval of transactions between Altisource and Ocwen, were materially false and misleading.  As has now been admitted in the 2014 Consent Order, there were at all times throughout the Class Period "widespread conflicts of interest" between Altisource and Ocwen that funneled revenues to Altisource by forcing Ocwen-serviced borrowers to overpay for products and services, and caused Altisource and Ocwen to co-employ common top executive officers, including their Chief Risk Officer, who could not effectively serve both companies.

151.    Indeed, it was first partially revealed in the August 4 DFS Letter and admitted in the 2014 Consent Order that, contrary to statements made by both companies and Defendant Erbey himself, Erbey violated the companies' policies and failed to recuse himself in "a number of transactions between [Altisource and Ocwen] or from which Altisource received some benefit" including, but not limited to the pass-through force-placed insurance arrangement by which Altisource earned $65 million per year in exchange for little, if any work. The NY DFS characterized "Erbey's approval of this force-placed insurance arrangement as . . .  <u>a gross violation of this supposed recusal policy</u>."

152.     Further, the above statements in ¶¶138 & 143 concerning the identity of Altisource's Chief Risk Officer and Altisource's and Ocwen's "separate management" were false and misleading.   In particular, the companies' representation that they had "separate management" – a statement that assured investors that conflicts of interest were being managed – was false because in reality, the companies employed the same Chief Risk Officer, among other senior managers.   As the NY DFS revealed, Ravi concurrently served as the Chief Risk Officer of Altisource and Ocwen until sometime shortly before the issuance of the February DFS Letter and reported directly to Mr. Erbey in both capacities.

153.     CWs further confirmed that Ravi and other senior managers (including the Director of Quality Assurance) were employed by both companies.   CWs also described how the Companies were run as one entity.   Indeed, CW1 described how all of the "c" [Chief] level executives "were running the things together" at both companies, and that everyone at Altisource "basically worked for Ocwen."   CW1 represented that the separation was essentially fictional and acknowledged with a "wink."   Similarly, CW2 and CW3 further confirmed how, contrary to being "separate[ly] manage[d]," executives from both companies – including Defendants Erbey and Shepro – regularly participated in joint weekly and quarterly meetings, where both companies' business was discussed.

**B.     False and Misleading Statements And Omissions Concerning The "Market Rates" Charged For Services Provided Under Altisource's Exclusive Arrangements With Ocwen**

154.     Throughout the Class Period, Defendants repeatedly represented that the services and technologies that Altisource provided to Ocwen – including the fees charged by Hubzu, the Company's online auction real estate site – were priced at "market rates."   These representations communicated to investors that Altisource was engaging in arm's-length transactions with Ocwen and not colluding with them to overcharge Ocwen borrowers that were forced to use Altisource's services and products.

155.    The Altisource 2013 Q1 10-Q represented that Altisource "record[s] revenue we earn from Ocwen under various long-term servicing contracts <u>at rates we believe to be market rates</u> as they are consistent with one or more of the following: the fees we charge to other customers for comparable services, the fees Ocwen pays to other service providers, fees commensurate with market surveys prepared by unaffiliated firms and fees charged by our competitors."  The revenue generated from these services included both "revenue earned directly from Ocwen and its subsidiaries and revenue earned from the loans serviced by Ocwen," *i.e.*, from fees charged to and paid by Ocwen borrowers.  The Altisource 2013 Q1 10-Q also identified the Company's revenue from Ocwen by segment (Mortgage Services, Technology Services and Financial Services) and stated that:

> Services provided to Ocwen during such periods included residential property valuation, real estate asset management and sales, trustee management services, property inspection and preservation, closing and insurance services, charge-off mortgage collections, core technology back office support and multiple business technologies including our REALSuite of products.  <u>We provided all services at rates we believe to be comparable to market rates</u>.

156.    Altisource repeated the statement identified in ¶155 above in each of the Company's subsequent Class Period quarterly reports and the Altisource 2013 Form 10-K.  These quarterly reports were filed with the SEC on July 25, 2013; October 24, 2013; April 24, 2014; July 29, 2014; and October 23, 2014.

157.    Ocwen made the same or substantially similar representations to the market regarding the purportedly "<u>market rates</u>" charged by Altisource under the companies' long-term service agreements.  Specifically, Ocwen assured the market that it had determined that the "market rates" charged by Altisource were "consistent with one or more of the following fees: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other services providers."  For example, the Ocwen 2013 Q1 Form 10-Q discussed Ocwen's agreements with Altisource as follows:

> Our business is currently dependent on many of the services and products provided under these long-term contracts [with Altisource] which are effective through 2025. The contracts include renewal provisions. <u>We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.</u>

158.    Ocwen repeated the statement identified in ¶157 above in each of its subsequent Class Period quarterly reports and the Ocwen 2013 Form 10-K.  These quarterly reports were filed with the SEC on May 8, 2013; August 6, 2013; November 5, 2013; May 2, 2014; August 18, 2014; and October 31, 2014.

159.    As described above, the inflated, above-market rates charged by Altisource through its online real estate auction site Hubzu were partially revealed in the April 21 DFS Letter in which the NY DFS raised "serious concerns" that Altisource was engaging in "conflicted business relationships" with Ocwen to charge Ocwen customers inflated fees that were "up to three times the fees charged to non-Ocwen borrowers."   Defendant Shepro responded to the NY DFS Hubzu accusations during Altisource's first quarter 2014 earnings call on April 24, 2014.  During the call, Defendant Shepro falsely assured investors that while the NY DFS's inquiries "primarily relat[e] to Hubzu," <u>"[w]e firmly believe that Altisource's asset management business provides a very transparent and efficient method to sell real estate [and] , that the fees we charge are in line with or lower than industry standards.</u>"  Defendant Shepro further explained, in response to analysts' questions about Hubzu, that Altisource's "overall strategy is to <u>align [its] pricing to the market, [to beat] the market or lower</u>," "<u>we feel very comfortable that the pricing we charge is in line with or lower than market</u>," and "<u>we are charging the same or less than anyone else would typically charge a servicer for the services that we provide and we charge other customers in line with what we charge Ocwen.</u>"

160.    Altisource's and Ocwen's statements concerning the "market rates" Altisource purportedly charged for services under its long term services agreement with Ocwen, including

with respect to Hubzu, were false and misleading.  As the NY DFS concluded following an extensive investigation with access to internal documents and employees, Hubzu charged "up to three times" more for its services to Ocwen than to other customers.  According to the April 21 DFS Letter, Ocwen's own internal documents demonstrated that "when Ocwen selects its affiliate Hubzu to host foreclosure or short sale auctions on behalf of mortgage investors and borrowers, the Hubzu auction fee is 4.5%; when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%."  The NY DFS further uncovered that the underlying HTML code for Hubzu's website queries whether Ocwen is the seller of the property being listed on Hubzu and, for those properties where Ocwen was the seller, imposed higher fees.  Indeed, Ocwen admitted in the 2014 Consent Order that "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors."

161.    Altisource's and Ocwen's statements concerning the "market rates" Altisource charged for services under its long-term services agreement with Ocwen were also false and misleading because Altisource overcharged Ocwen borrowers for valuation estimates and appraisals.  Specifically, CW8 stated that Ocwen's "entire [valuation] operation was completely delegated to Altisource."  CW8 explained that Altisource was responsible for choosing the form of appraisal and would then pass on the cost of the appraisal to borrowers through Ocwen.  With Ocwen's knowledge, however, Altisource regularly overcharged borrowers for appraisals and pocketed the difference.  CW8 described this overcharging as "the business model of Altisource . . . [charging] substantially above market rate for the [appraisal]."

162.    Furthermore, Altisource's and Ocwen's statements concerning the "market rates" purportedly charged for Altisource services were false and misleading because, as the NY DFS explained in the April 21 DFS Letter and Defendant Ocwen admitted in the 2014 Consent Order, Altisource subsidiary REALHome Services and Solutions, Inc. overcharged Ocwen-serviced borrowers for out-of-state agents who did not perform the required onsite work and lacked sufficient knowledge and relevant expertise to justify the charges.

163.    In addition, Altisource charged Ocwen above-market rates for its IT services, including the REALServicing platform. CW2 explained that employees that joined Ocwen in connection with the acquisition of mortgage servicing rights from Litton and Homeward, commented to CW2 that Altisource charged Ocwen three to five times what other vendors were charging competitors for the same services.   This information was confirmed to CW2 by Ocwen's Chief Investment Officer who was tasked with comparing costs of Litton and Homeward to Ocwen.

### C.    Statements Concerning The Effectiveness Of REALServicing And Its Ability To Comply With The Law

164.    From the very start of the Class Period, Defendants repeatedly touted the effectiveness and regulatory compliance of Altisource's technology and services, and in particular, the quality, effectiveness, compliance, and scalability of the REALServicing platform.

165.    In the Altisource 2013 Q1 10-Q, the Company touted its REALServicing platform as "[a]n enterprise residential mortgage loan servicing product that offers an <u>efficient and effective platform</u> for loan servicing including default administration."

166.    Altisource repeated the statement identified in ¶165 above in each of the Company's Class Period quarterly reports, as well as in Altisource's Form 10-K for 2013.  As stated above, the Forms 10-Qs were signed by Defendant Esterman and filed with the SEC on July 25, 2013; October 24, 2013; April 24, 2014; July 29, 2014; and October 23, 2014. Altisource's Form 10-K for 2013 was signed by the Individual Defendants and filed on February 13, 2014.

167.    Altisource further stressed REALServicing's focus on compliance during the Company's April 25, 2013 earnings conference call.   On that call, a Piper Jaffray analyst questioned Defendants about the onboarding of loans from Ocwen's acquisitions of Homeward and ResCap, and Altisource's capacity to handle additional loans from Ocwen in the near term. Specifically, the Piper Jaffray analyst asked why there was a delay in uploading and boarding

certain loans onto REALServicing. In response, Shepro stated: "we just want to make sure that . . . everything . . .  from a compliance perspective is in place to service the Fannie loans and to comply with all of the ResCap's obligations before we service transfer those loans onto REALServicing.  And so that's all going along in accordance with our project plan and the expected timing."

168.    Ocwen also extolled the REALServicing platform.  Indeed, on May 8, 2013, in Ocwen's 2013 Q1 10-Q, Ocwen stated that REALServicing as a "low cost," "high quality," and quickly scalable servicing platform:

> We expect that other non−prime and prime servicing platforms and servicing portfolios will come to market in the next several months. We are currently tracking potential MSR acquisition opportunities with a total UPB of approximately $375.0 billion. We believe that servicing and subservicing opportunities with an aggregate UPB of up to $1.0 trillion could come to market in the next 2 to 3 years. To the extent that we find these opportunities to be attractive, we believe that we are positioned to effectively compete for such opportunities in light of our low cost and our high−quality servicing platform. Our technology also provides us the ability to quickly scale our servicing operations to handle acquired loan portfolios.

169.    Defendant Erbey made similar statements about REALServicing's low cost and effectiveness during an August 1, 2013 conference call hosted by Ocwen in connection with its second quarter 2013 earnings, where he emphasized that "Ocwen enjoys substantive and sustainable competitive advantages within the servicing business, both in terms of cost and performance."  Erbey added that "Ocwen's cost to service non-performing loans is 70% lower than the industry average," and that REALServicing allows Ocwen "to manufacture new capacity more efficiently and effectively than other servicers."  Ocwen's Forms 10-Q for the second and third quarters of 2013, dated August 6, 2013 and November 5, 2013, respectively, made similar statements regarding REALServicing's "low cost, high quality servicing platform": "[W]e believe that we are positioned to effectively compete for such opportunities in light of our

low cost, high-quality servicing platform. Our technology also provides us the ability to quickly scale our servicing operations to handle acquired loan portfolios."

