## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

In re: Altisource Portfolio Solutions, S.A.
Securities Litigation

Case 14-81156 CIV-WPD

**<u>JURY TRIAL DEMANDED</u>**

**<u>SECOND AMENDED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

Page(s)

I.   OVERVIEW OF THE CASE ................................................................................. 2

II.  JURISDICTION AND VENUE ........................................................................... 9

III. THE PARTIES ....................................................................................................... 10

A.   Lead Plaintiffs ............................................................................................ 10

B.   Defendants ................................................................................................... 10

1.   The Altisource Defendants .............................................................. 10

2.   Ocwen ................................................................................................... 12

IV.  BACKGROUND AND NATURE OF THE FRAUD AT ALTISOURCE ..................... 13

A.   Ocwen Spins Off Altisource And Becomes Its Primary Customer ..................... 13

B.   The Spin-Off Creates Potential Conflicts  of Interest For Erbey, Altisource And Ocwen ............................................................................... 18

C.   Ocwen's Ability To Acquire New Servicing Rights Is Material To Investors And Is Essential To Altisource's Success .................................. 21

D.   Ocwen's Growth Attracts Regulators' Scrutiny And Compels Both Ocwen And Altisource To Comply With Specific Mortgage Servicing Guidelines And Practices .......................................................... 24

E.   Throughout The Class Period, Defendants Falsely Represented That Altisource Controlled Against Conflicted Transactions And Provided Compliant Products And Services To Ocwen ......................................... 26

1.   Defendants Exploited Rather Than Managed Their Conflicts Of Interest ....................................................................... 28

2.   Altisource's REALServicing Platform Was Ineffective And Incapable Of  Processing Ocwen's Mortgage Servicing Portfolio In Compliance With The Law .................................................. 45

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS .............................................................. 55

A.   False and Misleading Statements And Omissions Concerning The Adequacy Of Controls For Managing  Transactions With Ocwen And Avoiding Conflicts Of Interest .............................................................. 56

B.   False and Misleading Statements And Omissions Concerning The "Market Rates" Charged For Services Provided Under Altisource's Exclusive Arrangements With Ocwen .................................................. 64

i

C.      Statements Concerning The Effectiveness Of REALServicing And
        Its Ability To Comply With The Law.................................................. 68

D.      Statements Concerning Altisource's Revenues From Related Party
        Transactions With Ocwen.................................................................... 74

E.      Shepro And Esterman Falsely Certify The Contents Of
        Altisource's SEC Filings...................................................................... 77

VI.     DEFENDANTS SCHEMED TO FUNNEL MONEY TO ALTISOURCE
        AT THE EXPENSE OF OCWEN BORROWERS ........................................ 77

VII.    THE TRUTH BEGINS TO EMERGE ................................................................ 82

A.      The NY DFS Suspends Ocwen's  Acquisition Of New Mortgage
        Servicing Rights Due To Concerns About REALServicing.................. 82

B.      The February 26 DFS Letter Raises Concerns Over Serious
        Conflicts of Interest Between Altisource And Ocwen.......................... 84

C.      The April 21 DFS Letter Raises Concerns That Altisource
        Regularly Overcharges Ocwen Customers ........................................ 86

D.      The NY DFS Addresses The Risks That Altisource And Its
        Relationship With Ocwen Pose To Homeowners On May 20, 2014 ........ 87

E.      The August 4 DFS Letter Raises Concerns That Defendants Lied
        About Erbey's Recusal From Conflicted Transactions And
        Engaged In A Kickback Arrangement ................................................ 88

F.      The October 21 DFS Letter Raises "Serious Issues" With
        REALServicing..................................................................................... 90

G.      Altisource Concedes The Impropriety of Its Force-Placed
        Insurance Contract On November 12, 2014 ....................................... 92

H.      Ocwen Admits That "Widespread Conflicts of Interest" With
        Altisource And The "Inadequate and Ineffective" REALServicing
        Platform Harmed Borrowers on December 22, 2014 ......................... 93

I.      Post-Class Period Events ................................................................... 95

VIII.   ALLEGATIONS CONFIRMING DEFENDANTS' SCIENTER ...................... 98

A.      Erbey's Direct Participation In And Knowledge Of The Fraud
        Establishes His And The Companies' Scienter .................................. 99

B.      Ocwen's Admissions Together With The Findings Of The NY
        DFS And The NMS Monitor Establish Defendants' Scienter .......... 101

C.      Additional Facts Establishing Defendants' Scienter.......................... 105

IX.     LOSS CAUSATION................................................................................ 111

X.      THE PRESUMPTION OF RELIANCE ....................................................................... 114

XI.     CLASS ACTION ALLEGATIONS ............................................................................ 115

XII.    CAUSES OF ACTION ................................................................................................. 117

XIII.   PRAYER FOR RELIEF ............................................................................................... 130

XIV.    JURY DEMAND .......................................................................................................... 131

1.      Lead Plaintiffs the Pension Fund for the International Union of Painters and Allied Trades District Council 35 and the Annuity Fund for the International Union of Painters and Allied Trades District Council 35 ("Lead Plaintiffs"), by their undersigned counsel, hereby bring this action on behalf of themselves and all persons or entities who purchased or otherwise acquired the common stock of Altisource Portfolio Solutions, S.A. ("Altisource" or the "Company") during the period from April 25, 2013 through December 21, 2014 inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants Altisource, Ocwen Financial Corporation ("Ocwen"), William C. Erbey ("Erbey"), Altisource Chief Executive Officer ("CEO") William Shepro ("Shepro") and Altisource Chief Financial Officer ("CFO") Michelle Esterman ("Esterman"), present or former executive officers of Altisource or Ocwen, and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)). As explained further below, Lead Plaintiffs seek to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on, *inter alia,* the independent investigation of their counsel. This investigation included, but was not limited to, a review and analysis of: (i) Altisource's and Ocwen's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Altisource's and Ocwen's earnings conference calls and industry conferences; (iv) publicly available presentations by Altisource and Ocwen; (v) Altisource's and Ocwen's press releases and media reports; (vi) economic analyses of Altisource's securities movement and pricing data; (vii) consultations with relevant experts; (viii) information obtained from former Altisource and Ocwen employees throughout the course of counsel's investigation; and (ix) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants or are exclusively

within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    <u>OVERVIEW OF THE CASE</u>

3.    Altisource and its former parent Ocwen – at the direction of Defendant Erbey, both companies' Chairman and founder – conspired to funnel money to Altisource and Erbey through self-dealing transactions that illegally harmed innocent borrowers and, ultimately, Altisource investors.  Ocwen, as one of the country's largest mortgage servicers, was legally obligated to help struggling borrowers stay in their homes.  Altisource, on the other hand, provided default- and foreclosure-related services to Ocwen's borrowers and profited from removing struggling borrowers from their homes.  To assure investors and regulators that the two companies did not engage in self-dealing transactions that would harm Ocwen's borrowers, both the Ocwen and the Altisource Defendants publicly represented to Altisource investors that (i) the companies maintained "separate management" that was "independent" and operated at "arm's length"; (ii) Erbey recused himself from transactions involving the two companies to ensure the absence of conflicts and self-dealing; (iii) Altisource charged "market prices" to Ocwen and its borrowers (who were required to use Altisource for numerous services); and (iv) Altisource's REALServicing platform, which Ocwen used exclusively to service its borrowers' loans, was legally "compliant," "high quality," and "superior" and implemented "best practices."

4.    In reality – and in stark contrast to Defendants' Class Period statements to Altisource investors – Defendants, at Erbey's direction, engaged in conflicted related-party transactions designed to improperly funnel money from innocent homeowners to Altisource and Erbey.  <u>Every aspect of this fraud has now been admitted by Ocwen</u>.  When the truth of Defendants' Class Period statements was finally revealed, Altisource's common stock had lost a total of over *$1 billion* in market capitalization.

5.     Defendants' representations to Altisource investors concerning the strong controls in place to ensure the companies' independence and avoidance of conflicts of interest were absolutely critical to investors given the companies' diametrically opposed business interests, unusually close affiliation, and contractual exclusivity agreements, as well as the intense regulatory environment facing Ocwen in the wake of the financial crisis.  All of the Defendants – Altisource, Ocwen, Erbey, and Altisource's CEO and CFO – emphasized that Ocwen and Altisource prioritized compliance and operated strictly at "arm's length" to prevent Altisource's foreclosure-driven business from harming Ocwen-serviced borrowers seeking to stay in their homes. Defendants' assurances regarding REALServicing's capabilities and legal compliance, were particularly important in light of Ocwen's and Altisource's tremendous growth in the years leading up to, and at the start of the Class Period.  Between August 10, 2009 (the date of Altisource's spin-off from Ocwen) and the end of 2013, Ocwen's mortgage servicing rights portfolio grew eightfold, from approximately 351,000 loans to approximately 2.9 million loans, making Ocwen the largest non-bank servicer in the United States.  Given the size and rapid growth of Ocwen's mortgage servicing portfolio, it was critical that Altisource's REALServicing platform be highly scalable (meaning capable of servicing an ever-increasing number of loans) and able to service loans in compliance with Ocwen's legal obligations.

6.     Altisource's stock value was inextricably linked to Ocwen's acquisition of mortgage servicing rights because Ocwen was by far Altisource's largest client and was contractually obligated to exclusively employ Altisource for all servicing, default and foreclosure-related services for its troubled borrowers.  As a direct result of its relationship with Ocwen and Ocwen's increasing portfolio, Altisource's revenues increased over 700% between 2009 and 2013, from $103 million in 2009 to $768 million in 2013.  The price of Altisource stock followed suit, rising from approximately $21 per share at the end of 2009 to a Class Period high of just over $170 per share on December 3, 2013, a whopping 1,600% increase.  Defendant Erbey – who personally owns approximately 29% of Altisource and 14% of Ocwen – saw his wealth balloon to nearly ***$2.3 billion*** during the Class Period based on his substantial personal holdings in the companies.

3

7.      Ocwen's and Altisource's historic growth attracted the scrutiny of powerful regulators who were skeptical of the companies' ability to effectively and fairly service the millions of loans acquired by Ocwen in such a short time.  By the start of the Class Period, the New York State Department of Financial Services (the "NY DFS"), one of Ocwen's primary regulators, and other regulators had the authority to suspend future acquisitions by Ocwen, revoke Ocwen's license to do business in certain states, and impose significant fines on Ocwen, all of which would have an immediate and material negative effect on Altisource's business and growth prospects. Thus, it was critical for Defendants to assure Altisource investors that Ocwen and Altisource: (i) had the technological capability to service the millions of new loans in a manner that was not only cost-effective and revenue-accretive, but complied with all applicable laws, rules and regulations; and (ii) were not engaging in self-dealing, conflicted business transactions with each other that maximized Erbey's and Altisource's wealth at the direct expense of Ocwen's captive and financially struggling borrowers.

8.      Unfortunately for investors and borrowers alike, those assurances were false.  In a series of partial disclosures stemming from a two-year-long investigation by the NY DFS, the truth was exposed about Altisource's conflicted relationship with Ocwen, Erbey's failure to recuse himself from related party transactions, Altisource's manipulative pricing for Ocwen borrowers, and the serious deficiencies with REALServicing, which exposed struggling borrowers to significant risks.

9.      Defendants' fraudulent scheme began to unravel on February 6, 2014, when the NY DFS placed an indefinite suspension on Ocwen's massive acquisition of mortgage servicing rights from Wells Fargo due to "concerns about Ocwen's servicing portfolio growth."  In a series of letters that followed on February 26 (the "February 26 DFS Letter"), April 21 (the "April 21 DFS Letter"), August 4 (the "August 4 DFS Letter"), and October 21 (the "October 21 DFS Letter") (collectively, the "DFS Letters"), the NY DFS gradually revealed to the market that Defendants' repeated assurances about the Company's purported controls on related party transactions and conflicts of interest, and the ability of REALServicing to process mortgage loans effectively and

4

in compliance with the applicable laws and regulations, were false.  These four letters provided evidence, based on internal company documents and witnesses, that partially revealed to investors the conflicts and servicing weaknesses inherent in the parties' business dealings.  For example:

- The February 26 DFS Letter noted that, contrary to Defendants' public representations, the NY DFS had "uncovered a number of potential conflicts of interest between Ocwen and [Altisource]" that "cast serious doubt on recent public statements . . . that Ocwen has a 'strictly arm's-length business relationship' with [Altisource]."

- Two months later, the April 21 DFS Letter raised additional "significant concerns" that Altisource and Ocwen were engaged in "self-dealing" through Altisource's over-charging of Ocwen customers.

- Shortly thereafter, the August 4 DFS Letter raised further concerns regarding a "troubling transaction" between Ocwen and Altisource that was approved by Erbey in an apparent "gross violation" of public statements that Erbey would recuse himself from all related-party transactions.  The August 4 DFS Letter also reported that one particular transaction "appear[ed] designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work."

- The October 21 DFS Letter described "serious issues with Ocwen's systems and processes" for mortgage loan servicing that "raise critical questions about Ocwen's ability to perform its core function of servicing loans."  Specifically, the October 21 DFS Letter highlighted Ocwen's practice of "backdating [] potentially hundreds of thousands of letters to borrowers, likely causing significant harm" by causing unjustified foreclosures.  The NY DFS reported that Ocwen admitted that "senior management" was informed of the backdating problem as early as November 2013 but failed to "alert its regulators, borrowers, or other interested parties to these issues."

10.     Ultimately, on December 22, 2014, Ocwen was forced to enter into a Consent Order with the NY DFS (the "2014 Consent Order") in which it **admitted** to the details of the Defendants' fraudulent conduct, and ***paid $150 million in penalties and restitution*** for knowing and willful

violations of the New York Banking Law.  As stated in the 2014 Consent Order, the NY DFS found, and Ocwen "agreed," that its business dealings with Altisource constituted "numerous and significant violations" of New York State laws and regulations.

11.     In response to each of these revelations, the market reacted swiftly and caused Altisource's stock price to suffer significant and immediate declines, erasing a total of over *$1 billion* in shareholder market capitalization.

12.     Specifically, the 2014 Consent Order revealed that, during the Class Period, Altisource, Ocwen and Erbey improperly operated with "widespread conflicts of interests" and engaged in self-dealing transactions designed to enrich Erbey (and other senior Altisource and Ocwen executives) by, among other things, requiring Ocwen's captive borrowers to use, and ultimately pay for loan services performed by Altisource at above market rates.

13.     One of the most glaring undisclosed conflicts of interest that Ocwen admitted in the 2014 Consent Order was that, contrary to Defendants' statements that Altisource and Ocwen were "independent" and had completely "separate management," the two companies shared several executive officers and were managed as one business entity.  Most glaringly, one of Altisource's six "C-Level" executives – its Chief Risk Officer – concurrently (and secretly) served as Ocwen's Chief Risk Officer.  It was grossly improper for both companies to secretly share a Chief Risk Officer because the risks inherent to Altisource and Ocwen were often in conflict.  For example, in his role as head of Ocwen's Internal Review Group, which was specifically created to ensure Ocwen's compliance with governing regulations, Ocwen's Chief Risk Officer was responsible for discovering deficiencies in Altisource's REALServicing.  Simultaneously, in his role as Altisource's Chief Risk Officer, he was charged with protecting against raised costs and preventing Ocwen from discovering serious deficiencies in REALServicing and replacing it with a better system (such as its major competitor Fiserv).  The clear conflict of interest posed by this dual role was well known throughout the companies and was communicated to Defendants. Former employees of both Altisource and Ocwen have also confirmed that other executives and managers also worked for both companies during the Class Period, and the companies jointly

6

operated and staffed important departments, including payroll, accounting, human resources and IT, contrary to the Altisource and Ocwen Defendants' representations to Altisource investors that the companies were "independent" and not affiliated.

14.     In short, according to a former Director of Valuations at Altisource, while Altisource may have technically been a separate entity, the separation was fictional and said "with a wink." As this former Altisource employee explained, "we basically worked for Ocwen," but were told not to "say it out loud or write it in an e-mail."

15.     The Consent Order and the additional evidence set forth in the DFS Letters also revealed that Defendant Erbey, Altisource's and Ocwen's Chairman and leader who, by all accounts, "ha[d] the last word on all important decisions," lied about his recusal from conflicted transactions. Specifically, the Consent Order confirmed the allegations set forth in the August 4 DFS Letter, and found (and Ocwen admitted) that Erbey refused to "recuse[] himself from approvals of several transactions" involving Ocwen and Altisource, and, instead, personally approved a "pass through" agreement for force-placed insurance services that caused struggling Ocwen borrowers to pay Altisource $65 million per year for little or no work. Significantly, under scrutiny from the NY DFS and just a few weeks prior to the 2014 Consent Order, Altisource announced that it would discontinue its entire lucrative force-placed insurance line of business.

16.     Altisource's admittedly conflicted dealings with Ocwen are also evidenced through Altisource's practice of routinely overcharging Ocwen borrowers for services. Contrary to Defendants' representations that Altisource charged Ocwen customers "market rates" based on specified objective criteria, the conflicted business relationship between the companies allowed Altisource to charge auction fees for Hubzu, an Altisource subsidiary used by Ocwen as its principal online auction site for the sale of its borrowers' homes facing foreclosure, "that are up to three times the fees charged to non-Ocwen customers." In the 2014 Consent Order, Ocwen specifically admitted that, "[i]n certain circumstances, [Altisource subsidiary] Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors." Hubzu was not the only Altisource service charging above-market rates

to Ocwen and its customers.  Ocwen and Altisource former employees have confirmed that Altisource regularly charged above market rates to Ocwen customers for other services as well, including real estate appraisals.

17.      The 2014 Consent Order also revealed that Ocwen's "technology systems" and "core servicing functions," which were provided exclusively by Altisource through REALServicing, were "inadequate and ineffective," knowingly accelerated foreclosures, and denied loan modifications through, among other things, the egregious backdating of letters, and violated the law to the detriment of Ocwen's struggling borrowers.  The identity of REALServicing as the cause of Ocwen's servicing deficiencies was further confirmed in a court-filed report issued by Joseph Smith, the independent monitor retained to ensure compliance with a 2012 National Mortgage Settlement between Ocwen and 49 state attorneys general and other regulators (the "NMS Monitor").  The NMS Monitor's December 16, 2014 Report on Ocwen (the "NMS Monitor December Report"), confirmed, through admissions by Ocwen as well as the independent conclusion of a consultant retained by the NMS Monitor, that it was Altisource's REALServicing platform that caused Ocwen's letter backdating and "create[d] a material impact on the accuracy of the letter[s]," wrongfully forcing people out of their homes for failure to comply with falsely accelerated foreclosure deadlines.

18.      The ramifications of the 2014 Consent Order have had, and will continue to have, a significant impact on Altisource's revenue and future earnings. *First*, these revelations caused Altisource's shares to plummet by over *33%* in a single trading day.  *Second*, under the terms of the Consent Order, the NY DFS, among other things, (i) banned Ocwen from acquiring any additional mortgage servicing rights, severely hampering both Ocwen's and Altisource's ability to generate new revenue; (ii) forced Erbey to resign his Chairman positions at Ocwen and Altisource and banned him from any role whatsoever at the companies; (iii) ordered that Ocwen undergo a thorough review of REALServicing and other information technology systems, as well as all related party contracts, and fees charges to Ocwen borrowers by Ocwen or Altisource; and (iv)

prohibited Ocwen and Altisource from "shar[ing] any common officer or employees" or "risk, internal audit, or vendor oversight functions."

19.     In response to the DFS Letters, the 2014 Consent Order, and other corrective disclosures discussed herein, Altisource's stock price crashed from a Class Period high of $170 per share, to close at just $31 per share on December 22, 2014, a staggering decline of 76%.  This action seeks to hold Defendants accountable for their fraudulent misrepresentations, deceptive devices, and fraudulent scheme that harmed Altisource investors and caused a massive destruction of shareholder wealth in violation of the federal securities laws.

## II.    **JURISDICTION AND VENUE**

20.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

21.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

22.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.  In addition, Ocwen is incorporated in the State of Florida, and both Ocwen and Altisource have substantial business operations in West Palm Beach, Florida.

23.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## III.     THE PARTIES

### A.     Lead Plaintiffs

24.     Lead Plaintiffs the Pension Fund of the International Union of Painters and Allied Trades District Council 35 and the Annuity Fund of the International Union of Painters and Allied Trades District Council 35 were appointed by the Court as Lead Plaintiffs by Order dated December 5, 2014.  Lead Plaintiffs are pension funds that manage pension and other assets on behalf of more than 4,000 union members in Massachusetts, Maine, New Hampshire, Vermont, and Rhode Island who have actively participated in "Finishing Trades" as industrial and commercial painters, drywall finishers, wall coverers, glaziers, glass workers, floor covering installers, sign makers, display workers, convention and, *inter alia*, show decorators.  As set forth in Lead Plaintiffs' Certifications Pursuant to the Federal Securities Laws dated January 29, 2015 (DE 50, Exhibit A), Lead Plaintiffs collectively purchased 1,100 shares of Altisource common stock on the NASDAQ at artificially inflated prices during the Class Period and suffered losses from their Class Period purchases of Altisource common stock.

### B.     Defendants

#### 1.     The Altisource Defendants

25.     Defendant Altisource provides back-office mortgage processing and servicing technology to mortgage loan servicing providers.  Its primary client is its former parent Defendant Ocwen.  Altisource was spun-off into a standalone publicly traded company from Defendant Ocwen in August 2009, and from that time, has derived the majority of its revenue from providing services to Ocwen.  Altisource is incorporated in the Grand Duchy of Luxembourg, which allows the Company to benefit from a global effective tax rate of 6%, a significantly lower rate than Ocwen's 11.9% effective tax rate for 2013 and 29.7% tax rate for 2012.  The Company maintains offices throughout the United States, including in this District.  In addition, according to the Company's Form 10-K for the year ended December 31, 2013, at least three Altisource subsidiaries

10

are incorporated and maintain their principal offices in Florida. Defendant Altisource is traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol "ASPS."

26.    Defendant Erbey served as Chairman of the Board of Directors for Altisource from August 2009 through January 16, 2015 when he was forced to resign under the terms of the 2014 Consent Order with the NY DFS. Erbey also served as the Executive Chairman of the Board of Directors of Ocwen since 1996, the CEO of Ocwen from 1988 through October 2010, and as President of Ocwen from 1988 through May 1998. Defendant Erbey is Altisource's and Ocwen's single largest shareholder, and owned or controlled 29% of Altisource's shares and 14% of Ocwen's shares outstanding as of September 30, 2014. Erbey spoke on behalf of Altisource and Ocwen on analyst and investor conference calls and to the press, and signed Forms 10-K filed with the SEC by both Ocwen and Altisource.

27.    At all relevant times during the Class Period, Erbey also served as the Chairman for three other Ocwen-affiliated companies: Altisource Residential Corporation ("Residential"), Altisource Asset Management Corporation ("AAMC"), and Home Loan Servicing Solutions ("HLSS").

28.    Under the terms of the 2014 Consent Order, Erbey was forced to resign his position as Chairman of the Boards of Ocwen, Altisource, Residential, AAMC and HLSS. Erbey is also prohibited under the 2014 Consent Order from serving as a director, officer or employee of these or any other Ocwen-related company. As of September 29, 2014, Defendant Erbey owned or controlled 28% of the common stock of AAMC, 4% of the common stock of Residential, and 1% of the common stock of HLSS.

29.    Defendant Shepro is the CEO of Altisource and has served in that role since August 2009. Shepro has also served as a Director of Altisource since August 2009 and sits on the Board's Executive Committee. Prior to Altisource's spinoff, Shepro served as the President and Chief Operating Officer of its predecessor, Ocwen Solutions. Shepro made statements to investors and analysts during conference calls throughout the Class Period and also signed Altisource's Forms 10-K and 10-Q filed with the SEC. Specifically, Shepro signed Altisource's Form 10-Q dated

April 25, 2013 and the Forms 10-K for 2012 and 2013, dated February 13, 2013 and February 13, 2014, respectively.  Defendant Shepro signed the Sarbanes-Oxley certifications contained in each of Altisource's Forms 10-Q and 10-K that are discussed below.

30.     Defendant Esterman has served as the CFO of Altisource since March 12, 2012. Defendant Esterman previously worked at Deloitte & Touche, LLP.  Defendant Esterman made statements to investors and analysts during conference calls throughout the Class Period and also signed Altisource's financial statements filed with the SEC.  Specifically, Esterman signed all of Altisource's Forms 10-Q during the Class Period except for the April 25, 2013 Form 10-Q; and the Forms 10-K for 2012 and 2013, dated February 13, 2013 and February 13, 2014, respectively. Esterman signed the Sarbanes-Oxley certifications contained in each of Altisource's Forms 10-Q and 10-K that are discussed below, with the exception of the August 25, 2013 Form 10-Q.

31.     Defendants Erbey, Shepro, and Esterman are sometimes referred to herein as the "Individual Defendants."

32.     Altisource and the Individual Defendants are sometimes referred to herein as "the Altisource Defendants."

### 2.     Ocwen

33.     Defendant Ocwen is Altisource's former parent and has remained its largest customer since the August 2009 spin off.  Ocwen originates and services mortgage loans and specializes in servicing subprime and delinquent loans.   To service its loans, Ocwen uses Altisource's REALServicing technology platform and employs Altisource to provide Ocwen borrowers with all ancillary services.  Ocwen is incorporated in Florida with offices in West Palm Beach and Orlando, and headquartered in Atlanta, Georgia. It maintained during the Class Period executive offices in St. Croix, U.S.V.I. and West Palm Beach, Florida. Throughout the Class Period, Ocwen made statements to the market concerning its strategic relationship with Altisource and its use of REALServicing in presentations to investors and in filings with the SEC.  Defendant Ocwen is traded on the New York Stock Exchange under the symbol "OCN."

## IV.   BACKGROUND AND NATURE OF THE FRAUD AT ALTISOURCE

### A.   Ocwen Spins Off Altisource
### And Becomes Its Primary Customer

34.     Altisource's primary source of revenue is generated from the provision of mortgage servicing support to its former parent company Ocwen.  Because so much of Altisource's revenue and revenue growth derives from Ocwen, in order to understand the nature of Altisource's business, as well as the fraud inflicted upon Altisource shareholders by Altisource and Ocwen, it is necessary to understand the nature of Ocwen's business.

35.     Ocwen was founded by Defendant Erbey in 1988.  Ocwen was one of the first non-bank residential mortgage servicers to acquire "mortgage servicing rights," which allowed Ocwen to service loans for a fee on behalf of third parties.  Ocwen specializes in servicing subprime or delinquent home loans, and places a major emphasis on resolving delinquency through loss mitigation or foreclosure.

36.     Mortgage loan servicing became a big business along with the rise of loan securitization and the issuance of residential mortgage-backed securities ("RMBS").  In the typical scenario, a bank or other financial institution would either itself originate mortgage loans or would purchase pools of mortgage loans from bulk loan sellers.  Then, the bank would pool and securitize the loans as RMBS or more exotic securities, and sell the securities to investors.  During the height of the mortgage securitization boom, banks that originated and/or securitized mortgage loans often retained for themselves the rights to service the loans.  As the securitization boom neared its peak, the servicing of distressed loans had grown to become a particularly large and lucrative business.

37.     By 2009, in the face of mounting regulations, costs, and heightened scrutiny, large commercial banks that had once dominated the servicing industry began an exodus from the mortgage loan servicing business, opening up an opportunity for Ocwen to acquire billions of dollars of mortgage loan servicing rights.  Ocwen capitalized on this opportunity and bought huge portfolios of loans from large banks like Goldman Sachs, Morgan Stanley and JP Morgan.  In 2009, Ocwen had a portfolio of approximately 350,000 residential loans.  By the end of 2013,

Ocwen had grown its portfolio to nearly three million residential loans. These acquisitions transformed Ocwen from the 12th largest servicer in the United States into the 4th largest servicer and the largest non-bank servicer in the United States.

38.     Ocwen earns set fees for servicing mortgage loans until a loan is either paid off or defaults and enters foreclosure. The amount of fees earned by Ocwen depends on the unpaid principal balance or "UPB" of its total portfolio. As loans are paid off or are otherwise disposed, the UPB of Ocwen's portfolio declines. Therefore, Ocwen must continuously replenish its portfolio in order to keep its revenues steady, and acquire an ever-increasing number of mortgage servicing rights to grow its revenues.

39.     Ocwen relies on Altisource to service the mortgages in its portfolio through Altisource's provision of a variety of technology and ancillary services for loans in various stages of default, delinquency, and foreclosure. All of Altisource's technology and ancillary services generate lucrative fees above and beyond the set mortgage servicing fees earned by Ocwen. Indeed, although Ocwen ceases to generate any fees from a loan that defaults and enters foreclosure, Altisource makes the bulk of its revenue through the provision of default administration services including services related to foreclosures and short sales.