170.   Erbey also highlighted the platform's scalability as essential to the Company's compliance.  Specifically, Erbey addressed the companies' increasing regulatory scrutiny at the December 2013 Investor Day Conference, stating during the conference call that "[c]ertainly looking at regulations and being compliant is at the top of the list" of the companies' priorities and reassured investors that all of the regulatory scrutiny is "on balance . . . actually positive for us since we have scale."

171.   On February 13, 2014, Altisource held an analyst conference call following the release of its full-year and fourth quarter 2013 financial results. During the conference call, Defendant Shepro assured investors that: "Our relationship with Ocwen is a strong and growing foundation for our business and remains an important priority for us.  We continue to focus on providing high-quality compliance services to enhance their competitive position."

172.   Just two weeks later, Ocwen filed a Form 8-K announcing the release of its full-year and fourth quarter 2013 financial results in which it represented that "[w]e continue to focus our attention on regulatory compliance and on assisting struggling homeowners" and "[d]uring 2013 we made significant progress in enhancing our compliance management system."

173.   Ocwen's 2013 Form 10-K lauded Altisource's REALServicing platform as providing a competitive advantage that helped Ocwen navigate an increasingly complex regulatory environment.  For example, Ocwen's 2013 Form 10-K stated that REALServicing is "the most scalable servicing platform in the industry primarily as a result of our access to superior technology," Ocwen further stated in its 2013 Form 10-K:  "We also believe that our [REALServicing] platform enables us to operate in a compliant manner in an increasingly complex and highly regulated environment."

174.   On April 24, 2014, Altisource held an earnings conference call following the release of its first quarter 2014 financial results, wherein Defendants Erbey and Shepro further assured investors regarding the compliance of Altisource's services.  At the beginning of the call,

Erbey noted that Altisource was "making good progress" on its strategic initiative" to have a "robust, world-class compliance management system."  Specifically, Erbey then added, "[w]ith respect to Ocwen, we continue to focus on providing high-quality compliance services to enhance their competitive position."  Defendant Erbey attributed Altisource's success to its "compliance focus."  Defendant Shepro similarly assured investors on the April 24, 2014 conference call that "[o]ur first initiative and primary focus is providing high quality compliant services to Ocwen's servicing portfolio."

175.   The Individual Defendants also assured investors of Altisource's and Ocwen's regulatory compliance in a conference call on July 24, 2014, following the release of Altisource's second quarter 2014 financial results.  Defendant Erbey discussed how Altisource's "compliance focus has been and will continue to be a contributing factor to our success" because of the Company's ability to successfully "operate in a highly regulated environment with oversight from many regulatory authorities."  Erbey emphasized to investors Altisource's "world-class compliance management system" that "provid[ed] our customers with high-quality services in a compliant manner."  Defendant Shepro similarly emphasized on the conference call that Altisource is "executing well against [its] strategic plan, which focuses on developing a diversified revenue stream, long-term growth and strong cash flow generation, driven by the delivery of high-quality compliance services." Likewise, Defendant Esterman stated on the call that "[w]e are very pleased with our operating results as we continue to focus on compliance, quality, and efficiency initiatives expanding service offerings and investing in our next generation technologies and other growth initiatives."

176.   The next week, on July 31, 2014, Ocwen hosted its quarterly earnings conference call, during which Defendants attempted to minimize the accusations by the NY DFS. Defendant Erbey stated that "Ocwen is deeply committed to adhering to the highest standards of compliance and regulatory oversight."

177.   On October 24, 2014, Altisource held an earnings conference call following the release of its third quarter 2014 financial results and just three days after the release of the

October 21 DFS Letter.  On this call, the Individual Defendants touted Altisource's performance and prospects, and reassured investors regarding the compliance of Altisource's services in the wake of the DFS Letters.  On the call, Defendant Shepro stated that "the number one strategic objective of Altisource's management team was "helping Ocwen maintain its leadership position and providing sensible loan modifications and helping it run a profitable, efficient and <u>compliant operation</u>."

178.    The above statements in ¶¶164-177 regarding the legal and regulatory compliance of Altisource's REALServicing technologies and services were false and misleading because, as Ocwen admitted in the 2014 Consent Order, Defendants maintained "inadequate and ineffective" information technology systems for the servicing of mortgage loans.  Ocwen specifically admitted in the 2014 Consent Order that its "failure to fulfill its legal obligations" stems from its reliance on "[Defendants'] <u>inadequate systems . . . to service its portfolio of distressed loans.</u>"  Moreover, as set forth in the 2014 Consent Order, Defendants' patently "inadequate infrastructure" has resulted in non-compliance with applicable regulations and legal obligations, including reforms that were required to be implemented under Ocwen's 2011 Agreement with the NY DFS.  For example, as Ocwen admitted in the 2014 Consent Order, "Defendants regularly supplied borrowers with incorrect or outdated information" and "pursued foreclosure even while modification applications were pending ('dual tracking')."  Furthermore, as Defendants admitted in the 2014 Consent Order, the REALServicing platform "is unable to maintain accurate records; relies on inadequate infrastructure; and has insufficient controls in place to catch and resolve the foregoing errors."

179.    Additionally, the above statements in ¶¶164-177 regarding "effectiveness" and "scalability" of Ocwen's REALServicing platform were false and misleading because Defendants omitted to disclose that the technology could not adequately handle, from a compliance perspective, the massive influx of loans being boarded onto the platform in connection with Ocwen's mortgage servicing rights acquisitions.  Former Ocwen and Altisource employees confirm that as CW1 stated, Altisource was "not ready" for the growth it achieved.

CW9 described how CW9 concluded "pretty quickly" in 2013 that Altisource's REALServicing platform "[was not] going to be in compliance."

180.    Contrary to Altisource's and Ocwen's representations that REALServicing was "scalable," "effective" and "compliant," the NY DFS determined and Ocwen admitted in the 2014 Consent Order that in reality, Defendants' REALServicing platform consisted of a "patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible" and an "unnecessarily complex system of comment codes" for initiating servicing processes that "ballooned to more than 8,400 such codes."

181.    Contrary to Altisource's and Ocwen's representations to the market, Altisource's REALServicing platform was unable to manage the growth in Ocwen's servicing portfolio during the Class Period while ensuring compliance with all applicable regulations.  For example, as set forth in the October 21 DFS Letter and confirmed in the 2014 Consent Order, the NY DFS's investigation "uncovered serious issues with Ocwen's systems and processes, including Ocwen's backdating of potentially hundreds of thousands of letters to borrowers, likely causing them significant harm." Indeed, the failures of the REALServicing platform frequently caused Ocwen-serviced borrowers to receive backdated loan modification request denial letters.  As a result, by the time the homeowner received Ocwen's denial, which was "dated more than 30 days prior to the date that Ocwen mailed the letter," the mandatory thirty-day appeal period required by various applicable regulations had already expired.  Additionally, the October 21 DFS Letter outlined "inconsistencies in Ocwen's servicing system that call into question the accuracy and reliability of Ocwen's recordkeeping."

182.    Statements regarding the superiority and compliance of the REALServicing platform compared to other platform options in the industry were false because Ocwen acquired a competitor technology platform similar to REALServicing as a result of its Homeward and ResCap purchase at the start of the Class Period.  According to CW4, on a weekly basis throughout 2013, Ocwen and Altisource management, including S.P. Ravi and Ocwen CEO Faris, was informed of REALServicing's significant compliance-related deficiencies and urged to

use FiServ – the servicing platform that ResCap had used to comply with, among other things, the National Mortgage Settlement and applicable CFPB regulations – and to abandon REALServicing, which had proved to be incapable of complying with the regulations. Nonetheless, a decision was made by top executives to transfer all loans to the inferior REALServicing platform and not to use the superior FiServ platform.

### D.   Statements Concerning Altisource's Revenues From Related Party Transactions With Ocwen

183.    As discussed above, Altisource's business operations, financial performance, and future prospects were highly dependent on Ocwen.  Altisource derived the substantial majority of its revenues during the Class Period from transactions with Ocwen, which was the Company's number one customer and principal source of business from the time of Altisource's spin-off in 2009 and continuing through the end of the Class Period.  For example, 60% and 65% of the Company's total revenue in 2012 and 2013, respectively, was realized from providing services to Ocwen.  As one analyst noted after the 2014 Consent Order, "more than 60% of [Altisource's] business was tied to [Ocwen]-related sources.  All of this is at risk under the DFS Settlement."

184.    Altisource's Forms 10-K and 10-Q filed during the Class Period specifically identified Altisource's revenues from transactions with related parties, including Ocwen, as set forth on the table below.  As this table indicates, virtually all of the Company's related party revenue was generated from Ocwen:

| Altisource Revenue Transactions with Related Parties (amounts in millions, rounded) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Segment | FY 2012 | Quarter Ended | | | | FY 2013 | Quarter Ended | | | Class Period Totals |
| | | Mar 31 2013 | Jun 30 2013 | Sep 30 2013 | Dec 31 2013 | | Mar 31 2014 | Jun 30 2014 | Sep 30 2014 | |
| **Mortgage Services** | | $44.2 | $62.1 | $76.5 | $81.6 | $264.4 | $80.6 | $103.9 | $100.1 | $730.9 |
| | | 21.6 | 24.8 | 10.9 | 41.7 | 99.0 | 26.2 | 22.7 | 14.8 | 236.1 |
| Asset management serv. | $181.9 | 9.5 | 9.8 | 27.5 | (4.4) | 42.5 | 11.0 | 18.6 | 25.4 | 135.2 |
| Insurance services | 73.4 | 4.4 | 4.3 | 4.6 | 3.3 | 16.5 | 4.2 | 3.0 | 3.1 | 40.4 |
| Resid. property valuation | 37.8 | 0.2 | 0.4 | 0.6 | 0.5 | 1.7 | 0.4 | 0.5 | 0.8 | 3.4 |
| Default mgt. services | 13.5 | | | | | | | | | |
| Origination mgt. services | 0 | 79.9 | 101.3 | 120.1 | 122.8 | 424.0 | 122.4 | 148.6 | 144.1 | 1,146 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Mortgage Services From Related Parties** | **306.8** | | | | | | | | | |
| **Financial Services** | | | | | | | | | | |
| Asset recovery mgt. | **0.2** | **0** | **6.7** | **10.1** | **10.8** | **27.6** | **6.3** | **7.1** | **8.2** | **49.5** |
| **Technology Services** | | | | | | | | | | |
| REALSuite, Equator and Mortgage Builder | 20.9 | 7.2 | 8.8 | 8.4 | 9.6 | 34.0 | 11.3 | 12.6 | 13.6 | 92.6 |
| IT infrastructure services | 10.3 | 3.0 | 4.5 | 5.0 | 4.0 | 16.5 | 5.5 | 10.6 | 12.2 | 55.1 |
| **Total Technology Services From Related Parties** | **31.2** | **10.2** | **13.3** | **13.4** | **13.6** | **50.5** | **16.8** | **23.3** | **25.8** | **147.7** |
| **Total Revenue From Related Parties** | **338.2** | **90.1** | **121.2** | **143.6** | **147.2** | **502.1** | **145.6** | **179.0** | **178.2** | **1,343** |
| **Total Revenue From Ocwen** | **338.2** | **89.8** | **121.0** | **142.7** | **n/a** | **n/a** | **144.9** | **175.0** | **171.7** | **1,330** |
| **Ocwen Revenue, as % of Related Party Revenue** | **100%** | **99.7%** | **99.8%** | **99.4%** | **n/a** | **n/a** | **99.5%** | **97.8%** | **96.4%** | **99.1%** |

185.    Of the Company's three main business segments, Altisource derived the greatest amount of overall revenue and related party revenue from its Mortgage Services segment.  As set forth in the table above, two categories of services within the Mortgage Services segment consistently accounted for the overwhelming majority of reported related party revenue during the Class Period: (i) asset management services, including Hubzu, for which the Company reported related party revenues of approximately $730.9 million during the Class Period; and (ii) insurance services, including the Company's forced-placed insurance line of business, for which the Company reported related party revenues of approximately $236.1 million during the Class Period.  The Company's second largest segment by revenue was the Technology Services segment.  Within this segment, the REALSuite of software applications, including REALServicing, comprised the majority of reported related party revenue during the Class Period.  Specifically, the Company reported REALSuite revenues of approximately $92.6 million during the Class Period.