40.     Altisource has provided mortgage servicing support to Ocwen since its inception. Prior to August 2009, Altisource operated as Ocwen Solutions, a wholly-owned division of Ocwen that was created in 2008. However, Defendant Erbey, who was at the time the CEO and Executive Chairman of Ocwen, felt that the market did not properly value the worth of the services provided by Ocwen Solutions and would not properly value so long as it was part of Ocwen. Thus, under Erbey's direction, on August 10, 2009, Ocwen spun off Ocwen Solutions to create Altisource as a standalone publicly-traded company to capture and be valued for the adjacent revenue it garnered from its ancillary mortgage servicing services, including the lucrative default-related services that Ocwen was barred from providing itself under applicable law and regulations. Following the spin-off, Erbey appointed himself Chairman of Altisource but also retained his position as Executive Chairman of Ocwen.

14

41.     Altisource and Ocwen have remained inextricably linked since the spin-off.  In addition to sharing Defendant Erbey as Chairman, the companies entered into several long-term services agreements pursuant to which Altisource is the exclusive provider of numerous ancillary services to Ocwen or its borrowers.   According to Altisource, these mortgage services include, but are not limited to, "residential property valuation, real estate asset management and sales, trustee management services, property inspection and preservation, insurance services, charge-off mortgage collections, IT infrastructure management, services and software applications including our REALSuite of software products."  Under its exclusive contracts with Ocwen, Altisource was able to reap significant fees for ancillary mortgage services and Ocwen was required to use Altisource as the exclusive provider of all of the mortgage services for Ocwen borrowers.

42.     Altisource's business after the spinoff remained essentially the same as when it was officially a part of Ocwen, and Ocwen remained and continued to expand as Altisource's primary customer and source of revenue.  At all relevant times, Altisource's business consisted of three distinct business lines:  (i) Mortgage Services; (ii) Technology Services; and (iii) Financial Services.  As discussed below, Altisource's Mortgage Services and Technology Services, the two largest business lines by revenue, are of primary relevance to the allegations herein.

## Business Overview



| Mortgage Services | Financial Services | Technology Services |
| --- | --- | --- |
| ▪ Services to the real estate and mortgage marketplaces that are typically outsourced by loan servicers, originators and home owners | ▪ Accounts receivable management and customer relationship management services | ▪ Business process management solutions and distribution solutions to enable the real estate and mortgage marketplaces and infrastructure support |

43.     As indicated on the slide above, Altisource's Mortgage Services segment provides loan origination services (such as valuation and title insurance services) and default administration services (such as sales, foreclosure and property preservation and inspection fee).  The majority of these services are utilized only after a loan is deemed delinquent, in default or entering foreclosure, and include services relevant to the wrongdoing alleged herein:  (i) the facilitation of short sales and foreclosure sales of distressed properties through Hubzu, Altisource's online auction web portal; (ii) the provision of insurance services, including "brokerage services" for force-placed insurance (mandatory insurance taken out by the servicer and charged to the homeowner at generally high rates); and (iii) property valuation services including appraisals.   Altisource repeatedly touted to investors that these services "span the mortgage and real estate lifecycle" and were provided by Altisource "primarily for loan portfolios serviced by Ocwen."   In fact, as set forth in the chart below, Altisource derived between 64% and nearly 73% of its Mortgage Services revenue each year from Ocwen:

| Mortgage Services (MS) Revenues (in millions) | | | | | | |
|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| MS Revenue from Ocwen | $74 M | $136 M | $223 M | $307 M | $424 M | $528 M |
| Total MS Revenue | $103 M | $187 M | $311 M | $453 M | $662 M | $790M |
| Ocwen MS Revenue as % of Total MS Revenue | 71.8% | 72.7% | 71.7% | 67.7% | 64.0% | 66.8% |

Source:  Altisource's Forms 10-K for years 2009 through 2014.

44.     Technology Services provides technology products to handle loan servicing.  In particular, Altisource owned, operated and then leased back to Ocwen its REALServicing platform, a mortgage loan servicing product that provided Ocwen with the technology to process

and service the loans in its portfolio through the life of the loan.  As the Fitch rating agency stated in October 2013, Ocwen's REALServicing is a "legacy" platform the serves as its "core servicing system" that was formerly owned and developed by Ocwen and then turned over to Altisource in 2009.  Ocwen relied exclusively on REALServicing to process and service its loans.  Altisource earned revenue for each Ocwen loan "boarded" on the REALServicing platform, which was recorded under "Technology Services."

45.    REALServicing was a significant source of continued growth for Altisource because the Company earned more fees as Ocwen grew its loan portfolio and boarded these loans onto the REALServicing platform.  Indeed, in its 2013 Form 10-K, the Company attributed increased revenue in 2013 to "Ocwen's growth as loans from its servicing platform acquisitions are boarded on REALServicing."

46.    Altisource generated highly lucrative fees by providing these services to Ocwen and Ocwen-serviced borrowers both prior to and during the Class Period.  As demonstrated in the table below, Altisource's Ocwen-derived and total revenue climbed in tandem with Ocwen's growing portfolio from 2009 through 2013, rising over 500%, from $95 million in Ocwen-derived revenue in 2009 to $502 million in 2013, and $503 million for the first three quarters of 2014:

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| **Related Party Revenue** | $95M | $155M | $245M | $338M | $502M | $667 |
| **Total Consolidated Revenue** | $203M | $301M | $424M | $568M | $768M | $1,079M |
| **Related Party Revenue as % of Total** | 47% | 51% | 58% | 60% | 65% | 62% |

Source:  Altisource's Forms 10-K for years 2009 through 2014.

47.    Altisource's total revenues became increasingly dependent on Ocwen as a percentage of its total revenue.  As the below chart indicates, while slightly less than half of

Altisource's revenue was derived from the provision of Ocwen services at the end of 2009, that figure increased to 65% by the end of 2013:



48.     As discussed below, Altisource was able to generate these large and increasing revenue streams as a result of Ocwen's acquisitions of massive numbers of mortgage servicing rights.

### B.     The Spin-Off Creates Potential Conflicts of Interest For Erbey, Altisource And Ocwen

49.     Altisource's spin-off was the brainchild of Erbey, Ocwen's founder and, at the time, Ocwen's CEO and Chairman, who saw great growth opportunities for non-bank residential mortgage servicers in the wake of the housing crisis. Whereas Ocwen earns a set revenue amount per loan that is limited by the fees paid by the mortgage investors who pay for servicing, the revenues earned by Altisource for its provision of default- and foreclosure-related services to Ocwen and Ocwen's borrowers were not capped at all.   However, the companies' businesses were inherently conflicted, with Ocwen legally obligated to help struggling borrowers stay in their homes and Altisource primarily profiting from foreclosures and defaults.  As a result, Erbey and

Ocwen realized that the fees charged by wholly-owned subsidiary Ocwen Solutions, even if not technically capped, would be scrutinized for conflicts with Ocwen.

50.     Erbey's decision to spin off Altisource from Ocwen directly benefited Erbey, among other Ocwen and Altisource executives.  In August 2009, the initial shares of Altisource were distributed to existing Ocwen shareholders in the spin-off such that every Ocwen shareholder became an Altisource shareholder.  Defendant Erbey stood to gain the most from a successful spin-off by claiming a significant stake in Altisource such that, as of September 30, 2014, Erbey owned 29% of Altisource, more than double his 14% ownership interest in Ocwen.   Thus, for every dollar that Altisource makes, Defendant Erbey's share is 29 cents, but for every dollar that Ocwen makes, his share is 14 cents.

51.     The Altisource spinoff paid off tremendously for Defendant Erbey.  As the chart below demonstrates, Defendant Erbey's stake in Altisource increased 1,600% from $72 million to nearly $1.2 billion between the August 2009 spin-off and December 3, 2013, the day that Altisource stock peaked at $170 shortly before, as discussed below, the truth of Defendants' wrongdoing began to emerge, without any significant increase in the number of shares he owned:

|  | Date and Share Closing Price | No. of Altisource Shares Owned | Total Value |
|---|---|---|---|
| **Spin-Off (8/10/2009)** | $12.20 | 6,292,670 | $72 Million |
| **1st Day of the Class Period (4/25/2013)** | $80.08 | 6,780,071 | $542 Million |
| **Class Period High (12/3/2013)** | $170.19 | 6,809,683 | $1.16 Billion |

52.     Defendant Erbey played an unusually prominent role in both Altisource's and Ocwen's day to day operations.  Erbey was the keynote speaker at every quarterly earnings analyst call for both companies.  Indeed, it was Erbey – and not Altisource's CEO, Defendant Shepro – who was generally recognized as the leader and key decision-maker for Altisource, as well as for the other affiliated companies.  An October 30, 2013 profile of Erbey in *The Street.com* noted that

Erbey "is arguably the leading figure in the rise of an industry known as non-bank mortgage servicing," reporting that "[w]hile Erbey is chairman of five companies and CEO of none, followers of the five companies say he has the last word on all important decisions."

53.    Defendant Erbey was involved in all aspects of both Altisource's and Ocwen's business.  Confidential Witness ("CW") 1, the Director of Valuations at Altisource's Coppell, Texas office from February 2013 through December 2013, explained that, Erbey was involved in even the most minute Company decisions.[1]  For example, CW1 described how it was surprising to see that Erbey was regularly copied "on e-mails of simple reporting numbers (daily execution numbers and valuations)," and thought "my God, this guy is the [Chairman] of Ocwen and he's getting this down in the weeds on this kind of thing – it was just odd."

54.    Erbey's hands-on leadership of and financial interests in both Ocwen and Altisource, together with the codependency of these companies, created the potential for massive conflicts of interest between Ocwen and Altisource.  Such conflicts of interest could materially harm the millions of borrowers with Ocwen-serviced loans that were being provided ancillary services by Altisource, as well as the shareholders of either company.

55.    In order to withstand regulatory scrutiny and dispel concerns of conflicted transactions, Altisource and Ocwen needed to assure borrowers, investors and regulators alike that those conflicts would not lead to predatory business practices that favored Altisource or Ocwen at the expense of the captive borrowers.  To do so, the Altisource Defendants and Ocwen made repeated statements in SEC filings, conference calls and interviews promising that the two entities operated at "arm's length," were "strategic allies," and "non-affiliates," and maintained "separate management"; that Erbey, as Chairman and acknowledged leader of both companies, recused himself from any role in negotiating or approving contracts between the two entities; and that Altisource took great efforts to ensure that it charged Ocwen and Ocwen borrowers "market rates."

---

[1] CWs 1-10 retain the same numeral designation as in the February 2, 2015 Corrected Amended Class Action Complaint.  In light of the Court's September 4, 2015 Order, references to CW2 and CW3 have been removed from the Second Amended Class Action Complaint.

**C.     Ocwen's Ability To Acquire New Servicing Rights
        Is Material To Investors And Is Essential To Altisource's Success**

56.     Despite the legal separation of Altisource and Ocwen in 2009, investors continued to directly tie Altisource's performance and growth potential to Ocwen. The reason for this was clear. Ocwen was Altisource's primary customer, and Altisource's revenue was increasingly dependent on the services it provided to Ocwen and Ocwen's borrowers. Indeed, Altisource's Ocwen-derived revenue grew from 47% of Altisource's total revenue in 2009 to 65% of Altisource's total revenue in 2013. In Altisource's Form 10-K for 2013, filed with the SEC on February 13, 2014, the Company stated that it was "dependent" on its "key customer relationship" with Ocwen, and warned investors that "If Ocwen does not continue to acquire mortgage servicing rights or does not grow its mortgage origination business, our business and results of operations could be negatively impacted."

57.     Altisource stock was positively impacted when Ocwen announced new acquisitions of mortgage servicing rights. Under Altisource's long-term, exclusive dealing agreements with Ocwen, the addition of those mortgage servicing rights directly translated to increased revenue for Altisource through the boarding of loans on REALServicing and the contractually-guaranteed provision of ancillary services to struggling borrowers. Statements, therefore, made by Ocwen about its ability to acquire additional mortgage servicing rights and the ability of Altisource's legacy REALServicing platform to board and process those acquisitions were highly material to Altisource investors. The market understood the connection between the businesses of Altisource and Ocwen, and viewed Ocwen's acquisition of mortgage servicing rights as a bellwether of Altisource's financial health and performance.

58.     Indeed, prior to and throughout the Class Period, analysts from Piper Jaffray, Stephens, Compass Point and Stern Agee repeatedly identified Ocwen's failure to increase its mortgage servicing rights portfolio as a key risk to Altisource's outlook and continued growth, and reacted positively to new acquisitions announced by Ocwen. Analysts from Piper Jaffray attempted to directly quantify the correlation between Ocwen's mortgage servicing rights portfolio

acquisitions and Altisource's profits and share price, estimating on March 6, 2012 that Altisource increased its share value by over $10 per share with every $30 billion addition to Ocwen's servicing portfolio.  The analysts concluded that "[a]s investors can see, new business wins for [Ocwen] are very meaningful to [Altisource]."

59.     Ocwen's statements concerning new acquisitions, REALServicing and, as discussed above, its relationship with Altisource and their management of conflicts of interest, were therefore relevant to Altisource investors.  These representations were communicated to Altisource investors through their dissemination to the market generally and discussion of them in analyst and news reports covering Altisource.  Indeed, Lead Plaintiffs' counsel has not been able to locate a single substantive equity analyst report covering Altisource that does not discuss Ocwen in the analyst's assessments of the Company's risks, value and performance.  Moreover, there was significant overlap between Altisource investors and Ocwen investors by virtue of, among things, the spin-off.   A review of Forms 13-F filed by Altisource reveals that, as of the start of the Class Period, more than half of Ocwen's top 10 investors by dollar value were also top 10 Altisource investors by dollar value.  Additionally, over half of Ocwen's top 10, top 25, top 50, and top 100 investors were also top 100 investors of Altisource.

60.     The market's appreciation of Altisource's dependence on Ocwen's portfolio growth is demonstrated by Altisource's stock price reaction to major Ocwen transactions.  Between December 31, 2009 and December 31, 2013, while Ocwen's mortgage servicing rights portfolio grew from $50 billion UPB to $465 billion UPB, Altisource's Ocwen-derived revenue increased 500% from nearly $100 million to just over $500 million.  During this same period, Altisource's stock price increased nearly 800%, skyrocketing from just $21 per share to nearly $159 per share. This incredible performance was inextricably tied to Altisource's unfettered contractual right to provide valuable services for every one of the nearly 2.9 million loans serviced by Ocwen.  The below chart plots the relative returns of $100 invested in Altisource and Ocwen on the day of the spin-off, with comparisons to the S&P and NASDAQ, and demonstrates how investors in each company closely tracked each other and often reacted to the same news:



61.     By the end of the second quarter of 2012, Ocwen had nearly doubled its mortgage servicing portfolio in just one year, and Altisource had more than doubled its Mortgage Services and Technology Services revenue in that same period.   Analysts predicted that Ocwen and Altisource would continue to grow in the next few years, and Piper Jaffray analysts in a July 26, 2012 report stated that "The outlook for [Altisource] remains strong as [Ocwen's] pipeline is robust and banks continue to sell servicing."   [Altisource] analysts continued to predict Ocwen-based growth during the Class Period.

62.     In the months leading up to the start of the Class Period, Ocwen and Altisource grew dramatically.   On October 3, 2012, Altisource shares rocketed up nearly 17%, trading at $102.69 per share from a previous day's close of $88.05 per share, in direct reaction to Ocwen's announcement of a $750 million acquisition of Homeward Residential Holdings, Inc. ("Homeward"), a transaction that would add 422,000 loans representing approximately $77 billion of unpaid principal balance.   News and investment commentary immediately emphasized how the transaction would directly benefit Altisource.   For example, analysts from Piper Jaffray stated on

October 3, 2012 that: "Based on a sum of the parts valuation, we are raising our price target to $114 from $95. [Altisource's] core business remains leveraged to growth in [Ocwen's] portfolio such that [Ocwen's] acquisition is a clear positive for [Altisource]."

63.     Less than one month later, on October 24, 2012, Altisource's stock price once again shot up, growing over 13% in just one day from an October 23, 2012 closing price of 109.76 per share, to an October 24, 2012 closing price of $124.33 per share, upon news of Ocwen's submission of a winning $3 billion bid on Residential Capital's ("ResCap") (formerly GMAC) loan servicing platform, a deal that would bring in mortgage servicing rights assets totaling more than $272 billion in unpaid principal balance.

> **D.     Ocwen's Growth Attracts Regulators' Scrutiny And Compels Both Ocwen And Altisource To Comply With Specific Mortgage Servicing Guidelines And Practices**

64.     Ocwen's rapid and extreme growth attracted the scrutiny of regulators eager to confirm Ocwen's ability to "effectively handle the increased servicing volume" before taking on the servicing of millions of at-risk borrowers' loans. Without such confirmation, the NY DFS and other regulators had the ability to threaten Ocwen with suspension of its acquisitions and even revocation of its license to do business in particular states. In exchange for the ability to continue its acquisition strategy, Ocwen agreed to comply with – and ensure that Altisource complied with – various regulatory guidelines and practices, including but not limited to those established by the NY DFS in its "Mortgage Servicing Practices" and by the 49 state attorneys general and federal agencies that drafted the "National Mortgage Settlement."

65.     For example, in September 2011, Ocwen agreed to comply with the NY DFS's Mortgage Servicing Practices in exchange for the NY DFS's approval of a planned acquisition (the "DFS Agreement"). Included in these Mortgage Servicing Practices was an express prohibition against Ocwen's purchase of a force-placed insurance policy from any Ocwen affiliate (*i.e.*, Altisource). Significantly, the Mortgage Servicing Practices' reforms and guidelines compelled Altisource's compliance as an Ocwen affiliate that provided services to Ocwen borrowers.

66.     The NY DFS continued to scrutinize Ocwen's acquisitions and adherence to the DFS Agreement throughout 2012.   By the end of 2012, the NY DFS determined that Ocwen had not yet complied and on December 5, 2012 imposed a Consent Order to ensure Ocwen's compliance with the DFS Agreement (the "2012 Consent Order").   The 2012 Consent Order required Ocwen to submit to an onsite independent compliance monitor to "conduct a comprehensive review . . . of Ocwen's servicing operations, including its compliance program and operational policies and procedures" that would include, among things, consideration of "the robustness of Ocwen's established policies and procedures" and "the fairness of servicing fees and foreclosure charges."   This onsite NY DFS monitor commenced his onsite work and investigation of Ocwen in 2013.

67.     At all relevant times, in addition to scrutiny by the NY DFS, Altisource and Ocwen were also bound by the terms of the National Mortgage Settlement.   The National Mortgage Settlement was an agreement between Ocwen (and other servicers) and 49 state attorneys general and federal agencies that created heightened servicing standards, provided for relief to distressed homeowners and provided funding for state and federal governments.   In connection with the National Mortgage Settlement, Ocwen signed a Consent Judgment and submitted to the authority of the independent NMS Monitor, Joseph Smith, who has the authority to levy significant fines in the case of noncompliance.   The NMS Monitor is authorized to assess Ocwen's performance in meeting the standards of the National Mortgage Settlement. As part of his independent oversight, the NMS Monitor has access to Ocwen's business records, computer systems, and personnel.   He publicly releases and files with the United States District Court for the District of Columbia (Civil Action No. 12-00361) (RMS)) compliance reports.   The NMS Monitor consistently reviewed and monitored Ocwen's compliance during the Class Period with the standards set forth in the National Mortgage Settlement.   Pursuant to the National Mortgage Settlement, Ocwen established a purportedly independent Internal Review Group (led by conflicted Chief Risk Officer S.P. Ravi) to assess Ocwen's compliance with the strict standards set forth in the National Mortgage Settlement and report those findings back to the NMS Monitor.

68.    Ocwen's public agreement to adhere to all governing laws and regulations in the NY DFS Mortgage Servicing Practices and the National Mortgage Settlement gave comfort to investors that Ocwen took seriously the need to protect homeowners and abide by the operative regulations in order to continue its acquisition plans and stay clear of regulatory scrutiny.  This assurance was critical to Altisource shareholders because the Company's growth and future viability depended on Ocwen's continued operation and ability to grow, both of which would be in serious jeopardy in the event of noncompliance.  Indeed, as Altisource itself warned the market in its SEC filings, a failure by Ocwen to grow and to abide by the law could "negatively impact[]" Altisource's business.

     **E.**    **Throughout The Class Period, Defendants Falsely**
            **Represented That Altisource Controlled Against Conflicted**
            **Transactions And Provided Compliant Products And Services To Ocwen**

69.    By no later than the first quarter of 2013 (the start of the Class Period), Defendants needed to comply with all of the regulations discussed above in order to continue its growth strategy.  Because many of the new regulations imposed a heightened obligation for Altisource and Ocwen to manage the potential conflicts of interest that had only intensified with the companies' growth, it was important to investors that, throughout the Class Period, Altisource and Ocwen had sufficient systems in place to manage potential conflicts of interest.

70.    Defendants took great pains to convince the market that there were "robust" controls in place to prevent abusive servicing practices that would attract the attention of regulators.  Specifically, throughout the Class Period, the Altisource Defendants and Ocwen trumpeted the companies' "sound corporate governance" policies in place to avoid the conflicts of interest from negatively affecting borrowers and homeowners.  These policies included (i) "Robust Related Party Transaction Approval Policies," including, specifically, Erbey's representation that he recused himself from any decisions involving transactions between Altisource and Ocwen; (ii) the insistence that the two companies have (except for Erbey) "separate management"; and (iii)

"[t]ransparency in intercompany relationships," including the representation that Altisource charged Ocwen and Ocwen's borrowers competitive "market rates."

71.     Defendants also made great efforts to convince the market that the companies had the ability and technology – through Altisource's REALServicing platform – to integrate the millions of new loans coming in from Ocwen's ResCap and Homeward acquisitions.  Defendants assured the market that REALServicing was cost-effective, scalable and able to comply with all applicable laws and regulations.  These assurances conveyed to the market the impression that Ocwen and Altisource were operating in a manner that would allow them to continue their growth.

72.     Unfortunately for investors and borrowers, these assurances were false.  After conducting an extensive investigation, the NY DFS revealed serious and pervasive misconduct at Ocwen and Altisource.  The DFS Letters and the 2014 Consent Order – the facts of which Ocwen admitted – provide detailed information regarding the widespread conflicts of interest and compliance deficiencies that existed throughout the Class Period.  For example, the 2014 Consent Order and DFS Letters specifically describe internal emails, documents and loan file records, including direct communications with Defendant Erbey, which demonstrate, among other things, Erbey's involvement in conflicted related party transactions.   In addition, the NY DFS investigation relied on an onsite monitor located in Ocwen's offices who had direct access to Ocwen and Altisource employees and officers, including shared Chief Risk Officer Ravi, who reported to Erbey.  The NY DFS investigation was specifically focused on the "business relationships between Ocwen Financial Corporation and its affiliated companies, including Altisource," as well as Ocwen's mortgage servicing practices and systems including Altisource's REALServicing platform.

73.     Through this investigation, the NY DFS determined that Ocwen and Altisource (i) shared high-level executive management, (ii) allowed Defendant Erbey to direct and approve related party transactions, (iii) engaged in self-dealing transactions that improperly overcharged Ocwen customers and funneled kickbacks to Altisource; and (iv) could not rely on REALServicing as it was "inadequate and ineffective" and caused, among other failures, the issuance of potentially

hundreds of thousands of backdated letters to homeowners, forcing them into unnecessary foreclosures.  These admitted "widespread conflicts of interest with related parties" created ill-gotten revenue for Erbey and artificially inflated Altisource's stock price throughout the Class Period and misrepresented the sustainability of Altisource's projected growth.

### 1.   Defendants Exploited Rather Than <u>Managed Their Conflicts Of Interest</u>

#### a.   Defendants Tout The Companies' Independent And Separate Management To Deflect Concerns Over Conflicts Of Interest

74.   In light of the amplified regulatory risks posed by the affiliated companies' tangled relationship, Defendants went to great lengths to continue to assure the market that there were sufficient controls in place to manage the many potential conflicts of interest inherent to Altisource's and Erbey's relationship with Ocwen.  Both companies repeatedly emphasized their separation and independence, and detailed their "policies, procedures and practices to avoid potential conflicts with respect to [their] dealings" with the related companies.

75.   For example, on September 30, 2013, Bill Erbey was interviewed by Dean Kenneth Freeman of Boston University Questrom School of Business.  A video of the interview was posted publicly on the school's website and on the YouTube video sharing website, and was publicly reported in the news media.  In the interview, Erbey publicly recognized that investors were "worried" about the interrelated structure of the companies, but emphasized that investors could take comfort in the fact that they were operated at "arm's length" and were only related with respect to "me" (Erbey).  Specifically, in response to a question about the future of his "morphed" conglomerate of companies (including most prominently Ocwen and Altisource), Erbey assured investors that the companies' management and operations were separate and Ocwen and Altisource were truly "non-affiliated":

> We create these companies . . . spins . . . for a couple reasons one of
> which it enables us to capture adjacent revenue in certain cases you
> can't have the same revenue stream in the same business, because

people are worried about whether it's arm's-length, etc.  <u>All the companies are actually not affiliated, they are only related because of me, so they are non-affiliated companies.</u>  [This allows] Altisource [to] capture a lot of adjacent revenue.

76.    Defendants further highlighted this separateness and emphasized these controls during a unique December 3, 2013 Investor Day joint presentation to <u>both</u> Ocwen's and Altisource's analysts and investors (the "December 2013 Investor Day Conference").  On that day, Altisource and Ocwen jointly hosted a two-day event during which the Individual Defendants along with other key executives from Ocwen, Altisource and other related entities, presented on the purported independence of the affiliated entities, as well as on their services, performance and goals.  In fact, Defendant Erbey spoke directly to Altisource and Ocwen investors during the December 2013 Investor Day Conference and "<u>stress[ed]</u> . . . that [Altisource and Ocwen] are not affiliates, that they are <u>independent companies</u> . . . [that] have <u>independent boards</u> and they have <u>[independent] management teams</u>."  Altisource and Ocwen further emphasized this point with a slide presentation that highlighted the safeguards put in place to ensure that the companies were independent and had "<u>sound Corporate Governance</u>," that included an insistence on "<u>separate Boards with separate management</u>."

77.    As has now been revealed and admitted in the 2014 Consent Order, Defendants' public representations that the two purported "non-affiliated" "strategic allies" were "<u>independent companies</u>" that <u>operated at "arm's length</u>," and had "<u>sound corporate governance with separate boards and separate management</u>" and "<u>[independent] management teams</u>," were false.  Altisource and Ocwen improperly and secretly co-employed several high level officers, including but not limited to their joint Chief Risk Officer, S.P. Ravi, one of only six "C-Level" officers at Altisource during the Class Period.  Moreover, former employees detail how the top executives of both companies ran the two companies as one enterprise, forcing employees to choose vendors and services that benefited Altisource at the expense of innocent Ocwen borrowers.

(1)    One Of Six Altisource "C-Level" Officers Secretly Worked For Ocwen, Causing Significant Conflicts Of Interest

78.     Given that the relationship between Ocwen and Altisource was so highly regulated and scrutinized, perhaps the most important C-level executive to ensure that Altisource and Ocwen remained at arm's length and did not take advantage of captive Ocwen borrowers (which would also ensure the viability of the business model)– was each company's Chief Risk Officer. Altisource reported that its Chief Risk Officer was an individual named S.P. Ravi. As set forth in an April 25, 2013 Form 8-K, Altisource explained that Ravi "previously [and not currently] served as VP for Ocwen Financial Corp." Similarly, during the Class Period, Ravi was listed and pictured on the Company's website as one of Altisource's top six "C-level" executives. The website identified Ravi as Altisource's Chief Risk Officer, who "previously served as Vice President and Chief Risk Officer for Ocwen Financial Corporation." Altisource's description of Ravi as having "previously" served as Ocwen's Chief Risk Officer clearly communicated to investors that he was no longer employed by Ocwen. Indeed, the description of Defendant Shepro on Altisource's Class Period website similarly indicated that "Mr. Shepro previously served as President and Chief Operating Officer of Ocwen Solutions at Ocwen," a position he resigned from upon his appointment as Altisource's CEO. Nowhere on Altisource's website or in public filings, including in Ravi's biographical description, did the Company indicate that Ravi was concurrently also serving as Ocwen's Chief Risk Officer.

79.     However, as Ocwen has now admitted in the 2014 Consent Order, Altisource's Chief Risk Officer Ravi was simultaneously serving as both Altisource's and Ocwen's Chief Risk Officer and "reported directly to Mr. Erbey in both capacities" throughout most of the Class Period.