186.    These Ocwen-derived revenues were falsely represented as the result of contracts

that had been purportedly negotiated and implemented on an arm's-length basis between the companies during which Erbey recused himself, and that Ocwen and Ocwen borrowers were charged "market rates" for Altisource's services. In reality, Altisource's Ocwen-derived revenue was the result of conflicted negotiations and agreements from which Erbey failed to recuse himself, and products and services that were not sold at market rates.

187.    The revenues set forth on the table above and specifically identified in the Company's Forms 10-Q and 10-K filed during the Class Period were false and misleading and/or omitted material facts regarding the Company's business and operations. Specifically, the statements above failed to disclose: (i) the true nature of the relationship between Altisource, Ocwen, and the Ocwen-related parties; (ii) that the transactions that took place between these related parties were the result of an unfair process from which Defendant Erbey secretly failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the revenues were inflated and not sustainable because they were derived from (a) services provided at above-market rates; (b) services that Altisource was already obligated to provide under other agreements with Ocwen; (c)  no legitimate services being provided at all; and/or (d) unlawful commissions and kickback arrangements with Ocwen and other related parties.

188.    Revenues that the Company received from Ocwen during the Class Period were not the result of arm's-length negotiations, but were the result of unlawful self-dealing and kickbacks that overcharged Ocwen borrowers and over-compensated Altisource on certain fees and payments.  For example, as the Company acknowledged in the 2014 Consent Order, certain of the Company's highest-margin services, including Hubzu, were provided to Ocwen borrowers at above-market rates.  Similarly, other lucrative revenues derived through Ocwen were the result of minimal or no legitimate services being provided by Altisource, including at least $65 million in annual revenues derived through an unlawful force-placed insurance kickback scheme. Consequently, the Company's disclosures concerning its transactions with Ocwen and Ocwen-related companies implied that Altisource's non-Ocwen business was more profitable than it really was and did not provide a fair presentation of the Company's finances, operations, and

prospects.   As a result of the above, the Company's statements were materially false and misleading at all relevant times and lacked any reasonable basis when made.

### E.     Shepro And Esterman Falsely Certify The Contents Of Altisource's SEC Filings

189.    Altisource's 2013 Q1 10-Q contained a Sarbanes-Oxley required certification, signed by Defendant Shepro.  This certification stated that Defendant Shepro had "reviewed the quarterly report" and that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

190.    The representation set forth above, in ¶189, was repeated in Sarbanes-Oxley required certifications contained in the Altisource quarterly reports filed on Forms 10-Q for the second and third quarters of 2014; the Form 10-K for 2013; and the Forms 10-Q for the first, second and third quarters of 2014.  Defendants Shepro and Esterman signed these certifications, which were materially false and misleading for all of the reasons set forth above.

## VI.    THE TRUTH BEGINS TO EMERGE

191.    Beginning in February 2014, the truth about Altisource's and Ocwen's unchecked conflicts of interest, improper related party transactions, kickback arrangements and the inadequacy of REALServicing to service Ocwen's loans in compliance with the law gradually began to be revealed to the market. These announcements surprised investors because Ocwen and Altisource had repeatedly represented that they operated on an arm's-length basis, followed specific practices to avoid conflicts of interest and maintained an effective and compliant servicing platform.  However, in an attempt to quiet market concerns, Defendants' denied that they engaged in any conflicted related party transactions and assured investors that all

transaction were at "arm's-length." The market ultimately learned the full truth in December 2014 with the release of the 2014 Consent Order.

**A. The NY DFS Suspends Ocwen's Acquisition Of New Mortgage Servicing Rights Due To Concerns About REALServicing**

192. On February 6, 2014, Ocwen announced that its planned acquisition of $39 billion worth of mortgage servicing rights from Wells Fargo was suspended at the direction of the NY DFS due to "concerns about Ocwen's servicing portfolio growth." The NY DFS's suspension of the Wells Fargo transaction raised investors' concerns about Ocwen's and Altisource's business and growth prospects as the regulator focused on Ocwen's ability to process loans using Altisource's REALServicing platform, in a manner that complied with the law. Indeed, as reported by *The New York Times* on February 7, 2014, the regulator's "move to delay the Wells Fargo transaction, which was announced two weeks ago, or future transactions could complicate Ocwen's strategy of increasing its revenue by acquiring more servicing rights from the big banks."

193. Indeed, analysts connected the suspension of the Wells Fargo transaction to Altisource's business prospects. For example, Piper Jaffray issued a report covering both companies together on February 6, 2014 entitled "OCN/ASPS: NY Regulator Threatens to Halt OCN's $39B Wells Fargo UPB Acquisition," which discussed the impact of the suspension on both Ocwen's and Altisource's stock prices.

194. Ocwen's February 6, 2014 announcement caused Altisource's share price to decline $7.89, or nearly 6%, from a close of $133.40 per share on February 5, 2014 to $125.51 per share on February 6, 2014.

195. NY DFS Superintendent Lawsky provided additional details underlying the reasons for the suspension the following week when he revealed "serious concerns" over possible technological weaknesses in Ocwen's loan servicing platform. During a February 12, 2014 speech given to the New York Bankers Association, the text of which was released publicly

that same day, Superintendent Lawsky explained that the NY DFS had "serious concerns that some non-bank mortgage servicers are getting too big, too fast" because of seemingly unrealistic promises made concerning their "scalable technology [that can] grow with their business" and provide "efficiencies" that seemed "too good to be true." Lawsky discussed how one particular servicer (referring to Ocwen) was telling the market that it could acquire trillions of dollars of mortgages in the next 2-3 years, while the NY DFS investigation showed that the servicer's "computer systems containing critical borrower information" (referring to REALServicing) were not working properly and resulted in "struggling homeowners getting caught in a vortex of lost paperwork, unexplained fees, and avoidable foreclosures." Investors understood Lawsky to be referencing Ocwen as the NY DFS's focus on limiting Ocwen's future acquisitions was well-publicized.

196.    On February 13, 2014, Altisource held its first call with investors since Ocwen announced the suspension of the Wells Fargo acquisition. On that call, Altisource tried to downplay the significance of the Wells Fargo suspension as it related to Altisource's business by focusing on the continued revenue the Company would realize from Ocwen and by telling analysts that questions about the suspension - that at least one analyst noted would "clearly have an impact on Altisource" - were better directed to Ocwen. For example, Defendant Erbey touted how Altisource would continue to "benefit" from "the loans we expect Ocwen to board on REALServicing in 2014." Similarly, Defendant Shepro emphasized that "[o]ur relationship with Ocwen is a strong and growing foundation for our business and remains an important priority for us. We continue to focus on providing high-quality compliance services to enhance their competitive position."

197.    Analysts, however, were concerned about the suspension's impact on Altisource's revenue given how important Ocwen's acquisitions were to Altisource's business. For example, a Millennium Partners analyst pressed Shepro and Erbey for information about how the suspension would affect Altisource, asking:

> [C]an you just comment; when a company that has a huge
> customer like Ocwen as part of the business model runs into a
> problem like this, how do you see that? The commentary coming
> from [NY DFS Superintendent] Lawsky himself suggests that
> Ocwen will not be winning any new business for an extended
> period of time.  So how would you suggest modeling the future
> based on how we have been modeling the past?

198.    When Erbey and Shepro refused to answer these questions directly, the
Millennium Partners analyst continued to ask follow-up questions, such as "[d]o you have any –
just conceptually on what is going on right now, do you feel like this is the early stages of what
Lawsky might do? . . . It is just hard to start modeling the future a few days after this news
breaks, which is pretty significant news. Is there anything you can add other than just saying let's
let Ocwen answer that?"  Erbey and Shepro represented that they had nothing to add.

**B.**     **The February 26 DFS Letter Raises Concerns Over Serious Conflicts of
Interest Between Altisource And Ocwen**

199.    Less than three weeks later, on February 26, 2014, the NY DFS issued a letter
detailing concerns about "potential conflicts of interest between Ocwen and other public
companies with which Ocwen is closely affiliated, including Altisource." In particular, the
February 26 DFS Letter identified S.P. Ravi's dual role as Chief Risk Officer of both Ocwen and
Altisource, and indicated that the NY DFS had uncovered other potential conflicts between
Ocwen, Altisource, and the three other related companies (Residential, AAMC and HLSS).
According to the February 26 DFS Letter, these relationships "cast serious doubts on recent
public statements" that Ocwen has a "strictly arms-length business relationship" with Altisource
and other affiliated companies   The NY DFS also noted that "Ocwen's management" and,
specifically, Defendant Erbey, the largest shareholder of [Ocwen and Altisource]," owned stock
or stock options in the affiliated companies, which "raises the possibility that management has
the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit
the share price of the affiliated companies, resulting in harm to borrowers, mortgage investors, or
Ocwen's shareholders as a result."

200.    As a result of these concerns, the NY DFS asked Ocwen to provide additional information and documents to the NY DFS monitor to assist in its ongoing review in this matter, including, among other things, information about: (i) the financial interests of Ocwen officers, directors, and employees in Altisource; (ii) the financial interests in Ocwen of officers, directors, and employees at Altisource; (iii) services provided by Altisource; and (iv) all policies, procedures, and practices employed by Ocwen and Altisource to avoid or mitigate potential conflicts of interest.

201.    In response to the February 26 DFS Letter, Altisource's share price declined $15.76 per share, or 13.5%, from a close of $120.35 on February 25, 2014 to close at $98.26 per share on February 26, 2014.   This decline eliminated more than $360 million in market capitalization.

202.    Ocwen responded to the February 26 DFS Letter in an earnings conference call held the next day, on February 27, 2014.   During that call, Defendant Erbey assured investors that the related-party agreements with Ocwen were "on an arm's-length basis," and that he "looked forward to addressing the matters raised by [the] DFS."

### C.    The April 21 DFS Letter Raises Concerns That Altisource Regularly Overcharges Ocwen Customers

203.    Less than two months after Ocwen and Erbey assured the market that the related-party agreements were "on an arm's-length basis" and Altisource and Erbey reaffirmed Altisource's controls on related party transactions (in the Company's April 7, 2014 Proxy), the NY DFS raised further "concerns regarding conflicted business relationships between Ocwen and Altisource."   Specifically, in the April 21 DFS Letter addressed to Ocwen, the NY DFS raised "significant concerns" that Altisource and Ocwen were engaged in self-dealing transactions that resulted in Altisource charging Ocwen customers three times the market rate for fees in order to inflate the Company's revenues.   The April 21 DFS Letter stated:

> The relationship between Ocwen, Altisource Portfolio, and Hubzu raises significant concerns regarding self-dealing. In particular, it

creates questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting borrowers and mortgage investors. Alternatively, if the lower fees are necessary to attract non-Ocwen business in the open market, it raises concerns about whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs.

204.    Based on its concerns, the NY DFS sought additional information to assist in its review of the relationship between Altisource and Ocwen.  For example, the NY DFS requested, among other things, information about: (i) whether "Ocwen use[s] any online auction site other than Hubzu;" (ii) the "percentage of Ocwen's online auction sales [] on Hubzu" and on other sites; and (iii) the "percentage of Hubzu's listings [] serviced by Ocwen."  The NY DFS also asked specific questions about the fees charged by Hubzu. For instance, the NY DFS asked that Ocwen "[p]lease confirm that Hubzu charges a 4.5% auction fee on auctions of properties serviced by Ocwen and a 1.5% to 3.5% fee on auctions of properties not serviced by Ocwen" and further asked about the services covered by this fee.