80.     A company's "chief risk officer" serves a critical role and is tasked with identifying, analyzing, and mitigating circumstances that can threaten the company. The chief risk officer must work to (i) ensure that the company is in compliance with, among other things, government regulations and (ii) develop internal controls to identify and prevent areas of risk, including compliance and regulatory issues. The role of the chief risk officer became increasingly important to a company's regulatory compliance following the financial meltdown of 2008. In a white paper titled "The Role of The Chief Risk Officer:  Why You Are The Most Important Person In Your

Financial Institution," Michael D. Cohn, the Director of Wolf & Company, wrote that "the CRO has become the most important person in the financial institution today [because] financial institutions are increasingly becoming more risk-oriented in their strategic and operational focus." Given the divergent business models of Altisource and Ocwen (the former focused on maximizing foreclosures, while the latter focused on keeping borrowers in their homes), it was critical that the two companies have two independent officers overseeing their risk management. Standard & Poor's ("S&P") described the critical responsibilities held by Ocwen's Chief Risk Officer. S&P stated that the unnamed Ocwen Chief Risk Officer oversaw the internal audit, quality assurance and information security divisions of Ocwen's risk management group. In addition, the Ocwen Chief Risk Officer met bi-monthly with "key [Ocwen Loan Servicing] management" along with the director of internal audit and general counsel "to discuss audit activities and areas of risk."

81.     Thus, the role played by Ocwen's Chief Risk Officer – to protect against areas of risk and ensure the quality of Ocwen's loan servicing – created serious conflicts of interest with Altisource, a company that was focused on foreclosures and whose risks were publicly stated to be managed by Ravi. This is especially true because Ravi, in his capacity as Ocwen's Chief Risk Officer, was the head of Ocwen's purportedly independent Internal Review Group, a fact confirmed by CW4, who worked as a Supervisor within Ocwen's Internal Review Group between February 2013 and March 2014. In that role, he was required to independently assess, among other things, Altisource's proprietary REALServicing platform's ability to service loans in compliance with the standards set forth in the National Mortgage Settlement, and to report those findings directly to the NMS Monitor and to Ocwen's Board of Directors. It was grossly improper to task Ravi with heading up the Internal Review Group while serving as Altisource's Chief Risk Officer, who was obligated to protect Altisource's business and revenues.

82.     The serious conflicts of interest created by Ravi's dual role were first raised by the NY DFS in the February 26 DFS Letter. In that letter, the DFS stated that it had recently forced Altisource to remove Ravi as its Chief Risk Officer, and had significant concerns that Ravi – the officer responsible for ensuring that both companies' risk was managed – did not even "appreciate

the potential conflicts of interest posed by this dual role."  Moreover, the NY DFS reported that not only did Ocwen pay Ravi his salary – despite Altisource reporting he was its Chief Risk Officer – but that Ravi "did not know and had apparently never asked which company paid his risk management staff," which also provided services for both companies.  The NY DFS concluded in the February 26 DFS Letter that the "failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination." Ultimately, as part of the 2014 Consent Order, Ocwen admitted to the impropriety of, unbeknownst to investors, employing Ravi as its Chief Risk Officer while he also served as Altisource's Chief Risk Officer.  Ocwen also agreed that it "will not share any common officers or employees with any related party," indicating that Ravi's co-employment had not been an isolated incident.

83.    Former Ocwen and Altisource employees confirmed that Altisource and Ocwen shared the same Chief Risk Officer as well as other key executives, contrary to their public statements.  For example, CW1, the former Director of Valuations at Altisource during the Class Period, explained that all of the "C" level executives at both Ocwen and Altisource – the CEO, CFO and others – ran the two companies jointly.  CW1 stated that "everybody in the C suite were running things together" regardless of official company assignations.  CW1 described how he participated in weekly "Leadership" meetings with Altisource and Ocwen's senior management, including Erbey, Shepro, and Esterman, during which the two companies' issues.  These weekly meetings were not narrowly limited to the business relationship between Ocwen and Altisource, but included discussion of broader issues such as compliance.

84.    Like the conflicts present in connection with writing contracts between the two companies, the conflicts posed by this role are abundantly clear.  Ravi simply could not effectively protect both companies from risk without causing harm to the other.  For example, should Ravi have determined that Altisource's REALServicing platform used by Ocwen was inferior to other available platforms and should be replaced – something that, as discussed below, had been communicated to him – he could not make that decision on behalf of Ocwen without causing harm to Altisource.  Similarly, Ravi's dual role prevented him from independently controlling the risk

of Ocwen's illegal letter backdating caused by Altisource's REALServicing "mapping issue," described below, because fixing the problem (by selecting another platform or overhauling REALServicing) would necessarily harm Altisource by increasing its costs or severely reducing its revenues.

(2)    The Companies' Senior Management And Key
Departments Overlapped, Causing Additional
Significant Conflicts Of Interest

85.    Former Ocwen and Altisource employees have identified additional executives employed by both Altisource and Ocwen.  For example, CW5, a Senior Compliance Analyst at Ocwen from January 2012 to September 2014, stated that Altisource and Ocwen co-employed several executives, including the former Director of Quality Assurance who reported directly to Ravi, a Senior Manager in the Relationship Manager Department whose direct "reports would handle calls for both Ocwen and Altisource," and a Senior Vice President of Risk Management. CW5 stated that there was little distinction between the companies because "you worked for Bill Erbey, bottom line."

86.    Former Altisource employees have exposed that, in reality, Altisource was not independent and, in fact, there was simply no separation between Altisource and Ocwen – an open secret within Altisource that the companies took great pains to conceal.  CW1 reported directly to Kevin Raney, the Vice President of Valuation.   CW1 stated Altisource employees "basically worked for Ocwen."   CW1 explained that while the companies were technically separated (acknowledged "with a wink"), they operated as one entity.   While this was common knowledge within Altisource, Altisource employees were strictly forbidden from telling anyone that they worked for Ocwen, and were even instructed not to say out loud or write in an e-mail that they worked for Ocwen.   CW1 explained how his superior, Raney, "met frequently" with Defendants Erbey and Shepro and Ocwen CEO Faris – and was "very particular about being careful with the language of how you talked about Ocwen in an e-mail."

87.    Additional former Altisource employees also recounted how there was little physical separation or employee independence between Altisource and Ocwen.  CW6, a Senior

33

Manager in Altisource's Texas office from December 2012 through September 2014 described how managers and other employees would swing like a "pendulum" between positions at Altisource and Ocwen because they were all "part of the same team" with Defendant Erbey serving as "the eyes behind the curtain."  Moreover, CW7, a former Director of Real Estate Owned Asset Management in Altisource's Florida offices who had worked at Ocwen for 16 years until the spin-off, and then with Altisource from August 2009 until February 2013, described how after the spin-off, Altisource remained in the same offices with Ocwen and that there was "no separation at all."

88.     The conflicts of interest caused by the commingled management at Ocwen and Altisource were far-reaching and affected many departments within each company.  For example, CW11, a Manager of IT Operations at Altisource from July 2013 through March 2015, reported that there were several "shared employees" whom CW11 worked with who were formally employed by either Ocwen or Altisource but, in reality, worked for both companies.  CW11 recalled that Suresh Iyer, the Director of Information Security from October 2013 through the present, was shared by both Ocwen and Altisource, despite supposedly working solely for Ocwen on paper.  This arrangement ensured that there would be no safety precautions or any type of wall between the two companies.  CW11 specifically identified the group that was responsible for both "Information Security" and "Risk" compliance – that was headed by conflicted Chief Risk Officer Ravi – as a key group whose employees worked for both Ocwen and Altisource.  CW11 observed this overlap firsthand through CW11's position as Manager of IT Operations.

89.     CW11 also explained that there was an "inappropriate" commingling of several IT operations during CW11 tenure at Altisource.  For example, the two companies' "e-mail systems were combined" such that Altisource employees could see calendars and address books of Ocwen employees.  CW11 also explained that the two companies were so integrated that all software licenses acquired by Altisource would be allocated to both companies jointly.  CW12, a Senior Manager of Valuations with Altisource from March 2013 to June 2014, further corroborated the interdependence and lack of separation between the two companies, explaining that Ocwen and Altisource shared Human Resources, Accounting and Payroll departments.  CW12 stated that this

overlap was evident because any e-mail sent to those departments from Altisource employees had an "@ocwen.com" email address.  Moreover, CW7, a former Director of Real Estate Owned Asset Management in Altisource's Florida offices described above, also reported that Altisource controlled the payroll department and all IT functions for both Altisource and Ocwen.

90.     Only in late 2014/early 2015, following the crippling 2014 Consent Order, did the companies commence an initiative to separate their operational and IT systems.  During that same period, according to CW11, the companies began to separate certain human resources functions, to create separate organizational charts for the two companies, and to create physical barriers within office spaces shared by Altisource and Ocwen.  Implementation of these changes was fast-paced.  CW11, as Manager of IT Operations, was personally involved in the separation of various IT services and products, and was informed by managers that the "reason for urgency" on this separation was the "legal issues" facing the companies.

### b.     Altisource Over-Charged Ocwen Borrowers For Its Services

91.     Contrary to Defendants' repeated public statements emphasizing their commitment to charging Ocwen borrowers "market rates," the 2014 Consent Order demonstrates, and former employees confirm, that these statements were false.

92.     Indeed, throughout the Class Period, Altisource and Owen repeatedly made assurances that Ocwen borrowers were not being subjected to unfair pricing through their forced use of Altisource's services.  For example, in its SEC filings, Altisource said: "the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers."  Similarly, in its April 7, 2014 Proxy Statement, Altisource stated that "[t]he Company provides all services [to Ocwen] at rates it believes to be comparable to market rates."  Significantly, Ocwen made identical statements regarding Altisource's guarantee of "market rates" in its Class Period SEC filings, thereby

reinforcing to the market that the contracts and service agreements between Altisource and Ocwen were fair, proper and conducted at arm's length.

93.     Given long-term agreements that required Ocwen and its borrowers to use and pay for Altisource's services, as well as Defendant Erbey's position and ownership interests in both companies, both Altisource and Ocwen could - and, unbeknownst to investors, did – create improper incentives in the fees Altisource charged Ocwen, these statements were critical to assure the market and borrowers that there was no secret self-dealing going on.  Further, by assuring the market that Altisource was charging only "market rates" for its services and not taking advantage of captive Ocwen borrowers, Altisource communicated a false picture that its mortgage products and services provided revenue that was sustainable even without Ocwen's business.

94.     In reality, these assurances were false and misleading.  As the NY DFS found when investigating the "conflicted business relationships" between Ocwen and Altisource, and Ocwen admitted in the 2014 Consent Order, Altisource overcharged Ocwen for certain services.     For instance, Altisource's online auction site Hubzu charged Ocwen an above market fee of up to three times for listing on its auction website.  As detailed by the NY DFS in the Consent Order and the April 21 DFS Letter, Altisource, through Hubzu, had been charging Ocwen customers inflated fees that were "up to three times the fees charged to non-Ocwen customers."   Ocwen's own internal documents demonstrated that "when Ocwen selects its affiliate Hubzu to host foreclosure or short sale auctions on behalf of mortgage investors and borrowers, the Hubzu auction fee is 4.5%." Based on its "review[] [of the] business relationships between Ocwen Financial Corporation and its affiliated companies, including Altisource Portfolio Solutions S.A.," the NY DFS reported that, "when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%." Altisource's and Ocwen's overcharging of Ocwen customers was so entrenched that the NY DFS reported that, "[f]urther illustrating the web of connections between the affiliated companies, the underlying HTML code for Hubzu's website" actually queries whether Ocwen is the seller of the property being listed on Hubzu and, if so, automatically charges higher fees for the same services as provided to non-Ocwen-serviced properties.

95.      This overcharging of Ocwen-serviced businesses on Hubzu had a significant impact.  These higher fees were passed on to struggling borrowers who were, according to the NY DFS, "trying to mitigate losses and are not involved in the selection of Hubzu as the host site." Thus, because Ocwen used Hubzu as its principal online portal for selling borrowers' homes facing foreclosure and the majority of properties listed on Hubzu were being serviced by Ocwen, this self-dealing arrangement benefited Altisource and Erbey at the direct expense of numerous Ocwen-serviced borrowers.  The April 21 NY DFS Letter concluded that Altisource's pricing of Hubzu services to Ocwen "raises significant concerns regarding self-dealing."

96.      Three days after the NY DFS issued its letter, Altisource responded to the NY DFS's statements in an attempt to allay investors' concerns and prevent a steeper stock decline. Specifically, on an April 24, 2014 investor conference call, Defendant Shepro stated that Altisource "firmly believes" that Hubzu "provides a very transparent and efficient method to sell real estate [and] that the rates we charge are in line with or lower than industry standards."   In this denial, Shepro stated that the NY DFS's concerns about Altisource's pricing to Ocwen and its customers were unfounded, claiming that "we are charging the same or less than anyone else would typically charge a servicer for the services that we provide and we charge other customers in line with what we charge Ocwen."  Shepro did not address in any detail the discrepancies uncovered by the NY DFS concerning the 4.5% premium charged to Ocwen borrowers and the 1.5% premium charged to others.

97.      Notwithstanding Altisource's detailed denial, the NY DFS still determined, and Ocwen admitted, that Hubzu overcharged Ocwen borrowers.  Significantly, this determination and admission were reached after the NY DFS continued its investigation for an additional eight months, and reviewed additional documents produced on this exact issue.  Specifically, the NY DFS firmly concluded, and Ocwen admitted, this over-charging in the 2014 Consent Order, stating: "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen then to other customers - charges which are then passed on to borrowers and investors."

98.     Ocwen also admitted in the 2014 Consent Order that another Altisource subsidiary, REALHome Services and Solutions, Inc. ("REALHome"), which Ocwen used as its "default real estate agency for short sales and investor-owned properties," overcharged borrowers.  Specifically, REALHome provided inferior agency services because it "principally employs out-of-state agents who do not perform the onsite work that local agents perform," but charged borrowers as if the agents were local agents performing on-site work.  For example, New York borrowers forced to sell their homes would be charged fees equal to those paid to local real estate agents in New York for marketing the homes and securing the best sale prices.  However, in reality, the marketing and sale services were rendered by real estate agents located several states away with no expertise in the area who did not perform onsite visits to see the properties.  Thus, the Ocwen borrowers vastly overpaid for substandard services provided by Altisource.

99.     Former employees confirm that Altisource's undisclosed practice of overcharging captive Ocwen customers was widespread and not limited to the Hubzu and REALHome arrangements.  CW1 stated that Altisource regularly overcharged borrowers by misrepresenting the quality of the services being provided.  In this regard, CW1 described a practice whereby Altisource charged Ocwen borrowers a standard rate for a home valuation but, in reality, provided "a really cheap version" of that valuation that was of far lesser quality.

100.    CW8, Altisource's former Chief Appraiser for Default Valuation from April 2013 through July 2014, who worked in Ocwen's Coppell, Texas offices and had previously been employed by Ocwen, provided additional information about Altisource's practice of overcharging for appraisal services.  CW8 described how Altisource significantly overcharged Ocwen investors for appraisals while pocketing all of the excess charges.  CW8 stated that Ocwen's "entire [valuation] operation was completely delegated to Altisource."  In this regard, CW8 explained that Altisource was responsible for choosing the form of appraisal and would then pass on the cost of the appraisal to borrowers through Ocwen.  According to CW8, Altisource, with Ocwen's knowledge, regularly overcharged borrowers for appraisals and pocketed the difference.

101.    CW8 explained that the costs of an appraisal are passed through Altisource to Ocwen, and then Ocwen collects fees for the appraisal from the borrower or investor.   CW8 provided an example of a typical situation whereby Altisource pays $80 for a broker price opinion ("BPO") - a type of property valuation metric - and then charges Ocwen, and by extension Ocwen borrowers, nearly double, or $150 for that service.   CW8 described this overcharging as "the business model of Altisource . . . [charging] substantially above market rate for the [appraisal]." Based on CW8's observations and experience, Altisource charged "substantially above market rate for the BPO and then Ocwen guaranteed that Altisource was the source for the BPO - they were exclusive."

**c.      Erbey Participated In Conflicted Transactions That Improperly Funneled Money To Altisource At Borrowers' Expense**

102.    At the center of the alleged fraud is Defendant Erbey, who until his termination on January 16, 2015, led and served as Chairman of both Ocwen and Altisource (as well as three other related companies).   Throughout the Class Period, Altisource, Ocwen and Erbey repeatedly assured investors in SEC filings and in a joint presentation and conference call on December 3, 2013 that they followed specific "[r]obust [r]elated [p]arty [t]ransaction" "policies, procedures and practices" to "avoid potential conflicts" that "may arise . . . because of [Altisource's] ongoing agreements with Ocwen," "the nature of [Altisource's] respective business" and Erbey's "substantial investments" in Altisource and the other related companies.   Most prominent among these purportedly followed "policies, procedures and practices" was the representation that Erbey "recus[ed] himself from negotiations regarding, and approvals of, transactions" between Altisource and Ocwen.

103.    In reality, Defendants failed to follow these policies, practices and procedures. Specifically, Ocwen admitted in the 2014 DFS Consent Order that Erbey knowingly failed to recuse himself in "a number of transactions between the two companies or from which Altisource

received some benefit, including the renewal of Ocwen's force-placed insurance program in early 2014."

104.    The NY DFS first raised concerns about Erbey's refusal to recuse himself – and the harm suffered by Ocwen homeowners as a result of that failure – in the August 4 DFS Letter where the NY DFS stated that this failure appeared to be "a gross violation of [Altisource's and Ocwen's] supposed recusal policy."

105.    Specifically, the August 4 DFS Letter detailed an example of how Defendant Erbey involved himself and played a primary role in negotiating and approving a sweetheart deal between Ocwen, Altisource and a third-party insurance agent, SWBC, that would improperly funnel $65 million annually – close to 10% of the Company's total revenue and nearly 50% of the Company's net income for 2013 – to Altisource in exchange for minimal work, while concealing Altisource's role in the provision of the insurance.

106.    In the letter, the NY DFS raised "serious concerns about the apparently conflicted role played by Ocwen Executive Chairman William Erbey and potentially other Ocwen officers and directors in directing profits to Altisource, which is related to Ocwen but is formally a separate, publicly-traded company."  The NY DFS suggested that Erbey orchestrated the force-placed insurance transaction to directly enrich himself, given his greater ownership interest in Altisource:

> As you know, Mr. Erbey is Ocwen's largest shareholder and is also the Chairman of and largest shareholder in Altisource. In fact, Mr. Erbey's stake in Altisource is nearly double his stake in Ocwen: 29 percent versus 15 percent. Thus, for every dollar Ocwen makes, Mr. Erbey's share is 15 cents, but for every dollar Altisource makes, his share is 29 cents.

107.    Force-placed insurance, which Altisource referred to in public filings as "lender placed insurance," is insurance forced on a borrower by a loan servicer when the borrower fails to maintain his own or sufficient homeowners insurance.  It is typically a more expensive alternative to homeowners' insurance, costing sometimes two to ten times as much as a borrower would pay for insurance taken out voluntarily, and can result in large increases in borrowers' monthly

payments.  In fact, in certain circumstances, the extra expense of higher premiums "can push already struggling families over the foreclosure cliff," according to the NY DFS.  Additionally, if mortgage borrowers refuse to pay for the newly purchased insurance, a servicer may be entitled to foreclose on their homes.

108.    As force-placed insurance is usually only required when there is effectively no customer to select an insurance provider, there is significant potential for conflicts of interest, kickbacks and self-dealing.  In particular, the NY DFS noted in the August 4, 2014 Letter that in a recent investigation, it had uncovered evidence suggesting that "mortgage servicers were setting up affiliated insurance agencies to collect commissions on force-placed insurance, and funneling all of their borrowers' force-placed business through their own agencies." These agencies "had an incentive to purchase force-placed insurance with higher premiums because the higher the premiums, the higher the commissions kicked back by insurers to the servicers or their affiliates."

109.    The NY DFS has been focused on Ocwen's use of force-placed insurance for years. To start, in September 2011, the NY DFS required Ocwen to agree that "[i]n no event shall [Ocwen] purchase a master hazard insurance policy from an affiliated entity" such as Altisource.  Then, two years later, in September 2013, the NY DFS continued to crack down on force-placed insurance and announced heavier prohibitions on kickbacks to servicers and their affiliates.  The prohibitions included forbidding force-placed insurers to (i) "pay commissions to a bank or servicer or a person or entity affiliated with a bank or servicer on force-placed insurance policies obtained by the servicer;" or (ii) "make any payments, including but not limited to the payment of expenses, to servicers, lenders, or their affiliates in connection with securing business."

110.    In direct violation of these regulations and the companies' purported recusal policies, Ocwen and Altisource devised a lucrative force-placed insurance sweetheart deal for Altisource through a series of transactions directly approved by Erbey in January 2014.  According to the NY DFS, Altisource's force-placed insurance program was no inadvertent mistake; rather, it was the result of an elaborate year-long scheme designed to circumvent regulations and borrowers' protections implemented by the NY DFS and other regulators in order to funnel money to

Altisource from homeowners saddled with force-placed insurance.  As the NY DFS explained in the October 21 DFS Letter, this conclusion was the result of an investigation which included the review of documents, including an Altisource memo to Ocwen's Credit Committee and contracts involving Ocwen and Altisource, and the work carried out by the NY DFS's onsite independent monitor.  Indeed, in the August 4 DFS Letter, Superintendent Lawsky wrote:

> Based on [the NY DFS's] investigation and through the [DFS] Monitor's work, the Department understands that Ocwen's force-placed arrangement with Altisource features the use of an unaffiliated insurance agent, Southwest Business Corporation ("SWBC"), apparently as a pass-through so that Ocwen and Altisource are not directly contracting with each other, but Altisource can still receive insurance commissions and certain fees seemingly for doing very little work.

111.    The scheme arose out of Ocwen's December 27, 2012 acquisition of the Homeward servicing portfolio and ancillary businesses.  On January 31, 2013, Ocwen sold certain of Homeward's fee-based businesses, including its insurance division subsidiary Beltline Road Insurance Agency Inc. ("Beltline"), to Altisource.

112.    Thereafter Ocwen appointed Beltline, now an Altisource subsidiary, as its "exclusive insurance representative" tasked with finding an insurance company to provide Ocwen with force-placed insurance, as its existing force-placed arrangement was set to expire.  The NY DFS concluded from its analysis of internal documents that, in reality, "a careful review of these and other documents suggests that Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself."  Indeed, in conjunction with Altisource's selection of SWBC as the insurance company to provide Ocwen with force-placed insurance, Altisource "recommended itself to provide fee-based services to SWBC."

113.    Specifically, Altisource devised a transaction whereby Altisource contracted with SWBC, an unaffiliated insurance agent in exchange for certain fee-based services.  These contracts made it superficially appear as if Ocwen and Altisource had not entered into the same transaction.

42

However, Ocwen's contract with SWBC—approved solely by Defendant Erbey—"indicate[d] that Altisource [would] generate significant revenue from Ocwen's new force-placed arrangement while apparently doing very little work."

114.    The agreement with SWBC was intentionally designed to funnel commissions and fees to Altisource without the exchange of meaningful work.  First, as detailed in the August 4 DFS Letter, Altisource would "reap enormous [15%] insurance commissions for having recommended that Ocwen hire SWBC."  The NY DFS concluded that Altisource would receive $60 million annually based on "Ocwen['s] expect[ation] to force-place policies on its borrowers in excess of $400 million net written premium per year."  Second, Altisource would be paid 75% of SWBC's total per loan monitoring fee – valued at $5 million per year based on Ocwen's loan portfolio – in exchange for providing technology support to SWBC for its monitoring services, support that it was already contractually obligated to provide through Altisource's existing services agreements with Ocwen. Significantly, Ocwen paid SWBC double for its monitoring services than it had paid to its prior insurance provider – 20 cents per loan as opposed to 10 cents per loan – just so the $5 million in kickbacks could be transferred to Altisource.

115.    Internal Ocwen documents demonstrate Erbey's direct involvement in this deal. Specifically, in January 2014, Altisource sent a memo to Ocwen's Credit Committee (on which Erbey sat), recommending SWBC as the manager of Ocwen's force-placed insurance program, and recommending itself to provide fee-based services to SWBC.  Internal documents demonstrate that Defendant Erbey and two other members of Ocwen's Credit Committee approved this transaction involving both SWBC and Altisource on January 15 and 16, 2014.  With respect to the January 2014 vote, the NY DFS determined that "the Credit Committee did not meet to discuss this proposal, no minutes were taken of the Credit Committee's consideration of this proposed transaction, and the proposed transaction apparently was not presented for review or approval to any member of [Ocwen or Altisource's] Board of Directors except Erbey." Thus, far from recusing himself as both Altisource and Ocwen claimed occurred, Erbey was the decision maker.  On June 1, 2014, Ocwen and Altisource executed contracts formalizing this new force-placed arrangement

43

based on Erbey's January approval and "apparently without the further consideration of any Board member other than Mr. Erbey."   Once again, contrary to Altisource's and Ocwen's public representations throughout the Class Period, Erbey actively participated in the improper related party transaction.

116.   The NY DFS concluded the August 4 DFS Letter with a request for Ocwen to provide "every instance where Mr. Erbey has approved a transaction involving a related company notwithstanding Ocwen's statements to the contrary" because:

> The Department and its Monitor have uncovered a <u>growing body of evidence</u> that Mr. Erbey has approved <u>a number of transactions</u> with the related companies, <u>despite Ocwen's and Altisource's public claims – including in SEC filings – that he recuses himself from decisions involving related companies</u>. Mr. Erbey's approval of this force-placed insurance arrangement as described above appears to be <u>a gross violation of this supposed recusal policy</u>.

117.   Ultimately, the DFS concluded and Ocwen admitted that "[d]espite Mr. Erbey's holdings in [Altisource and Ocwen], Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties."   Specifically, in the 2014 Consent Order, Ocwen admitted that "Mr. Erbey, who owns approximately 15% of Ocwen's stock, and nearly double that percentage of the stock of Altisource Portfolio, <u>has participated in the approval of a number of transactions between the two companies or from which Altisource received some benefit</u>, including the renewal of Ocwen's forced placed insurance program in early 2014."

118.   The language used by the NY DFS – "<u>a number of transactions between the two companies or from which Altisource received some benefit</u>" – did not in any way excuse Erbey's failure to recuse himself from related-party transactions, nor did it render his prior public statements concerning recusal any less false.   In fact, the NY DFS's conclusion and Ocwen's admission is wholly consistent with securities regulations such as Item 404 of Regulation S-K. Under Item 404, certain transactions <u>must</u> be disclosed in SEC filings to investors, among them, transactions "in which the registrant was or is to be a participant" and "in which any related person

had or will have a direct or indirect material interest." The SEC specifically adopted this language of "direct or indirect material interest," as opposed to the strict adherence of a formalized one to one business relationship, recognizing that it would be easy for parties to ignore the disclosure requirements if they could set up a pass-through arrangement. Similarly here, Erbey's role in approving both contracts directly between Ocwen and Altisource and Ocwen pass through transactions that provided a direct benefit to Altisource was a "gross violation" of his repeated public representations that he recused himself from decisions involving both companies in order to prevent the exploitation of conflicts of interest.

**2.      Altisource's REALServicing Platform
Was Ineffective And Incapable Of
Processing Ocwen's Mortgage Servicing
<u>Portfolio In Compliance With The Law</u>**

119.      As set forth above, Altisource owns and operates REALServicing, Ocwen's legacy system that provides its core servicing technology platform. Given the millions of loans that Ocwen had acquired leading up to the start of the Class Period and the millions of additional loans that the market anticipated Ocwen would acquire in 2013 and 2014, it was critical to Altisource's success that its REALServicing platform could effectively integrate the acquired loans into its platform and service all of Ocwen's loans in compliance with the governing laws and regulations, including the NY DFS's Mortgage Servicing Practices, and the reforms set forth in the National Mortgage Settlement. This was especially true in light of regulators' strict scrutiny of Ocwen. Ocwen's regulators had (and later exercised) the authority to bar Ocwen from acquiring new mortgage servicing rights, a penalty that would have a direct negative effect on Altisource, which relied upon Ocwen's acquisition of new servicing rights for its existence.

120.      Thus, throughout the Class Period, both Altisource and Ocwen assured investors that Altisource's REALServicing platform was "effective," and "scalable" - *i.e.*, able to handle an ever-increasing amount of loans. For example, in its Class Period SEC filings, Altisource described REALServicing as "an efficient and effective platform for loan servicing including

default administration," and touted the REALServicing platform as an "[e]xtensible, scalable and secure technology platform [that] drives services delivery and innovation for the real estate and mortgage marketplaces."   Moreover, on its website, Altisource heralded REALServicing as its "proprietary platform [that] incorporates robust analytical models to drive decisioning," as well as employs "principles to enhance borrower communication" and "rules to ensure consistent deployment of best practices."   Ocwen also touted the high quality and cost effective benefits of using REALServicing, stating in its SEC filings that Altisource's REALServicing platform provided Ocwen with a "Highly Scalable Platform with Lowest Operating Cost" and a "70% cost advantage" compared to its competitors.