205.    In response to the April 21 DFS Letter, Altisource's share price declined $2.79, or approximately 2.4%, from a close of $117.03 on April 17, 2014, to $114.24 on April 21, 2014.

206.    Thereafter, Altisource falsely reassured investors that Altisource, Ocwen and Hubzu did not engage in a conflicted business relationship and denied that Hubzu charged Ocwen above market rates.  On an April 24, 2014 investor conference call, Defendant Shepro specifically addressed the NY DFS's letter and represented that, contrary to the assertions made by the NY DFS, Altisource "firmly believes" that Hubzu "provides a very transparent and efficient method to sell real estate [and] that the rates we charge are in line with or lower than industry standards."    In response to analyst questioning about the fees and services that Altisource provided to Ocwen, Shepro further emphasized that the NY DFS's concerns about Altisource's failure to charge market rates were unfounded, stating, "[n]o, we are charging the same or less than anyone else would typically charge a servicer for the services that we provide and we charge other customers in line with what we charge Ocwen."

207.    The market was mollified by these assurances.  Analysts from Sterne Agee noted in a report issued that day that the conference call "added clarity around Hubzu."  In a report issued April 25, 2014, Sterne Agee further stated that "[m]anagement commentary on . . . ASPS relative pricing parity vs. competitors provided some positive takeaways, but the regulatory overhang remains, until it is resolved."

### D.    The NY DFS Addresses The Risks That Altisource And Its Relationship With Ocwen Pose To Homeowners On May 20, 2014

208.    On May 20, 2014, in a speech to the Mortgage Bankers Association (the "May 20, 2014 Lawsky Speech"),  NY DFS Superintendent Lawsky provided greater detail regarding the threat posed to borrowers by Ocwen's and Altisource's affiliated relationship.  Lawsky explained that the Department's "review of non-bank servicers has also turned up another enormous profit center associated with these MSRs [Mortgage Servicing Rights] that could put homeowners and mortgage investors at risk: the provision of what we call ancillary services" whereby "an affiliate provides fee-based services for every single step in the real estate process."  As Superintendent Lawsky explained, this provision of services poses a threat to consumers because "there effectively is no customer to select its vendor for ancillary services.  Non-bank servicers have a captive (and often confused) consumer in the homeowner."  Superintendent Lawsky stated that "the potential for conflicts of interest and self-dealing are perfectly clear.  Servicers have every incentive to use these affiliated companies exclusively for their ancillary services, and they often do.  The affiliated companies have every incentive to provide low-quality services for high fees, and they appear in some cases to be doing so."  Superintendent Lawsky concluded his speech with a representation that the market "should expect [the NY DFS] to expand our investigation into ancillary services in the coming weeks and months."

209.    Given the NY DFS's prior letters raising concerns about the relationship between Ocwen and Altisource, the market understood that Lawsky's May 20, 2014 speech was directed, at least in part, at the relationship between Altisource and Ocwen, and that his investigation was

only in its early stages.   For example, in a May 20, 2014 article reporting on the speech, *HousingWire* stated that Lawsky was referring to Ocwen and Altisource when he addressed how servicers benefit from having related parties provide the ancillary services.   A May 20, 2014 article in *Mortgage Daily* also made the connection between Lawsky's speech and Ocwen and Altisource, as providers of ancillary services that Lawsky has been investigating.

210.   As a result of the speech, Altisource's stock price dropped 6%, from a close of $105.44 per share on May 19, 2014, to close at $99.15 per share on May 20, 2014.

**E.**   **The August 4 DFS Letter Raises Concerns That Defendants Lied About Erbey's Recusal From Conflicted Transactions And Engaged In A <u>Kickback</u> Arrangement**

211.   On August 4, 2014, the NY DFS published another letter, raising concerns regarding the provision of force-placed insurance to Ocwen borrowers through a "complex arrangement" with Altisource.   In its letter, the NY DFS detailed a "troubling transaction involving Ocwen's related company, Altisource" which, according to the NY DFS, "appears designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work."   The NY DFS cited to emails and evidence indicating that "<u>Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself</u>."

212.   The NY DFS also singled out Defendant Erbey's role in this "troubling transaction," including the fact that: "the role that [he] played in approving this arrangement appears to <u>be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings</u>" that he recuses himself from decisions involving related companies. The NY DFS characterized Defendant Erbey's role in the approval of this force-placed program as appearing to be a "gross violation of this supposed recusal policy."   The NY DFS further disclosed in its August 4 DFS letter that it had "<u>uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies</u>," despite Defendants' contrary representations to the market.

213.     While the August 4 DFS Letter identified "troubling" conduct, the NY DFS indicated that their investigation was ongoing and requested additional information and documents.  The requested documents and information focused on: (i) "the amount of revenue Altisource or its affiliates has realized" from the force-placed insurance arrangement; (ii) what services, if any, Altisource provided to receive payment in this transaction; (iii) how and why Mr. Erbey approved this force-placed insurance arrangement; (iv) every instance where Mr. Erbey has approved a transaction involving a related company notwithstanding Ocwen's statements to the contrary; and (v) whether Ocwen has performed any independent analysis to support the assertion that the rates charged under other related party agreements are market rates.

214.     Analysts reported on this news as equally applicable to both Altisource and Ocwen.  On August 4, 2014, Piper Jaffray issued an industry note on both Ocwen and Altisource, noting the NY DFS Letter "implies [Altisource] is benefiting from its relationship with [Ocwen] and buying expensive, high premium insurance on behalf of delinquent borrowers."

215.     In response to the August 4 DFS Letter, Altisource's share price plummeted $15.18 per share, or 14.6%, from a close of $103.83 on August 1, 2014 to close at $88.65 on August 4, 2014.  This decline eliminated approximately $330 million in market capitalization.

216.     Shortly thereafter, on August 18, 2014 Ocwen revealed to the market that, on June 12, 2014, the Company "received a subpoena from the SEC requesting production of various documents related to [its] business dealings with Altisource, HLSS, AAMC and [RESI] and the interests of our directors and executive officers in these companies."

**F.     The October 21 DFS Letter Raises "Serious Issues" With REALServicing**

217.     On October 21, 2014, the NY DFS publicly released another letter to Ocwen, detailing "serious issues with Ocwen's systems and processes" for mortgage loan servicing, including Ocwen's practices that "backdate[ed] potentially hundreds of thousands of letters to borrowers, likely causing significant harm."  The NY DFS expressed concern that "[t]he existence and pervasiveness of these issues raise critical questions about Ocwen's ability to

perform its core function of servicing loans."   According to Superintendent Lawsky, Ocwen's faulty "systems and processes" – the core of which is Altisource's REALServicing – caused "new, inaccurate records [to be] created with each passing day," ordering that these systems be fixed "without delay."   The October 21 DFS Letter concluded that "[t]he stakes for borrowers and investors are enormous. If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law.  If Ocwen cannot demonstrate immediately that it is capable of properly servicing borrowers' needs, the Department intends to take whatever action is necessary to ensure borrowers are protected."

218.   In response to this news, the Company's share price fell by $10.32, or 10.9%, from a close of $94.83 on October 20, 2014 to a close of $84.51 on October 21, 2014.

219.   That same day, Ocwen issued a press release attempting to minimize the scope and severity of the backdating problem.  In particular, Ocwen represented that the issue was "inadvertent," limited to only "283 borrowers in New York" and had been fully resolved. However, after the market closed that day, Ocwen issued a second press release retracting the above statement and admit that the problem was larger in scope than just 283 borrowers.  The second press release stated that Ocwen was aware of "additional borrowers in New York who received letters with incorrect dates" but could not quantify the scope of the problem.

220.   In response to this news, which further partially revealed the extent and severity of problems with Altisource's servicing technologies, Altisource's stock price declined an additional $15.40, or over 18%, from its close of $84.51 per share on October 21, 2014 to close at $69.11 per share on October 22, 2014.  In total, the declines in Altisource stock prices on October 21 and 22, 2014, collectively destroyed more than $570 million in shareholder market capitalization.

221.   The NY DFS's concerns about the "serious issues with Ocwen's systems and processes" directly implicated Altisource's REALServicing platform and other technologies upon which Ocwen was "dependent" to perform its core servicing function.  These revelations also raised concerns about whether these systems could be fixed such that Ocwen and Altisource

would be able continue to grow their businesses through Ocwen's acquisitions of servicing rights.   For instance, on the same day, October 21, 2014, Moody's downgraded Altisource, reporting that the "serious issues with Ocwen's servicing systems and processes" raised by the NY DFS directly impacted Altisource's rating because its rating is "driven in large part by their reliance on Ocwen."   Similarly, Sterne Agee analyst Henry Coffey advised investors to "avoid the OCN complex until we can get some clarity around this issue," and further noted that the inaccuracies in Ocwen's initial response to the DFS letter were particularly "disconcerting."

> **G.    Altisource Concedes The Impropriety**
> **of Its Force-Placed Insurance Contract**
> **On November 12, 2014**

222.    On November 12, 2014, before the market opened, Altisource surprised investors by announcing that the Company was entirely discontinuing its force-placed insurance program. In its press release announcing the termination of this highly-profitable line of business, Altisource blamed "uncertainties with industry-wide litigation and the regulatory environment" and explained that "it is in the best interest of the Company and its shareholders to discontinue this line of business and continue to focus attention and resources on developing and delivering leading innovative technology-driven products and services for the real estate and mortgage markets that will provide benefits to consumers, lenders, originators and other participants." Altisource disclosed that the termination of its force-placed insurance program would reduce the Company's quarterly earnings for the next five quarters by $0.50 to $0.65 per share.

223.    In an attempt to assure the market that there was nothing improper about its force-placed insurance business, the November 12, 2014 press release stated that: "<u>Altisource believes that it developed a lender placed insurance program that is unique in its benefits to consumers and investors</u>."

224.    In response to this news, Altisource's stock price declined $12.28, or nearly 17%, from its close of $72.78 per share on November 11, 2014 to close at $60.50 per share on November 12, 2014.   On November 13, 2014, Altisource's stock price continued to decline in

response to the news, falling an additional $5.50 per share, or 9.1%, from its close of $60.50 on November 12, 2014 to close at $55 on November 13, 2014.  In total, the declines in Altisource stock prices on November 12 and 13, 2014, collectively destroyed approximately $360 million in shareholder market capitalization.

225.    Analysts understood that Altisource's announcement was connected to the allegations set forth in the August 4 DFS Letter.  An analyst at Piper Jaffray echoed these sentiments, stating in a November 12, 2014 report that Altisource's decision was "a step in the direction of a potential settlement with the NY DFS."  A Sterne Agee analyst stated "We cannot imagine ASPS is dropping a line of business that appeared to be so significant to EPS just to avoid future litigation. . . . We think OCN is inching closer to a settlement [with Lawsky]."

### H.    Ocwen Admits That "Widespread Conflicts of Interest" With Altisource And The "Inadequate and Ineffective" REALServicing Platform Harmed Borrowers on December 22, 2014

226.    On December 22, 2014, before the market opened, the NYS DFS announced that it had entered into a sweeping Consent Order with Ocwen.  In the 2014 Consent Order, the NY DFS found and Ocwen admitted to "numerous and significant violations" of the law, including New York State laws and regulations and the terms of the 2011 Agreement, which required Altisource's regulatory compliance.   In particular, Ocwen admitted to having "widespread conflicts of interest with related parties," and "inadequate and ineffective information technology."  For example, Ocwen admitted to conflicts of interest surrounding "its relationship with Altisource Portfolio," including, (among other things discussed herein), by: (i) sharing the same Chief Risk Officer; (ii) allowing Altisource's subsidiary Hubzu to charge Ocwen-serviced borrowers above-market rates, and (iii) overcharging Ocwen-serviced borrowers for out-of-state agents who did not perform the necessary onsite work and lacked sufficient knowledge or expertise.  Ocwen also admitted that, contrary to Defendants' representations to investors during the Class Period, Defendant Erbey "has not in fact recused himself from approvals of several transactions" with Altisource, including the transaction approving Altisource's provision of force

placed insurance.   In addition, Ocwen also admitted that Altisource's REALServicing "information technology systems" for servicing mortgage loans were "inadequate," "ineffective," and "resulted in Ocwen's failure to fulfill its legal obligations."