121.   Defendants also assured the market that REALServicing's legacy platform was able to process all of Ocwen's present and future loans in compliance with the law.   For example, on April 24, 2014, Defendant Erbey spoke to investors about Altisource's "world-class compliance management system" and Altisource's "continue[d] [] focus on providing high-quality compliant services to enhance [Ocwen's] competitive position."   Defendant Shepro echoed these sentiments when he described that Altisource's "primary focus is providing compliant services to Ocwen servicing portfolio" through the boarding of loans on REALServicing.   Ocwen similarly touted REALServicing's ability to comply with regulations, representing in its 2013 Form 10-K that Altisource's REALServicing "platform enable[d] [Ocwen] to operate in a compliant manner in an increasingly complex and highly regulated environment."

122.   In reality, however, Altisource's REALServicing platform was entirely unable to manage Ocwen's portfolio during the Class Period.   Indeed, Ocwen has now admitted in the 2014 Consent Order that its "core servicing functions rel[ied] on its inadequate systems [*i.e.*, REALServicing]" and "resulted in Ocwen's failure to fulfill its legal obligations."

### a.   Ocwen Admits That REALServicing
### Backdated Letters and Accelerated Foreclosures

123.   Following a long and rigorous investigation into the cause and scope of Ocwen's letter-backdating problem, the NY DFS determined and Ocwen admitted that its servicing system – REALServicing – caused Ocwen to backdate "potentially hundreds of thousands of letters" to struggling borrowers. Ocwen was also forced to admit that, while its "senior management" was informed of the backdating problem as early as November 2013, the Company did nothing to fix the problem.  Indeed, rather than informing its regulators, investors or borrowers in an effort to prevent unmerited foreclosures, Ocwen interfered with the NY DFS's investigation by affirmatively concealing the full extent of the problem.

124.   The NY DFS's investigation into Ocwen was focused on mortgage-servicing practices in general and, in the course of that investigation, the NY DFS monitor began to find specific examples of backdating by REALServicing.  Such backdated letters were in violation of Ocwen's obligations under both New York and federal law, as well as its agreements with regulators and state attorneys general to provide borrowers with 30 days to appeal any denials of requests for loan modifications.  As a result, by the time the borrower received the denial letter, the mandatory thirty day appeal period had expired, in violation of Ocwen's legal obligation under the National Mortgage Settlement and other agreements to timely inform borrowers about foreclosure and loan-modification deadlines.  Examples of such backdated letters uncovered by the NY DFS include:

- A pre-foreclosure notice was sent to an Ocwen borrower that was dated May 23, 2013.  However, Ocwen's internal records demonstrated that the letter was created nearly one year later, on April 9, 2014.

- A letter informing a borrower that it would be in danger of foreclosure if it failed to make a payment by August 7, 2013. However, internal Ocwen records demonstrated the letter was dated October 29, 2013, nearly three months after the payment deadline's determination.

125.    The NY DFS took immediate action after uncovering instances of such backdating. Indeed, on June 19, 2014, after discovering that Ocwen had backdated a letter denying a loan modification by 41 days, the NY DFS demanded an immediate explanation about this issue.   Over the course of the next three months, Ocwen told the NY DFS that (i) the backdating problem affected only 6,100 letters, (ii) the problem had been discovered and resolved by Ocwen in April or May 2014; and (iii) Ocwen implemented changes to its systems in May 2014 that resolved the problem.   In a written memorandum from Ocwen to the NY DFS dated September 10, 2014, Ocwen reiterated that it had first discovered the backdating problem in April 2014.

126.    Disturbingly, the NY DFS determined Ocwen had lied to the regulator and that "[e]ach of these representations turned out to be false." As described in the October 21 DFS Letter, the NY DFS concluded after a rigorous investigation that the 6,100 letters were only "a fraction" of the total backdated letters that could ultimately number in the "hundreds of thousands."  Then, following "persistent questioning," Ocwen admitted that it actually knew of the backdating issue eight months earlier.  Specifically, Ocwen admitted that in November 2013, an employee informed "senior management," including the Company's Vice President of Compliance, of the backdating issue, but neither Ocwen nor the Vice President of Compliance did anything to address the problem even though the backdating was in direct violation of Ocwen's legal obligations and posed enormous and life changing risks to its borrowers. Ocwen did not resolve the problem as represented. The NY DFS based its findings in the October 21 DFS Letter on its review of Owen loan files, thousands of Ocwen loan letters to borrowers, a September 10, 2014 memorandum from Ocwen to the NY DFS (in which Ocwen lied about when senior management learned about the issue), and interviews with Ocwen executives, among other sources.

127.    Ultimately, in the 2014 Consent Order, the NY DFS concluded – and Ocwen admitted – that "Ocwen's core servicing functions rely on its inadequate systems" and that "Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records. There are insufficient controls in place—either manual or automated—to catch all of these errors and resolve them."

Specifically, the 2014 Consent Order explained how "Ocwen's systems [*i.e.* REALServicing] have been backdating letters for years by sending out letters to borrowers denying a mortgage loan modification that were "dated more than 30 days prior to the date that Ocwen mailed the letter," meaning that the borrowers' 30 days to appeal the denial had "already elapsed."

128.     Referring to the discussion in the October 21 DFS Letter concerning Ocwen's knowledge of the backdating errors, the 2014 Consent Order explained (and Ocwen admitted) how "Ocwen failed to fully investigate and appropriately address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the company's Vice President of Compliance."  In violation of its legal obligations, "Ocwen ignored the issue for five months until the same employee raised it again. While Ocwen then began efforts to address the backdating issue, its investigation was incomplete and Ocwen has not fully resolved the issue to date, more than a year after its initial discovery."

129.     After the NY DFS disclosed the evidence of letter backdating at Ocwen in the October 21 DFS Letter, the NMS Monitor initiated an immediate and extensive investigation of the issue.  This was a serious focus for the NMS Monitor because, under the National Mortgage Settlement, Ocwen was required to comply with – but appeared to be in violation of – specific servicing standards for borrowers, including "timeline requirements, many of which are triggered by the date correspondence is sent to a consumer."  Thus, the NMS Monitor directed Ocwen to immediately "furnish a full explanation of the letter dating issue and any possible effects that it may have had on [Ocwen's] compliance with the terms of the [National Mortgage Settlement]."

130.     Over the course of his investigation, the NMS Monitor determined that Ocwen's pervasive letter backdating was caused by Altisource's REALServicing system.  As reported in the NMS Monitor's December 2014 Ocwen Report, Ocwen specifically admitted to the NMS Monitor that the letter-backdating failures identified in the October 21 DFS Letter were caused by Altisource's REALServicing.

131.     In particular, on November 11, 2014, Ocwen admitted to the NMS Monitor that the backdating that occurred in the first half of 2014 (the time period being tested by the NMS

Monitor) was "because of a mapping issue in the templates used to create correspondence on its REALServicing platform." Ocwen further explained that the inherited FiServ system that the Company was integrating into REALServicing did <u>not</u> suffer from this technical deficiency, which was "limited to its REALServicing platform." Ocwen described how "most of its letters on the REALServicing platform [were dated] using the trigger dates [*i.e.*, the date[s] Ocwen made the decision], not the generation or mail date [*i.e.* the send date]" as the date from which foreclosure deadlines accrued. Because REALServicing did not generate letters immediately and used the trigger date as the mail date, this defective "mapping issue" created "a material impact on the accuracy of the letter date when there was a delay between the trigger date and the mail date."

132. Moreover, the NMS Monitor also reported in his December 2014 Ocwen Report that he had engaged independent consultant McGladrey LLP, a leading provider of assurance, tax and consulting services, to investigate Ocwen's backdating errors. McGladrey reported to Mr. Smith "that the letter dating issue was limited to REALServicing."

133. Defendant Shepro tacitly confirmed that the 2014 Consent Order's references to "inadequate and ineffective" systems were referring to Altisource's REALServicing system. Shepro did not dispute an analyst's inquiry into whether the 2014 Consent Order was "a direct condemnation of the REALServicing System," responding only that Altisource was "very proud to support Ocwen with technologies and services that we believe have contributed to Ocwen's success."

134. Former employees of Altisource and Ocwen also confirmed that REALServicing caused the backdating. For instance, Altisource former employee CW1 confirmed that REALServicing was the Altisource platform that Ocwen used to generate the backdated letters to borrowers. Similarly, former Ocwen employee CW4, who was a Supervisor within Ocwen's Internal Review Group tasked with monitoring REALServicing's capabilities, confirmed that REALServicing processed the backdated letters. CW4 was responsible for, among other things, ensuring that borrowers were notified that their requests for loan modifications were being reviewed within the timeline required by the National Mortgage Settlement. In that role, CW4 had

witnessed the issuance of many improperly backdated letters caused by errors with REALServicing, a serious deficiency for Ocwen that needed to be "very timeline driven."  CW4 explained that Altisource was "responsible" for the backdated letters because Altisource would input its own codes into the system, which created "a gap between when [Ocwen] might code on REALServicing and how it was received with Altisource," affecting the date a letter was sent to a borrower and causing Ocwen to fail certain requirements of the National Mortgage Settlement.

135.    The NMS Monitor December Report, the 2014 Consent Order, and the October 21 DFS Letter all conveyed that the backdating was pervasive and had existed since at least 2013. Thus, years into the monitoring process enacted based on Ocwen's past regulatory violations, Altisource's REALServicing was forcing early foreclosures on Ocwen borrowers based on known deficiencies in the system.  Ocwen's admissions to the NY DFS and NMS Monitor demonstrate that Altisource and Ocwen intentionally (or at the very least severely recklessly) used a technology that caused accelerated foreclosures and failed loan modifications.  From Ocwen's own admissions to the NY DFS, it is clear that by no later than November 2013, Ocwen and Altisource – including Ravi and Erbey – knew that Altisource's REALServicing platform improperly accelerated foreclosures.  Because Ravi, who reported directly to Erbey in his role at both companies, (i) as Ocwen's Chief Risk Officer, was responsible for Ocwen's compliance with the National Mortgage Settlement which set forth strict guidelines governing the timing and dating of letters, and (ii) as Altisource's Chief Risk Officer, oversaw REALServicing's capabilities and relationship with Ocwen, there is no conceivable scenario under which Ravi and Erbey were not directly informed of the backdating issue in November 2013.  Indeed, only Altisource could correct any "mapping" or coding issues in REALServicing, as confirmed by CW4, a member of the Internal Review Group.

136.    Shockingly, the letter backdating issue was so pervasive that these systemic failures caused in large part by REALServicing's improper programming have still not been corrected. The NMS Monitor provided an update on the letter backdating on August 4, 2015, which included the fact that – 20 months after Ocwen knew that REALServicing was backdating letters – Ocwen

finally had a plan to correct the problems.  Importantly, this August 2015 report did not alter the Monitor's December 2014 findings that REALServicing was the system that caused the backdated letters.

> **b.      REALServicing's Technology Was "Inadequate and Ineffective" And Incapable Of Processing Loans In Accordance With Governing Regulations**

137.    The NY DFS revealed in the Consent Order that the heart of REALServicing's known deficiencies and "inadequate and ineffective technology" relied on an unwieldy and poorly understood morass of <u>thousands</u> of "comment codes entered either manually or automatically to service [Ocwen's] portfolio."  As explained by the NY DFS, "each code initiates a process, such as sending a delinquency letter to a borrower, or referring a loan to foreclosure counsel."  The NY DFS explained how the deficiencies in REALServicing's comment code system contributed directly to the backdating described above, and resulted in other gross servicing errors that directly and negatively affected homeowners in violation of applicable laws, leading in some cases to unwarranted foreclosures:

> <u>With Ocwen's rapid growth and acquisitions of other servicers, the number of Ocwen's comment codes has ballooned to more than 8,400 such codes</u>. Often, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function. <u>The result is an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative.</u>

138.    Numerous former employees of Altisource and Ocwen that were directly responsible with ensuring the effectiveness and compliance of REALServicing have confirmed its failings, including but not limited to the backdating and coding deficiencies highlighted by the NY DFS.  Moreover, former employees of the companies have recounted how Ocwen had the opportunity to use a far superior and legally compliant mortgage processing platform called FiServ that was available to Ocwen by the start of the Class Period through the Homeward and ResCap

acquisitions, but deliberately chose not to do so despite their knowledge of REALServicing's deficiencies.

139.    For example, CW4, a Supervisor within Ocwen's Internal Review Group between February 2013 and March 2014, was responsible for overseeing the transfer of data associated with the loans acquired through the ResCap acquisition from the Fiserv system to REALServicing.  In that role, CW4 tested the effectiveness of the REALServicing platform to ensure that the loans were being serviced in compliance with the National Mortgage Settlement and other regulations. CW4's manager reported directly to Altisource's and Ocwen's Chief Risk Officer Ravi who, in turn, reported directly to Erbey.  Ravi oversaw Ocwen's Internal Review Group and was supposed to ensure REALServicing's compliance with all applicable laws and regulations.  According to CW4, Ravi was specifically responsible for REALServicing's compliance with the NY DFS Agreement and the NY DFS's Mortgage Servicing Practices.

140.    CW4 confirmed the NY DFS's conclusions (and Ocwen's admissions) that REALServicing's "unnecessarily complex" "system of comment codes" created the serious letter backdating issue.  CW4 described how, following the acquisition of the servicing rights for over $270 billion worth of ResCap mortgage loans, the decision was made to transfer all of the over 1.5 million loan files from ResCap's FiServ platform to Altisource's REALServicing platform. Having worked on the FiServ platform since 2008, CW4 knew that "REALServicing was just inferior" and "didn't give us the capability that FiServ did, especially for filtering certain information by date which made it difficult to work efficiently" because the regulations were "very timeline driven."

141.    CW4 described how the transfer of loans from the Fiserv platform to the REALServicing platform created immediate and significant problems, most of which were due to the coding errors identified in the 2014 Consent Order.  Whereas Fiserv – a platform that had adequately and capably processed mortgage loans for years – had a finite set of a few hundred codes that were carefully approved and utilized, REALServicing had thousands of codes, most of which meant exactly the same thing.  Given that confusion, "there was no way you could keep up

and feel sure that when someone sent in a package for modification that it was being [serviced] effectively."

142.    CW4 described another situation that CW4 uncovered and reported to supervisors (in addition to the letter backdating) that demonstrated how REALServicing's failure to effectively manage or have any control over its thousands of codes negatively impacted borrowers.  CW4 detailed how a large number of mortgage loans for condominium units had been saddled with improper payments for force-placed insurance simply because they had been coded incorrectly in Altisource's vast and confusing system.  CW4 explained that typically, homeowners' insurance policies for condominium owners are covered by the condominium owners' association and such properties should be coded to reflect this situation.  However, at Ocwen, CW4 was asked to review a sample of condominium loans in which CW4 determined that somewhere between 20% percent and 40% percent of those loans had been improperly charged with force-placed insurance, noting that "almost every loan that we tried to review, that issue came up on it."  While CW4 noted that the force-placed insurance fees on the sample of loans CW4 reviewed were removed and refunded, the errors were egregious enough that Ocwen failed to meet the required National Mortgage Settlement regulatory benchmarks in 2013 and through at least the first quarter of 2014.

143.    CW4 further explained how the Internal Review Group Team that CW4 supervised provided "constant feedback" to high level executives, including but not limited to Ocwen's CEO Ronald Faris and Chief Risk Officer Ravi, who reported directly to Erbey regarding the serious deficiencies in REALServicing.

144.    CW9 also confirmed the deficiencies with REALServicing.  CW9, a former Compliance and Default Timeline Supervisor who worked at ResCap since July 2008 and switched over to Ocwen in early 2013 following the ResCap acquisition, was responsible for ensuring that borrowers were not in the foreclosure process while simultaneously trying to save their home, a banned practice known as dual-tracking. CW9 stated that the compliance team CW9 led discovered problems, gaps, and excessive and misapplied codes "pretty quickly," leading the group to realize that "[w]e aren't going to be in compliance with this setup" because there were no

systems in place for the team to catch and fix errors.  CW9 notified CW9's immediate supervisors about the serious problems with REALServicing.  CW9 explained that because of the number of codes and flags in REALServicing – at least four times more than contained in the competing Fiserv system – it was impossible to ensure that loans were not being dual-tracked because the thousands of codes were so unmanageable that "[b]y the time [someone] learned [of the dual tracking] we'[d] be getting fined and behind in compliance."  CW1 reiterated CW9's concerns over REALServicing's ability to handle Ocwen's growing mortgage servicing rights portfolio, stating that CW1 thought that Altisource was not ready during the Class Period.

145.    Similarly, CW10, a Loan Servicing Foreclosure Specialist at Ocwen from February 2013 through February 2014, who previously worked at ResCap from 2006 until the Ocwen acquisition, also stated that there were problems with REALServicing.  CW10 worked with both FiServ and REALServicing, and confirmed that there were issues with REALServicing because "it was more complicated and wasn't as detailed" as FiServ, was overly reliant on an unwieldy code-based system that "was difficult to learn and constantly changing," and varied department to department.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

146.    Throughout the Class Period, Defendants carried out a scheme to mislead the market through a series of materially false and misleading statements and omissions about the controls Altisource and Ocwen had in place to protect borrowers from conflicted related party transactions; the quality, effectiveness and regulatory compliance of Altisource's REALServicing platform, and the sustainability of Altisource's revenues from related party transactions with Ocwen.  Even as regulatory scrutiny increased, beginning in February 2014 when the NY DFS investigation raised concerns about deficiencies in each of these areas, Defendants continued to make false and misleading statements about these topics.

147.    In regular press releases, conference calls, investor presentations, and filings with the SEC, Defendants made materially false and misleading statements and omissions concerning,

among other things: (i) the Company's "robust" "policies, practices and procedures" in place for ensuring that the potential conflicts of interests posed by the relationship between Ocwen and Altisource (and by Erbey's position and ownership interests in both Altisource and Ocwen) were effectively managed; (ii) the purported "market rates" charged under the Company's long-term service agreements with Ocwen, including for homes sold through Hubzu; (iii) the ability of Altisource's REALServicing to effectively and properly service the millions of loans on its platform, while continuing to comply with the laws and regulations enforced by the NY DFS and other state and national regulators by the start of the Class Period; and (iv) the source and sustainability of Altisource's Ocwen-derived revenue as a result of the wrongdoing.  Defendants' misleading statements and omissions are set forth below, organized topically, along with explanations for their falsity.  The statements made by Ocwen that are identified below concern its relationship with Altisource and its use of Altisource services.  These statements, which reinforce the Altisource Defendants' statements, were communicated to the market and were relevant and material to Altisource investors.

> **A.  False and Misleading Statements And Omissions Concerning The Adequacy Of Controls For Managing Transactions With Ocwen And Avoiding Conflicts Of Interest**

148.   From the beginning of the Class Period, the Altisource and Ocwen Defendants represented that both companies had sufficient policies and procedures in place for the "review, approval and monitoring" of actual or potential conflicts of interests between Altisource and Ocwen, including, specifically, the guarantee that Erbey recused himself from any negotiations or approval of transactions involving Altisource and Ocwen and that, aside from Erbey (whose conflicts were purportedly managed through his recusal and "independent" Board oversight), the companies had completely "separate management," such that no executive officers overlapped.

149.   On April 25, 2013, the first day of the Class Period, Altisource filed a Form 8-K with the SEC (the "April 25, 2013 8-K") attaching a slide presentation made during a meeting with the Company's lenders.  That presentation contained a slide titled "Seasoned Management Team"

and identified various members of Altisource's senior management, including S.P. Ravi, Altisource's Chief Risk Officer who "[p]reviously served as VP for Ocwen Financial Corp." Altisource's website also identified S.P. Ravi as Altisource's Chief Risk Officer who "previously served as Vice President and Chief Risk Officer for Ocwen Financial Corporation."  These statements were false because S.P. Ravi never left his position as Chief Risk Officer of Ocwen, and concurrently served as Chief Risk Officer of both Ocwen and Altisource until sometime just prior to the issuance of the February DFS Letter, and "reported directly to Mr. Erbey in both capacities."

150.    Also on April 25, 2013, Altisource filed with the SEC a Form 10-Q for the first quarter of 2013 (the "Altisource 2013 Q1 10-Q"), which was signed by Defendant Shepro.  The Altisource 2013 Q1 10-Q incorporated by reference the Risk Factors set forth under Item 1A of Altisource's annual report on Form 10-K for the year ended December 31, 2012, filed with the SEC on February 13, 2013 (the "Altisource 2012 Form 10-K") and signed by each of the Individual Defendants.  The Altisource 2012 Form 10-K Risk Factors concerning "Risks Related to our Employees" (the "Employees Risk Factor") informed investors that Altisource "could have conflicts with Ocwen . . .  and the Chairman [Erbey] or other members of our Board of Directors could have conflicts of interest due to his or their relationship with Ocwen."  The Company disclosed that it would "manage these potential conflicts through," *inter alia*, "other provisions of [Altisource's] agreements with Ocwen . . . and through oversight by independent members of our Board of Directors," which was chaired by Defendant Erbey.  Specifically, it stated:

> Conflicts may arise between Ocwen, HLSS, Residential or AAMC and us as a result of our ongoing agreements and the nature of our respective businesses. Our Chairman is also the Chairman of Ocwen, HLSS, Residential and AAMC. As a result, he has obligations to us as well as to these other entities and may have conflicts of interest with respect to matters potentially or actually involving or affecting us and Ocwen, HLSS, Residential or AAMC, as the case may be.
>
> We will also seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with

Ocwen, HLSS, Residential or AAMC and through oversight by independent members of our Board of Directors.

151.    Altisource's Forms 10-Q for the second and third quarters of 2013, dated July 25, 2013 and October 24, 2013, respectively, were all signed by Defendant Esterman, and incorporated the same Employees Risk Factor from the Altisource 2012 Form 10-K identified above in ¶150, above.

152.    Ocwen made similar statements regarding conflicts of interest and Erbey's recusal from transactions involving Altisource in Risk Factors set forth in Ocwen's Form 10-Q for the first quarter of 2013, filed with the SEC on May 8, 2013 and signed by Ocwen's CFO John V. Britti ("Britti") (the "Ocwen 2013 Q1 10-Q").  The Ocwen 2013 Q1 10-Q incorporated by reference the "Risks Relating to the Separation of Altisource" Risk Factor set forth in its 10-K for the year ended December 31, 2012, filed with the SEC on March 1, 2013 (the "Ocwen 2012 Form 10-K").  This Form 10-K was signed by Defendant Erbey.  Ocwen's Risk Factor relating to its business with Altisource provided specific details to investors about the companies' steps taken to control conflicts of interest.  It stated:

> Matters that could give rise to conflicts between Ocwen and Altisource include, among other things:
>
> - any competitive actions by Altisource;
>
> - the quality and pricing of services that Altisource has agreed to provide to us or that we have agreed to provide to Altisource; and
>
> - our ongoing and future relationships with Altisource, including related party agreements and other arrangements with respect to the administration of tax matters, employee benefits, indemnification and other matters.
>
> We have adopted policies, procedures and practices to avoid potential conflicts involving significant transactions with related parties such as Altisource, including Mr. Erbey's recusal from negotiations regarding and credit committee and board approvals of such transactions.

58

153.    Ocwen's Forms 10-Q for the second and third quarters of 2013, dated August 6, 2013 and November 5, 2013, respectively, and signed by Britti, incorporated the same business Risk Factors from the Ocwen 2012 Form 10-K, including the Risks Relating to the Separation of Altisource.  Ocwen's Form 10-K for the year ended December 31, 2013, filed with the SEC on March 3, 2014 (the "Ocwen 2013 Form 10-K"), similarly represented that Erbey recused himself in order to avoid potential conflicts.  In particular, it stated:  "We have adopted policies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource, HLSS, AAMC and Residential, including our Executive Chairmen recusing himself from negotiations regarding, and approvals of, transactions with these entities."  Ocwen's Forms 10-Q for the first, second and third quarters of 2014, dated May 2, 2014, August 18, 2014 and October 31, 2014, respectively, all signed by Britti, incorporated the same Risk Factors from the Ocwen 2013 Form 10-K.

154.    On September 30, 2013, Bill Erbey was interviewed by Dean Kenneth Freeman of Boston University Questrom School of Business.  A video of the interview was posted for public consumption on the school's website and on the YouTube video sharing website.  During this interview, Erbey highlighted the purpose of the Ocwen spin-off transactions, emphasizing that the companies were not affiliated entities and operated at arm's length:

> We create these companies . . . spins . . . for a couple reasons one of which it enables us to capture adjacent revenue.  In certain cases you can't have the same revenue stream in the same business, because people are worried about whether it's arm's length, etc.  All the companies are actually not affiliated, they are only related because of me, so they are non-affiliated companies.  [This allows] Altisource [to] capture a lot of adjacent revenue.

155.    On December 3 and December 4, 2013, Altisource hosted an Investor Day together with Ocwen and their three other related companies Residential, AAMC and HLSS, during which the Individual Defendants along with other top executives from Ocwen and Altisource made presentations to analysts and investors and held a conference call (the "December 2013 Investor

Day Conference"). On December 3, 2013, Altisource filed a Form 8-K with the SEC that was signed by Defendant Esterman and attached a slide presentation from the December 2013 Investor Day Conference titled "Welcome and Opening Remarks Presentation" that was co-authored by Ocwen, Altisource, Residential, AAMC and HLSS (the "December 3, 2013 Related Companies Presentation"). Ocwen also filed a Form 8-K that same day attaching the December 3, 2013 Related Companies Presentation. The lead presentation for the conference emphasized the strategic – yet purportedly arm's-length – relationship between Altisource and Ocwen. In particular, the presentation explained that Altisource and Ocwen did not operate as affiliated entities but as "strategic allies." The presentation touted the "<u>Strategic Allies have sound Corporate Governance</u>," and represented to investors that the following three conditions contributed to this "Sound Corporate Governance":

- "<u>[S]eparate [M]anagement</u>"

- "<u>Robust Related Party Transaction Approval Policies</u>"

- "<u>Transparency in inter company relationships through public company disclosures</u>"

156. During the conference, Defendant Erbey emphasized Altisource's and Ocwen's corporate governance policies and affirmed that, in accordance with the companies' policies, practices and procedures, with respect to "<u>[a]ny related party transactions between [Altisource and Ocwen] I actually recuse myself from that decision</u>." Defendant Erbey also underscored to investors that "<u>[o]ne of the things that I like to stress again is that the strategic allies are not affiliates</u>, that each company has its own separate Board of Directors, the majority of whom are independent, and <u>we have robust related party transaction approval process.</u>" Erbey "<u>stress[ed]</u> . . . that these companies are not affiliates, that they are <u>independent companies</u> . . . [that] have <u>independent boards</u> and they have <u>[independent] management teams</u>."

157. On February 13, 2014, Altisource filed with the SEC its Annual Report on Form 10-K for 2013 (the "Altisource 2013 Form 10-K"), which was signed by the Individual

Defendants.  The Altisource 2013 Form 10-K expanded upon the Employees Risk Factor contained in the Altisource 2012 Form 10-K, but renamed to "Risks Related to Our Relationships (the "Relationship Risk Factor") and explained that the Company's "policies, procedures, and practices" for avoiding conflicts of interest with, *inter alia*, Defendants Ocwen and Erbey included having Defendant Erbey recuse himself from transactions with related parties.  It stated:

> We follow policies, procedures and practices to avoid potential conflicts with respect to our dealings with Ocwen, HLSS, AAMC and Residential, including our Chairman recusing himself from negotiations regarding, and approvals of, transactions with these entities. We also manage potential conflicts of interest through oversight by independent members of our Board of Directors (independent directors constitute a majority of our Board of Directors), and we will also seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Ocwen, HLSS, Residential and AAMC….

158.     Altisource's Forms 10-Q for the first, second and third quarters of 2014, filed on April 24, 2014; July 29, 2014; and October 23, 2014, respectively, were all signed by Defendant Esterman, and incorporated the same Relationship Risk Factor from the Altisource 2013 Form 10-K identified in ¶157, above.

159.     Ocwen also assured the market that conflicts of interest were managed by the companies and that the related party transactions were negotiated at arm's length.  Specifically, on February 27, 2014, Ocwen held an earnings conference call the day following the release of the February 26 DFS Letter that raised serious concerns regarding potential conflicts of interest between Altisource and Ocwen (the "February 27, 2014 Ocwen Call").   During this call, Erbey directly addressed the February 26 DFS Letter and assured the market that the companies' agreements are on an arm's-length basis and thus, that the allegations made by the DFS were inaccurate:

> [Ocwen] received a letter yesterday from the DFS asking about our relationships with four related companies, independent companies. I would note that the agreements among the companies are fully disclosed in our public SEC filings and we believe them to be on an

<u>arm's-length basis.</u> We look forward to addressing the matters raised by DFS and will fully cooperate.

160.     During the question and answer session of the February 27, 2014 Ocwen Call, Erbey was asked to explain the manner in which the companies addressed potential conflicts of interest.  In response, Erbey deflected the question and responded that the companies had been "<u>very complete and open about what [the related party] relationships are</u>" and had provided "<u>full disclosure</u>" about the business relationships between Ocwen, Altisource and the other related companies. Ocwen's CEO expanded on Erbey's response, explaining that Ocwen's purported "full disclosures" about the related party agreements were material to investors, noting that the disclosures "are an important element of the investors' decisions to be reached."