227.   As a result of the NY DFS's findings and Ocwen's admissions, the NY DFS terminated Defendant Erbey from his position as Chairman of Ocwen, Altisource and the other related companies and also barred him from the receipt of any non-public information concerning the companies.  The NY DFS also barred him from serving in any other role at Ocwen, Altisource or any other related party.  The NYS DFS also required that Ocwen, Altisource and the other related companies not share any common officers or employees, among other significant operational and corporate governance changes.  Ocwen was also prohibited indefinitely from acquiring additional mortgage servicing rights unless and until it received prior approval from the NY DFS monitor, and meets benchmarks concerning REALServicing's ability to onboard newly acquired mortgage servicing rights and properly service both those newly acquired loans and its existing loan portfolio.  Ocwen was also required to pay a $100 million penalty to the NY DFS and an additional $50 million in restitution to current and former Ocwen borrowers in New York.

228.   In response to these shocking admissions and revelations, Altisource's stock price plummeted $16.05 from its close of $47.54 per share on December 19, 2014, to close at $31.49 per share on December 22, 2014, a one-day decline of 33.7% that destroyed more than $320 million in shareholder market capitalization.

229.   Analysts were stunned by the news that Ocwen had admitted to "widespread conflicts of interest" with Altisource and other related parties, and that it used an "inadequate and ineffective" mortgage servicing platform.  For example, in a December 23, 2014 report, analysts at Sterne Agee wrote that "[t]he settlement between Ocwen and the New York Department of Financial Services went way beyond anything we were anticipating and leaves at risk ASPS's major source of revenue—loss mitigation services provided for OCN or OCN related clients." The Sterne Agee analysts added that "[p]rior to walking away from its lender place insurance

business, ASPS's loss mitigation servicers represented approximately 65% of its overall business mix and more than 60% of its business was tied to OCN related sources. All of this is at risk under the DFS Settlement." As a result, Sterne Agee lowered its price target on ASPS shares from $50 to merely $30 – a startlingly low figure given that Altisource shares had traded at over $170 less than a year before.

230. With the announcement and release of the 2014 Consent Order, the market finally learned the full truth about Altisource's conflicted relationship and business dealings with Ocwen, lack of controls for managing such conflicts, inadequate and ineffective technology systems and services, inflated fee structures, and true financial circumstances and prospects. As a result, at least in part, of the disclosures set forth above from February 6, 2014 through until December 22, 2014, as the magnitude and severity of the conflicts of interests, self-dealing transactions and the REALServicing deficiencies were revealed, Altisource's stock price plummeted by $101.92, from $133.40 per share to $31.49 per share, a decline of 76.4%.

## I.     Post-Class Period Events

231. On January 12, 2015, after the market closed, the *Los Angeles Times* reported that the California Department of Business Oversight ("CDBO"), which licenses and oversees the operations of nonbank mortgage servicers in California, was seeking to suspend Ocwen's servicing license because Ocwen did not adequately respond to repeated information requests regarding its compliance with California's Homeowner Bill of Rights. Despite an escalating series of demands and a court order, the CDBO asserted that Ocwen failed to provide all the information the regulator was seeking in order to determine Ocwen's compliance with the Homeowner's Bill of Rights. As the *Los Angeles Times* reported, losing its California license would be a "big blow to Ocwen, which counts California as its biggest source of business."

232. On January 14, 2015, Moody's downgraded Altisource's Corporate Family Rating and Senior Secured Bank Credit Facility to B3 from B2. In its press release announcing the downgrade, Moody's explained that "the rating actions reflect the continued regulatory scrutiny

of Ocwen that could lead to the loss of their license to service loans in California along with the seriously impaired franchise value of the [Erbey Companies]."   Moody's added that the downgrade in Altisource's ratings was "driven by [its] reliance on Ocwen," noting that "as of Q3 2014 approximately 60% of Altisource's revenues were derived from its relationship with Ocwen."

233.   Also on January 14, 2015, reports of large-scale workforce reductions at Altisource began to emerge.  For example, *BostInno*, an online news site for the Boston area, reported that as many as 60 employees had been let go from Altisource's regional offices in Boston. The article also reproduced an online post that reported on "[m]assive firings in Altisource Bangalore . . . .  Around 300 shown Pinkslips today."  Later that day, Altisource issued a statement confirming it had "made the difficult but necessary decision to realign [its] employee base with the growth opportunities in front of Altisource."

234.   On January 16, 2015, Altisource held a conference call to discuss changes in the Company's business strategy following the 2014 Consent Order and other recent events. On the call, Defendants announced disappointing results, namely, projected pretax income for the fourth quarter 2014 of between zero and $4 million – an amount that equaled less than 10% of the previous quarter even under the most positive scenario – a staggering decline that Defendants "primarily" attributed to the discontinuance of the Company's force-placed insurance program, as well as "$8 million of higher costs in our technology services segment."   Defendants acknowledged that, consistent with the reforms instituted in the 2014 Consent Order, the growth the Company anticipated to experience through Ocwen had been negatively impacted and that "Ocwen is not likely to grow that much in the near-term."  As a result, during the fourth quarter Altisource was forced to dedicate "more resources to advance [its] customer diversification and growth initiatives" and focus on "realigning [the Company's] expenses for this new reality." Defendants also confirmed earlier reports of massive layoffs at the Company, including the elimination of "over 800 individual employee positions and hundreds of contractors across [Altisource's] geographical footprint."

235.    Significantly, during the January 16, 2015 conference call, Defendant Shepro tacitly confirmed that the 2014 Consent Order's references to "inadequate and ineffective" systems were referring to Altisource's REALServicing system."   In response to an analyst question whether the 2014 Consent Order was "a direct condemnation of the REALServicing System," Defendant Shepro did not deny this accusation, stating only that Altisource was "very proud to support Ocwen with technologies and services that we believe have contributed to Ocwen's success" and that "[o]ur objective as is Ocwen's is to provide high-quality technologies and services so that Ocwen and our other customers can meet their obligations in this rapidly changing regulatory environment."   Shepro admitted that Altisource anticipated having to spend more to meet its objective of providing high quality and compliant technologies and services, and acknowledged that the disappointing fourth quarter earnings "reflected the elevated spend."

236.    In a report released later that day, a Piper Jaffray analyst highlighted the fact that Altisource's margins had been significantly impacted by the discontinuance of the forced-placed insurance business and the "increased expenses associated with revenue growth expectations that have not materialized." In another report released on January 16, 2015, a Stern Agee analyst claimed Defendants had failed to "answer the broader existential questions about the viability of the loss mitigation and REO disposition business given recent events." The Stern Agee analyst explained that: "The unanswered question is what steps Altisource is taking to be sure that its fees and product offering will prove acceptable to some of its biggest antagonists (and biggest customers) mortgage-backed security note holders, state agencies, and other counter parties." The Stern Agee analyst emphasized that Defendants' optimistic revenue projections only work "if nothing at [Ocwen] changes and that nothing about [Altisource's] fee stream from [Ocwen] changes for the worse.  In the sale or loss of servicing by [Ocwen], the loss mitigation business would travel with that servicing"—*i.e.*, Altisource would lose the majority of its revenues.

237.    On January 20, 2015, Stern Agee issued another report on Altisource, lowering its price target from $30 to $18 per share and changed its rating from Neutral to Underperform. Explaining the downgrades, Stern Agee stated that it had revised its outlook on earnings at

Altisource over the next five years, and taken into consideration the "significant potential risk around the resolution of . . . .  Ocwen's ability to avoid losing more servicing due to actions taken by its trustees or the [CDBO]."

238.    On January 23, 2015, the hedge fund BlueMountain Capital Management ("BlueMountain") sent notices of default to Ocwen and HLSS, asserting that Ocwen's regulatory troubles had caused an "irrefutable" default on notes BlueMountain holds in connection with the Ocwen and Altisource-related company, HLSS Servicer Advance Receivables Trust. In the default notice, BlueMountain explained that Ocwen had admitted in the 2014 DFS Consent Order to "facts that give rise to material breaches and defaults of the covenants and agreements under an Indenture, dated as of January 17, 2014, between itself and other relevant parties."

239.    Also, on January 23, 2015, the CDBO announced a $2.5 million settlement with Ocwen. Under that consent order, the CDBO is to select an independent, third-party auditor whose duties will include ensuring Ocwen provides the CDBO all the information it has requested from loan files.  Additionally, under the CDBO consent order, Ocwen is prohibited from "taking on any new California customers until the CDBO determines the firm can fully respond in a timely manner to future requests for information." Significantly, the CDBO will have the ability to pursue an enforcement action against Ocwen should the examination of the loan files uncover substantive violations of laws designed to protect mortgage loan consumers.

240.    Altisource's stock price still has not recovered from the revelations set forth in Section VI.  To the contrary, since the end of the Class Period, Altisource's stock price has continued to spiral downward.  As of the date of the filing of this Complaint, Altisource's shares price trade at $20.28 per share, or 88% below the Class Period high of $170 per share.

## VII.    ALLEGATIONS CONFIRMING DEFENDANTS' SCIENTER

241.    As alleged above, numerous facts – including Defendant Ocwen's detailed admissions in the 2014 Consent Order – give rise to a strong inference that Defendants Altisource, Ocwen, Erbey, Shepro and Esterman knew or recklessly disregarded that their Class

Period statements and omissions set forth herein were materially false and misleading when made.   Among other things, Defendants knew, or recklessly disregarded, that (i) Altisource and Ocwen failed to follow stated procedures, practices and policies for managing their related party transactions and avoiding conflicts of interest, particularly those posed by Erbey; (ii) Altisource frequently charged Ocwen-serviced borrowers inflated, above-market rates for various types of mortgage services; (iii) Altisource's REALServicing platform was inadequate and could not effectively service the millions of loans being boarded onto the platform during the Class Period while complying with heightened regulatory requirements enforced by state and federal authorities; and (iv) as a result of the foregoing, Altisource's substantial Ocwen-derived revenues were not sustainable.   Because Defendant Erbey was the Executive Chairman of Ocwen and the Chairman of Altisource at all times during the Class Period, his scienter is ascribed to both companies.   Because Defendants Shepro and Esterman were the CEO and the CFO, respectively, of Altisource at all times during the Class Period, their scienter is ascribed to Altisource.

242.    In addition to the facts set forth above, Defendants' scienter is demonstrated by the following summary.

243.    <u>Defendant Ocwen Admits That Erbey Knowingly Violated the Recusal Policy.</u> Based on the admitted facts set forth in the 2014 Consent Order alone, there can be no question that Defendant Erbey acted with scienter with respect to his non-recusal, and that his knowledge is imputed to both Altisource and Ocwen.   Defendant Erbey personally approved numerous conflicted related party transactions between Altisource and Ocwen in direct contravention of his public statements during the Class Period.   As admitted in the 2014 Consent Order, "Mr. Erbey has not in fact recused himself from approvals of several transactions" between the two companies, and, in fact, "participated in the approval of a number of transactions between the two companies or from which Altisource received some benefit, including the renewal of Ocwen's forced placed insurance program in early 2014."   The scienter of Defendants Shepro and Esterman, as the CEO and CFO of Altisource who were personally involved in some or all of the related party transactions approved by Erbey is also established through the damning

86

admissions in the 2014 Consent Order.  Further, as a Director himself, Shepro participated in some of the decisions where Erbey improperly refused to recuse himself.