161.     Defendants' statements about managing potential related party conflicts of interest were false and misleading, concealed material facts, and lacked any reasonable basis.  Contrary to Defendants' statements that they maintained "robust related party transaction approvals" and that Erbey recused himself from related party transactions, Erbey failed to recuse himself from a number of such transactions.  The companies' statements about managing potential conflicts of interest and operating at "arm's length" were also false and misleading, concealed material facts, and lacked any reasonable basis because the companies had overlapping senior management and operated as one entity.

162.     Specifically, the above statements in ¶¶148-161 concerning Altisource's "sound Corporate Governance," "separate management," "transparency in inter company relationships," and "non-affiliated" and "arm's-length" operations, and Erbey's recusal from negotiations regarding and approval of transactions between Altisource and Ocwen, were materially false and misleading, concealed material facts, and lacked a reasonable basis.  These statements reasonably conveyed to the market that Altisource and Ocwen were committed to preventing the two related companies from colluding in ways that unduly benefitted one company over the other in order to maximize Erbey's or that company's revenue.  As has now been admitted in the 2014 Consent Order, contrary to these clear statements concerning safeguards against conflicts of interest,

throughout the Class Period there were "widespread conflicts of interest" between Altisource and Ocwen that funneled revenues to Altisource by forcing Ocwen-serviced borrowers to overpay for products and services, and caused Altisource and Ocwen to co-employ common top executive officers, including their Chief Risk Officer, who could not effectively serve both companies.

163.    Moreover, it was first partially revealed in the August 4 DFS Letter and admitted in the 2014 Consent Order that, contrary to statements made by both companies and Defendant Erbey himself, Erbey personally violated the companies' policies and failed to recuse himself in "a number of transactions between [Altisource and Ocwen] or from which Altisource received some benefit" including, but not limited to the pass-through force-placed insurance arrangement by which Altisource earned $65 million per year in exchange for little, if any work. The NY DFS characterized "Erbey's approval of this force-placed insurance arrangement as . . . a gross violation of this supposed recusal policy."    Defendants' statements concerning Erbey's recusal communicated to a reasonable investor that his role in transactions involving both Ocwen and Altisource presented "potential conflicts," conflicts that were avoided by Erbey's recusal from any involvement in negotiating and approving transactions between the two companies, directly or indirectly.   Moreover, investors understood that related party transactions, as defined by the SEC, included both direct contractual arrangements and indirect financial "sham" transactions.

164.    Further, the above statements in ¶¶149 & 154-156 concerning the identity of Altisource's Chief Risk Officer and Altisource's and Ocwen's "separate management" and "independen[ce]" were false and misleading and concealed the material fact that one out of six of the Company's "C-level" officers overlapped, as did numerous other senior executives.   In particular, the companies' representation that they had "separate management" – a statement that assured investors that conflicts of interest were being managed – was false because in reality, the companies employed the same Chief Risk Officer, among other senior managers.   The statements were misleading because they conveyed that key executives were not overlapping when, in reality, the company's Chief Risk Officer – the person charged with ensuring compliance – was head of Ocwen's Internal Review Group and head of REALServicing for Altisource.    As the NY DFS

revealed, Ravi concurrently served as the Chief Risk Officer of Altisource and Ocwen until sometime shortly before the issuance of the February DFS Letter and reported directly to Mr. Erbey in both capacities.

165.    CWs further confirmed that Ravi and other senior managers were employed by both companies.   CWs also described how the Companies were run as one entity.   Indeed, CW1 described how all of the "c" [Chief] level executives "were running the things together" at both companies, and that everyone at Altisource "basically worked for Ocwen."  CW1 represented that the separation was essentially fictional and acknowledged with a "wink."  Similarly, CW1 further confirmed how, contrary to being "separate[ly] manage[d]," executives from both companies – including Defendants Erbey and Shepro – regularly participated in joint weekly meetings, where both companies' business was discussed.

### B.    False and Misleading Statements And Omissions Concerning The "Market Rates" Charged For Services Provided Under Altisource's Exclusive Arrangements With Ocwen

166.    Throughout the Class Period, Defendants repeatedly represented that the services and technologies that Altisource provided to Ocwen – including the fees charged by Hubzu, the Company's online auction real estate site – were priced at "market rates."  These representations communicated to investors that Altisource was engaging in arm's-length transactions with Ocwen and not colluding with them to overcharge Ocwen borrowers that were forced to use Altisource's services and products.

167.    The Altisource 2013 Q1 10-Q represented that Altisource "record[s] revenue we earn from Ocwen under various long-term servicing contracts at rates we believe to be market rates as they are consistent with one or more of the following: the fees we charge to other customers for comparable services, the fees Ocwen pays to other service providers, fees commensurate with market surveys prepared by unaffiliated firms and fees charged by our competitors."  The revenue generated from these services included both "revenue earned directly from Ocwen and its subsidiaries and revenue earned from the loans serviced by Ocwen," *i.e.*, from fees charged to and

paid by Ocwen borrowers.  The Altisource 2013 Q1 10-Q also identified the Company's revenue from Ocwen by segment (Mortgage Services, Technology Services and Financial Services) and stated that:

> Services provided to Ocwen during such periods included residential property valuation, real estate asset management and sales, trustee management services, property inspection and preservation, closing and insurance services, charge-off mortgage collections, core technology back office support and multiple business technologies including our REALSuite of products.  <u>We provided all services at rates we believe to be comparable to market rates</u>.

168.    Altisource repeated the statement identified in ¶167 above in each of the Company's subsequent Class Period quarterly reports and the Altisource 2013 Form 10-K.  These quarterly reports were filed with the SEC on July 25, 2013; October 24, 2013; April 24, 2014; July 29, 2014; and October 23, 2014.

169.    Ocwen made the same or substantially similar representations to the market regarding the purportedly "<u>market rates</u>" charged by Altisource under the companies' long-term service agreements.  Specifically, Ocwen assured the market that it had determined that the "market rates" charged by Altisource were "consistent with one or more of the following fees: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other services providers."  For example, the Ocwen 2013 Q1 Form 10-Q discussed Ocwen's agreements with Altisource as follows:

> Our business is currently dependent on many of the services and products provided under these long-term contracts [with Altisource] which are effective through 2025. The contracts include renewal provisions. <u>We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.</u>

170.    Ocwen repeated the statement identified in ¶169 above in each of its subsequent Class Period quarterly reports and the Ocwen 2013 Form 10-K.  These quarterly reports were filed with the SEC on May 8, 2013; August 6, 2013; November 5, 2013; May 2, 2014; August 18, 2014; and October 31, 2014.

171.    As described above, the inflated, above-market rates charged by Altisource through its online real estate auction site Hubzu were partially revealed in the April 21 DFS Letter in which the NY DFS raised "serious concerns" that Altisource was engaging in "conflicted business relationships" with Ocwen to charge Ocwen customers inflated fees that were "up to three times the fees charged to non-Ocwen borrowers."  Defendant Shepro responded to the NY DFS Hubzu accusations during Altisource's first quarter 2014 earnings call on April 24, 2014.  During the call, Defendant Shepro falsely assured investors that while the NY DFS's inquiries "primarily relat[e] to Hubzu," "[w]e firmly believe that Altisource's asset management business provides a very transparent and efficient method to sell real estate [and] that the fees we charge are in line with or lower than industry standards."  Defendant Shepro further explained, in response to analysts' questions about Hubzu, that Altisource's "overall strategy is to align [its] pricing to the market, [to beat] the market or lower," "we feel very comfortable that the pricing we charge is in line with or lower than market," and "we are charging the same or less than anyone else would typically charge a servicer for the services that we provide and we charge other customers in line with what we charge Ocwen."

172.    Altisource's and Ocwen's objective statements concerning the "market rates" Altisource purportedly charged for services under its long term services agreement with Ocwen based upon specific and enumerated benchmarks, including with respect to Hubzu, were false and misleading, concealed material facts, and lacked any reasonable basis.  As the NY DFS concluded following an extensive investigation with access to internal documents and employees, Hubzu charged "up to three times" more for its services to Ocwen than to other customers.  According to the April 21 DFS Letter, Ocwen's own internal documents demonstrated that "when Ocwen selects its affiliate Hubzu to host foreclosure or short sale auctions on behalf of mortgage investors and

borrowers, the Hubzu auction fee is 4.5%; when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%." The NY DFS further uncovered that the underlying HTML code for Hubzu's website queries whether Ocwen is the seller of the property being listed on Hubzu and, for those properties where Ocwen was the seller, imposed higher fees.

173.   Moreover, further evidence of the false and misleading nature of these statements is represented by the fact that Ocwen's admission that Altisource overcharged it occurred after the NY DFS's investigation continued for an additional eight months, and following the release of the April 21 DFS Letter and Altisource's April 24, 2014 public denial of the misconduct. Significantly, notwithstanding Altisource's April denial, in the December 2014 Consent Order, the NY DFS concluded based on its investigation – and Ocwen itself admitted – that "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors."

174.   Altisource's and Ocwen's statements concerning the "market rates" Altisource charged for services under its long-term services agreement with Ocwen were also false and misleading because Altisource overcharged Ocwen borrowers for valuation estimates and appraisals. Specifically, CW8 stated that Ocwen's "entire [valuation] operation was completely delegated to Altisource." CW8 explained that Altisource was responsible for choosing the form of appraisal and would then pass on the cost of the appraisal to borrowers through Ocwen. With Ocwen's knowledge, however, Altisource regularly overcharged borrowers for appraisals and pocketed the difference. CW8 described this overcharging as "the business model of Altisource . . . [charging] substantially above-market rate for the [appraisal]."

175.   Furthermore, Altisource's and Ocwen's statements concerning the "market rates" purportedly charged for Altisource services were false and misleading because, as the NY DFS explained in the April 21 DFS Letter and Defendant Ocwen admitted in the 2014 Consent Order, Altisource's subsidiary REALHome Services and Solutions, Inc. overcharged Ocwen-serviced borrowers for out-of-state agents who did not perform the required onsite work and lacked sufficient knowledge and relevant expertise to justify the charges.

176.   Ocwen's admissions and the evidence provided by several former Ocwen and Altisource employees make clear that the rates charged by Altisource to Ocwen and its borrowers were not "market rates" because they were not commensurate with the objective standards both Altisource and Ocwen publicly set forth: "fees [Altisource] charge[d] to other customers for comparable services, the fees Ocwen pa[id] to other service providers, fees commensurate with market surveys prepared by unaffiliated firms [or] fees charged by [Altisource's] competitors."

### C.   Statements Concerning The Effectiveness Of REALServicing And Its Ability To Comply With The Law

177.   From the very start of the Class Period, Defendants repeatedly touted the effectiveness and regulatory compliance of Altisource's technology and services, and in particular, the quality, effectiveness, compliance, and scalability of the REALServicing platform.

178.   Throughout the Class Period, Altisource heralded REALServicing on its website as its "proprietary platform [that] incorporates robust analytical models to drive decisioning," as well as employs "principles to enhance borrower communication" and "rules to ensure consistent deployment of best practices."

179.   Similarly, in the Altisource 2013 Q1 10-Q, the Company touted its REALServicing platform as "[a]n enterprise residential mortgage loan servicing product that offers an efficient and effective platform for loan servicing including default administration."  Altisource repeated this statement in each of the Company's Class Period quarterly reports, as well as in Altisource's Form 10-K for 2013.  As stated above, the Forms 10-Q were signed by Defendant Esterman and filed with the SEC on July 25, 2013; October 24, 2013; April 24, 2014; July 29, 2014; and October 23, 2014.  Altisource's Form 10-K for 2013 was signed by the Individual Defendants and filed on February 13, 2014.

180.   Altisource further stressed REALServicing's focus on compliance during the Company's April 25, 2013 earnings conference call.  On that call, a Piper Jaffray analyst questioned Defendants about the onboarding of loans from Ocwen's acquisitions of Homeward

68

and ResCap, and Altisource's capacity to handle additional loans from Ocwen in the near term. Specifically, the Piper Jaffray analyst asked why there was a delay in uploading and boarding certain loans onto REALServicing. In response, Shepro stated: "we just want to make sure that . . . everything . . . from a compliance perspective is in place to service the Fannie loans and to comply with all of the ResCap's obligations before we service transfer those loans onto REALServicing. And so that's all going along in accordance with our project plan and the expected timing."

181.   Ocwen also extolled the REALServicing platform.   Indeed, on May 8, 2013, in Ocwen's 2013 Q1 10-Q, Ocwen stated that REALServicing was a "low cost," "high quality," and quickly scalable servicing platform:

> We expect that other non−prime and prime servicing platforms and servicing portfolios will come to market in the next several months. We are currently tracking potential MSR acquisition opportunities with a total UPB of approximately $375.0 billion. We believe that servicing and subservicing opportunities with an aggregate UPB of up to $1.0 trillion could come to market in the next 2 to 3 years. To the extent that we find these opportunities to be attractive, we believe that we are positioned to effectively compete for such opportunities in light of our low cost and our high−quality servicing platform. Our technology also provides us the ability to quickly scale our servicing operations to handle acquired loan portfolios.

182.   Defendant Erbey made similar statements about REALServicing's low cost and effectiveness during an August 1, 2013 conference call hosted by Ocwen in connection with its second quarter 2013 earnings, where he emphasized that "Ocwen enjoys substantive and sustainable competitive advantages within the servicing business, both in terms of cost and performance."   Erbey added that "Ocwen's cost to service non-performing loans is 70% lower than the industry average," and that REALServicing allows Ocwen "to manufacture new capacity more efficiently and effectively than other servicers."   Ocwen's Forms 10-Q for the second and third quarters of 2013, dated August 6, 2013 and November 5, 2013, respectively, made similar statements regarding REALServicing's "low cost, high quality servicing platform": "[W]e believe that we are positioned to effectively compete for such opportunities in light of our low cost, high-

quality servicing platform. Our technology also provides us the ability to quickly scale our servicing operations to handle acquired loan portfolios."

183.    Erbey also highlighted the platform's scalability as essential to the Company's compliance.  Specifically, Erbey addressed the companies' increasing regulatory scrutiny at the December 2013 Investor Day Conference, stating during the conference call that "[c]ertainly looking at regulations and being compliant is at the top of the list" of the companies' priorities and reassured investors that all of the regulatory scrutiny is "on balance . . . actually positive for us since we have scale."

184.    On February 13, 2014, Altisource held an analyst conference call following the release of its full-year and fourth quarter 2013 financial results. During the conference call, Defendant Shepro assured investors that: "Our relationship with Ocwen is a strong and growing foundation for our business and remains an important priority for us.  We continue to focus on providing high-quality compliance services to enhance their competitive position."

185.    Just two weeks later, Ocwen filed a Form 8-K announcing the release of its full-year and fourth quarter 2013 financial results in which it represented that "[w]e continue to focus our attention on regulatory compliance and on assisting struggling homeowners" and "[d]uring 2013 we made significant progress in enhancing our compliance management system."

186.    Ocwen's 2013 Form 10-K lauded Altisource's REALServicing platform as providing a competitive advantage that helped Ocwen navigate an increasingly complex regulatory environment.  For example, Ocwen's 2013 Form 10-K stated that REALServicing is "the most scalable servicing platform in the industry primarily as a result of our access to superior technology," Ocwen further stated in its 2013 Form 10-K:   "We also believe that our [REALServicing] platform enables us to operate in a compliant manner in an increasingly complex and highly regulated environment."

187.    On April 24, 2014, Altisource held an earnings conference call following the release of its first quarter 2014 financial results, wherein Defendants Erbey and Shepro further assured investors regarding the compliance of Altisource's services.  At the beginning of the call, Erbey

noted that Altisource was "making good progress" on its strategic initiative" to have a "robust, world-class compliance management system." Specifically, Erbey then added, "[w]ith respect to Ocwen, we continue to focus on providing high-quality compliance services to enhance their competitive position." Defendant Erbey attributed Altisource's success to its "compliance focus." Defendant Shepro similarly assured investors on the April 24, 2014 conference call that "[o]ur first initiative and primary focus is providing high quality compliant services to Ocwen's servicing portfolio."

188.   The Individual Defendants also assured investors of Altisource's and Ocwen's regulatory compliance in a conference call on July 24, 2014, following the release of Altisource's second quarter 2014 financial results. Defendant Erbey discussed how Altisource's "compliance focus has been and will continue to be a contributing factor to our success" because of the Company's ability to successfully "operate in a highly regulated environment with oversight from many regulatory authorities." Erbey emphasized to investors Altisource's "world-class compliance management system" that "provid[ed] our customers with high-quality services in a compliant manner." Defendant Shepro similarly emphasized on the conference call that Altisource is "executing well against [its] strategic plan, which focuses on developing a diversified revenue stream, long-term growth and strong cash flow generation, driven by the delivery of high-quality compliance services." Likewise, Defendant Esterman stated on the call that "[w]e are very pleased with our operating results as we continue to focus on compliance, quality, and efficiency initiatives expanding service offerings and investing in our next generation technologies and other growth initiatives."

189.   The next week, on July 31, 2014, Ocwen hosted its quarterly earnings conference call, during which Defendants attempted to minimize the accusations by the NY DFS. Defendant Erbey stated that "Ocwen is deeply committed to adhering to the highest standards of compliance and regulatory oversight."

190.   On October 24, 2014, Altisource held an earnings conference call following the release of its third quarter 2014 financial results and just three days after the release of the October

21 DFS Letter.  On this call, the Individual Defendants touted Altisource's performance and prospects, and reassured investors regarding the compliance of Altisource's services in the wake of the DFS Letters.  On the call, Defendant Shepro stated that "the number one strategic objective of Altisource's management team was "helping Ocwen maintain its leadership position and providing sensible loan modifications and helping it run a profitable, efficient and <u>compliant operation</u>."

191.    The above statements in ¶¶177-190 regarding the legal and regulatory compliance of Altisource's REALServicing technologies and services were false and misleading, concealed material information, and lacked any reasonable basis.  As Ocwen admitted in the 2014 Consent Order, Defendants maintained "inadequate and ineffective" information technology systems for the servicing of mortgage loans which, among other problems, caused Ocwen to issue up to hundreds of thousands of backdated letters.  As further revealed in the October NY DFS Letter and reiterated in the Consent Order, Ocwen admitted to the NY DFS that Ocwen's "senior management" discovered as early as November 2013 that REALServicing was creating backdated letters, but intentionally chose to ignore the problem and "did not notify regulators, borrowers, or investors of this significant issue."   Altisource's and Ocwen's repeated positive statements concerning REALServicing's compliance and capabilities were false and misleading, concealed material information, and lacked a reasonable basis in light of their admitted knowledge of its noncompliance and deficiencies.

192.    The deficiencies admitted by Ocwen in the Consent Order were directly caused by REALServicing.  Indeed, the NMS Monitor December Report revealed that Ocwen admitted to the NMS Monitor that Ocwen "dated most of its letters on the REALServicing platform using the trigger date [*i.e.*, the date Ocwen made the decision to send the letter] not the generation or mail date," which "create[d] a material impact on the accuracy of the letters" "because of a mapping issue in the templates used to create correspondence on its REALServicing platform." Furthermore, as Ocwen admitted in the 2014 Consent Order, the REALServicing platform "is

unable to maintain accurate records; relies on inadequate infrastructure; and has insufficient controls in place to catch and resolve the foregoing errors."

193.    Additionally, the above statements in ¶¶177-190 regarding the "effectiveness" and "scalability" of REALServicing and its use of "robust analytical models" and "rules to ensure consistent deployment of best practices" were false and misleading, concealed material facts, and lacked a reasonable basis because Defendants omitted to disclose that the technology could not adequately handle, from a compliance perspective, the massive influx of loans being boarded onto the platform in connection with Ocwen's mortgage servicing rights acquisitions.  Former Ocwen and Altisource employees confirm that as CW1 stated, Altisource was "not ready" for the growth it achieved.  CW9 described how CW9 concluded "pretty quickly" in 2013 that Altisource's REALServicing platform "[was not] going to be in compliance."

194.    Contrary to Altisource's and Ocwen's representations that REALServicing was "scalable," "effective" and "compliant," the NY DFS determined and Ocwen admitted in the 2014 Consent Order that in reality, Defendants' REALServicing platform consisted of a "patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible." As noted above, REALServicing is Ocwen's "legacy" platform that served as its "core servicing system" responsible for integrating the systems of acquired companies.  Indeed, Fitch identified REALServicing as such in its October 2013 report on Ocwen.  Ocwen similarly admitted that its REALServicing system's failures were due in large part to an "unnecessarily complex system of comment codes" for initiating servicing processes that "ballooned to more than 8,400 such codes."

195.    Statements regarding the superiority and compliance of the REALServicing platform compared to other platform options in the industry were false and misleading, concealed material facts, and lacked a reasonable basis because Ocwen acquired a competitor technology platform similar to REALServicing as a result of its Homeward and ResCap purchase at the start of the Class Period.  According to CW4, on a weekly basis throughout 2013, Ocwen and Altisource management, including S.P. Ravi and Ocwen CEO Faris, were informed of REALServicing's significant compliance-related deficiencies and urged to use FiServ – the servicing platform that

ResCap had used to comply with, among other things, the National Mortgage Settlement and applicable CFPB regulations – and to abandon REALServicing, which had proved to be incapable of complying with the regulations.  Nonetheless, a decision was made by top executives to transfer all loans to the inferior REALServicing platform and not to use the superior FiServ platform.

**D.     Statements Concerning Altisource's Revenues
        From Related Party Transactions With Ocwen**

196.    As discussed above, Altisource's business operations, financial performance, and future prospects were highly dependent on Ocwen.  Altisource derived the substantial majority of its revenues during the Class Period from transactions with Ocwen, which was the Company's number one customer and principal source of business from the time of Altisource's spin-off in 2009 and continuing through the end of the Class Period.  For example, 60% and 65% of the Company's total revenue in 2012 and 2013, respectively, was realized from providing services to Ocwen.  As one analyst noted after the 2014 Consent Order, "more than 60% of [Altisource's] business was tied to [Ocwen]-related sources.  All of this is at risk under the DFS Settlement."

197.    Altisource's Forms 10-K and 10-Q filed during the Class Period specifically identified Altisource's revenues from transactions with related parties, including Ocwen, as set forth on the table below.  As this table indicates, virtually all of the Company's related party revenue was generated from Ocwen:

| Altisource Revenue Transactions with Related Parties (amounts in millions, rounded) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Segment | FY 2012 | Quarter Ended | | | | FY 2013 | Quarter Ended | | | Class Period Totals |
| | | Mar 31 2013 | Jun 30 2013 | Sep 30 2013 | Dec 31 2013 | | Mar 31 2014 | Jun 30 2014 | Sep 30 2014 | |
| **Mortgage Services** | | | | | | | | | | |
| Asset management serv. | $181.9 | $44.2 | $62.1 | $76.5 | $81.6 | $264.4 | $80.6 | $103.9 | $100.1 | $730.9 |
| Insurance services | 73.4 | 21.6 | 24.8 | 10.9 | 41.7 | 99.0 | 26.2 | 22.7 | 14.8 | 236.1 |
| Resid. property valuation | 37.8 | 9.5 | 9.8 | 27.5 | (4.4) | 42.5 | 11.0 | 18.6 | 25.4 | 135.2 |
| Default mgt. services | 13.5 | 4.4 | 4.3 | 4.6 | 3.3 | 16.5 | 4.2 | 3.0 | 3.1 | 40.4 |
| Origination mgt. services | 0 | 0.2 | 0.4 | 0.6 | 0.5 | 1.7 | 0.4 | 0.5 | 0.8 | 3.4 |
| **Total Mortgage Services From Related Parties** | **306.8** | **79.9** | **101.3** | **120.1** | **122.8** | **424.0** | **122.4** | **148.6** | **144.1** | **1,146** |
| **Financial Services** | | | | | | | | | | |
| Asset recovery mgt. | **0.2** | **0** | **6.7** | **10.1** | **10.8** | **27.6** | **6.3** | **7.1** | **8.2** | **49.5** |
| **Technology Services** | | | | | | | | | | |
| REALSuite, Equator and Mortgage Builder | 20.9 | 7.2 | 8.8 | 8.4 | 9.6 | 34.0 | 11.3 | 12.6 | 13.6 | 92.6 |
| IT infrastructure services | 10.3 | 3.0 | 4.5 | 5.0 | 4.0 | 16.5 | 5.5 | 10.6 | 12.2 | 55.1 |
| **Total Technology Services From Related Parties** | **31.2** | **10.2** | **13.3** | **13.4** | **13.6** | **50.5** | **16.8** | **23.3** | **25.8** | **147.7** |
| **Total Revenue From Related Parties** | **338.2** | **90.1** | **121.2** | **143.6** | **147.2** | **502.1** | **145.6** | **179.0** | **178.2** | **1,343** |
| **Total Revenue From Ocwen** | **338.2** | **89.8** | **121.0** | **142.7** | **n/a** | **n/a** | **144.9** | **175.0** | **171.7** | **1,330** |
| **Ocwen Revenue, as % of Related Party Revenue** | **100%** | **99.7%** | **99.8%** | **99.4%** | **n/a** | **n/a** | **99.5%** | **97.8%** | **96.4%** | **99.1%** |

198.    Of the Company's three main business segments, Altisource derived the greatest amount of overall revenue and related party revenue from its Mortgage Services segment.  As set forth in the table above, two categories of services within the Mortgage Services segment consistently accounted for the overwhelming majority of reported related party revenue during the Class Period: (i) asset management services, including Hubzu, for which the Company reported related party revenues of approximately $730.9 million during the Class Period; and (ii) insurance services, including the Company's forced-placed insurance line of business, for which the

75

Company reported related party revenues of approximately $236.1 million during the Class Period. The Company's second largest segment by revenue was the Technology Services segment. Within this segment, the REALSuite of software applications, including REALServicing, comprised the majority of reported related party revenue during the Class Period. Specifically, the Company reported REALSuite revenues of approximately $92.6 million during the Class Period.

199.    These Ocwen-derived revenues were falsely represented as the result of contracts that had been purportedly negotiated and implemented on an arm's-length basis between the companies during which Erbey recused himself, and that Ocwen and its borrowers were charged "market rates" for Altisource's services. In reality, Altisource's Ocwen-derived revenue was the result of conflicted negotiations and agreements from which Erbey failed to recuse himself, and products and services that were not sold at market rates.

200.    The revenues set forth on the table above and specifically identified in the Company's Forms 10-Q and 10-K filed during the Class Period were false and misleading and/or omitted material facts regarding the Company's business and operations. Specifically, the statements above failed to disclose: (i) the true nature of the relationship between Altisource, Ocwen, and the Ocwen-related parties; (ii) that the transactions that took place between these related parties were the result of an unfair process from which Defendant Erbey secretly failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the revenues were inflated and not sustainable because they were derived from (a) services provided at above-market rates; (b) services that Altisource was already obligated to provide under other agreements with Ocwen; (c) no legitimate services being provided at all; and/or (d) unlawful commissions and kickback arrangements with Ocwen and other related parties.

201.    Revenues that the Company received from Ocwen during the Class Period were not the result of arm's-length negotiations, but were the result of unlawful self-dealing and kickbacks that overcharged Ocwen borrowers and over-compensated Altisource on certain fees and payments. For example, as the Company acknowledged in the 2014 Consent Order, certain of the Company's highest-margin services, including Hubzu, were provided to Ocwen borrowers at

above-market rates.  Similarly, other lucrative revenues derived through Ocwen were the result of minimal or no legitimate services being provided by Altisource, including at least $65 million in annual revenues derived through an unlawful force-placed insurance kickback scheme. Consequently, the Company's disclosures concerning its transactions with Ocwen and Ocwen-related companies implied that Altisource's non-Ocwen business was more profitable than it really was and did not provide a fair presentation of the Company's finances, operations, and prospects. As a result of the above, the Company's statements were materially false and misleading at all relevant times and lacked any reasonable basis when made.

**E.    Shepro And Esterman Falsely Certify**
**The Contents Of Altisource's SEC Filings**

202.    Altisource's 2013 Q1 10-Q contained a Sarbanes-Oxley required certification, signed by Defendant Shepro.  This certification stated that Defendant Shepro had "reviewed the quarterly report" and that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

203.    The representation set forth above, in ¶202, was repeated in Sarbanes-Oxley required certifications contained in the Altisource quarterly reports filed on Forms 10-Q for the second and third quarters of 2014; the Form 10-K for 2013; and the Forms 10-Q for the first, second and third quarters of 2014.  Defendants Shepro and Esterman signed these certifications, which were materially false and misleading for all of the reasons set forth above.