244.    Defendant Erbey's direct involvement in approving the force-placed insurance transaction between Altisource and Ocwen further demonstrates all Defendants' scienter.    The force-placed insurance transaction, approved by Erbey in January 2014, funneled $65 million in fees to Altisource – an amount that equaled 8.5% of Altisource's 2013 revenue and nearly 50% of Altisource's 2013 net income.  Moreover, the transaction created a new business line for the Company.   Internal Ocwen documents described by the NY DFS provide evidence that the Defendant companies and Erbey knew that this transaction was improper because "Ocwen hired Altisource to design Ocwen's force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself."   The NY DFS characterized Erbey's approval of the forced-placed insurance program as "a gross violation" of both companies' stated recusal policy.  It is inconceivable that Erbey, as a hands-on Chairman of both companies and the individual who approved the transaction was not aware of this information.  Further, it is not plausible that Altisource's CEO and CFO would not know the details of such a new and large line of business.

245.    The timing of Defendants' execution of the force-placed insurance transaction is also evidence of Defendants' scienter.  Only three months before the transaction was executed in June 2014, the NY DFS had expressly cautioned Defendants in the February 26 DFS Letter that it had "serious doubts" about the companies' relationship, and specifically, had concerns over the arm's length nature of the companies' transactions and the multiple roles played by Erbey in the two companies.  Defendants disregarded these express concerns and knowingly executed this highly improper arrangement in June 2014.

246.    Altisource's unexpected withdrawal from the force-placed insurance line of business in November 2014, an act that had a profound negative impact on Altisource's financials, further demonstrates the Altisource Defendants' scienter.   Specifically, it provides clear evidence that the 2014 force-placed insurance transaction was not in compliance with

regulations and was improperly approved by Erbey, as Ocwen admitted in the 2014 Consent Order.

247.    Defendant Ocwen Admits That Altisource and Ocwen Did Not Maintain "Separate Management."  Defendants' scienter is further established by their knowing integration of both companies' management and operations.  Ocwen admitted in the 2014 Consent Order that S.P. Ravi served as the Chief Risk Officer for both Altisource and Ocwen during the Class Period, in direct contravention of Ocwen's and Altisource's statements to investors that Ravi worked for Altisource only and that the companies maintained "separate management."  Ocwen also admitted in the 2014 Consent Order that Ravi reported directly to Defendant Erbey in both capacities, demonstrating that Defendant Erbey knew of Ravi's conflicted position.

248.    Moreover, former employees confirm that the companies' regularly commingled their management and operations.  CW2 described how Ravi's dual roles were well known and that concerns over the conflicts of interest caused by his dual role were directly communicated to Defendants Erbey and Shepro, as well as to other senior Altisource and Ocwen executives, during weekly Leadership Meetings.  CW5 described how other senior managers – including the head of Quality Assurance – worked for both Altisource and Ocwen, causing additional conflicts of interest.  Further, all "Chief"-level executives of both companies worked closely together, as confirmed by  CW1 who stated that "everybody in the C suite were running things together" regardless of official company assignations.  In fact, CW1 stated that the companies operated as one entity.  Thus, Defendants Erbey, Shepro and Esterman had direct knowledge of the conflicts posed by Ravi's and other high level managers' positions with both Altisource and Ocwen.   This is particularly true for Defendant Erbey, who served as the Chairman of both Ocwen and Altisource and had unique insight into the dual employment of these individuals and the co-management of the companies.

249.    Defendant Ocwen Admits That Altisource Charged Ocwen-Serviced Borrowers Above-Market Rates.  In the 2014 Consent Order, Ocwen admitted that Altisource subsidiary Hubzu conspired with Ocwen to "charge[] more for its services to Ocwen than to other

customers – charges which are then passed on to borrowers and investors," a fact that provides additional direct evidence of scienter. The Hubzu charges – up to three times the fees charged to Ocwen customers – are in violation of representations made by both companies that Altisource charged Ocwen-serviced borrowers "market rates" for its services. Specifically, the NY DFS presented specific evidence of how the two companies knowingly colluded to harm Ocwen borrowers in its April 21 DFS Letter. The NY DFS indicated that the Hubzu website – managed by Altisource – programmed "underlying HTML code" that consists of "a built-in notation stating 'is OcwenSeller' – followed by a 'Y' or 'N' – for each individual property," and that "[f]or those properties where 'Y' is noted, the auction fees typically appear to be higher." In other words, Altisource specifically programmed Hubzu to target Ocwen borrowers so they could be charged above-market rates.

250. Moreover, Defendants Erbey and Shepro were focused on the profits generated by this high-margin line of business and held themselves out to be knowledgeable about the source of Hubzu's revenues to investors during analyst and investor conference calls. These statements further support a strong inference of scienter. For example, during an October 24, 2013 conference call, Defendant Shepro discussed how a "primary area[] of focus" for Altisource was "to generate more revenue per home sale transaction on Hubzu." Defendant Erbey spoke directly about why the Company's revenue per home sold on Hubzu increased from $2600 to $3400 per home sold in 2013, attributing the increase to the receipt of a "buyer's premium" through the auction of real estate owned properties, evidencing an intimate knowledge of Hubzu's fee generation.

251. Former Altisource and Ocwen employees have confirmed that Altisource regularly overcharged Ocwen borrowers for a variety of services, and that Ocwen was aware of this practice. CW8, Altisource's former Chief Appraiser for Default Valuation, stated that Ocwen "completely delegated to Altisource" its "entire valuation operation" and allowed Altisource to charge Ocwen fees for appraisals that were significantly inflated above the actual cost of the appraisal. CW8 described how Ocwen would simply pass on those inflated, non-market rate fees

to its borrowers.  CW2 also provided information that Altisource overcharged Ocwen by three to five times for various Technology Services, a fact known to Ocwen at minimum through a comparison performed by its Chief Information Officer of Altisource's rates to those charged to Ocwen's competitors.  The pervasiveness of Altisource's predatory conduct in overcharging Ocwen-serviced borrowers supports a strong inference of scienter.

252.    Defendant Ocwen Admits That The REALServicing Platform Was "Inadequate And Ineffective" In Direct Contradiction To Defendants' Class Period Statements.  According to the 2014 Consent Order, Altisource's REALServicing platform was an "inadequate and ineffective information technology" system for servicing mortgage loans that "resulted in Ocwen's failure to fulfill its legal obligations."  This admission stands in direct contrast to Defendants' repeated Class Period statements about REALServicing's scalability and compliance with the law.  Further, Ocwen's Internal Review Group that tested the effectiveness of REALServicing's compliance regularly reported on a weekly basis serious concerns about REALServicing's deficiencies and ability to comply with the law to Chief Risk Officer Ravi, who in turn reported directly to Defendant Erbey.  The direct contrast between Defendants' public statements and the reality regarding the REALServicing platform supports a strong inference of scienter.

253.    REALServicing Was Essential To The Companies' Core Servicing Operations. Defendants' scienter is further demonstrated by the fact that Altisource's REALServicing platform was crucial to both companies' ability to effectively service the nearly three million loans in Ocwen's portfolio, and to acquire additional mortgage servicing rights going forward. REALServicing's purported "scalability" allowed Ocwen to drive its mortgage servicing portfolio up from $50 billion UPB to over $450 billion UPB in the space of a few years.  As Altisource's core technology product that served as the backbone of Ocwen's entire business, Defendants knew that REALServicing's capabilities, quality and legal compliance was essential to the Company's financial performance and future growth, and that the consequences of non-compliance could result in the cessation of their servicing business and/or the loss of substantial

revenue streams.   The fact that REALServicing's gross deficiencies threatened to severely jeopardize both companies' businesses further supports a strong inference of scienter.

254.   <u>The Magnitude and Duration of the Wrongdoing.</u>   The magnitude and duration of the REALServicing deficiencies further support an inference of scienter.   As set forth above, Ocwen admitted that the backdating of the loan modification denial letters had been going on for years and affected "potentially hundreds of thousands" of borrowers.   It is simply not plausible that Ocwen had been sending out improperly backdated loan modification denial letters for such a prolonged period of time without knowing or recklessly disregarding the problem and, more specifically, the source of the problem – REALServicing.   In fact, the NY DFS findings that Ocwen had ignored the problem for months and had still not resolved the backdating problem as of the date of the 2014 Consent Order, demonstrates Defendants' scienter.

255.   Moreover, former employees confirm that the backdated letters were caused by REALServicing's deficiencies, and that this practice was in direct violation of various agreements and regulations, thus further establishing that Altisource knew or recklessly disregarded this severe problem with its own technology.

256.   <u>The Severity and Scope of the Penalties Imposed By The 2014 Consent Order.</u> The severity and scope of the penalties and remedial measures imposed by the Consent Order further supports Defendants' scienter.   First, Ocwen remains indefinitely barred from any future acquisitions, a devastating blow to both Ocwen, Altisource and the other related parties.   Second, Erbey was forced to resign from his position as Chairman of Ocwen and Altisource.   Third, Ocwen was forced to pay $150 million cash in penalties and restitution – or nearly half of all fines and penalties collected by the NY DFS for the entire 2013 fiscal year.   Fourth, the Consent Order prohibits Ocwen and Altisource from sharing any common officers or employees.   Fifth, the Consent Order requires the implementation of significant operational and corporate governance changes, including analyses and confirmation by an outside "Operations Manager" that Altisource charges market rates to Ocwen-serviced borrowers.   These highly unusual and severe penalties indicate that the only way the NY DFS believed it could protect the public from

Defendants' unlawful actions in the future was to remove the mechanisms by which Defendants perpetrated this massive fraud.

257.    Defendant Erbey's termination alone is extremely strong evidence of his scienter. Indeed, the NY DFS specifically demanded that:

> Erbey will have no directorial, management, oversight, consulting, or any other role at Ocwen or any related party, or at any of Ocwen's or the related parties' affiliates or subsidiaries as of the date of his resignation. Effective at his resignation, Ocwen's Board members and management will not disclose to Mr. Erbey any non-public information about Ocwen that is not available to other shareholders.

258.    <u>Defendants Claimed They Were Focused On Compliance.</u>  Defendants' scienter is further demonstrated by the fact that compliance with servicing regulations was central to Altisource's and Ocwen's reputation and success.   Indeed, the Company's reputation for compliance with the NY DFS and other regulators' laws and practices was of critical importance to Altisource's investors because the mortgage servicing industry is heavily regulated and the consequences of not complying with regulations can be devastating to any company in the industry, and particularly so for a large and prominent servicer of distressed mortgage loans such as Ocwen.  Altisource and Ocwen therefore emphasized to investors that they were focused on compliance.  As Defendant Shepro stated on April 24, 2014, Altisource's "primary focus is providing compliant services to Ocwen servicing portfolio" through the boarding of loans on REALServicing.  The fact that the misstatements and omissions at issue here went directly to this core compliance factor further supports a strong inference of Defendants' scienter.   This is particularly true given that Defendants held themselves out as knowledgeable regarding Altisource's and Ocwen's compliance practices and capabilities in the Company's SEC filings, conference calls, and investor presentations.

259.    <u>Defendants Intentionally Risked The Consequences Of Noncompliance.</u>   CW1 confirmed that Defendants' failure to comply with laws and regulations governing mortgage

servicing was intentional. CW1 described a Company culture at Altisource and Ocwen – established through a "tone at the top" (including directives from Defendants Erbey and Shepro, among others) – that stressed the need to grow at any cost and the belief that the costs of regulatory fines and penalties would not outweigh the resulting massive profits. Essentially, Defendants believed that Ocwen and Altisource were "so big that even if we do [] wrong, we'll make more money on the percentage of things that go right." Defendants thought that when the companies "hit capacity" and did not need to acquire more mortgage servicing rights, they would "muddle through" and simply pay off the regulators with immaterial sums. Defendants' gamble failed, but their deliberate risk-taking supports a scienter inference.