**VI.    DEFENDANTS SCHEMED TO FUNNEL**
**MONEY TO ALTISOURCE AT**
**THE EXPENSE OF OCWEN BORROWERS**

204.    Altisource and Ocwen engaged in a series of sham transactions and conflicted business relationships that had no business or economic purpose other than to skim money off of

captive Ocwen borrowers in order to direct money to Altisource and Erbey. These schemes, which were communicated to the market as legitimate transactions, allowed Altisource to project the appearance of outstanding revenue and earnings growth, enabling Erbey to enrich himself by billions of dollars, while placing Altisource's and Ocwen's financial health in serious risk.

205. Defendant Erbey was highly motivated to force Ocwen and its management to engage in this scheme, because Altisource – nearly 30% of which was individually owned by Erbey – could generate substantially more revenue by foreclosing on Ocwen-serviced properties than Ocwen could generate through its servicing business. This is because, whereas Ocwen's loan-servicing revenue is capped to a set servicing fee, Altisource could generate income through appraisals, foreclosure proceedings, short sales, property rentals, and other streams of revenue unavailable to Ocwen. In addition, because Erbey's 29% ownership interest in Altisource was more than double his 14% interest in Ocwen, he earned more than twice as much for every Ocwen dollar that he could shift to Altisource.

206. Ocwen and its management participated in this deceptive conduct because they were controlled from the top down by Erbey. The most blatant example of this top-down control was the fact that both companies secretly shared a Chief Risk Officer who, in turn, reported directly to Erbey. Erbey's public statements that Ocwen and Altisource were "independent companies" that had "sound corporate governance with separate boards and separate management" and "[independent] management teams" were all false. Not only did Ocwen and Altisource share an integral C-Level officer who was unable to ensure the arm's-length nature of the relationship because of this dual role, but multiple former employees have detailed how the top executives of both companies - led by Erbey - ran the two companies as one enterprise, forcing employees to choose vendors and services that benefited Altisource at the expense of innocent homeowners.

207. Altisource and Ocwen also engaged in a series of transactions that exploited Ocwen's borrowers to Altisource's – and Erbey's – benefit. For example, Altisource and Ocwen engaged in a deliberate scheme to use a loan-servicing platform owned and operated by Altisource – REALServicing – which was represented to Altisource investors as supporting Ocwen's business

and its borrowers while driving sustainable revenue growth for Altisource.   In actuality, REALServicing was fundamentally flawed and rigged to accelerate foreclosures and failed loan modifications, which funneled money into Altisource's and Erbey's coffers at Ocwen borrowers' expense.

208.   Throughout the Class Period, Defendants communicated to the market that Altisource's REALServicing was a sophisticated, "efficient," "effective," and "compliant" technology that benefited Ocwen and its borrowers by "boarding" and servicing millions of mortgages while allowing borrowers the appropriate and lawful periods of time to seek loan modifications without losing their homes, in compliance with the law.   For example, Altisource's 2013 Form 10-K noted that Altisource recognized a 39% year-over-year increase in revenue, "primarily driven by Ocwen's growth as loans from its servicing platform acquisitions are boarded on REALServicing."   Defendant Erbey echoed these statements in the February 13, 2014 conference call, boasting that "we assisted Ocwen with the boarding of 1.15 million loans onto REALServicing."   Defendant Esterman on the same call added, "we knew service revenue would grow as Ocwen boarded the ResCap and Homeward loans on REALServicing."   These statements confirmed for the market that the REALServicing technology was above-board and a sustainable source of revenue for Altisource.

209.   As has now been admitted by Ocwen both to the NY DFS and to the NMS Monitor, in reality, Ocwen paid Altisource significant fees for a technology that Altisource and Ocwen knew or recklessly disregarded was hurting Ocwen's customers.   The NMS Monitor reported in the NMS Monitor December Report that representatives of Ocwen "admitted" in a meeting on November 11, 2014 that the REALServicing platform backdated letters because of a "mapping issue" within REALServicing that incorrectly used the wrong date in correspondence, forcing numerous borrowers into unjustified foreclosures.   The NMS Monitor December Report further corroborated the evidence set forth in the October 21 DFS Letter.   Defendants failed to fix this serious problem for nearly one year even though they knew or recklessly disregarded that REALServicing was wrongfully harming Ocwen's customers.

210.    Ocwen formally admitted to this scheme in the 2014 Consent Order, when it admitted that its "core servicing functions rel[ied] on its inadequate systems [*i.e.*, REALServicing]" and that this "resulted in Ocwen's failure to fulfill its legal obligations."  As the NY DFS concluded, the REALServicing platform "regularly" caused Ocwen to "give[] borrowers incorrect or outdated information, send[] borrowers backdated letters, unreliably track[] data for investors, and maintain[] inaccurate records."    Furthermore, as Ocwen admitted in the 2014 Consent Order, the REALServicing platform "is unable to maintain accurate records; relies on inadequate infrastructure; and has insufficient controls in place to catch and resolve the foregoing errors."

211.    Likewise, Altisource and Ocwen continuously disclosed to Altisource's investors that Altisource's subsidiary Hubzu charged fair "market rates" to Ocwen and its borrowers for short sales of distressed properties, which accelerated Altisource's revenue by eliminating the middleman in broker transactions.  However, like REALServicing, the Hubzu technology was implemented to charge captive Ocwen borrowers exploitive fees up to three times the market rate for listing on its auction website.  In the December 3, 2013 dual-company investor conference, Erbey emphasized that Hubzu was an extraordinary money maker for Altisource, noting that "Hubzu makes more earnings and net income in a quarter than [competitors] Tr[ulia] and Zil[low] make all year."  Altisource's 2013 Form 10-K similarly noted that "[a]sset management service revenue also increased from new services introduced in 2013, from expanding the percentage of homes sold through auction on Hubzu."  These statements confirmed for the market that these transactions were aboveboard and were a sustainable source of revenue for the Company.

212.    However, Hubzu was a technology that allowed Altisource to prey on Ocwen's borrowers by creating record but unsustainable profits for Altisource and Erbey.  According to the April 21 DFS Letter, Ocwen's own internal documents demonstrated that "when Ocwen selects its [Altisource] affiliate Hubzu to host foreclosure or short sale auctions on behalf of mortgage investors and borrowers, the Hubzu auction fee is 4.5%," but "when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%."  Despite Altisource's ineffective

April 24, 2014 attempt to refute the NY DFS's April 21 allegations of improprieties at Hubzu, Ocwen ultimately admitted - and the NY DFS concluded - that Ocwen did allow Altisource to vastly overcharge Ocwen and its borrowers through the forced use of Hubzu for all Ocwen borrowers.  In addition to the admitted Hubzu overpricing, multiple former Altisource and Ocwen employees confirmed that Altisource significantly overcharged Ocwen and its borrowers for other forced services, including appraisals, foreclosure registrations, and IT services.

213.    In addition to the scheme to inflate Altisource's revenue through the use of REALServicing and the charging of above-market rates to Ocwen borrowers, Erbey personally approved sham transactions between the companies, in a "gross violation" of both companies' and Erbey's public statements that he recused himself from all such related-party transactions in order to protect against the inherent conflicts of interest posed by his joint chairmanship.  In its detailed August 4 DFS Letter - which was supported by documentary evidence – the NY DFS alleged that Altisource set up a "complex" force-placed insurance arrangement with Ocwen that "appears designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work."  The NY DFS also concluded that Altisource was paid approximately $5 million per year for providing a monitoring service to the force-placed insurance provider that Altisource was already contractually obligated to provide to Ocwen.  Ocwen admitted to engaging in this improper transaction in violation of Erbey's recusal policies in the 2014 Consent Order.

214.    Altisource and Ocwen engaged in a series of transactions that demonstrate a pattern of exploitive behavior by Altisource that was fostered and supported by Erbey and Ocwen's management. While Altisource's investors were informed that these "independent" companies run by "separate management" went to great lengths to protect Ocwen's borrowers by (i) providing a compliant servicing platform, (ii) providing services to Ocwen and its borrowers at market rates, and (iii) entering into unconflicted transactions between Ocwen and Altisource that did not unduly benefit Altisource, the opposite was true.  All of this was revealed in 2014, causing Altisource's

stock price to plummet as its relationship and transactions with Ocwen were placed in serious jeopardy.

## VII.   THE TRUTH BEGINS TO EMERGE

215.   Beginning in February 2014, the truth about Altisource's and Ocwen's unchecked conflicts of interest, improper related party transactions, kickback arrangements and the inadequacy of REALServicing to service Ocwen's loans in compliance with the law gradually began to be revealed to the market. These announcements surprised investors because Ocwen and Altisource had repeatedly represented that they operated on an arm's-length basis, followed specific practices to avoid conflicts of interest and maintained an effective and compliant servicing platform.  However, in an attempt to quiet market concerns, Defendants' denied that they engaged in any conflicted related party transactions and assured investors that all transaction were at "arm's length."  The market ultimately learned the full truth in December 2014 with the release of the 2014 Consent Order.

### A.   The NY DFS Suspends Ocwen's Acquisition Of New Mortgage Servicing Rights Due To Concerns About REALServicing

216.   On February 6, 2014, Ocwen announced that its planned acquisition of $39 billion worth of mortgage servicing rights from Wells Fargo was suspended at the direction of the NY DFS due to "concerns about Ocwen's servicing portfolio growth."  The NY DFS's suspension of the Wells Fargo transaction raised investors' concerns about Ocwen's and Altisource's business and growth prospects as the regulator focused on Ocwen's ability to process loans using Altisource's REALServicing platform, in a manner that complied with the law.  Indeed, as reported by *The New York Times* on February 7, 2014, the regulator's "move to delay the Wells Fargo transaction, which was announced two weeks ago, or future transactions could complicate Ocwen's strategy of increasing its revenue by acquiring more servicing rights from the big banks."

217.    Indeed, analysts connected the suspension of the Wells Fargo transaction to Altisource's business prospects.  For example, Piper Jaffray issued a report covering both companies together on February 6, 2014 entitled "OCN/ASPS: NY Regulator Threatens to Halt OCN's $39B Wells Fargo UPB Acquisition," which discussed the impact of the suspension on both Ocwen's and Altisource's stock prices.

218.    Ocwen's February 6, 2014 announcement caused Altisource's share price to decline $7.89, or nearly 6%, from a close of $133.40 per share on February 5, 2014 to $125.51 per share on February 6, 2014.

219.    NY DFS Superintendent Lawsky provided additional details underlying the reasons for the suspension the following week when he revealed "serious concerns" over possible technological weaknesses in Ocwen's loan servicing platform.  During a February 12, 2014 speech given to the New York Bankers Association, the text of which was released publicly that same day, Superintendent Lawsky explained that the NY DFS had "serious concerns that some non-bank mortgage servicers are getting too big, too fast" because of seemingly unrealistic promises made concerning their "scalable technology [that can] grow with their business" and provide "efficiencies" that seemed "too good to be true."  Lawsky discussed how one particular servicer (referring to Ocwen) was telling the market that it could acquire trillions of dollars of mortgages in the next 2-3 years, while the NY DFS investigation showed that the servicer's "computer systems containing critical borrower information" (referring to REALServicing) were not working properly and resulted in "struggling homeowners getting caught in a vortex of lost paperwork, unexplained fees, and avoidable foreclosures."   Investors understood Lawsky to be referencing Ocwen as the NY DFS's focus on limiting Ocwen's future acquisitions was well-publicized.

220.    On February 13, 2014, Altisource held its first call with investors since Ocwen announced the suspension of the Wells Fargo acquisition.  On that call, Altisource tried to downplay the significance of the Wells Fargo suspension as it related to Altisource's business by focusing on the continued revenue the Company would realize from Ocwen and by telling analysts that questions about the suspension - that at least one analyst noted would "clearly have an impact

on Altisource" - were better directed to Ocwen. For example, Defendant Erbey touted how Altisource would continue to "benefit" from "the loans we expect Ocwen to board on REALServicing in 2014." Similarly, Defendant Shepro emphasized that "[o]ur relationship with Ocwen is a strong and growing foundation for our business and remains an important priority for us. We continue to focus on providing high-quality compliance services to enhance their competitive position."

221.    Analysts, however, were concerned about the suspension's impact on Altisource's revenue given how important Ocwen's acquisitions were to Altisource's business. For example, a Millennium Partners analyst pressed Shepro and Erbey for information about how the suspension would affect Altisource, asking:

> [C]an you just comment; when a company that has a huge customer like Ocwen as part of the business model runs into a problem like this, how do you see that? The commentary coming from [NY DFS Superintendent] Lawsky himself suggests that Ocwen will not be winning any new business for an extended period of time. So how would you suggest modeling the future based on how we have been modeling the past?

222.    When Erbey and Shepro refused to answer these questions directly, the Millennium Partners analyst continued to ask follow-up questions, such as "[d]o you have any – just conceptually on what is going on right now, do you feel like this is the early stages of what Lawsky might do? . . . It is just hard to start modeling the future a few days after this news breaks, which is pretty significant news. Is there anything you can add other than just saying let's let Ocwen answer that?" Erbey and Shepro represented that they had nothing to add.

### B.    The February 26 DFS Letter Raises Concerns Over Serious Conflicts of Interest Between Altisource And Ocwen

223.    Less than three weeks later, on February 26, 2014, the NY DFS issued a letter detailing concerns about "potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated, including Altisource." In particular, the

February 26 DFS Letter identified S.P. Ravi's dual role as Chief Risk Officer of both Ocwen and Altisource, and indicated that the NY DFS had uncovered other potential conflicts between Ocwen, Altisource, and the three other related companies (Residential, AAMC and HLSS).  According to the February 26 DFS Letter, these relationships "cast serious doubts on recent public statements" that Ocwen has a "strictly arm's-length business relationship" with Altisource and other affiliated companies   The NY DFS also noted that "Ocwen's management" and, specifically, Defendant Erbey, the largest shareholder of [Ocwen and Altisource]," owned stock or stock options in the affiliated companies, which "raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of the affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen's shareholders as a result."

224.    As a result of these concerns, the NY DFS asked Ocwen to provide additional information and documents to the NY DFS monitor to assist in its ongoing review in this matter, including, among other things, information about: (i) the financial interests of Ocwen officers, directors, and employees in Altisource; (ii) the financial interests in Ocwen of officers, directors, and employees at Altisource; (iii) services provided by Altisource; and (iv) all policies, procedures, and practices employed by Ocwen and Altisource to avoid or mitigate potential conflicts of interest.

225.    In response to the February 26 DFS Letter, Altisource's share price declined $15.76 per share, or 13.5%, from a close of $120.35 on February 25, 2014 to close at $98.26 per share on February 26, 2014.  This decline eliminated more than $360 million in market capitalization.

226.    Ocwen responded to the February 26 DFS Letter in an earnings conference call held the next day, on February 27, 2014.  During that call, Defendant Erbey assured investors that the related-party agreements with Ocwen were "on an arm's-length basis," and that he "looked forward to addressing the matters raised by [the] DFS."

C.   **The April 21 DFS Letter Raises Concerns
That Altisource Regularly Overcharges Ocwen Customers**

227.   Less than two months after Ocwen and Erbey assured the market that the related-party agreements were "on an arm's-length basis" and Altisource and Erbey reaffirmed Altisource's controls on related party transactions (in the Company's April 7, 2014 Proxy), the NY DFS raised further "concerns regarding conflicted business relationships between Ocwen and Altisource." Specifically, in the April 21 DFS Letter addressed to Ocwen, the NY DFS raised "significant concerns" that Altisource and Ocwen were engaged in self-dealing transactions that resulted in Altisource charging Ocwen customers three times the market rate for fees in order to inflate the Company's revenues.   The April 21 DFS Letter stated:

> The relationship between Ocwen, Altisource Portfolio, and Hubzu raises significant concerns regarding self-dealing. In particular, it creates questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting borrowers and mortgage investors. Alternatively, if the lower fees are necessary to attract non-Ocwen business in the open market, it raises concerns about whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs.

228.   Based on its concerns, the NY DFS sought additional information to assist in its review of the relationship between Altisource and Ocwen.  For example, the NY DFS requested, among other things, information about: (i) whether "Ocwen use[s] any online auction site other than Hubzu;" (ii) the "percentage of Ocwen's online auction sales [] on Hubzu" and on other sites; and (iii) the "percentage of Hubzu's listings [] serviced by Ocwen."  The NY DFS also asked specific questions about the fees charged by Hubzu. For instance, the NY DFS asked that Ocwen "[p]lease confirm that Hubzu charges a 4.5% auction fee on auctions of properties serviced by Ocwen and a 1.5% to 3.5% fee on auctions of properties not serviced by Ocwen" and further asked about the services covered by this fee.

229.   In response to the April 21 DFS Letter, Altisource's share price declined $2.79, or approximately 2.4%, from a close of $117.03 on April 17, 2014, to $114.24 on April 21, 2014.

86

230.    Thereafter, Altisource falsely reassured investors that Altisource, Ocwen and Hubzu did not engage in a conflicted business relationship and denied that Hubzu charged Ocwen above market rates.  On an April 24, 2014 investor conference call, Defendant Shepro specifically addressed the NY DFS's letter and represented that, contrary to the assertions made by the NY DFS, Altisource "firmly believes" that Hubzu "provides a very transparent and efficient method to sell real estate [and] that the rates we charge are in line with or lower than industry standards."   In response to analyst questioning about the fees and services that Altisource provided to Ocwen, Shepro further emphasized that the NY DFS's concerns about Altisource's failure to charge market rates were unfounded, stating, "[n]o, we are charging the same or less than anyone else would typically charge a servicer for the services that we provide and we charge other customers in line with what we charge Ocwen."

231.    The market was mollified by these assurances.  Analysts from Sterne Agee noted in a report issued that day that the conference call "added clarity around Hubzu."  In a report issued April 25, 2014, Sterne Agee further stated that "[m]anagement commentary on . . . ASPS relative pricing parity vs. competitors provided some positive takeaways, but the regulatory overhang remains, until it is resolved."

**D.    The NY DFS Addresses The Risks That Altisource And Its Relationship With Ocwen Pose To Homeowners On May 20, 2014**

232.    On May 20, 2014, in a speech to the Mortgage Bankers Association (the "May 20, 2014 Lawsky Speech"),  NY DFS Superintendent Lawsky provided greater detail regarding the threat posed to borrowers by Ocwen's and Altisource's affiliated relationship.  Lawsky explained that the Department's "review of non-bank servicers has also turned up another enormous profit center associated with these MSRs [Mortgage Servicing Rights] that could put homeowners and mortgage investors at risk: the provision of what we call ancillary services" whereby "an affiliate provides fee-based services for every single step in the real estate process."  As Superintendent Lawsky explained, this provision of services poses a threat to consumers because "there effectively

is no customer to select its vendor for ancillary services.  Non-bank servicers have a captive (and often confused) consumer in the homeowner."  Superintendent Lawsky stated that "the potential for conflicts of interest and self-dealing are perfectly clear.  Servicers have every incentive to use these affiliated companies exclusively for their ancillary services, and they often do.  The affiliated companies have every incentive to provide low-quality services for high fees, and they appear in some cases to be doing so."  Superintendent Lawsky concluded his speech with a representation that the market "should expect [the NY DFS] to expand our investigation into ancillary services in the coming weeks and months."

233.    Given the NY DFS's prior letters raising concerns about the relationship between Ocwen and Altisource, the market understood that Lawsky's May 20, 2014 speech was directed, at least in part, at the relationship between Altisource and Ocwen, and that his investigation was only in its early stages.  For example, in a May 20, 2014 article reporting on the speech, *HousingWire* stated that Lawsky was referring to Ocwen and Altisource when he addressed how servicers benefit from having related parties provide the ancillary services.  A May 20, 2014 article in *Mortgage Daily* also made the connection between Lawsky's speech and Ocwen and Altisource, as providers of ancillary services that Lawsky has been investigating.

234.    As a result of the speech, Altisource's stock price dropped 6%, from a close of $105.44 per share on May 19, 2014, to close at $99.15 per share on May 20, 2014.

**E.     The August 4 DFS Letter Raises Concerns That
         Defendants Lied About Erbey's Recusal From
         Conflicted Transactions And Engaged In A Kickback Arrangement**

235.    On August 4, 2014, the NY DFS published another letter, raising concerns regarding the provision of force-placed insurance to Ocwen borrowers through a "complex arrangement" with Altisource.  In its letter, the NY DFS detailed a "troubling transaction involving Ocwen's related company, Altisource" which, according to the NY DFS, "appears designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work."  The NY DFS cited to emails and evidence indicating that "Ocwen hired

<u>Altisource to design Ocwen's new force-placed program with the expectation and intent that</u> <u>Altisource would use this opportunity to steer profits to itself</u>."

236.   The NY DFS also singled out Defendant Erbey's role in this "troubling transaction," including the fact that: "the role that [he] played in approving this arrangement appears to <u>be inconsistent with public statements Ocwen has made, as well as representations in</u> <u>company SEC filings</u>" that he recuses himself from decisions involving related companies. The NY DFS characterized Defendant Erbey's role in the approval of this force-placed program as appearing to be a "gross violation of this supposed recusal policy."  The NY DFS further disclosed in its August 4 DFS letter that it had "<u>uncovered a growing body of evidence that Mr. Erbey has</u> <u>approved a number of transactions with the related companies</u>," despite Defendants' contrary representations to the market.

237.   While the August 4 DFS Letter identified "troubling" conduct, the NY DFS indicated that their investigation was ongoing and requested additional information and documents.  The requested documents and information focused on: (i) "the amount of revenue Altisource or its affiliates has realized" from the force-placed insurance arrangement; (ii) what services, if any, Altisource provided to receive payment in this transaction; (iii) how and why Mr. Erbey approved this force-placed insurance arrangement; (iv) every instance where Mr. Erbey has approved a transaction involving a related company notwithstanding Ocwen's statements to the contrary; and (v) whether Ocwen has performed any independent analysis to support the assertion that the rates charged under other related party agreements are market rates.

238.   Analysts reported on this news as equally applicable to both Altisource and Ocwen. On August 4, 2014, Piper Jaffray issued an industry note on both Ocwen and Altisource, noting the NY DFS Letter "implies [Altisource] is benefiting from its relationship with [Ocwen] and buying expensive, high premium insurance on behalf of delinquent borrowers."

239.   In response to the August 4 DFS Letter, Altisource's share price plummeted $15.18 per share, or 14.6%, from a close of $103.83 on August 1, 2014 to close at $88.65 on August 4, 2014.  This decline eliminated approximately $330 million in market capitalization.

240.     Shortly thereafter, on August 18, 2014 Ocwen revealed to the market that, on June 12, 2014, the Company "received a subpoena from the SEC requesting production of various documents related to [its] business dealings with Altisource, HLSS, AAMC and [RESI] and the interests of our directors and executive officers in these companies."

**F.     The October 21 DFS Letter Raises "Serious Issues" With REALServicing**

241.     On October 21, 2014, the NY DFS publicly released another letter to Ocwen, detailing "serious issues with Ocwen's systems and processes" for mortgage loan servicing, including Ocwen's practices that "backdate[ed] potentially hundreds of thousands of letters to borrowers, likely causing significant harm."  The NY DFS expressed concern that "[t]he existence and pervasiveness of these issues raise critical questions about Ocwen's ability to perform its core function of servicing loans."  According to Superintendent Lawsky, Ocwen's faulty "systems and processes" – the core of which is Altisource's REALServicing – caused "new, inaccurate records [to be] created with each passing day," ordering that these systems be fixed "without delay."  The October 21 DFS Letter concluded that "[t]he stakes for borrowers and investors are enormous. If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law.  If Ocwen cannot demonstrate immediately that it is capable of properly servicing borrowers' needs, the Department intends to take whatever action is necessary to ensure borrowers are protected."

242.     In response to this news, the Company's share price fell by $10.32, or 10.9%, from a close of $94.83 on October 20, 2014 to a close of $84.51 on October 21, 2014.

243.     That same day, Ocwen issued a press release attempting to minimize the scope and severity of the backdating problem.   In particular, Ocwen represented that the issue was "inadvertent," limited to only "283 borrowers in New York" and had been fully resolved. However, after the market closed that day, Ocwen issued a shocking second press release retracting the above statement and admitting that the problem was significantly larger in scope than just 283 borrowers.  The second press release stated that Ocwen was aware of "additional borrowers in

New York who received letters with incorrect dates" but could not quantify the scope of the problem.

244.     In response to this news, which further partially revealed the extent and severity of problems with Altisource's servicing technologies, Altisource's stock price declined an additional $15.40, or over 18%, from its close of $84.51 per share on October 21, 2014 to close at $69.11 per share on October 22, 2014.  In total, the declines in Altisource stock prices on October 21 and 22, 2014, collectively destroyed more than $570 million in shareholder market capitalization.

245.     The NY DFS's concerns about the "serious issues with Ocwen's systems and processes" directly implicated Altisource's REALServicing platform and other technologies upon which Ocwen was "dependent" to perform its core servicing function.  These revelations also raised concerns about whether these systems could be fixed such that Ocwen and Altisource would be able continue to grow their businesses through Ocwen's acquisitions of servicing rights.  For instance, on the same day, October 21, 2014, Moody's downgraded Altisource, reporting that the "serious issues with Ocwen's servicing systems and processes" raised by the NY DFS directly impacted Altisource's rating because its rating is "driven in large part by their reliance on Ocwen." Similarly, Sterne Agee analyst Henry Coffey advised investors to "avoid the OCN complex until we can get some clarity around this issue," and further noted that the inaccuracies in Ocwen's initial response to the DFS letter were particularly "disconcerting."

246.     The revelations in the October 21 DFS Letter raised immediate concerns for the NMS Monitor concerning Ocwen's compliance with the National Mortgage Settlement's defined standards, one of which required the provision of ample time for borrowers to appeal loan-modification and foreclosure decisions.  The NMS Monitor reported in his December 16, 2014 report that, "Given that several Servicing Standards under the Judgment require [Ocwen] to comply with timeline requirements, many of which are triggered by the date correspondence is sent to a consumer, I immediately communicated to [Ocwen] that it must furnish a full explanation of the letter dating issue and any possible effects that it may have had on Servicer's compliance

with the terms of the Judgment."  A months' long investigation into the matter commenced immediately and independent consultant McGladrey was retained to investigate this wrongdoing.

### G.     Altisource Concedes The Impropriety of Its Force-Placed Insurance Contract On November 12, 2014

247.    On November 12, 2014, before the market opened, Altisource surprised investors by announcing that the Company was entirely discontinuing its force-placed insurance program. In its press release announcing the termination of this highly-profitable line of business, Altisource blamed "uncertainties with industry-wide litigation and the regulatory environment" and explained that "it is in the best interest of the Company and its shareholders to discontinue this line of business and continue to focus attention and resources on developing and delivering leading innovative technology-driven products and services for the real estate and mortgage markets that will provide benefits to consumers, lenders, originators and other participants."  Altisource disclosed that the termination of its force-placed insurance program would reduce the Company's quarterly earnings for the next five quarters by $0.50 to $0.65 per share.

248.    In an attempt to assure the market that there was nothing improper about its force-placed insurance business, the November 12, 2014 press release stated that: "Altisource believes that it developed a lender placed insurance program that is unique in its benefits to consumers and investors."

249.    In response to this news, Altisource's stock price declined $12.28, or nearly 17%, from its close of $72.78 per share on November 11, 2014 to close at $60.50 per share on November 12, 2014.  On November 13, 2014, Altisource's stock price continued to decline in response to the news, falling an additional $5.50 per share, or 9.1%, from its close of $60.50 on November 12, 2014 to close at $55 on November 13, 2014.  In total, the declines in Altisource stock prices on November 12 and 13, 2014, collectively destroyed approximately $360 million in shareholder market capitalization.

250.    Analysts understood that Altisource's announcement was connected to the allegations set forth in the August 4 DFS Letter.  An analyst at Piper Jaffray echoed these sentiments, stating in a November 12, 2014 report that Altisource's decision was "a step in the direction of a potential settlement with the NY DFS."  A Sterne Agee analyst stated "[w]e cannot imagine ASPS is dropping a line of business that appeared to be so significant to EPS just to avoid future litigation. . . . We think OCN is inching closer to a settlement [with Lawsky]."

251.    It is clear that Altisource's withdrawal from the force-placed insurance business was caused by heightened regulatory skepticism over Erbey's role in approving the Ocwen-Altisource-SWBC transaction.  As revealed by Ocwen on May 11, 2015 in its 2014 Form 10-K, Ocwen received an additional subpoena from the SEC on November 20, 2014 "requesting certain documents related to Ocwen's agreement with Southwest Business Corporation, and related to Mr. Erbey's approvals for specifically enumerated board actions."