260.    Altisource Was Entirely Dependent On Ocwen-Derived Revenue.   The fact that during the Class Period, Altisource derived between 60% to 65% of its total revenues through Ocwen provides additional evidence of scienter. Defendants routinely acknowledged that Ocwen was Altisource's largest and most important client. For example, Altisource listed "supporting Ocwen's growth" as one of its top strategic growth initiative in the Company's third quarter 2013 Form 10-Q. Moreover, many of the mortgage support services that Altisource provided to Ocwen borrowers were among the Company's most profitable businesses, including Hubzu (pre-tax margin of over 60%) and the forced placed insurance program ($0.50-$0.65 quarterly earnings per share, or 17% of Altisource's total gross revenue by the third quarter of 2014). The fact that the misstatements and omissions at issue here go directly to these lines of business further supports a strong inference of scienter.

261.    The Extensive Involvement of the Individual Defendants in Altisource's Day-to-Day Operations.   The Individual Defendants' scienter is further established by their direct and extensive involvement in the Company's day-to-day business operations. Former Altisource and Ocwen employees from a variety of levels and positions at Company confirm that the Individual Defendants were actively involved in all aspects of the Company's relevant operations. For example, CW1 explained that Erbey was involved in even the minutest Company decisions and was regularly copied "on e-mails of simple reporting numbers (daily execution numbers and

valuations)."  CW2 also confirmed that Erbey was a "micromanager" who "knows everything that goes on" in Ocwen and Altisource, noting Erbey was referred to as "the shepherd" in weekly Leadership Meetings during which top senior executives from both Altisource and Ocwen (including Shepro) attended telephonically and discussed important aspects of each company's business.  These witnesses report that the Individual Defendants were aware of and/or actively involved in making the operative decisions regarding, among other areas: (1) related party transactions between Altisource and Ocwen; (2) the Company's force-placed insurance line of business; (3) the development and operation of Hubzu; and (4) the compliance features of REALServicing.

262.  The Individual Defendants' Personal Financial Motives.  The Individual Defendants were motivated to steer business and revenue to Altisource in violation of applicable regulations and the Company's purported policies because they – as well as other members of the Boards and senior management the companies – held significant personal financial stakes in both Ocwen and Altisource.  In connection with Altisource's spin-off from Ocwen, Defendant Erbey, Defendant Shepro (the former President and COO of Ocwen Solutions), and numerous Ocwen inside and outside directors received the initial distribution of Altisource shares.  These individuals continued to maintain substantial holdings in both Ocwen and Altisource stock during the Class Period.  In particular, Erbey's personal holdings of Ocwen and Altisource shares were massive, worth approximately $1.4 billion as of the start of the Class Period, and nearly $2.4 billion when Altisource shares reached their Class Period high.  Likewise, Defendant Shepro's held an enormous personal stake in the companies, worth approximately $90 million as of the start of the Class Period, and nearly $150 million when Altisource shares reached their Class Period high, as set forth below:

| Director/Officer | OCN Shares Owned | | ASPS Shares Owned | | |
| --- | --- | --- | --- | --- | --- |
| | No. of Shares Owned | Value | No. of Shares Owned | Value | Total |
| **Aug. 10, 2009 (Spin Off)** | | | | | |
| William C. Erbey | 18,913,168 | $191,590,392 | 6,292,670 | $72,011,428 | $263,601,820 |
| William B Shepro | 464,982 | $4,710,268 | 154,994 | $1,773,705 | $6,483,972 |
| **Feb. 13, 2013 (Start of Class Period)** | | | | | |
| William C. Erbey | 20,154,198 | $832,771,461 | 6,780,071 | $568,576,754 | $1,401,348,215 |
| William B Shepro | 1,297,137 | $53,597,701 | 432,379 | $36,259,303 | $89,857,004 |
| **Dec. 3, 2013 (Altisource Stock - Class Period High)** | | | | | |
| William C. Erbey | 20,143,183 | $1,207,986,685 | 6,780,071 | $1,159,371,753 | $2,367,358,438 |
| William B Shepro | 1,249,176 | $74,913,085 | 416,392 | $71,203,032 | $146,116,117 |

263.    As the NY DFS recognized in the August 4 DFS Letter, Defendant Erbey's substantial ownership stake in Altisource ensured that Erbey profited personally every time Ocwen diverted revenues to Altisource.  For example, as of December 31, 2013, while Erbey owned 13% of Ocwen's common stock, he owned double that amount – 26% – of Altisource's common stock. This meant that Erbey took home $0.26 for every dollar earned by Altisource, compared to $0.13 for every dollar earned by Ocwen.  By approving Ocwen's force-placed arrangement with SWBC and Altisource, Erbey ensured that Altisource would earn approximately $65 million in annual revenues without providing any meaningful services to Ocwen or SWBC.  Erbey's share of those revenues amounted to approximately $16.9 million annually.  Likewise, Erbey's stake in Altisource meant that he also profited from Altisource's decision to overcharge Ocwen borrowers to pay 4.5% in fees to list on Hubzu, as opposed to the 1.5% fee Hubzu charged non-Ocwen borrowers.  Each time an Ocwen borrower paid an additional 3% over and above Hubzu's market rates, Erbey stood to earn 26% (or more) of that amount.

## VIII.   LOSS CAUSATION

264.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.  Throughout the Class Period, Altisource's stock price was artificially inflated by materially false and misleading statements and omissions that created the false impression that (i) the Company had established and applied robust controls on related party transactions and for avoiding potential conflicts of interest, and (ii) the Company's technology systems and mortgage services were effective, compliant with regulations, and provided at market rates.  As a result, the market price of Altisource common stock was inflated by the materially false and misleading statements and omissions made by Altisource, the Individual Defendants, and Ocwen, as identified above, and Lead Plaintiffs and the Class purchased Altisource common stock at artificially inflated prices during the Class Period.

265.    The ensuing disclosures on these topics by the NY DFS, Altisource and Ocwen, as described in Section VI revealed to the market on a piecemeal basis the fraudulent nature of these statements and the extent of the misrepresentations contained in Altisource's public filings, press releases, conference call statements, and presentations that form the primary basis of this action.  When the truth about Altisource was revealed to the market, the price of Altisource common stock declined in response, as the artificial inflation caused by Altisource's, Ocwen's and the Individual Defendants' material omissions and false and misleading statements was removed from the price of Altisource common stock, thereby causing substantial damage to Lead Plaintiffs and other members of the Class.

266.    Indeed, during the Class Period, Altisource common stock traded as high as $170 per share on December 3, 2013, and closed at $133.40 per share the day before Ocwen's February 6, 2014 press release, when the first partial disclosures about the serious compliance deficiencies of Altisource's systems were made.

267.    Over the next ten months, in response to several additional partial disclosures that exposed more about the Company's numerous, serious, and pervasive compliance deficiencies, and lack of controls on related party transactions and conflicts of interest, the market reacted, and Altisource's stock price partially corrected as it was significantly driven downward.    The Company, the Individual Defendants, and Ocwen mitigated the impact of those disclosures and prevented the full truth about Altisource from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market.    As the market finally learned the magnitude of the problems facing the Company and the implications for Altisource's business operations, financial condition and growth prospects, the price of Altisource's common stock plummeted to $31.49 per share on December 22, 2014, the day the 2014 DFS Consent Order was announced.    The truth emerging about the Company's lack of controls on related party transactions and widespread conflicts of interest, inadequate and ineffective technology systems and services, inflated fee structures, and true financial circumstances and prospects, caused the market price of Altisource common stock to fall more than $101.91 per share, from $133.40 on February 5, 2014 to $31.49 on December 22, 2014.    In total, the declines in Altisource's stock prices on the 8 disclosure dates identified in Section VI erased a total of $2.3 billion in shareholder market capitalization, as demonstrated in the below chart:



| | Date | Close Price | Price Drop | Pct. Change | Market Cap. Drop |
|---|---|---|---|---|---|
| 1 | 02/06/14 | $125.51 | ($7.89) | (5.9%) | ($180,341,730) |
| 2 | 02/26/14 | $101.00 | ($15.76) | (13.5%) | ($356,633,040) |
| 3 | 04/21/14 | $114.24 | ($2.79) | (2.4%) | ($62,320,230) |
| 4 | 05/20/14 | $99.15 | ($6.29) | (6.0%) | ($139,990,240) |
| 5 | 08/04/14 | $88.65 | ($15.18) | (14.6%) | ($331,470,480) |
| 6 | 10/21/14 | $84.51 | ($10.32) | (10.9%) | ($225,347,520) |
| 7 | 10/22/14 | $69.11 | ($15.40) | (18.2%) | ($336,274,400) |
| 8a | 11/12/14 | $60.50 | ($12.28) | (16.9%) | ($248,940,160) |
| 8b | 11/13/14 | $55.00 | ($5.50) | (9.1%) | ($111,496,000) |
| 9 | 12/22/14 | $31.49 | ($15.97) | (33.6%) | ($325,365,600) |

269.   Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, among other things, during the Class Period:

(a)   The Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The misrepresentations and omissions were material;

(c)   Altisource's common stock was actively traded in an efficient market on the NASDAQ;

(d)   Altisource's common stock traded at high weekly volumes;

(e)   As a regulated issuer, Altisource filed periodic public reports with the SEC;

98

(f)     Altisource was eligible to file registration statements with the SEC on Form S-3 or F-3, its equivalent;

(g)     Altisource regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(h)     The market reacted promptly to public information disseminated by Altisource;

(i)     Altisource common stock were covered by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. These reports were publicly available and entered the public marketplace;

(j)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Altisource common stock; and

(k)     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Altisource common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

270.    Additionally, Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), because certain of the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

271.    Accordingly, Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Altisource's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## X.    CLASS ACTION ALLEGATIONS

272.    Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired common stock issued by Altisource during the

period from April 25, 2013 through December 21, 2014, inclusive, and who were damaged thereby. Excluded from the Class are Defendants; Altisource's affiliates and subsidiaries; Ocwen's affiliates and subsidiaries; the officers and directors of Altisource and Ocwen at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

273.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Altisource common shares were actively traded on the NASDAQ.  As of the start of the Class Period, Altisource had approximately 23.4 million shares of common stock issued and outstanding.  Although the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are at least hundreds, if not thousands, of members of the proposed Class.  Members of the Class can be identified from records maintained by Altisource or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

274.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

275.    Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of fact and law common to the Class are:

(a)    whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b)    whether Defendants' misrepresentations and omissions as alleged herein misrepresented material facts about Altisource's management of conflicts of interest, related party transactions, and the effectiveness and capabilities of the Company's servicing platform  during the Class Period;

(c)    whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(d)    whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(e)    whether the members of the Class have sustained damages, and the proper measure of damages.

276.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiffs have no interest that conflicts with the interests of the Class.

277.    A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
#### (Against Defendant Altisource And The Individual Defendants)

278.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above, as if fully set forth herein.

279.    This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Lead Plaintiffs and members of the Class against Defendants Altisource, Erbey, Shepro, and Esterman.

280.    Throughout the Class Period, Defendants Altisource, Erbey, Shepro, and Esterman, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the United States mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Altisource, its management, business operations, relationships and business dealings with Ocwen, Altisource's REALServicing platform, Altisource's Mortgage Services segment, and future prospects, as specified herein.  This plan, scheme and course of conduct was intended to

and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiffs, as alleged herein; (b) artificially inflate the market price of Altisource common stock; and (c) cause Lead Plaintiffs and members of the Class to purchase Altisource common stock at artificially inflated prices.