**H.    Ocwen Admits That "Widespread Conflicts of Interest"
With Altisource And The "Inadequate and Ineffective"
REALServicing Platform Harmed Borrowers on December 22, 2014**

252.    On December 22, 2014, before the market opened, the NYS DFS announced that it had entered into a sweeping Consent Order with Ocwen.  In the 2014 Consent Order, the NY DFS found and Ocwen "agreed" that it had engaged in "numerous and significant violations" of the law, including New York State laws and regulations and the terms of the 2011 Agreement, which required Altisource's regulatory compliance.  In particular, Ocwen admitted to having "widespread conflicts of interest with related parties," and "inadequate and ineffective information technology." For example, Ocwen admitted to conflicts of interest surrounding "its relationship with Altisource Portfolio," including, (among other things discussed herein), by: (i) sharing the same Chief Risk Officer; (ii) allowing Altisource's subsidiary Hubzu to charge Ocwen-serviced borrowers above-market rates, and (iii) overcharging Ocwen-serviced borrowers for out-of-state agents who did not perform the necessary onsite work and lacked sufficient knowledge or expertise.  Ocwen also admitted that, contrary to Defendants' representations to investors during the Class Period,

Defendant Erbey "has not in fact recused himself from approvals of several transactions" with Altisource, including the transaction approving Altisource's provision of force placed insurance. In addition, Ocwen also admitted that Altisource's REALServicing "information technology systems" for servicing mortgage loans were "inadequate," "ineffective," and "resulted in Ocwen's failure to fulfill its legal obligation."

253.    As a result of the NY DFS's findings and Ocwen's admissions, the NY DFS terminated Defendant Erbey from his position as Chairman of Ocwen, Altisource and the other related companies and also barred him from receiving any non-public information concerning the companies.  The NY DFS also barred him from serving in any role at Ocwen, Altisource or any other related party.

254.    Further, the 2014 Consent Order required Ocwen to pay a staggering $100 million penalty to the NY DFS "as a civil monetary penalty pursuant to New York Banking Law § 44," as well as an additional $50 million in restitution to current and former Ocwen borrowers in New York.  This $150 million penalty and restitution was greater than all of Ocwen's income for 2014. The amount of the penalty shows that the NY DFS concluded that Ocwen "knowingly and willfully committed" a violation of New York Banking Law.  *See* New York Banking Law § 44(4) (penalties of up to $250,000 per day are allowed only for violations committed "knowingly and willfully").

255.    The NY DFS also required that Ocwen, Altisource and the other related companies not share any common officers or employees, among other significant operational and corporate governance changes.  Ocwen was also prohibited indefinitely from acquiring additional mortgage servicing rights unless and until it received prior approval from the NY DFS monitor, and meets benchmarks concerning REALServicing's ability to onboard newly acquired mortgage servicing rights and properly service both those newly acquired loans and its existing loan portfolio.

256.    In response to these shocking admissions and revelations, Altisource's stock price plummeted $16.05 from its close of $47.54 per share on December 19, 2014, to close at $31.49 per share on December 22, 2014, a one-day decline of 33.7% that destroyed more than $320 million in shareholder market capitalization.

257.    Analysts were stunned by the news that Ocwen had admitted to "widespread conflicts of interest" with Altisource and other related parties, and that it used an "inadequate and ineffective" mortgage servicing platform.  For example, in a December 23, 2014 report, analysts at Sterne Agee wrote that "[t]he settlement between Ocwen and the New York Department of Financial Services went way beyond anything we were anticipating and leaves at risk ASPS's major source of revenue—loss mitigation services provided for OCN or OCN related clients."  The Sterne Agee analysts added that "[p]rior to walking away from its lender place insurance business, ASPS's loss mitigation servicers represented approximately 65% of its overall business mix and more than 60% of its business was tied to OCN related sources.  All of this is at risk under the DFS Settlement."  As a result, Sterne Agee lowered its price target on ASPS shares from $50 to merely $30 – a startlingly low figure given that Altisource shares had traded at over $170 less than a year before.

258.    With the announcement and release of the 2014 Consent Order, the market finally learned the full truth about Altisource's conflicted relationship and business dealings with Ocwen, lack of controls for managing such conflicts, inadequate and ineffective technology systems and services, inflated fee structures, and true financial circumstances and prospects.  As a result, at least in part, of the disclosures set forth above from February 6, 2014 through until December 22, 2014, as the magnitude and severity of the conflicts of interests, self-dealing transactions and the REALServicing deficiencies were revealed, Altisource's stock price plummeted by $101.92, from $133.40 per share to $31.49 per share, a decline of 76.4%.

## I.    Post-Class Period Events

259.    On January 14, 2015, Moody's downgraded Altisource's Corporate Family Rating and Senior Secured Bank Credit Facility to B3 from B2.  In its press release announcing the downgrade, Moody's explained that "the rating actions reflect the continued regulatory scrutiny of Ocwen that could lead to the loss of their license to service loans in California along with the seriously impaired franchise value of the [Erbey Companies]."  Moody's added that the downgrade

in Altisource's ratings was "driven by [its] reliance on Ocwen," noting that "as of Q3 2014 approximately 60% of Altisource's revenues were derived from its relationship with Ocwen."

260.     Also on January 14, 2015, reports of large-scale workforce reductions at Altisource began to emerge.  For example, *BostInno*, an online news site for the Boston area, reported that as many as 60 employees had been let go from Altisource's regional offices in Boston. The article also reproduced an online post that reported on "[m]assive firings in Altisource Bangalore . . . . Around 300 shown Pinkslips today."  Later that day, Altisource issued a statement confirming it had "made the difficult but necessary decision to realign [its] employee base with the growth opportunities in front of Altisource."

261.     On January 16, 2015, Altisource held a conference call to discuss changes in the Company's business strategy following the 2014 Consent Order and other recent events. On the call, Defendants announced disappointing results, namely, projected pretax income for the fourth quarter 2014 of between zero and $4 million – an amount that equaled less than 10% of the previous quarter even under the most positive scenario – a staggering decline that Defendants "primarily" attributed to the discontinuance of the Company's force-placed insurance program, as well as "$8 million of higher costs in our technology services segment."  Defendants acknowledged that, consistent with the reforms instituted in the 2014 Consent Order, the growth the Company anticipated to experience through Ocwen had been negatively impacted and that "Ocwen is not likely to grow that much in the near-term."  As a result, during the fourth quarter Altisource was forced to dedicate "more resources to advance [its] customer diversification and growth initiatives" and focus on "realigning [the Company's] expenses for this new reality." Defendants also confirmed earlier reports of massive layoffs at the Company, including the elimination of "over 800 individual employee positions and hundreds of contractors across [Altisource's] geographical footprint."

262.     Significantly, during the January 16, 2015 conference call, Defendant Shepro tacitly confirmed that the 2014 Consent Order's references to "inadequate and ineffective" systems were referring to Altisource's REALServicing system."  In response to an analyst question whether the

2014 Consent Order was "a direct condemnation of the REALServicing System," Defendant Shepro did not deny this accusation, stating only that Altisource was "very proud to support Ocwen with technologies and services that we believe have contributed to Ocwen's success" and that "[o]ur objective as is Ocwen's is to provide high-quality technologies and services so that Ocwen and our other customers can meet their obligations in this rapidly changing regulatory environment." Shepro admitted that Altisource anticipated having to spend more to meet its objective of providing high quality and compliant technologies and services, and acknowledged that the disappointing fourth quarter earnings "reflected the elevated spend."

263.    In a report released later that day, a Piper Jaffray analyst highlighted the fact that Altisource's margins had been significantly impacted by the discontinuance of the forced-placed insurance business and the "increased expenses associated with revenue growth expectations that have not materialized." In another report released on January 16, 2015, a Stern Agee analyst claimed Defendants had failed to "answer the broader existential questions about the viability of the loss mitigation and REO disposition business given recent events." The Stern Agee analyst explained that: "The unanswered question is what steps Altisource is taking to be sure that its fees and product offering will prove acceptable to some of its biggest antagonists (and biggest customers) mortgage-backed security note holders, state agencies, and other counter parties." The Stern Agee analyst emphasized that Defendants' optimistic revenue projections only work "if nothing at [Ocwen] changes and that nothing about [Altisource's] fee stream from [Ocwen] changes for the worse. In the sale or loss of servicing by [Ocwen], the loss mitigation business would travel with that servicing"—*i.e.*, Altisource would lose the majority of its revenues.

264.    On February 25, 2015, NY DFS Superintendent Lawsky spoke publicly about the NY DFS's prosecution of Ocwen during a speech concerning financial regulation at Columbia Law School. In this speech, Superintendent Lawsky discussed the commission of "fraud, after fraud, after fraud on Wall Street," and detailed the NY DFS's success in combatting fraud by "expos[ing] and penaliz[ing] misconduct by individual senior executives." Superintendent Lawsky described the ouster of Defendant Erbey as a prime example of the NY DFS's success, explaining how the

"NY DFS required . . . the Chairman of one of the United States' largest mortgage companies, Ocwen Financial, to step down as part of enforcement actions brought against those companies." Similarly, in a CNBC interview on May 26, 2015, Superintendent Lawsky explained the importance of "holding accountable individuals"—such as Bill Erbey—who "have engaged in wrongdoing" when the wrongdoing committed at the company was "awful."

265.   As first revealed during the Class Period, the SEC had commenced an investigation into potential conflicts of interests between Ocwen and Altisource.  Ocwen revealed the true extent of the ongoing SEC investigation into its conflicted relationship with Altisource and other related parties in its May 11, 2015 annual report filed in its Form 10-K.  On August 18, 2014, Ocwen had reported the receipt of a June 2014 subpoena from the SEC seeking documents "relating to our business dealings with Altisource, HLSS, AAMC and Residential and the interests of our directors and executive officers in these companies."  In the May 11, 2015 filing, Ocwen also revealed that "[i]n addition, we received a further subpoena on November 20, 2014 requesting certain documents related to Ocwen's agreement with Southwest Business Corporation, and related to Mr. Erbey's approvals for specifically enumerated board actions," in direct reference to the conflicted related-party transaction concerning force-placed insurance highlighted in the August 4 DFS Letter and admitted to in the 2014 Consent Order.

266.   Altisource's stock price still has not recovered from the revelations set forth in Section VII.  To the contrary, since the end of the Class Period, Altisource's stock price has continued to spiral downward.  As of January 30, 2015, Altisource's shares traded at $20.28 per share, or 88% below the Class Period high of $170 per share.

## VIII.   ALLEGATIONS CONFIRMING DEFENDANTS' SCIENTER

267.   As alleged above, numerous facts – including Defendant Ocwen's detailed admissions in the 2014 Consent Order – give rise to a strong inference that Defendants Altisource, Ocwen, Erbey, Shepro and Esterman knew or recklessly disregarded that their Class Period statements and omissions set forth herein were materially false and misleading, concealed material

facts, and lacked any reasonable basis when made.   Among other things, Defendants knew, or recklessly disregarded, that (i) Altisource and Ocwen failed to follow stated procedures, practices and policies for managing their related party transactions and avoiding conflicts of interest, particularly those posed by Erbey; (ii) Altisource frequently charged Ocwen-serviced borrowers inflated, above-market rates for various types of mortgage services; (iii) Altisource's REALServicing platform was inadequate and could not effectively service the millions of loans being boarded onto the platform during the Class Period while complying with heightened regulatory requirements enforced by state and federal authorities; and (iv) as a result of the foregoing, Altisource's substantial Ocwen-derived revenues were not sustainable.   Because Defendant Erbey was the Executive Chairman of Ocwen and the Chairman of Altisource at all times during the Class Period, his scienter is ascribed to both companies.   Because Defendants Shepro and Esterman were the CEO and the CFO, respectively, of Altisource at all times during the Class Period, their scienter is ascribed to Altisource.

268.     In addition to the facts set forth above, Defendants' scienter is demonstrated by the following summary.

### A.     Erbey's Direct Participation In And Knowledge Of The Fraud Establishes His And The Companies' Scienter

269.     Based on the admitted facts set forth in the 2014 Consent Order alone, there can be no question that Defendant Erbey acted with scienter with respect to his non-recusal, and that his knowledge is imputed to both Altisource and Ocwen.   Defendant Erbey personally approved numerous conflicted related party transactions between Altisource and Ocwen in direct contravention of his public statements during the Class Period.   As admitted in the 2014 Consent Order, "Mr. Erbey has not in fact recused himself from approvals of several transactions" between the two companies, and, in fact, "participated in the approval of a number of transactions between the two companies or from which Altisource received some benefit, including the renewal of Ocwen's forced placed insurance program in early 2014."

270.   Likewise, Ocwen also <u>admitted</u> in the 2014 Consent Order that Erbey directly supervised Ocwen's and Altisource's secretly overlapping Chief Risk Officer Ravi.  Given Erbey's own public statements in September and December 2013 emphasizing the companies' separation and independence, and Altisource's representation that Ravi "previously" (and not currently) worked for Ocwen in the role of Chief Risk Officer, there is no plausible inference to be made except that Erbey knew that Ravi's dual role was a violation of the companies' "sound corporate governance" and other statements confirming their independence.  Indeed, Erbey did not qualify or limit his statement in any way.  It is clear that Erbey knew the companies' shared a key, critical executive when he represented that he (Erbey) was the only connection between the two "non-affiliated" companies.

271.   Erbey also knew or recklessly disregarded the deficiencies in REALServicing. Ravi, Erbey's direct report for both companies, was tasked with ensuring REALServicing's compliance, and received regular updates about REALServicing's significant deficiencies including, but not limited to, the fact that REALServicing was delivering woefully backdated letters leading to unnecessary foreclosures and denied loan modifications.  By Ocwen's own admission, senior management (that must have included Ravi and Erbey who were active in both companies) knew of the backdating problem caused by REALServicing by at least November 2013, yet took no steps to correct the problem until forced to do so by the NY DFS and the NMS Monitor more than one year later.

272.   Erbey's knowing participation in the fraud was so integral to Altisource's and Ocwen's uncontrolled conflicts of interest and noncompliant REALServicing platform that the NY DFS concluded that the companies could no longer operate with Erbey as their Chairman.  Indeed, the NY DFS not only forced Erbey out of his role as Chairman of Ocwen and Altisource, but <u>banished</u> him from any role in the companies' operations.

**B.      Ocwen's Admissions Together With The Findings
         Of The NY DFS And The NMS Monitor Establish Defendants' Scienter**

273.    The NY DFS's and NMS Monitor's findings, together with Ocwen's admissions, further demonstrate all Defendants' scienter.

274.    First, in addition to Erbey's scienter, discussed above, the scienter of Defendants Shepro and Esterman, as the CEO and CFO of Altisource who were personally involved in some or all of the related-party transactions approved by Erbey, is established through the damning admissions in the 2014 Consent Order that Erbey "has not in fact recused himself from approvals of several [related-party] transactions."  As a fellow director of Altisource with Erbey, the only plausible inference to be made is that Shepro participated in some of the decisions where Erbey improperly refused to recuse himself.  Moreover, as is clear from the paper trail followed by the NY DFS (as described in the October 21 DFS Letter), the most plausible inference is that Shepro and Esterman, given their positions as Altisource's two highest officers, knew of Erbey's role in major multi-million dollar contracts.

275.    In particular, Defendant Erbey's direct involvement in approving the force-placed insurance transaction between Altisource and Ocwen further demonstrates all Defendants' scienter. The force-placed insurance transaction, approved by Erbey in January 2014, funneled $65 million in fees to Altisource – an amount that equaled 8.5% of Altisource's 2013 revenue and nearly 50% of Altisource's 2013 net income.  Moreover, the transaction created a new business line for the Company.   Internal Ocwen documents described by the NY DFS provide evidence that the Defendant companies and Erbey knew that this transaction was improper because "Ocwen hired Altisource to design Ocwen's force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself."  The NY DFS characterized Erbey's approval of the forced-placed insurance program as "a gross violation" of both companies' stated recusal policy.  It is not plausible that Altisource's CEO and CFO would not know the details of such a new and large line of business.

276.   The timing of Defendants' execution of the force-placed insurance transaction is also evidence of Defendants' scienter.  Only three months before the transaction was executed in June 2014, the NY DFS had expressly cautioned Defendants in the February 26 DFS Letter that it had "serious doubts" about the companies' relationship, and specifically, had concerns over the arm's-length nature of the companies' transactions and the multiple roles played by Erbey in the two companies.  Defendants disregarded these express concerns and knowingly executed this highly improper arrangement in June 2014.

277.   Altisource's unexpected withdrawal from the force-placed insurance line of business in November 2014, an act that had a profound negative impact on Altisource's financials, further demonstrates the Altisource Defendants' scienter.  Specifically, it provides clear evidence that the 2014 force-placed insurance transaction was not in compliance with regulations and was improperly approved by Erbey, as Ocwen admitted in the 2014 Consent Order.

278.   Second, Defendant Ocwen admits that Altisource and Ocwen did not maintain "separate management."  Thus, Defendants' scienter is further established by their knowing commingling of both companies' management and operations.  Ocwen admitted in the 2014 Consent Order that S.P. Ravi served as the Chief Risk Officer for both Altisource and Ocwen during the Class Period, in direct contravention of Ocwen's and Altisource's statements to investors that Ravi worked for Altisource only and that the companies maintained "separate management."  Ocwen also admitted in the 2014 Consent Order that Ravi reported directly to Defendant Erbey in both capacities, demonstrating that Defendant Erbey knew of Ravi's conflicted position.  Ravi's conflicted position as both companies' Chief Risk Officer who reported to Erbey, both companies' Chairman, demonstrates the corporate scienter of his employers, Ocwen and Altisource.

279.   Moreover, former employees confirm that the companies' regularly commingled their management and operations.  CW5 described how other senior managers – including the head of Quality Assurance – worked for both Altisource and Ocwen, causing additional conflicts of interest.  Further, all "Chief"-level executives of both companies worked closely together, as

confirmed by CW1 who stated that "everybody in the C suite were running things together" regardless of official company assignations.  In fact, CW1 stated that the companies operated as one entity.  Other CWs confirmed that the companies shared departments and their personnel, including payroll, email and accounting.  Thus, Defendants Erbey, Shepro and Esterman had direct knowledge of the conflicts posed by Ravi's and other high level managers' positions with both Altisource and Ocwen.  This is particularly true for Defendant Erbey, who served as the Chairman of both Ocwen and Altisource and had unique insight into the dual employment of these individuals and the co-management of the companies.

280.     Third, Ocwen admitted in the 2014 Consent Order that Altisource charged Ocwen-serviced borrowers above-market rates, "charges which are then passed on to borrowers and investors," a fact that provides additional direct evidence of scienter.  The Hubzu charges – up to three times the fees charged to Ocwen customers – are in violation of representations made by both companies that Altisource charged Ocwen-serviced borrowers "market rates" for its services.  Specifically, the NY DFS presented specific evidence of how the two companies knowingly colluded to harm Ocwen borrowers in its April 21 DFS Letter.  The NY DFS indicated that the Hubzu website – managed by Altisource – programmed "underlying HTML code" that consists of "a built-in notation stating 'is OcwenSeller' – followed by a 'Y' or 'N' – for each individual property," and that "[f]or those properties where 'Y' is noted, the auction fees typically appear to be higher."  In other words, Altisource specifically programmed Hubzu to target Ocwen borrowers so they could be charged above-market rates.

281.     Moreover, Defendants Shepro and Erbey were focused on the profits generated by this high-margin line of business and held himself out to be knowledgeable about the source of Hubzu's revenues to investors during analyst and investor conference calls.  These statements further support a strong inference of scienter.  For example, during an October 24, 2013 conference call, Defendant Shepro discussed how a "primary area[] of focus" for Altisource was "to generate more revenue per home sale transaction on Hubzu."  Likewise, during the December 3, 2013 dual-

company investor conference, Erbey emphasized that Hubzu was an extraordinary money-maker for Altisource, outperforming its competitors.

282.     Former Altisource and Ocwen employees have confirmed that Altisource regularly overcharged Ocwen borrowers for a variety of services, and that Ocwen was aware of this practice. CW8, Altisource's former Chief Appraiser for Default Valuation, stated that Ocwen "completely delegated to Altisource" its "entire valuation operation" and allowed Altisource to charge Ocwen fees for appraisals that were significantly inflated above the actual cost of the appraisal.  CW8 described how Ocwen would simply pass on those inflated, non-market rate fees to its borrowers. The pervasiveness of Altisource's predatory conduct in overcharging Ocwen-serviced borrowers supports a strong inference of scienter.

283.     Fourth, Ocwen's admission that Altisource's REALServicing Platform caused accelerated foreclosures and failed loan modifications provides direct evidence of Defendants' scienter. In the NY DFS October 2014 Letter, Superintendent Lawsky reported that Ocwen "admitted" that employees identified the backdating problem as early as November 2013 and "informed senior management," but senior management purposefully chose to ignore the problem. As reported in the NMS Monitor December Report, Ocwen "admitted" in a November 11, 2014 meeting that "most of its letters on the REALServicing platform" during 2014 were "dated using the trigger date, not the generation or mail date" as the date from which foreclosure and modification deadlines accrued.  Likewise, according to the 2014 Consent Order, Altisource's REALServicing platform was an "inadequate and ineffective information technology" system for servicing mortgage loans that "resulted in Ocwen's failure to fulfill its legal obligations."  These admissions stand in direct contrast to Defendants' repeated Class Period statements about REALServicing's scalability and compliance with the law.  Further, Ocwen's Internal Review Group that tested the effectiveness of REALServicing's compliance regularly reported on a weekly basis serious concerns about REALServicing's deficiencies and ability to comply with the law to Chief Risk Officer Ravi, who in turn reported directly to Defendant Erbey.  Ravi headed the entire Internal Review Group and knew or recklessly disregarded all of the deficiencies that infected

REALServicing and prevented it from servicing loans in compliance with governing laws and regulations. The direct contrast between Defendants' public statements and the reality regarding the REALServicing platform supports a strong inference of scienter.

284. Defendants' scienter is further demonstrated by the fact that Altisource's REALServicing platform was crucial to both companies' ability to effectively service the nearly three million loans in Ocwen's portfolio, and to acquire additional mortgage servicing rights going forward. REALServicing's purported "scalability" allowed Ocwen to drive its mortgage servicing portfolio up from $50 billion UPB to over $450 billion UPB in the space of a few years because REALServicing was Altisource's core technology product and legacy system inherited from Ocwen in 2009, which served as the backbone of Ocwen's entire business. Defendants knew that REALServicing's capabilities, quality, and legal compliance were essential to the Company's financial performance and future growth, and that non-compliance could result in the cessation of their servicing business and the loss of substantial revenue streams. The fact that REALServicing's gross deficiencies threatened to severely jeopardize both companies' businesses further supports a strong inference of scienter.

### C.   Additional Facts Establishing Defendants' Scienter

285. First, Defendants Erbey, Shepro, and Esterman knew or recklessly disregarded that Ocwen and Altisource were violating borrower-protection laws and that Ocwen – Altisource's primary source of revenue – was the subject of extensive regulatory investigations headed by two onsite independent monitors appointed by the NY DFS and the signatories to the National Mortgage Settlement. The NY DFS and the enforcers of the National Mortgage Settlement had (and exercised) the ability to prevent Ocwen from acquiring new mortgage servicing rights and impose severe financial penalties, all of which jeopardized both Ocwen's and Altisource's sources of revenue.

286. Second, the severity of the punitive actions imposed by the NY DFS supports a strong inference of scienter. Ocwen remains indefinitely barred from any future acquisitions, a

devastating blow to Ocwen, Altisource, and the other related parties.  Moreover, Erbey was forced to resign from his position as Chairman of Ocwen and Altisource.  Additionally, Ocwen was forced to pay $150 million cash in penalties and restitution – or nearly half of all fines and penalties collected by the NY DFS for the entire 2013 fiscal year.  Under New York Banking Law § 44, the amount of the fines levied upon Ocwen makes clear that the wrongdoing admitted in the Consent Order was for "knowing[] and willful[]" violations of the Banking Law, refuting any claims of mere negligence or mismanagement.  The Consent Order also prohibits Ocwen and Altisource from sharing any common officers or employees and requires significant operational and corporate-governance changes, including analyses and confirmation by an outside Operations Manager that Altisource charges market rates to Ocwen-serviced borrowers.  These highly unusual and severe penalties indicate that the only way the NY DFS believed it could protect the public from Defendants' unlawful actions in the future was to remove the mechanisms by which Defendants perpetrated this massive fraud.

287.   Defendant Erbey's termination <u>alone</u> is extremely strong evidence of his scienter. NY DFS Superintendent Lawsky has stated in public speeches in February and May 2015 that holding Erbey accountable for his role in the "awful" acts admitted by Ocwen was the goal of his forced termination.  ¶264.  Indeed, the NY DFS specifically demanded that:

> Erbey will have no directorial, management, oversight, consulting, or any other role at Ocwen or any related party, or at any of Ocwen's or the related parties' affiliates or subsidiaries as of the date of his resignation. Effective at his resignation, Ocwen's Board members and management will not disclose to Mr. Erbey any non-public information about Ocwen that is not available to other shareholders.

288.   <u>Third</u>, the magnitude and duration of the REALServicing deficiencies further support an inference of scienter.  As set forth above, Ocwen admitted that the backdating of the loan modification denial letters had been going on <u>for years</u> and affected "potentially hundreds of thousands" of borrowers.  It is simply not plausible that Ocwen and Altisource had been sending out improperly backdated loan-modification denial letters for such a prolonged period of time

without knowing or recklessly disregarding the problem and, more specifically, the source of the problem – REALServicing.  Moreover, not only is it implausible that Defendants did not know of the backdating, the NY DFS concluded that Ocwen lied to the DFS for months about the scope and timeline of the backdating wrongdoing.  As late as September 2014, Ocwen, in a written memorandum to the NY DFS (which Erbey, as a key target of the NY DFS's investigation, had to know about), misrepresented to the DFS that it found out about the backdating only in April 2014.  In reality, as later admitted by Ocwen, it knew of the letter backdating no later than November 2013.

289.    Moreover, former employees confirm that the backdated letters were caused by REALServicing's deficiencies, and that this practice was in direct violation of various agreements and regulations, thus further establishing that Altisource knew or recklessly disregarded this severe problem with its own technology.

290.    Fourth, Defendants' scienter is further demonstrated by the fact that compliance with servicing regulations was central to Altisource's and Ocwen's reputation and success.  Indeed, the Company's reputation for compliance with the NY DFS and other regulators' laws and practices was of critical importance to Altisource's investors because the mortgage servicing industry is heavily regulated and the consequences of not complying with regulations can be devastating to any company in the industry, and particularly so for a large and prominent servicer of distressed mortgage loans such as Ocwen.  Altisource and Ocwen therefore emphasized to investors that they were focused on compliance.  As Defendant Shepro stated on April 24, 2014, Altisource's "primary focus is providing compliant services to Ocwen servicing portfolio" through the boarding of loans on REALServicing.  The fact that the misstatements and omissions at issue here went directly to this core compliance factor further supports a strong inference of Defendants' scienter.  This is particularly true given that Defendants held themselves out as knowledgeable regarding Altisource's and Ocwen's compliance practices and capabilities in the Company's SEC filings, conference calls, and investor presentations.

291.   <u>Fifth</u>, Defendants intentionally risked the consequences of noncompliance.  CW1 confirmed that Defendants' failure to comply with laws and regulations governing mortgage servicing was intentional.   CW1 described a Company culture at Altisource and Ocwen – established through a tone at the top (including directives from Defendants Erbey and Shepro, among others) – that stressed the need to grow at any cost and the belief that the costs of regulatory fines and penalties would not outweigh the resulting massive profits.   Essentially, as CW1 explained, Defendants believed that Ocwen and Altisource were "so big that even if we do [] wrong, we'll make more money on the percentage of things that go right."  Defendants thought that when the companies "hit capacity" and did not need to acquire more mortgage servicing rights, they would "muddle through" and simply pay off the regulators with immaterial sums. Defendants' gamble failed, but their deliberate risk-taking supports a scienter inference.

292.   <u>Sixth</u>, Altisource's dependence on Ocwen's continued use of REALServicing – a core operation of Altisource – supports scienter because REALServicing was critically important to Altisource's financial performance and growth because Altisource earned fees for each Ocwen-serviced loan boarded onto REALServicing.  In total, during the Class Period, Altisource derived between 60% to 65% of its total revenues from Ocwen.  Defendants routinely acknowledged that Ocwen was Altisource's largest and most important client.   For example, Altisource listed "supporting Ocwen's growth" as one of its top strategic growth initiative in the Company's third quarter 2013 Form 10-Q.   Moreover, many of the mortgage support services that Altisource provided to Ocwen borrowers were among the Company's most profitable businesses, including Hubzu (pre-tax margin of over 60%) and the forced placed insurance program ($0.50-$0.65 quarterly earnings per share, or 17% of Altisource's total gross revenue by the third quarter of 2014).  The fact that the misstatements and omissions at issue here go directly to these lines of business further supports a strong inference of scienter.

293.   <u>Seventh</u>, the Individual Defendants' scienter is further established by their direct and extensive involvement in the Company's day-to-day business operations.  Former Altisource and Ocwen employees from a variety of levels and positions at the Company confirm that the

Individual Defendants were actively involved in all aspects of the Company's relevant operations. For example, CW1 explained that Erbey was involved in even the minutest Company decisions and was regularly copied "on e-mails of simple reporting numbers (daily execution numbers and valuations)." These witnesses report that the Individual Defendants were aware of and/or actively involved in making the operative decisions regarding, among other areas: (1) related party transactions between Altisource and Ocwen; (2) the Company's force-placed insurance line of business; (3) the development and operation of Hubzu; and (4) the compliance features of REALServicing.