281.    In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, individually and jointly, took the actions set forth herein.   While in possession of material, adverse non-public information, these Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to create and maintain artificially high market prices for Altisource's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   Each of these Defendants was a direct, necessary and substantial participant in the common course of conduct alleged herein. The Defendants named in this count are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons as alleged below

282.    Defendants knew or, but for their deliberate recklessness, should have known, that their statements concerning the Company's management, business operations, relationships and business dealings with Ocwen, Altisource's REALServicing platform, Mortgage Services segment, and future prospects, as disseminated to the investing public during the Class Period, were materially misstated.    Further, Defendants knew of existing adverse facts which undermined their representations about Altisource's management, existing business operations, relationships and business dealings with Ocwen, Altisource's REALServicing platform, Mortgage Services segment, and future prospects during the Class Period.

283.    As a result of their making affirmative statements and reports to the investing public, Altisource and the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure

provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, performance and compliance with the law, so that the market prices of Altisource's publicly traded common stock would be based on truthful, complete, and accurate information.

284.   The Individual Defendants - the Chairman and the top executive officers of the Company - are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as Chairman, CEO and CFO of the Company, each of these Individual Defendants was able to and did control the content of the public statements disseminated by Altisource.  With knowledge of the falsity and/or misleading nature of the statements contained therein and in reckless disregard of the true business operations and future prospects of the Company, the Individual Defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein.

285.   Altisource and the Individual Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior leadership of the Company and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, investor presentations, conference calls, and filings with the SEC.

286.   Altisource and the Individual Defendants' misrepresentations and/or omissions were intentional or deliberately reckless and in some instances done for the purpose of enriching themselves at the expense of Altisource's investors, including Lead Plaintiffs, and to conceal the Company's and Ocwen's true relationship, business dealings, conflicts of interest, services and future prospects from the investing public.  Altisource and the Individual Defendants engaged in this scheme to inflate the Company's reported revenues and prospects in order to create the illusion that Altisource was a successful, strong and growing company.

287.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Altisource common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Altisource's publicly traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Altisource Defendants, or upon the integrity of the market in which the common stock trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Altisource Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Altisource common stock during the Class Period at artificially high prices and were damaged thereby.

288.    Had Lead Plaintiffs and the other members of the Class and the marketplace known of the material adverse information not disclosed by Altisource and the Individual Defendants, or been aware of the truth behind these Defendants' material misstatements, they would not have purchased or otherwise acquired Altisource common stock at artificially inflated prices, or at all.

289.    By virtue of the foregoing, Altisource and the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

290.    As a direct and proximate result of the Altisource Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
(Against Defendants Ocwen and Erbey)

291.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above, as if fully set forth herein.

292.    This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Lead Plaintiffs and members of the Class against Defendant Ocwen and Defendant Erbey in his capacity as Executive Chairman of Ocwen.

293.    Throughout the Class Period, Defendants Ocwen and Erbey, individually and in concert with others, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the United States mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Altisource, its management, business operations, relationships and business dealings with Ocwen, Altisource's REALServicing platform, Altisource's Mortgage Services segment, and future prospects, as specified herein. This plan, scheme and course of conduct was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiffs, as alleged herein; (b) artificially inflate the market price of Altisource common stock; and (c) cause Lead Plaintiffs and members of the Class to purchase Altisource common stock at artificially inflated prices.

294.    In furtherance of this unlawful scheme, plan and course of conduct, and while in possession of material, adverse non-public information, Defendants Ocwen and Erbey (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to create and maintain artificially high market prices for Altisource's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Erbey and Ocwen are sued in this count as primary participants in the wrongful and illegal conduct charged herein. Erbey is also sued as a controlling person of Altisource, as alleged below.

295.    As more fully described above, Ocwen and Erbey (as Executive Chairman of Ocwen) issued numerous public statements during the Class Period concerning their relationships and transactions with Altisource, and the nature and capabilities of services provided by Altisource to Ocwen, including the effectiveness and regulatory compliance of

Altisource's REALServicing platform and Mortgage Services. These public statements were disseminated to the public through conference calls, investor presentations, and SEC filings by Ocwen and Erbey, and contained misstatements and omissions of material facts as alleged herein. Additionally, as more fully described above, Ocwen and Erbey entered into numerous, conflicting relationships and transactions that had the effect of forming a conspiracy between and among Ocwen and Altisource. Pursuant to the plan and course of conduct, Ocwen and Erbey participated, directly and indirectly, in the preparation and/or issuance of the statements and documents attributed to the Altisource Defendants referred to above, including in Altisource's filings with the SEC, conference calls, and investor presentations. These statements and documents were also materially false and misleading.

296. At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused the damages sustained by Lead Plaintiffs and the Class.

297. Defendants Ocwen and Erbey knew or, but for their deliberate recklessness, should have known, that their statements concerning their relationships and transactions with Altisource, and the nature of services provided by Altisource under Altisource's service agreements with Ocwen, as disseminated to the investing public during the Class Period, were materially misstated. Further, Ocwen and Erbey knew of existing adverse facts which undermined their representations about their relationship and transactions with Altisource, and the nature and capabilities of services provided by Altisource to Ocwen, including the effectiveness and regulatory compliance of Altisource's REALServicing platform, and Mortgage Services, during the Class Period.

298. Ocwen acted with scienter throughout the Class Period in that Erbey and its other directors and senior officers either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

299.   Ocwen's and Erbey's misrepresentations and/or omissions were intentional or deliberately reckless and in some instances done for the purpose of enriching themselves, and to conceal the Company's and Ocwen's true relationship, business dealings, conflicts of interest, services, and future prospects from the investing public.   Ocwen and Erbey engaged in this scheme to inflate the Company's reported revenues and prospects in order to create the illusion that Altisource was successful, strong and growing.

300.   Ocwen and Erbey engaged in such scheme to misrepresent the operations and results of Altisource, and maintain and/or inflate the prices of Altisource stock, because Altisource was specifically created in order to capture adjacent revenue from mortgage servicing – including revenue from home foreclosures, short sales, appraisals and valuation that Ocwen, as a more heavily regulated entity and primary servicer, was unable to capture.  As more fully described above, in connection with Altisource's spin-off from Ocwen in August 2009, Altisource became a publicly-traded company in which Defendant Erbey, the founder and chairman of Ocwen, Defendant Shepro, the former President and COO of Ocwen Solutions, numerous Ocwen inside and outside directors, and all Ocwen shareholders of record, received the initial distribution of Altisource shares.  These individuals continued to maintain substantial holdings in both Ocwen common stock and Altisource common stock during the Class Period. In particular, Defendant Erbey claimed a 29% stake in Altisource, more than double his 14% ownership interest in Ocwen as of September 30, 2014.  As more fully described above, Ocwen, its senior officers, and its Executive Chairman Erbey knew, in making public statements about Altisource, its business, services, or operations, that current and prospective investors in Altisource stock would rely upon such statements, and such statements would affect the market prices of Altisource stock.

301.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Altisource common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Altisource's publicly traded common stock were artificially inflated, and relying directly or

indirectly on the false and misleading statements made by Defendants Ocwen and Erbey, or upon the integrity of the market in which the common stock trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants Ocwen and Erbey but not disclosed in public statements by Ocwen during the Class Period, Lead Plaintiffs and the other members of the Class acquired Altisource common stock during the Class Period at artificially high prices and were damaged thereby.

302.    Had Lead Plaintiffs and the other members of the Class and the marketplace known of the material adverse information not disclosed by Ocwen and Erbey, or been aware of the truth behind Ocwen's and Erbey's material misstatements, they would not have purchased or otherwise acquired Altisource common stock at artificially inflated prices, or at all.

303.    By virtue of the foregoing, Defendants Ocwen and Erbey have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

304.    As a direct and proximate result of Defendants Ocwen's and Erbey's wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

### COUNT III

**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendants Erbey, Shepro, and Esterman as Control Persons Of Altisource)**

305.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

306.    This Count is asserted on behalf of Lead Plaintiffs and members of the Class against the Individual Defendants, *i.e.*, Defendants Erbey, Shepro, Esterman, as control persons of Altisource.

307.    The Individual Defendants acted as controlling persons of Altisource within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions within Altisource, and, in the case of Erbey and Shepro, also as Altisource Directors, their ownership

and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the false statements and material omissions or cause such misleading statements and omissions to be corrected.

308.    In addition, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  For example, the Individual Defendants were able to and did control the content of various SEC filings, press releases, investor presentations, and other public statements pertaining to the Company during the Class Period. The Individual Defendants had access to the adverse undisclosed information about Altisource's business, operations, products, trends, financial statements, markets, and present and future business prospects via access to internal control documents; conversations and connections with other corporate officers, employees, and borrowers; participation at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

309.     The Individual Defendants both participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and presentations, as well as other communications attributed to Altisource alleged herein.

310.     As set forth above, Altisource and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Altisource, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT IV

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
#### (Against Defendant Erbey as Control Person of Ocwen)

311.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

312.     This Count is asserted on behalf of Lead Plaintiffs and members of the Class against Defendant Erbey as a control person of Ocwen.

313.     Defendant Erbey acted as controlling person of Ocwen within the meaning of Section 20(a) of the Exchange Act.  By virtue of his high-level position as Executive Chairman of Ocwen, ownership and contractual rights, participation in and awareness of Ocwen's operations, and intimate knowledge of Ocwen's actual performance, Erbey had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Ocwen, including the content and dissemination of the various statements made by Ocwen which Lead Plaintiffs contend are false and misleading.  Erbey was provided with, or had unlimited access to, copies of Ocwen's reports, press releases, public filings and other statements

alleged by Lead Plaintiffs to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the false statements and material omissions or cause such misleading statements and omissions to be corrected.

314.     In addition, Erbey had direct and supervisory involvement in the day-to-day operations of Ocwen and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  For example, Erbey was able to and did control the content of various SEC filings, press releases, investor presentations, and other public statements pertaining to Ocwen during the Class Period.  Erbey had access to the adverse undisclosed information about Ocwen's business, operations, products, trends, financial statements, markets, and present and future business prospects via access to internal control documents; conversations and connections with other corporate officers, employees, and borrowers; participation at management and Board of Directors meetings and committees thereof, and reports and other information provided to him in connection therewith.

315.     Erbey participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and presentations, as well as other communications attributed to Ocwen alleged herein.

316.     As set forth above, Ocwen and Erbey each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of Erbey's position as a controlling persons of Ocwen, Erbey is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Ocwen and Erbey's wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a)     Declaring that this action is a proper class action and certifying Lead Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Awarding such other and further relief as the Court may deem just and proper.

## XIII.  JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.


Dated: January 30, 2015                    Respectfully submitted,

                                           /s/ Hannah Ross
                                           Hannah Ross
                                           Lauren A. Ormsbee
                                           BERNSTEIN LITOWITZ BERGER
                                              & GROSSMANN LLP
                                           1285 Avenue of the Americas
                                           New York, New York 10019
                                           Telephone: (212) 554 1400
                                           Facsimile: (212) 554 1444
                                           hannah@blbglaw.com
                                           lauren@blbglaw.com

                                           -and-

                                           David R. Kaplan
                                           BERNSTEIN LITOWITZ BERGER
                                              & GROSSMANN LLP

12481 High Bluff Drive, Suite 300
San Diego, CA  92130
Telephone:  (858) 793-0070
Facsimile:  (858) 793-0323
davidk@blbglaw.com

*Counsel for Lead Plaintiffs the Pension Fund for the International Union of Painters and Allied Trades District Council 35 and the Annuity Funds for the International Union of Painters and Allied Trades District Council 35 and Proposed Lead Counsel for the Class*

/s/ Maya S. Saxena
**SAXENA WHITE P.A.**
Maya S. Saxena (FL Bar No. 0095494)
Joseph E. White, III (FL Bar No. 621064)
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com

*Local Counsel for Lead Plaintiffs*

113