294.    Eighth, the Individual Defendants were motivated to steer business and revenue to Altisource in violation of applicable regulations and the Company's purported policies because they – as well as other members of the Boards and senior management of the companies – held significant personal financial stakes in both Ocwen and Altisource.  In connection with Altisource's spin-off from Ocwen, Defendant Erbey, Defendant Shepro (the former President and COO of Ocwen Solutions), and numerous Ocwen inside and outside directors received the initial distribution of Altisource shares.  These individuals continued to maintain substantial holdings in both Ocwen and Altisource stock during the Class Period.  In particular, Erbey's personal holdings of Ocwen and Altisource shares were massive, worth approximately $1.4 billion as of the start of the Class Period, and nearly $2.4 billion when Altisource shares reached their Class Period high. Likewise, Defendant Shepro held an enormous personal stake in the companies, worth approximately $90 million as of the start of the Class Period, and nearly $150 million when Altisource shares reached their Class Period high, as set forth below:

| Director/Officer | OCN Shares Owned[2] | | ASPS Shares Owned | | |
| --- | --- | --- | --- | --- | --- |
| | No. of Shares Owned | Value | No. of Shares Owned | Value | Total |
| **Aug. 10, 2009 (Spin Off)** | | | | | |
| William C. Erbey | 18,437,757 | $186,777,517 | 6,292,670 | $72,011,428 | $258,788,945 |
| William B Shepro | 294,732 | $2,985,635 | 154,994 | $1,773,705 | $4,759,340 |
| **Feb. 13, 2013 (Start of Class Period)** | | | | | |
| William C. Erbey | 20,154,198 | $832,771,461 | 6,780,071 | $568,576,754 | $1,401,348,215 |
| William B Shepro | 1,297,137 | $53,597,701 | 432,379 | $36,259,303 | $89,857,004 |
| **Dec. 3, 2013 (Altisource Stock - Class Period High)** | | | | | |
| William C. Erbey | 20,143,183 | $1,207,986,685 | 6,780,071 | $1,159,371,753 | $2,367,358,438 |
| William B Shepro | 1,249,176 | $74,913,085 | 416,392 | $71,203,032 | $146,116,117 |

295.    As the NY DFS recognized in the August 4 DFS Letter, Defendant Erbey's substantial ownership stake in Altisource ensured that Erbey profited personally every time Ocwen diverted revenues to Altisource.  For example, as of December 31, 2013, while Erbey owned 13% of Ocwen's common stock, he owned double that amount – 26% – of Altisource's common stock.  This meant that Erbey took home $0.26 for every dollar earned by Altisource, compared to $0.13 for every dollar earned by Ocwen.  By approving Ocwen's force-placed arrangement with SWBC and Altisource, Erbey ensured that Altisource would earn approximately $65 million in annual revenues without providing any meaningful services to Ocwen or SWBC.  Erbey's share of those revenues amounted to approximately $16.9 million annually.  Likewise, Erbey's stake in Altisource meant that he also profited from Altisource's decision to overcharge Ocwen borrowers to pay 4.5% in fees to list on Hubzu, as opposed to the 1.5% fee Hubzu charged non-Ocwen borrowers.  Each time an Ocwen borrower paid an additional 3% over and above Hubzu's market rates, Erbey stood to earn 26% (or more) of that amount.

---

[2] All shareholdings calculated based on amounts identified in shareholder Proxy Statement filed with the SEC on Schedule 14A immediately preceding the given date, adjusted for changes identified in any intervening SEC filings.

## IX.   **LOSS CAUSATION**

296.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.   Throughout the Class Period, Altisource's stock price was artificially inflated by materially false and misleading statements and omissions, deceptive devices, and a fraudulent scheme that created the false impression that (i) the Company had established and applied robust controls on related party transactions and for avoiding potential conflicts of interest, and (ii) the Company's technology systems and mortgage services were effective, compliant with regulations, and provided at market rates.   As a result, the market price of Altisource common stock was inflated by the materially false and misleading statements and omissions, deceptive devices, and fraudulent scheme made by Altisource, the Individual Defendants, and Ocwen, as identified above, and Lead Plaintiffs and the Class purchased Altisource common stock at artificially inflated prices during the Class Period.

297.    The ensuing disclosures on these topics by the NY DFS, Altisource and Ocwen, as described in Section VII revealed to the market on a piecemeal basis the fraudulent nature of these statements and the extent of the misrepresentations contained in Altisource's public filings, press releases, conference call statements, and presentations that form the primary basis of this action. When the truth about Altisource was revealed to the market, the price of Altisource common stock declined in response, as the artificial inflation caused by Altisource's, Ocwen's and the Individual Defendants' material omissions and false and misleading statements, deceptive devices, and fraudulent scheme was removed from the price of Altisource common stock, thereby causing substantial damage to Lead Plaintiffs and other members of the Class.

298.    Indeed, during the Class Period, Altisource common stock traded as high as $170 per share on December 3, 2013, and closed at $133.40 per share the day before Ocwen's February 6, 2014 press release, when the first partial disclosures about the serious compliance deficiencies of Altisource's systems were made.

299.     Over the next ten months, in response to several additional partial disclosures that exposed more about the Company's numerous, serious, and pervasive compliance deficiencies, and lack of controls on related party transactions and conflicts of interest, the market reacted, and Altisource's stock price partially corrected as it was significantly driven downward.   The Company, the Individual Defendants, and Ocwen mitigated the impact of those disclosures and prevented the full truth about Altisource from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market.   As the market finally learned the magnitude of the problems facing the Company and the implications for Altisource's business operations, financial condition and growth prospects, the price of Altisource's common stock plummeted to $31.49 per share on December 22, 2014, the day the 2014 DFS Consent Order was announced.   The truth emerging about the Company's lack of controls on related party transactions and widespread conflicts of interest, inadequate and ineffective technology systems and services, inflated fee structures, and true financial circumstances and prospects, caused the market price of Altisource common stock to fall more than $101.91 per share, from $133.40 on February 5, 2014 to $31.49 on December 22, 2014.   In total, the declines in Altisource's stock prices on the 8 disclosure dates identified in Section VII erased a total of $2.3 billion in shareholder market capitalization, as demonstrated in the below chart:



Corrective Disclosures

|    | Date | Close Price | Price Drop | Pct. Change | Market Cap. Drop |
|----|------|-------------|------------|-------------|------------------|
| 1  | 02/06/14 | $125.51 | ($7.89)  | (5.9%)  | ($180,341,730) |
| 2  | 02/26/14 | $101.00 | ($15.76) | (13.5%) | ($356,633,040) |
| 3  | 04/21/14 | $114.24 | ($2.79)  | (2.4%)  | ($62,320,230)  |
| 4  | 05/20/14 | $99.15  | ($6.29)  | (6.0%)  | ($139,990,240) |
| 5  | 08/04/14 | $88.65  | ($15.18) | (14.6%) | ($331,470,480) |
| 6  | 10/21/14 | $84.51  | ($10.32) | (10.9%) | ($225,347,520) |
| 7  | 10/22/14 | $69.11  | ($15.40) | (18.2%) | ($336,274,400) |
| 8a | 11/12/14 | $60.50  | ($12.28) | (16.9%) | ($248,940,160) |
| 8b | 11/13/14 | $55.00  | ($5.50)  | (9.1%)  | ($111,496,000) |
| 9  | 12/22/14 | $31.49  | ($15.97) | (33.6%) | ($325,365,600) |

300.    It was entirely foreseeable to the Individual Defendants that concealing the Company's widespread conflicts of interest and lack of controls over related party transactions would artificially inflate the price of Altisource common stock.  It was similarly foreseeable to the Individual Defendants that the revelation of that misconduct, as well as the Company's true operations, financial condition, and prospects, would cause the price of Altisource common stock to drop significantly as the inflation caused by their misstatements and omissions, deceptive devices, and fraudulent scheme was corrected.  Accordingly, the conduct of Altisource, Ocwen and the Individual Defendants, as alleged herein, proximately caused foreseeable damages to Lead Plaintiffs and members of the Class.

## X.     THE PRESUMPTION OF RELIANCE

301.    Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions, deceptive devices, and fraudulent scheme pursuant to the fraud-on-the-market doctrine because, among other things, during the Class Period:

(a)    The Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The misrepresentations and omissions were material;

(c)    Altisource's common stock was actively traded in an efficient market on the NASDAQ;

(d)    Altisource's common stock traded at high weekly volumes;

(e)    As a regulated issuer, Altisource filed periodic public reports with the SEC;

(f)    Altisource was eligible to file registration statements with the SEC on Form S-3 or F-3, its equivalent;

(g)    Altisource regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(h)    The market reacted promptly to public information disseminated by Altisource;

(i)    Altisource common stock were covered by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. These reports were publicly available and entered the public marketplace;

(j)    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Altisource common stock; and

(k)    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Altisource common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

302.    Additionally, Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), because certain of the claims

114

asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

303.     Accordingly, Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Altisource's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions, deceptive devices, and fraudulent scheme during the Class Period.

## XI.     CLASS ACTION ALLEGATIONS

304.     Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired common stock issued by Altisource during the period from April 25, 2013 through December 21, 2014, inclusive, and who were damaged thereby. Excluded from the Class are Defendants; Altisource's affiliates and subsidiaries; Ocwen's affiliates and subsidiaries; the officers and directors of Altisource and Ocwen at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

305.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Altisource common shares were actively traded on the NASDAQ.  As of the start of the Class Period, Altisource had approximately 23.4 million shares of common stock issued and outstanding.  Although the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are at least hundreds, if not thousands, of members of the proposed Class.  Members of the Class can be identified from records maintained by Altisource or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

306.     Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

307.   Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of fact and law common to the Class are:

(a)   whether Defendants' misrepresentations and omissions, deceptive devices, and fraudulent scheme as alleged herein violated the federal securities laws;

(b)   whether Defendants' misrepresentations and omissions as alleged herein misrepresented material facts about Altisource's management of conflicts of interest, related party transactions, and the effectiveness and capabilities of the Company's servicing platform  during the Class Period;

(c)   whether Defendants engaged in deceptive devices and a fraudulent scheme by engaging in improper related-party transactions that were reported to Altisource investors as legitimate transactions;

(d)   whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions, deceptive devices, and fraudulent scheme described herein;

(e)   whether Defendants' misrepresentations and omissions, deceptive devices, and fraudulent scheme as alleged herein caused the Class members to suffer a compensable loss; and

(f)   whether the members of the Class have sustained damages, and the proper measure of damages.

308.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiffs have no interest that conflicts with the interests of the Class.

309.   A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b)**
**(Against Defendant Altisource And The Individual Defendants)**

310.   Lead Plaintiffs repeat and re-allege each and every allegation set forth above, as if fully set forth herein.

311.   This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Lead Plaintiffs and members of the Class against Defendants Altisource, Erbey, Shepro, and Esterman.

312.   Throughout the Class Period, Defendants Altisource, Erbey, Shepro, and Esterman, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the United States mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Altisource, its management, business operations, relationships and business dealings with Ocwen, Altisource's REALServicing platform, Altisource's Mortgage Services segment, and future prospects, as specified herein.  This plan, scheme and course of conduct was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiffs, as alleged herein; (b) artificially inflate the market price of Altisource common stock; and (c) cause Lead Plaintiffs and members of the Class to purchase Altisource common stock at artificially inflated prices.

313.   In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, individually and jointly, took the actions set forth herein.  While in possession of material, adverse non-public information, these Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading in an effort to create and maintain artificially high market prices for Altisource's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.  Each of these Defendants was a direct, necessary and substantial participant in the common course of conduct alleged herein. The Defendants named in this count are sued as primary participants in the

wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons as alleged below

314.    Defendants knew or, but for their deliberate recklessness, should have known, that their statements concerning the Company's management, business operations, relationships and business dealings with Ocwen, Altisource's REALServicing platform, Mortgage Services segment, and future prospects, as disseminated to the investing public during the Class Period, were materially misstated.  Further, Defendants knew of existing adverse facts which undermined their representations about Altisource's management, existing business operations, relationships and business dealings with Ocwen, Altisource's REALServicing platform, Mortgage Services segment, and future prospects during the Class Period.

315.    As a result of their making affirmative statements and reports to the investing public, Altisource and the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, performance and compliance with the law, so that the market prices of Altisource's publicly traded common stock would be based on truthful, complete, and accurate information.

316.    The Individual Defendants - the Chairman and the top executive officers of the Company - are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as Chairman, CEO and CFO of the Company, each of these Individual Defendants was able to and did control the content of the public statements disseminated by Altisource.  With knowledge of the falsity and/or misleading nature of the statements contained therein and in reckless disregard of the true business operations and future prospects of the Company, the Individual Defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein.

317.    Altisource and the Individual Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and/or omissions of

material facts set forth herein or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior leadership of the Company and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, investor presentations, conference calls, and filings with the SEC.

318.    Altisource and the Individual Defendants' misrepresentations and/or omissions were intentional or deliberately reckless and in some instances done for the purpose of enriching themselves at the expense of Altisource's investors, including Lead Plaintiffs, and to conceal the Company's and Ocwen's true relationship, business dealings, conflicts of interest, services and future prospects from the investing public.  Altisource and the Individual Defendants engaged in this scheme to inflate the Company's reported revenues and prospects in order to create the illusion that Altisource was a successful, strong and growing company.

319.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Altisource common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Altisource's publicly traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Altisource Defendants, or upon the integrity of the market in which the common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Altisource Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Altisource common stock during the Class Period at artificially high prices and were damaged thereby.

320.    Had Lead Plaintiffs and the other members of the Class and the marketplace known of the material adverse information not disclosed by Altisource and the Individual Defendants, or been aware of the truth behind these Defendants' material misstatements, they would not have purchased or otherwise acquired Altisource common stock at artificially inflated prices, or at all.

321.    By virtue of the foregoing, Altisource and the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

322.    As a direct and proximate result of the Altisource Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b)
### (Against Defendants Ocwen and Erbey)

323.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above, as if fully set forth herein.

324.    This Count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Lead Plaintiffs and members of the Class against Defendant Ocwen and Defendant Erbey in his capacity as Executive Chairman of Ocwen.

325.    Throughout the Class Period, Defendants Ocwen and Erbey, individually and in concert with others, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the United States mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Altisource, its management, business operations, relationships and business dealings with Ocwen, Altisource's REALServicing platform, Altisource's Mortgage Services segment, and future prospects, as specified herein.  This plan, scheme and course of conduct was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiffs, as alleged herein; (b) artificially inflate the market price of Altisource common stock; and (c) cause Lead Plaintiffs and members of the Class to purchase Altisource common stock at artificially inflated prices.

326.    In furtherance of this unlawful scheme, plan and course of conduct, and while in possession of material, adverse non-public information, Defendants Ocwen and Erbey made untrue statements of material fact and/or omitted to state material facts necessary to make the statements

120

made not misleading in an effort to create and maintain artificially high market prices for Altisource's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder. Erbey and Ocwen are sued in this count as primary participants in the wrongful and illegal conduct charged herein. Erbey is also sued as a controlling person of Altisource, as alleged below.

327.     As more fully described above, Ocwen and Erbey (as Executive Chairman of Ocwen) issued numerous public statements during the Class Period concerning their relationships and transactions with Altisource, and the nature and capabilities of services provided by Altisource to Ocwen, including the effectiveness and regulatory compliance of Altisource's REALServicing platform and Mortgage Services. These public statements were disseminated to the public through conference calls, investor presentations, and SEC filings by Ocwen and Erbey, and contained misstatements and omissions of material facts as alleged herein.

328.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused the damages sustained by Lead Plaintiffs and the Class.

329.     Defendants Ocwen and Erbey knew or, but for their deliberate recklessness, should have known, that their statements concerning their relationships and transactions with Altisource, and the nature of services provided by Altisource under Altisource's service agreements with Ocwen, as disseminated to the investing public during the Class Period, were materially misstated. Further, Ocwen and Erbey knew of existing adverse facts which undermined their representations about their relationship and transactions with Altisource, and the nature and capabilities of services provided by Altisource to Ocwen, including the effectiveness and regulatory compliance of Altisource's REALServicing platform, and Mortgage Services, during the Class Period.

330.     Ocwen acted with scienter throughout the Class Period in that Erbey and its other directors and senior officers either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

121

331.    Ocwen's and Erbey's misrepresentations and/or omissions were intentional or deliberately reckless and in some instances done for the purpose of enriching themselves, and to conceal the Company's and Ocwen's true relationship, business dealings, conflicts of interest, services, and future prospects from the investing public.  Ocwen and Erbey engaged in this scheme to inflate the Company's reported revenues and prospects in order to create the illusion that Altisource was successful, strong and growing.

332.    Ocwen and Erbey engaged in such scheme to misrepresent the operations and results of Altisource, and maintain and/or inflate the prices of Altisource stock, because Altisource was specifically created in order to capture revenue from mortgage servicing unavailable to Ocwen – including revenue from home foreclosures, short sales, appraisals and valuation that Ocwen, as a more heavily regulated entity and primary servicer, was unable to capture.  As more fully described above, in connection with Altisource's spin-off from Ocwen in August 2009, Altisource became a publicly traded company in which Defendant Erbey, the founder and chairman of Ocwen, Defendant Shepro, the former President and COO of Ocwen Solutions, numerous Ocwen inside and outside directors, and all Ocwen shareholders of record, received the initial distribution of Altisource shares.  These individuals continued to maintain substantial holdings in both Ocwen common stock and Altisource common stock during the Class Period.  In particular, Defendant Erbey held a 29% stake in Altisource, more than double his 14% ownership interest in Ocwen as of September 30, 2014.  As more fully described above, Ocwen, its senior officers, and its Executive Chairman Erbey knew, in making public statements about Altisource, its business, services, or operations, that current and prospective investors in Altisource stock would rely upon such statements, and such statements would affect the market prices of Altisource stock.

333.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Altisource common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Altisource's publicly traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants Ocwen and Erbey, or upon

the integrity of the market in which the common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants Ocwen and Erbey but not disclosed in public statements by Ocwen during the Class Period, Lead Plaintiffs and the other members of the Class acquired Altisource common stock during the Class Period at artificially high prices and were damaged thereby.

334.    Had Lead Plaintiffs and the other members of the Class and the marketplace known of the material adverse information not disclosed by Ocwen and Erbey, or been aware of the truth behind Ocwen's and Erbey's material misstatements, they would not have purchased or otherwise acquired Altisource common stock at artificially inflated prices, or at all.

335.    By virtue of the foregoing, Defendants Ocwen and Erbey have violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

336.    As a direct and proximate result of Defendants Ocwen's and Erbey's wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

### COUNT III
**For Violations of Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c)**
**(Against Altisource, Shepro and Esterman)**

337.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

338.    As alleged above, throughout the Class Period, Altisource, Shepro, and Esterman, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of any national securities exchange, carried out a plan, scheme and course of conduct described at length above which was intended to and did: (i) deceive the investing public, including Lead Plaintiffs and the other members of the Class; (ii) artificially create, inflate, and maintain the market for, and market prices of, Altisource securities; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase Altisource securities at artificially inflated prices. In furtherance of this unlawful plan, scheme and course of conduct, Altisource, Shepro, and

Esterman took the actions alleged above in contravention of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated by the SEC.

339.    Altisource, Shepro, and Esterman employed manipulative or deceptive devices and contrivances, schemes, and artifices to defraud, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive Lead Plaintiffs and Class members as to the success and viability of Altisource's business by, in particular, (i) entering into numerous conflicted relationships and transactions that had the effect of forming a conspiracy between Ocwen and Altisource; (ii) participating, directly and indirectly, in the preparation and issuance of the false and misleading statements and documents attributed to the Ocwen Defendants referred to above, including in Ocwen's filings with the SEC, conference calls, and investor presentations; and (iii) engaging in a scheme to misrepresent the operations and results of Altisource, and maintain and inflate the prices of Altisource stock, because Altisource was specifically created by Erbey in order to capture revenue from mortgage servicing unavailable to Ocwen – including revenue from home foreclosures, short sales, appraisals and valuations that Ocwen, as a more heavily regulated entity and primary servicer, was unable to capture.  In light of these facts concealed by Altisource, Shepro, and Esterman, Lead Plaintiffs and Class Members believed that the prices at which they purchased Altisource securities were not artificially inflated.

340.    As described above, Altisource, Shepro, and Esterman engaged in the fraudulent activity described herein knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Altisource securities during the Class Period.  Thus, Altisource, Shepro, and Esterman acted with scienter and are liable under Section 10(b) and Rule 10b-5(a) and (c).

341.    Altisource, Shepro, and Esterman's fraudulent activities occurred in connection with the purchase or sale of Altisource securities.

342.    In ignorance of Altisource's, Shepro's, and Esterman's fraudulent conduct, and relying directly or indirectly on the integrity of the market price for Altisource securities, Lead

Plaintiffs and the other members of the Class purchased Altisource securities at artificially inflated prices during the Class Period.

343.    But for Altisource's, Shepro's, and Esterman's fraud, Class members would not have purchased Altisource securities at artificially inflated prices, or at all.

344.    The market prices for Altisource securities declined materially upon the public disclosure of the true facts regarding the fraud perpetrated by Altisource, Shepro, and Esterman, as described above.

345.    As a direct and proximate cause of Defendants Altisource's, Shepro's, and Esterman's wrongful conduct as set forth in this Count, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Altisource securities during the Class Period.

**COUNT IV**
**For Violations of Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c)**
**(Against Ocwen and Erbey)**

346.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

347.    As alleged above, throughout the Class Period, Ocwen and Erbey, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of any national securities exchange, carried out a plan, scheme and course of conduct described at length above which was intended to and did: (i) deceive the investing public, including Lead Plaintiffs and the other members of the Class; (ii) artificially create, inflate, and maintain the market for, and market prices of, Altisource securities; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase Altisource securities at artificially inflated prices.  In furtherance of this unlawful plan, scheme and course of conduct, Ocwen and Erbey took the actions alleged above in contravention of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated by the SEC.

348.     Ocwen and Erbey employed manipulative or deceptive devices and contrivances, schemes and artifices to defraud, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive Lead Plaintiffs and Class members as to the success and viability of Altisource's business by, in particular, (i) entering into numerous conflicted relationships and transactions that had the effect of forming a conspiracy between Ocwen and Altisource; (ii) participating, directly and indirectly, in the preparation and issuance of the false and misleading statements and documents attributed to the Altisource Defendants referred to above, including in Altisource's filings with the SEC, conference calls, and investor presentations; and (iii) engaging in a scheme to misrepresent the operations and results of Altisource, and maintain and inflate the prices of Altisource stock, because Altisource was specifically created by Erbey in order to capture revenue from mortgage servicing unavailable to Ocwen – including revenue from home foreclosures, short sales, appraisals and valuations that Ocwen, as a more heavily regulated entity and primary servicer, was unable to capture.  In light of these facts concealed by Ocwen and Erbey, Lead Plaintiffs and Class Members believed that the prices at which they purchased Altisource securities were not artificially inflated.

349.     As described above, Ocwen and Erbey engaged in the fraudulent activity described herein knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Altisource securities during the Class Period.  Thus, Ocwen and Erbey acted with scienter and are liable under Section 10(b) and Rule 10b-5(a) and (c).

350.     Ocwen and Erbey's fraudulent activities occurred in connection with the purchase or sale of Altisource securities.

351.     In ignorance of Ocwen's and Erbey's fraudulent conduct, and relying directly or indirectly on the integrity of the market price for Altisource securities, Lead Plaintiffs and the other members of the Class purchased Altisource securities at artificially inflated prices during the Class Period.

352.    But for Ocwen's and Erbey's fraud, Class members would not have purchased Altisource securities at artificially inflated prices, or at all.

353.    The market prices for Altisource securities declined materially upon the public disclosure of the true facts regarding the fraud perpetrated by Ocwen and Erbey, as described above.

354.    As a direct and proximate cause of Defendants Ocwen's and Erbey's wrongful conduct as set forth in this Count, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Altisource securities during the Class Period.

## COUNT V

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against Defendants Erbey, Shepro, and Esterman as Control Persons of Altisource)

355.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

356.    This Count is asserted on behalf of Lead Plaintiffs and members of the Class against the Individual Defendants, i.e., Defendants Erbey, Shepro, Esterman, as control persons of Altisource.

357.    As alleged herein, Altisource violated Section 10(b) of the Exchange Act and Rule 10b-5 by making false and misleading statements and omissions in connection with the purchase or sale of Altisource common stock and by participating in a fraudulent scheme and course of business or conduct in connection with the purchase or sale of Altisource common stock.

358.    The Individual Defendants acted as controlling persons of Altisource within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions within Altisource, and, in the case of Erbey and Shepro, also as Altisource Directors, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead

Plaintiffs contend are false and misleading and Altisource's fraudulent scheme and course of business or conduct.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the false statements and material omissions or cause such misleading statements and omissions to be corrected.

359.    In addition, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  For example, the Individual Defendants were able to and did control the content of various SEC filings, press releases, investor presentations, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants had access to the adverse undisclosed information about Altisource's business, operations, products, trends, financial statements, markets, and present and future business prospects via access to internal control documents; conversations and connections with other corporate officers, employees, and borrowers; participation at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

360.    The Individual Defendants both participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and presentations, as well as other communications attributed to Altisource alleged herein.

361.    As set forth above, Altisource and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Altisource, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT VI

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
#### (Against Defendant Erbey as Control Person of Ocwen)

362.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

363.    This Count is asserted on behalf of Lead Plaintiffs and members of the Class against Defendant Erbey as a control person of Ocwen.

364.    As alleged herein, Ocwen violated Section 10(b) of the Exchange Act and Rule 10b-5 by making false and misleading statements and omissions in connection with the purchase or sale of Altisource common stock and by participating in a fraudulent scheme and course of business or conduct in connection with the purchase or sale of Altisource common stock.

365.    Defendant Erbey acted as controlling person of Ocwen within the meaning of Section 20(a) of the Exchange Act.  By virtue of his high-level position as Executive Chairman of Ocwen, ownership and contractual rights, participation in and awareness of Ocwen's operations, and intimate knowledge of Ocwen's actual performance, Erbey had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Ocwen, including the content and dissemination of the various statements made by Ocwen which Lead Plaintiffs contend are false and misleading and Ocwen's fraudulent scheme and course of business or conduct.  Erbey was provided with, or had unlimited access to, copies of Ocwen's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the false statements and material omissions or cause such misleading statements and omissions to be corrected.

366.    In addition, Erbey had direct and supervisory involvement in the day-to-day operations of Ocwen and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  For example, Erbey was able to and did control the content of various SEC filings, press releases, investor presentations, and other public statements pertaining to Ocwen during the Class

Period.   Erbey had access to the adverse undisclosed information about Ocwen's business, operations, products, trends, financial statements, markets, and present and future business prospects via access to internal control documents; conversations and connections with other corporate officers, employees, and borrowers; participation at management and Board of Directors meetings and committees thereof, and reports and other information provided to him in connection therewith.

367.   Erbey participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and presentations, as well as other communications attributed to Ocwen alleged herein.

368.   As set forth above, Ocwen and Erbey each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of Erbey's position as a controlling persons of Ocwen, Erbey is liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Ocwen and Erbey's wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a)   Declaring that this action is a proper class action and certifying Lead Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)   Awarding such other and further relief as the Court may deem just and proper.

## XIV.   <u>JURY DEMAND</u>

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: September 25, 2015   Respectfully submitted,

       /s/ Hannah Ross
       Hannah Ross
       Lauren A. Ormsbee
       Jai Chandrasekhar
       BERNSTEIN LITOWITZ BERGER
        & GROSSMANN LLP
       1285 Avenue of the Americas
       New York, New York 10019
       Telephone: (212) 554 1400
       Facsimile: (212) 554 1444
       hannah@blbglaw.com
       lauren@blbglaw.com

       *Counsel for Lead Plaintiffs the Pension Fund for the International Union of Painters and Allied Trades District Council 35 and the Annuity Funds for the International Union of Painters and Allied Trades District Council 35 and Proposed Lead Counsel for the Class*

       /s/ Maya S. Saxena
       **SAXENA WHITE P.A.**
       Maya S. Saxena (FL Bar No. 0095494)
       Joseph E. White, III (FL Bar No. 621064)
       5200 Town Center Circle, Suite 601
       Boca Raton, FL 33486
       Telephone: (561) 394-3399
       Facsimile: (561) 394-3382
       msaxena@saxenawhite.com
       jwhite@saxenawhite.com

       *Local Counsel for Lead Plaintiffs*

## Certificate of Service

I hereby certify that on September 25, 2015, I electronically filed the Second Corrected Amended Class Action Complaint with the Clerk of the Court using the CM/ECF system. Notice of filing will be sent to counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 25, 2015.

*/s/ Maya Saxena*
Maya Saxena