**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| In re: Altisource Portfolio Solutions, S.A. Securities Litigation | Case 14-81156 CIV-WPD |

**DECLARATION OF HANNAH G. ROSS IN SUPPORT OF (I) LEAD PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN
OF ALLOCATION, AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................ 1

II.   PROSECUTION OF THE ACTION ................................................................. 7

    A.     Overview of the Action.................................................................... 7

          1.     The Appointment of Lead Plaintiffs and Lead Counsel ........................... 9

          2.     Lead Counsel's Extensive Investigation ................................... 9

          3.     The Amended Complaint ........................................................ 10

    B.     Defendants' Motions to Dismiss the Amended Complaint ................................. 13

    C.     The Court Grants Defendants' Motions to Dismiss the Amended Complaint and Lead Plaintiffs File the Second and Third Amended Complaints ........................................................................................ 16

    D.     The Motions to Dismiss the Third Amended Complaint...................................... 19

    E.     Defendants' Motion for Reconsideration........................................... 21

    F.     Lead Plaintiffs' Extensive Discovery Efforts ...................................... 22

          1.     Lead Plaintiffs Serve Defendants, Ocwen, and Other Third Parties with Document Requests ........................................... 22

          2.     Lead Plaintiffs' Motions to Compel and Opposition to Defendants' Motion for a Protective Order................................... 26

          3.     Lead Plaintiffs' Interrogatories to Defendants......................... 33

          4.     Defendants' Discovery to Plaintiffs........................................ 33

          5.     Lead Plaintiffs' Motion for Class Certification ....................... 35

          6.     Lead Plaintiffs' Efforts in Deposition Discovery .................... 37

          7.     Lead Plaintiffs' Fourth Amended Complaint and Defendants' Motion to Dismiss the Fourth Amended Complaint............................... 37

          8.     Lead Plaintiffs' Expert Reports ............................................ 38

    G.     The Settlement Negotiation Process and the Proposed Settlement ...................... 39

III.     RISKS OF CONTINUED LITIGATION ........................................................... 41

    A.     Risks to Proving Falsity and Materiality ............................................. 43

    B.     Risks of Establishing Loss Causation and Damages ........................... 45

    C.     Risk of Appeal .................................................................................... 48

    D.     Defendants' Ability to Pay................................................................... 48

IV.      LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY
    APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE..................................... 49

V.       ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT.................................. 51

VI.      THE FEE AND LITIGATION EXPENSE APPLICATION ........................................ 53

    A.     The Fee Application................................................................................. 54

        1.     Lead Plaintiffs Support the Fee Application................................... 54

        2.     The Time and Labor of Plaintiffs' Counsel ................................... 55

        3.     The Skill and Experience of Plaintiffs' Counsel............................ 58

        4.     Standing and Caliber of Defendants' Counsel ............................... 58

        5.     The Risks of Litigation and the Need to Ensure the Availability of
        Competent Counsel in High-Risk Contingent Securities Cases ............... 59

        6.     The Settlement Class's Reaction to the Fee Application......................... 60

    B.     The Litigation Expense Application ..................................................... 61

VII.     CONCLUSION............................................................................................... 64

I, HANNAH G. ROSS, declare as follows:

## I.    INTRODUCTION

1.      I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), the Court-appointed Lead Counsel in this Action.[1] BLB&G represents the Court-appointed Lead Plaintiffs: the Pension Fund for the Painters and Allied Trades District Council 35 and the Annuity Fund for the Painters and Allied Trades District Council 35 ("Lead Plaintiffs" or the "Painters Funds"). I have personal knowledge of the contents of this Declaration based on my active supervision of and participation in the prosecution and settlement of the claims asserted in the Action.

2.      I respectfully submit this Declaration in support of Lead Plaintiffs' motion under Rule 23(e) of the Federal Rules of Civil Procedure for final approval of the proposed settlement (the "Settlement") that the Court preliminarily approved by its Order Preliminarily Approving Settlement and Providing for Notice, dated February 10, 2017 (the "Preliminary Approval Order"). ECF No. 251. This Declaration describes how Lead Counsel and Lead Plaintiffs were able to achieve this favorable Settlement on behalf of the Settlement Class. I also respectfully submit this Declaration in support of (i) Lead Plaintiffs' motion for approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Class Members (the "Plan of Allocation") and (ii) Lead Counsel's motion, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees in the amount of 22% of the Settlement Fund, reimbursement of Plaintiffs' Counsel's expenses in the amount of $988,206.72, and an award in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") in the total amount of $17,978.31 for costs

---

[1]      Unless otherwise defined in this Declaration, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated February 8, 2017 (the "Settlement Stipulation"), and previously filed with the Court. *See* docket entry ("DE") 250-1.

and expenses incurred by the Painters Funds and named Plaintiff West Palm Beach Firefighters' Pension Fund ("West Palm Beach Firefighters", and together with the Painters Funds, the "Plaintiffs") directly related to their representation of the Settlement Class (the "Fee and Expense Application").

3.     The proposed Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $32,000,000. As detailed below, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement represents a very favorable result for the Settlement Class in light of the significant risks in the Action, the amount of potential recovery, and the limitations on Defendants' ability to fund a settlement or judgment. As explained further below, the Settlement provides a considerable benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover nothing or substantially less than the Settlement Amount after years of additional litigation and delay.

4.     The proposed Settlement is the result of extensive efforts by Lead Counsel, which included, among other things detailed below:

(i)     conducting a thorough investigation of Altisource Portfolio Solutions, S.A. ("Altisource" or the "Company") and the allegedly fraudulent misrepresentations and omissions made during the period from April 25, 2013 through December 21, 2014, inclusive (the "Settlement Class Period" or "Class Period"), concerning Defendant William C. Erbey's ("Erbey") participation in and approval of conflicted, related-party transactions involving both Altisource and its related company Ocwen Financial Corporation ("Ocwen");

(ii)     drafting and filing the 113-page Amended Class Action Complaint (the "Amended Complaint"), filed on January 30, 2015 (DE 46, 50);

(iii)    researching, drafting, and filing an opposition to Defendants' motions to dismiss, filed with the Court on May 14, 2015 (DE 73, 74), as well as supplemental briefs in further opposition to Defendants' motions to dismiss (DE 84, 88);

(iv)    following the dismissal of the Amended Complaint, drafting and filing the 131-page Second Amended Class Action Complaint (the "Second Amended Complaint"), filed on September 25, 2015 (DE 90);

(v)     drafting and filing the 135-page Third Amended Class Action Complaint, which was filed to address a regulatory-enforcement event involving a related company that had occurred since the filing of the Second Amended Complaint (the "Third Amended Complaint"), filed on October 15, 2015 (DE 95);

(vi)    researching, drafting, and filing an opposition to Defendants' motions to dismiss the Third Amended Complaint, filed with the Court on October 22, 2015 (DE 97, 98), as well as supplemental briefs in further opposition to Defendants' motions to dismiss (DE 103);

(vii)   following the Court's Order granting the Ocwen Defendants' motion to dismiss and granting in part and denying in part the Altisource Defendants' motion to dismiss, researching, drafting, and filing an opposition to the Altisource Defendants' motion for partial reconsideration of the Court's decision on their motion to dismiss, filed with the Court on February 8, 2016 (DE 112);

3

(viii)   researching, drafting, and filing a motion for class certification, appointment of class representatives, and appointment of class and liaison class counsel, filed with the Court on August 12, 2016 (DE 159-162);

(ix)   drafting and filing the 150-page Fourth Amended Class Action Complaint (the "Fourth Amended Complaint"), filed on December 28, 2016 (DE 224);

(x)   engaging an expert on related-party transactions and a damages and loss-causation expert, each of whom drafted substantive expert reports;

(xi)   researching, drafting, and filing four motions to compel the production of party and third-party documents (DE 122, 184, 195, 197) and responding to two motions for protective orders and a motion to compel filed by Defendants (DE 125, 127, 166); and

(xii)   engaging in extensive discovery that included reviewing and analyzing more than one million pages of documents produced by Defendants and third parties.

5.     Lead Plaintiffs and Lead Counsel believe that the Settlement is in the best interests of the Settlement Class. Due to their efforts described in the preceding paragraph, Lead Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents a very favorable outcome for the Settlement Class.

6.     As discussed in further detail below, the excellent $32 million Settlement has been achieved in the face of dogged opposition by well-represented Defendants and serious litigation risks. Among other things, Defendants had serious arguments that their alleged misrepresentations were actually true because, for example, Defendant Erbey did not vote in his capacity as Altisource's Chairman on the force-placed insurance ("FPI") transaction, which was the primary

4

related-party transaction between Altisource and Ocwen alleged in the Complaint, so that Defendants' statement that he "recused" himself from related-party transactions was arguably literally true. Similarly, because this FPI transaction involved an intermediary, Southwest Business Corporation ("SWBC"), Defendants had a serious argument that SWBC's involvement meant that this transaction was not actually a related-party transaction directly between Altisource and Ocwen at all, so that again their statements about it were arguably literally true. The Court agreed with this argument in its initial dismissal Order on September 4, 2015, highlighting the risk that Lead Plaintiffs' re-alleged claims concerning this transaction might have failed.

7.      Even if Lead Plaintiffs had succeeded in proving that Defendants made materially false statements, Defendants would still have had serious arguments that they did not act with scienter because they reasonably believed that the statements were true. Defendants also had serious arguments that the alleged misrepresentations did not cause the Class's losses, which instead were arguably caused by intense regulatory scrutiny of Ocwen, Altisource's critical customer, and by statements by Ocwen mirroring the alleged false statements by Altisource. Since the Court dismissed all of Lead Plaintiffs' claims against Ocwen, Lead Plaintiffs arguably would have been obliged to disentangle the effects on Altisource's stock price of Ocwen's mirror-image statements from the effects of Altisource's own statements. These and other hurdles discussed in more detail below presented a substantial risk that further litigation might have recovered nothing, or much less than the Settlement, for the Class.

8.      A further major risk in this Action was that Defendants might not have been able to pay any judgment that Lead Plaintiffs might have won. As detailed below, Altisource had a limited amount of available insurance to fund a settlement or judgment. Altisource itself was also limited in its ability to fund a settlement or judgment because of the negative impact that Ocwen's

regulatory and legal troubles have had on Altisource. The fact that Lead Plaintiffs secured a $32 million Settlement Amount in the face of these limitations on collecting any larger amount after trial further demonstrates that this recovery is very favorable for the Class. In fact, as Altisource has now publicly disclosed, the $32 million Settlement was funded with $4 million of insurance proceeds and $28 million of the Company's own money. Given that most securities class-action settlements are funded primarily or entirely with insurance proceeds, Lead Plaintiffs' success in obtaining such a significant cash contribution to the Settlement Amount from Altisource is a significant achievement.

9.      As also discussed in further detail below, the Plan of Allocation was developed with the assistance of Lead Plaintiffs' damages expert, and provides for the distribution of the Net Settlement Fund to Class Members who submit Claim Forms that are approved for payment by the Court, pro rata based on their losses attributable to the alleged fraud.

10.     With respect to the Fee and Expense Application, as discussed in the accompanying Memorandum of Law in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Memorandum"), the requested fee of 22% of the Settlement Fund for Plaintiffs' Counsel was approved by Lead Plaintiffs and is towards the lower end of percentage awards granted by courts in this District and Circuit in complex common-fund cases involving comparably sized settlements. Additionally, the requested fee represents a fractional or "negative" multiplier of approximately 0.95 on Plaintiffs' Counsel's lodestar (i.e., less than the time incurred by Plaintiffs' Counsel in the prosecution of this litigation). Given that large contingency multipliers are commonly awarded in complex class actions, the negative multiplier of approximately 0.95 requested here strongly confirms the reasonableness of the requested fee.

11.     For all of the reasons discussed in this Declaration and in the accompanying memoranda, including the quality of the result obtained and the numerous significant litigation risks discussed fully below, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate and should be approved. In addition, Lead Counsel respectfully submits that its request for attorneys' fees and reimbursement of Litigation Expenses is also fair and reasonable and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Overview of the Action

12.     Altisource is a public company listed on the NASDAQ Global Select Market. As alleged, during the Settlement Class Period (April 25, 2013 through December 21, 2014), Altisource and its former parent Ocwen, at the direction of Defendant Erbey, both companies' Chairman and founder, conspired to funnel money to Altisource and Erbey through self-dealing transactions. At the same time that these transactions were occurring, Defendants represented to Altisource investors that Altisource managed the conflicts of interest posed by Erbey's leadership roles and financial interest in Altisource and Ocwen (and other related companies) through Erbey's recusal from transactions involving the related companies and through oversight by the independent members of each company's Board of Directors. As Plaintiffs allege, these representations communicated to investors that Defendants took affirmative steps to manage Erbey's serious conflicts of interest.

13.     As alleged in the Complaint, investors began to learn the truth through a series of letters issued by the New York Department of Financial Services ("NY DFS"), on of Ocwen's primary regulators. In particular, the NY DFS, in connection with its investigation, uncovered evidence of conflicts of interest between Ocwen and its related companies, including Altisource. For example, on February 26, 2014, the NY DFS issued a letter detailing its concerns about

7

"potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated, including Altisource" (the "February DFS Letter"). Later that year, on August 4, 2014, the market learned more information when the NY DFS issued another letter, revealing that its ongoing investigation had "uncovered a growing body of evidence that Erbey had approved a number of transactions with the related companies," and noting in particular Erbey's role in a transaction involving FPI that was described by the NY DFS as "a gross violation" of Altisource's and Ocwen's statements that Erbey recused himself from related-party transactions (the "August DFS Letter").

14.     Following these disclosures, on September 8, 2014, West Palm Beach Firefighters filed a securities class action in this District, asserting claims under the Exchange Act concerning related-party transactions between Altisource and Ocwen and Erbey's conflicts of interest.

15.     Then on November 12, 2014, following the concerns raised in the August DFS Letter and in the midst of the ongoing NY DFS investigation, Altisource announced that it would discontinue its entire lucrative FPI brokerage line of business.

16.     On December 22, 2014, the NY DFS investigation into Ocwen culminated, and the full extent of the truth about Defendants' misrepresentations and omissions was revealed when Ocwen entered into a Consent Order with the NY DFS (the "Consent Order"). The Consent Order forced Erbey to resign as Chairman at all related companies, including Altisource, and prohibited him from having any role whatsoever at any of the related companies. The Consent Order further disclosed that the NY DFS had "uncovered a number of conflicts of interest between Ocwen and [the related companies], all of which are chaired by Mr. Erbey," and that Erbey had failed to recuse himself from and, in fact, "participated in the approval of a number of transactions between [Ocwen and Altisource]."

### 1.    The Appointment of Lead Plaintiffs and Lead Counsel

17.    Following West Palm Beach Firefighters' filing of the first securities complaint on September 8, 2014, the Painters Funds filed a motion on November 7, 2014, seeking to be appointed as Lead Plaintiffs and for the appointment of their counsel, BLB&G, as Lead Counsel for the Class in accordance with the PSLRA's lead-plaintiff provisions. DE 10. That motion was fully briefed on November 24, 2014. *See* DE 15, 18, and 19.

18.    By Order dated December 5, 2014, Judge William P. Dimitrouleas of the United States District Court for the Southern District of Florida appointed the Painters Funds as Lead Plaintiffs and appointed BLB&G as Lead Counsel. DE 24. The filing of Lead Plaintiffs' amended class action complaint was set for January 30, 2015. DE 42.

### 2.    Lead Counsel's Extensive Investigation

19.    To prepare the Complaint, Lead Counsel conducted a comprehensive investigation and analysis of the potential claims that could be asserted on behalf of investors in Altisource common stock. This investigation included, among other things, a detailed review and analysis of a large volume of publicly available information concerning both Altisource and Ocwen that was issued during 2012 through 2014. For example, Lead Counsel reviewed all of Altisource's and Ocwen's (i) filings with the U.S. Securities and Exchange Commission ("SEC") during the relevant time period, (ii) earnings announcements and press releases, (iii) transcripts of analyst conference calls, and (iv) investor presentations.

20.    Lead Counsel reviewed a similarly large volume of news articles and all publicly available analysts' reports about Altisource and Ocwen issued during this time frame. Moreover, Lead Counsel reviewed all relevant letters released by the NY DFS during the Class Period (the February and August DFS Letters, plus two related letters released in April and October 2014 (the "April DFS Letter" and the "October DFS Letter")), the Consent Order, other regulatory

enforcement proceedings lodged against Ocwen between 2011 and January 2015, and reports filed by an independent monitor charged with ensuring Ocwen's compliance with a consent order filed by 49 state attorneys general. Based on Lead Counsel's extensive review of these materials, Lead Plaintiffs alleged in the Amended Complaint that Altisource, Ocwen, Erbey, and two top Altisource officers had made five categories of materially false and misleading statements during the year-and-a-half class period.

21.     Lead Counsel and their investigators also contacted and communicated with numerous former Altisource and Ocwen employees who had worked at these companies during the relevant time period. The information provided by these former employees was added to the Complaint and assisted Lead Plaintiffs in ultimately overcoming the Altisource Defendants' motion to dismiss. The type of thorough factual investigation conducted by Lead Counsel was critical to Lead Plaintiffs' ability to ultimately plead a detailed complaint sufficient to overcome the high pleading hurdles imposed on securities class actions by the PSLRA.

22.     In addition to this factual research, Lead Counsel thoroughly researched the law applicable to the claims asserted and Defendants' potential defenses. Lead Counsel also retained and consulted with experts, including a financial expert who analyzed potentially recoverable damages.

### 3.      The Amended Complaint

23.     On January 30, 2015, Lead Plaintiffs filed the Amended Complaint.[2] The Amended Complaint expanded the originally pleaded Class Period to include allegations concerning the Consent Order and additional new information related to the NY DFS investigation, among other

---

[2]     DE 46. A corrected Amended Complaint was filed on February 2, 2015, the following business day, to correct formatting errors in the Amended Complaint. DE 50.

relevant events that had occurred since September 8, 2014. In addition, the Amended Complaint also added Ocwen as a Defendant based on Ocwen's false and misleading statements concerning Altisource in Ocwen's SEC filings.

24.     Based on Lead Counsel's investigation, the Amended Complaint asserted claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of Lead Plaintiffs and all other persons and entities who purchased or acquired publicly traded shares of Altisource between April 25, 2013 and December 21, 2014. The Amended Complaint named as Defendants: (a) Altisource, (b) Ocwen, (c) Erbey (in his roles as Chairman as both Altisource and Ocwen), and (d) Altisource's Chief Executive Officer and Chief Financial Officer (the "Officer Defendants").

25.     By way of summary, the Amended Complaint alleged that during the Class Period (April 25, 2013 through December 21, 2014, inclusive), Altisource, Ocwen, Erbey, and the Officer Defendants told investors that (i) Altisource's revenues from its transactions with Ocwen were sustainable and free of self-dealing or other conflicts related to Erbey's inherent conflicts of interest as Chairman and a significant owner of both companies (the "Conflicts-of-Interest Allegations"); and (ii) the mortgage-servicing platform REALServicing, which was owned and maintained by Altisource and used exclusively by Ocwen, was effective and in compliance with governing mortgage-servicing regulations (the "REALServicing Allegations"). As discussed further below, the Court ultimately dismissed the REALServicing Allegations from the case and narrowed the Conflicts-of-Interest Allegations to a single category of false and misleading statements.

26.     ***The Conflicts-of-Interest Allegations***. According to the Amended Complaint, Defendants repeatedly assured investors that Altisource and Ocwen took effective steps to manage Erbey's conflicts of interest through Erbey's recusal from all related-party transactions involving

11

the two companies, and through the oversight of Altisource's and Ocwen's independent Boards of Directors. In fact, however, the Amended Complaint alleged that Erbey regularly participated in, negotiated, and approved related-party transactions involving Altisource and Ocwen. Plaintiffs alleged that Erbey's participation in these related-party transactions was improper and in direct violation of a previous NY DFS consent order and harmed shareholders by favoring one company over the other in conflicted transactions. The Amended Complaint also alleged that the Defendants falsely assured investors that the companies further protected against conflicts of interest by maintaining "separate management" and through Altisource's commitment to charge Ocwen and its borrowers "market rates."

27.     Plaintiffs further alleged that investors began to learn the truth about these conflicts of interest through the release of letters from the NY DFS to Ocwen. For example, the February DFS Letter noted that, contrary to Defendants' public representations, the NY DFS had "uncovered a number of potential conflicts of interest between Ocwen and [Altisource]" that "cast serious doubt on recent public statements . . . that Ocwen has a 'strictly arms-length business relationship' with those companies." Two months later, the April DFS Letter raised additional "significant concerns" that Altisource and Ocwen were engaged in "self-dealing" through Altisource's overcharging of Ocwen customers. Shortly afterward, the August 4 DFS Letter raised further concerns regarding a "troubling transaction" between Ocwen and Altisource that was approved by Erbey and "appear[ed] designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work." The full truth was finally revealed on December 22, 2014, when Ocwen entered into the Consent Order, admitted that Ocwen's business dealings with Altisource constituted "numerous and significant violations" of New York State laws and regulations, and specifically admitted that "Mr. Erbey, who owns approximately 15% of

Ocwen's stock, and nearly double that percentage of the stock of Altisource Portfolio, has participated in the approval of a number of transactions between the two companies or from which Altisource received some benefit, including the renewal of Ocwen's force placed insurance program in early 2014." According to the Complaint, these corrective disclosures caused the price of Altisource's common stock to decline significantly.

28.     ***The REALServicing Allegations.*** The purported REALServicing fraud was based on allegations that Defendants misrepresented the effectiveness and compliance of Altisource's REALServicing mortgage-servicing platform. As alleged in the Amended Complaint, REALServicing was the technology backbone of Ocwen's loan-servicing business. The Amended Complaint alleged that Altisource and Ocwen, in public statements throughout the Class Period, emphasized that REALServicing could service loans in an "efficient," "effective," "low-cost," and legally compliant manner. Defendants emphasized the platform's ability to "ensure compliance" with newly imposed regulations through a "robust, world class compliance management system" that was highly scalable and fully capable of processing millions of loans. Plaintiffs alleged that these statements were first partially revealed as false in October 2014 when the NY DFS released a letter that described "serious issues with Ocwen's systems and processes" for mortgage loan servicing, including Ocwen's practice of "backdating . . . potentially hundreds of thousands of letters to borrowers, likely causing significant harm." The NY DFS expressed concern that "[t]he existence and pervasiveness of these issues raise critical questions about Ocwen's ability to perform its core function of servicing loans." According to the Amended Complaint, these corrective disclosures caused the price of Altisource's common stock to decline significantly.

**B.     Defendants' Motions to Dismiss the Amended Complaint**

29.     On March 23, 2015, the Altisource Defendants (Altisource, Erbey, and the Officer Defendants) and the Ocwen Defendants (Ocwen and Erbey) filed two separate motions to dismiss

the Amended Complaint. Their motions to dismiss consisted of 47 pages of briefs and nearly 500

pages of exhibits. *See* DE 64, 65, 66. Defendants argued that the Complaint should be dismissed

on numerous grounds, including those described below.

(a)     Defendants argued that Lead Plaintiffs did not plead an adequate factual basis for the falsity of the statements that Altisource and Ocwen maintained "separate management" because the companies (i) did not promise investors that there was no overlap whatsoever between the management or employees of Ocwen and Altisource and (ii) had separate CEOs and CFOs.

(b)     Defendants argued that Lead Plaintiffs did not plead an adequate factual basis for the falsity of the statements that Erbey recused himself from approvals of Altisource's transactions with Ocwen and other related-party transactions because the related-party transaction identified by the NY DFS was not a direct transaction between Altisource and Ocwen, but rather involved a third-party intermediary.

(c)     Defendants argued that Altisource's and Ocwen's statements that Altisource charged Ocwen and its borrowers "market rates" were statements of genuinely held belief.

(d)     Defendants also argued that Lead Plaintiffs did not plead an adequate factual basis for the falsity of the "market rates" statements because they were based on (i) the statements of former Ocwen and Altisource employees who lacked sufficient knowledge and (ii) the NY DFS letter, which (according to Defendants) was based on a specific company pilot program that had been fully disclosed.

(e)     Defendants argued that the allegations concerning Altisource's statements about the REALServicing platform's quality and effectiveness were statements of genuinely held belief. Defendants also argued that these allegations amounted to nothing more than corporate mismanagement.

(f)     Defendants argued that the Amended Complaint did not allege particular facts raising a strong inference of scienter on the part of the individual Defendants because (i) the statements themselves were not false and misleading; (ii) allegations attributed to former employees did not independently raise an inference of scienter; (iii) allegations concerning financial motives based on stock ownership actually raised an inference against scienter, as there were no large insider sales; and (iv) the scope of the penalties imposed on Ocwen by the NY DFS and Ocwen's admissions in the Consent Order did not demonstrate knowledge sufficient to allege scienter.

(g)     The Altisource Defendants also argued that Lead Plaintiffs did not plead an adequate factual basis for the falsity of Altisource's statements about the

14

REALServicing platform's quality and effectiveness because the October DFS Letter and Consent Order focused on Ocwen's failures and did not discuss REALServicing by name.

(h)     The Altisource Defendants also argued that Plaintiffs could not establish falsity or scienter based on allegations derived from the NY DFS letters because neither Altisource nor the individual Defendants were parties to the NY DFS's Consent Order.

(i)     The Altisource Defendants argued that they could not be held liable for allegedly false statements made by Ocwen.

(j)     The Altisource Defendants argued that Lead Plaintiffs did not adequately plead loss causation because the alleged corrective disclosures did not correct any prior statements or reveal any fraud.

(k)     Defendants also argued that news of regulatory investigations does not, by itself, demonstrate loss causation, especially here where the DFS Letters voiced "concerns" and sought additional information.

(l)     The Ocwen Defendants argued that all claims against Ocwen (and Erbey in his role as Ocwen's Chairman) should be dismissed because Altisource's investors had no standing to bring claims against Ocwen for statements Ocwen made about Altisource and its relationship with Altisource, and these claims impermissibly expanded the scope of Rule 10b-5 liability.

(m)     The Ocwen Defendants argued that certain allegedly false statements were inactionable puffery.

30.     On May 14, 2015, Lead Plaintiffs filed two separate briefs totaling 47 pages in opposition to Defendants' motions to dismiss in which they vigorously disputed Defendants' arguments. *See* DE 73 & 74. Among other things, Lead Plaintiffs argued that:

(a)     The falsity of Defendants' statements concerning "separate management" was adequately pleaded and supported by the fact that the two companies secretly shared a Chief Risk Officer and other high-level executives, as admitted by Ocwen in the Consent Order and detailed by the NY DFS in the February DFS Letter.

(b)     Defendants' statements concerning Erbey's recusal from related-party transactions were false and misleading when made, as admitted by Ocwen in the Consent Order and detailed by the NY DFS in the August DFS letter.

(c)     Defendants' statements concerning the FPI transaction involving SWBC were materially misleading because SWBC was only a pass-through in the transaction, which in substance was a related-party transaction between Ocwen

15

and Altisource in violation of Altisource's representations that Erbey recused himself from related-party transactions.

(d) Defendants' statements concerning Altisource's provision of "market rates" were neither puffery nor opinion statements, and the falsity of those statements was bolstered by Ocwen's admissions in the Consent Order, the detailed information contained in the April DFS Letter, and the corroborative statements of former Altisource and Ocwen employees.

(e) Defendants' statements concerning the REALServicing platform's quality, effectiveness, and compliance were neither puffery nor statements of opinion, and were factually supported by Ocwen's admissions in the Consent Order, the detailed information in the October DFS Letter, and the corroborative statements of former Ocwen employees.

(f) The Amended Complaint alleged a strong inference of scienter against all Defendants.

(g) The Amended Complaint adequately alleged loss causation.

(h) Lead Plaintiffs had standing to bring claims against Ocwen because Ocwen's statements about Altisource were communicated to Altisource investors, and these claims were proper under Supreme Court and Eleventh Circuit law.

31.     On June 8, 2015, the Ocwen Defendants filed their reply papers, and on June 15, 2015, the Altisource Defendants filed their reply papers. The two sets of reply papers consisted of a combined 70 pages of additional briefs. *See* DE 82 and 83.

32.     On June 17, 2015, Lead Plaintiffs filed a motion for leave to file a sur-reply to the Ocwen Defendants' reply brief and attached the proposed sur-reply to the motion. DE 84. The Ocwen Defendants opposed that motion on June 22, 2015 (DE 86), and the Altisource Defendants opposed the motion on June 23, 2015 (DE 87). Plaintiffs filed a reply in support of the motion on June 24, 2015. DE 88.

**C.     The Court Grants Defendants' Motions to Dismiss the Amended Complaint and Lead Plaintiffs File the Second and Third Amended Complaints**

33.     On September 4, 2015, the Court entered a 34-page Omnibus Order granting Defendants' motions to dismiss without prejudice, and allowing Lead Plaintiffs to amend their

16

pleadings by September 25, 2015. DE 89. In particular, the Court held that: (i) Lead Plaintiffs lacked standing to bring claims against Ocwen (as a non-issuer) for losses due to purchases of Altisource stock; (ii) allegations concerning an overlapping Chief Risk Officer and other senior managers did not render the Defendants' "separate management" statements false and misleading; (iii) the Amended Complaint did not sufficiently allege that Defendants made false and misleading statements regarding Erbey's recusal, because the only specifically alleged transaction (the FPI transaction involving SWBC) involved a third party and therefore was not a direct related-party transaction between Altisource and Ocwen; (iv) the Complaint did not sufficiently allege that Defendants' statements concerning Altisource's commitment to charge Ocwen and its borrowers "market rates" was false and misleading; (v) the REALServicing statements were corporate puffery, and were not otherwise sufficiently alleged to be false and misleading; and (vi) because there were no false and misleading statements, scienter, loss causation, and control-person liability were not adequately alleged.

34.     Between September 4, 2015 and September 25, 2015, Lead Plaintiffs restarted their investigation for information to further bolster their allegations, and expanded their legal and factual research to address issues raised by the Court. On September 25, 2015, Lead Plaintiffs filed the Second Amended Complaint. DE 90. The Second Amended Complaint alleged a new claim of scheme liability against the Altisource and Ocwen Defendants under Rules 10b-5(a) and (c), in addition to the claims previously alleged under Rule 10b-5(b) and §20(a). The Second Amended Complaint also added numerous factual allegations in response to the Court's September 4, 2015 Order.

35.     On October 5, 2015, following the filing of the Second Amended Complaint, the SEC filed an "Order Instituting Cease-and-Desist Proceedings, Pursuant to Section 21C of the

17

Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order" (the "SEC Order") in an enforcement action against Home Loan Servicing Solutions, Ltd. ("HLSS"), a related party to Ocwen and Altisource that was also chaired by Defendant Erbey during the Class Period. The SEC Order included additional facts about related-party transactions between Ocwen and HLSS and about Erbey's involvement in the related-party transactions. Lead Plaintiffs believed that the facts contained in the SEC Order bolstered the falsity of Defendants' Class Period representations to investors, and Defendants' knowledge of those representations' falsity. Therefore, on October 15, 2015, Lead Plaintiffs filed the Third Amended Complaint, which added allegations concerning the SEC Order. DE 95.

36.     The Third Amended Complaint added significant factual allegations to both the Conflicts-of-Interest Allegations and the REALServicing Allegations, in addition to the new claim of scheme liability. For example,

(a) In response to the Court's finding that the NY DFS investigation and Consent Order, standing alone, were not sufficient to plead securities fraud, the Complaint also added new allegations demonstrating that the recusal misstatements were false and misleading. First, Plaintiffs alleged that Item 404 of Regulation S-K established the materially misleading nature of the FPI transaction, regardless of the interjection of a pass-through entity, because Item 404 requires disclosure of any transaction in which "any related person had or will have a direct *or indirect* material interest." 17 C.F.R. § 229.404(a) (emphasis added). Second, Plaintiffs alleged that the SEC Order corroborated the NY DFS's findings and Ocwen's admissions concerning Erbey's failure to recuse himself from related-party transactions, and thereby demonstrated a pattern and practice of fraudulent behavior. Third, Plaintiffs alleged that Ocwen revealed in May 2015 that the SEC had issued a subpoena concerning Erbey's approvals of the FPI transaction involving Ocwen and Altisource.

(b) Plaintiffs alleged additional misrepresentations made by Defendant Erbey on September 30, 2013, in which he emphasized that Ocwen and Altisource were "arm's-length" "non-affiliated companies."

(c) Plaintiffs added new allegations concerning the Company's misrepresentations concerning the dual role played by both companies' Chief Risk Officer, together with new allegations concerning the Chief Risk Officer's critical role.

(d) The Third Amended Complaint contained new allegations derived from former Altisource and Ocwen employees concerning the employment of another senior officer—the director of information security—by both companies, as well as additional improper commingling of the companies.

(e) The Third Amended Complaint alleged additional misrepresentations by Altisource concerning REALServicing, and new allegations concerning the National Mortgage Settlement Monitor's determination that Ocwen's letter-backdating scheme was caused by Altisource's REALServicing system.

(f) Plaintiffs alleged, based on statements of the NYS DFS Superintendent, that Erbey was forced out of Altisource and Ocwen because of his culpable "engage[ment] in wrongdoing."

**D.      The Motions to Dismiss the Third Amended Complaint**

37.      On October 22, 2015, the Ocwen and Altisource Defendants filed separate motions to dismiss the Third Amended Complaint. DE 97 & 98. Defendants argued that the newly pleaded allegations did not provide any basis to deviate from the Court's September 4, 2015 Order dismissing all claims. Specifically, Defendants raised numerous grounds for dismissal, including those described below:

(a) The new allegations concerning the role of the Chief Risk Officer and overlapping employees and services were not sufficient to state a claim regarding the "separate management" statements.

(b) The Third Amended Complaint failed to allege that the FPI transaction was a related-party transaction "between" Ocwen and Altisource, and the new allegations concerning the SEC Order and Item 404 of Regulation S-K were not sufficient to state a claim regarding the recusal statements.

(c) The Court had concluded that Defendants' statements concerning the "market rates" charged by Altisource were opinion statements, and the new allegations concerning rates charged by Altisource did not adequately allege that Defendants did not subjectively believe that the rates Altisource charged to Ocwen were "consistent" or "comparable" to "market rates."

(d) Plaintiffs did not add new allegations sufficient to overcome the Court's prior holding that the REALServicing Allegations were non-actionable puffery.

(e) Even if not puffery, the REALServicing statements were opinions, and the new allegations in the Third Amended Complaint, including the allegations about the National Mortgage Settlement monitor's report, did not adequately allege that Defendants did not subjectively believe these statements when made, or that

19

Defendants omitted material facts known to them.

(f) The REALServicing statements should also be dismissed on the grounds that they allege nothing more than corporate mismanagement.

(g) The Third Amended Complaint failed to allege scienter.

(h) The Third Amended Complaint failed to allege loss causation.

(i) The Third Amended Complaint failed to allege scheme liability under Rule 10b-5(a) and (c), for the same reasons that the Third Amended Complaint failed to allege liability for misrepresentations under Rule 10b-5(b).

(j) All claims against Ocwen should again be dismissed because purchasers of Altisource stock have no standing to sue Ocwen.

38.     On November 19, 2015, Lead Plaintiffs filed two separate briefs in opposition to Defendants' motions to dismiss the Third Amended Complaint, in which they vigorously disputed Defendants' arguments. *See* DE 99 & 100. Among other things, Lead Plaintiffs argued that their new allegations sufficiently addressed concerns raised by the Court in its September 4, 2015 Order. On December 7, 2015, Defendants filed two separate reply briefs in further support of their motions. DE 101 & 102.

39.     On December 11, 2015, Lead Plaintiffs filed a motion for leave to file a sur-reply to the Ocwen Defendants' reply brief (DE 103), and on December 18, 2015, the Ocwen Defendants responded to Lead Plaintiffs' motion. DE 104.

40.     On December 21, 2015, the Court entered an Order denying the Altisource Defendants' motion to dismiss in part and granting it in part with prejudice, and granting the Ocwen Defendants' motion to dismiss with prejudice. DE 105. In the Order, the Court dismissed with prejudice (a) all claims against Ocwen,[3] (b) the REALServicing Allegations, and (c) the

---

[3]     While released as a Defendant in this Action, Ocwen remains an interested third party and is, along with Erbey, a defendant in the related action *In re Ocwen Financial Corp. Securities*

allegations concerning "separate management" and the assurance of "market rates." The Court sustained, however, claims concerning Erbey's recusal from related-party transactions (the "Recusal Claims"). In so doing, the Court concluded that the Third Amended Complaint now "sufficiently pleads the material falsity of the statements regarding Erbey's recusal from related-party transactions," "sufficiently alleges scienter as to Defendant Erbey," "sufficiently pleads loss causation," and states both a Rule 10b-5(b) misrepresentations claim and a Rule 10b-5(a) and (c) scheme-liability claim against Altisource and Erbey. The Court also sustained control-person claims against Erbey and the Officer Defendants.

### E.   Defendants' Motion for Reconsideration

41.   On January 22, 2016, the Altisource Defendants (hereafter, "Defendants") filed a motion asking the Court to reconsider the December 21, 2015 Order. DE 108. In that motion, Defendants argued that the Court committed "clear error" in sustaining the Recusal Claims based on the SEC Order (because it did not involve Altisource) and a subsequent January 2016 SEC order addressing similar facts, which detailed how Erbey failed to recuse himself from the Ocwen board's vote on a related-party transaction but did recuse himself from the Altisource board's vote on the transaction.

42.   On February 8, 2016, Lead Plaintiffs opposed Defendants' motion for reconsideration, arguing that the December 21, 2015 Order was based on more than the SEC Order, and that all of the alleged facts, taken together, fully supported the Recusal Claims' viability. DE 112.

---

*Litigation*, 14-cv-81057-WPD (the "*Ocwen* action"), which is brought on behalf of damaged Ocwen shareholders and concerns some of the same wrongdoing as alleged in this Action.

43. On March 4, 2016, the Court denied Defendants' motion for reconsideration, holding that "the Altisource Defendants have failed to present facts or law that would compel the Court to invoke the extraordinary remedy of reconsideration." DE 120.

    **F.**    **Lead Plaintiffs' Extensive Discovery Efforts**

        **1.**    **Lead Plaintiffs Serve Defendants, Ocwen, and Other Third Parties with Document Requests**

44. Discovery in the Action was a significant undertaking. As discussed above, the Court sustained the Third Amended Complaint's claims that Altisource made materially false statements regarding Defendant Erbey's recusal from transactions between Altisource, on the one hand, and Ocwen and other related companies, on the other hand. Moreover, the Third Amended Complaint alleges that Defendants misrepresented that the conflicts of interest posed by Erbey's financial and leadership position at the related companies were subject to oversight by the independent members of Altisource's Board of Directors. To prove these claims, Lead Plaintiffs needed to obtain and develop evidence concerning the companies' recusal policies, the Altisource Board's oversight of conflicts of interest, and how the companies' conflicts-of-interest policies were implemented in practice.

45. By the time the Settlement was reached, Defendants and third parties had produced over one million pages of documents regarding the Recusal Claims. Lead Counsel reviewed and analyzed all of these productions.

46. Discovery in this Action commenced on March 2, 2016, when Lead Plaintiffs served Defendants with document requests. These requests sought, among other things, documents concerning: (i) prior investigations by governmental entities, including but not limited to the NY DFS, of the relationship and transactions between Altisource and Ocwen; (ii) Erbey's resignation from Ocwen; (iii) negotiations, transactions, and agreements between Altisource, on the one hand,

and Ocwen or the other related parties, on the other hand; (iv) all policies governing recusal; and (v) Altisource's FPI business. Plaintiffs' requests sought documents from as far back as August 10, 2009, through October 15, 2015.

47.     On April 4, 2016, Defendants served their responses and objections to Lead Plaintiffs' document requests. Defendants raised numerous objections to Lead Plaintiffs' requests, refused to produce documents on the majority of requested subjects, and agreed to produce only a small and narrow set of documents on the remaining subjects. As discussed in greater detail below, after an unsuccessful meet-and-confer process, Lead Plaintiffs were forced to file a motion to compel the production of documents from Defendants on April 27, 2016.

48.     On April 11, 2016, Lead Plaintiffs issued their first subpoena for the production of documents to third party Ocwen. These requests sought similar documents as the document requests directed at Altisource. On May 4, 2016, Ocwen served its responses and objections to Lead Plaintiffs' subpoena. Ocwen objected generally to producing any documents until the scope of discovery was clarified by the Court's opinion on Lead Plaintiffs' pending motion to compel.

49.     On May 2, 2016, Lead Plaintiffs served a subpoena for documents on third party SWBC, the company that served as an intermediary in the FPI transaction between Altisource and Ocwen. On May 27, 2016, SWBC filed a Motion to Quash and Motion for Protection regarding Lead Plaintiffs' subpoena in the United States District Court for the Western District of Texas. Lead Plaintiffs and SWBC then entered into a Stipulation and Proposed Order on June 6, 2016 that stayed SWBC's obligation to produce any responsive documents until the Court resolved Lead Plaintiffs' motion to compel and Defendants' motions for protective orders, discussed below.

50.     In addition to their subpoena to SWBC, Lead Plaintiffs pursued considerable additional non-party discovery. For instance, Lead Plaintiffs served a subpoena for documents on

an Altisource- and Ocwen-related party, HLSS. Following several meet and confers, HLSS began producing documents to Lead Plaintiffs concerning Erbey's conflicts of interest and recusal from related-party transactions. Lead Plaintiffs also served subpoenas for documents on another Altisource- and Ocwen-related party, Altisource Residential Corporation, and on Altisource's and Ocwen's outside auditor, Deloitte & Touche LLP. Lead Plaintiffs also sought documents from Altisource's independent director Michael Linn in anticipation of his deposition. In addition, Lead Plaintiffs pursued the lengthy and time-consuming process of requesting the production of documents from two of Altisource's board members who lived in Europe. In order to secure these documents, Lead Counsel retained foreign counsel to commence the Hague discovery process on those European board members and to contact European counsel for the two board members.

51.     Disputes arose immediately over the scope and adequacy of Defendants' document production. Fact and class-certification discovery was hotly contested by the parties. Indeed, as discussed in greater detail below, Defendants and Plaintiffs collectively filed seven separate discovery motions. These motions required extensive meet and confers between the parties and then required extensive briefing before the Court. In order to resolve these issues, the Court devoted a substantial amount of resources, conducting four hearings before Magistrate Judge Snow on discovery and related motion practice and a ruling by the Court on Defendants' objection to one of Judge Snow's discovery rulings.

52.     As a result of these efforts, Defendants and third parties produced over one million pages of documents to Lead Plaintiffs, including documents concerning all the subjects at issue in the Action. Lead Counsel's review and analysis of these productions was essential to their prosecution of the Action. To carry their burden to prove their challenging claims, Lead Plaintiffs had to independently develop a very substantial amount of evidence.

53.     For example, Lead Plaintiffs sought to develop evidence to prove that Defendant Erbey participated in discussions concerning and negotiations and approvals of agreements and transactions between Altisource and Ocwen, in violation of Defendants' representations that he recused himself (i.e., removed himself completely) from these transactions. To prove Erbey's involvement in these related-party transactions, Lead Plaintiffs had to review numerous board meeting packages and agendas and internal communications involving or referencing Mr. Erbey. Lead Plaintiffs and Lead Counsel needed to carefully analyze the documents produced not only by Altisource but also by related companies Ocwen and HLSS, as well as by SWBC.

54.     Developing this evidence was a daunting project requiring the commitment of enormous resources and effort by Lead Counsel. In that regard, Lead Counsel implemented a detailed process by which a team of attorneys employed by Lead Counsel reviewed the documents, and the evidence they discovered was shared among Lead Counsel and Lead Plaintiffs' experts. At the beginning of this process, Lead Counsel assembled a team of BLB&G attorneys to review and analyze the document productions. The document review was variously staffed by as many as five attorneys in light of the tight schedule set by the Court.

55.     BLB&G attorneys then began to review, analyze, and categorize the documents. In reviewing and analyzing the documents, the attorneys were tasked with making several determinations as to their importance and relevance. Specifically, they determined whether the documents were "hot," "relevant," or "irrelevant." They also assessed which specific issues the documents related to, including Erbey's knowledge, participation or recusal, and conflicts of interest; Board oversight; and the various state and federal investigations into Altisource's related-party transactions and relationships. In addition, the attorneys analyzed which Altisource and

Ocwen employees the documents related to, so that the documents could be easily retrieved when preparing for the depositions of those employees.

56.     During the document-review process, Lead Counsel held regular internal meetings with the attorneys conducting the document review. In advance of these meetings, the most significant documents that had recently been discovered and analyzed were compiled and circulated. At the meetings, the attorneys who analyzed these documents discussed their importance, and all participants asked questions and discussed additional, similar documents that had been discovered. Through these meetings, Lead Counsel ensured that all of these attorneys were aware of the important documentary evidence being developed in the case, and focused the document-review teams on developing similar evidence in support of Lead Plaintiffs' claims.

57.     The BLB&G attorneys working on the document review also provided important assistance to Lead Counsel in connection with drafting the amended complaints and in briefing discovery motions based on their knowledge of the evidence in the case.

### 2.     Lead Plaintiffs' Motions to Compel and Opposition to Defendants' Motion for a Protective Order

58.     As mentioned above, the parties had significant document-related discovery disputes. In order to resolve these disputes, Lead Plaintiffs had to file several motions to compel. Indeed, this Action was notable in that it involved a significant number of contested discovery motions that required Court assistance to resolve.

59.     ***The April 2016 Motion to Compel and May 2016 Motions for Protective Orders.*** As noted above, in their April 4, 2016 responses to Lead Plaintiffs' document requests, the Altisource Defendants refused to produce all but a small and inconsequential number of documents, and refused to produce any documents in response to 24 of the 30 document requests. Lead Counsel engaged in extensive meet and confers with Defendants and exchanged detailed

letters in which the parties stated their positions on the scope of Plaintiffs' document requests and Defendants' objections. Defendants continued to refuse to produce the vast majority of documents responsive to the requests. The time period to be covered by Defendants' production was also in dispute

60.    In light of Defendants' refusal to produce most of the responsive documents, on April 27, 2016, Lead Plaintiffs filed a motion to compel Defendants to produce documents responsive to Lead Plaintiffs' document requests. DE 122. Specifically, Lead Plaintiffs moved for the production of documents concerning (i) related-party transactions involving Altisource, Erbey, and Ocwen, including the FPI transaction that was detailed in the Third Amended Complaint; (ii) the parallel investigations into Erbey, Altisource, and Ocwen conducted by the SEC and the NY DFS; (iii) Erbey's resignation from Altisource and the related companies; and (iv) the causes of Altisource's stock-price declines as alleged in the Third Amended Complaint.

61.    On May 3, 2016, before they responded to Lead Plaintiffs' motion to compel, Defendants filed a motion for a protective order, asking the Court to limit Lead Plaintiffs' document requests to (i) Altisource's policies regarding the approval of related-party transactions, and (ii) documents sufficient to show whether Erbey played any role in approving Altisource's entry into related-party transactions. DE 125. Defendants argued that all other documents, including documents concerning (i) Erbey's participation in (as opposed to approval of) related-party transactions, (ii) the parallel investigations, (iii) loss causation, (iv) his resignation, and (v) the FPI transaction, should not be produced.

62.    One day later, on May 4, 2016, Defendants filed a motion for a protective order seeking to limit the document subpoena served on Ocwen on April 11, 2016, in the same manner

and on the same grounds as Defendants' motion for a protective order seeking to limit the document requests served on Defendants. DE 127.

63.     On May 5, 2016, Defendants filed an opposition to Lead Plaintiffs' motion to compel. DE 129. Defendants argued that Plaintiffs' requests for documents produced by Defendants to the SEC and NY DFS were improper "cloned" requests and that the remaining documents sought by Lead Plaintiffs were irrelevant in light of the Court's December 21, 2015 Order. Indeed, Defendants argued that (i) the Court's Order dismissed the allegations about the FPI transaction, and (ii) documents about the other related companies were not relevant to claims about Altisource. Defendants also argued that the SEC's document subpoena to Altisource did not seek documents relevant to the claims sustained by the Court in December 2015.

64.     On May 11 and 12, 2016, Lead Plaintiffs opposed Defendants' motions for protective orders. DE 130 & 132.

65.     On June 23, 2016, Magistrate Judge Lurana Snow held a hearing on Lead Plaintiffs' motion to compel and Defendants' motions for protective orders. Following a lengthy hearing, Judge Snow reserved ruling on the motions, but did order Defendants to file the SEC's subpoena to Altisource for her review. DE 143. Defendants then moved for the subpoena to be filed under seal and submitted for in camera inspection. DE 146. Lead Plaintiffs opposed this motion on July 1, 2016 (DE 148), and Defendants filed a reply in support of their motion on July 5, 2016 (DE 149). Judge Snow allowed the subpoena to be filed under seal on July 27, 2016. DE 150.

66.     On July 27, 2016, Magistrate Judge Snow granted in large part Lead Plaintiffs' motion to compel and denied in large part Defendants' motions for protective orders. DE 151. First, Judge Snow ordered Altisource and Ocwen to produce documents concerning the FPI transaction, holding that the Court had in fact considered this transaction in sustaining the Recusal

Claims. Second, Judge Snow ruled that her in camera review of the SEC subpoena to Altisource revealed that the documents sought by the SEC were "directly relevant to the subject matter of this litigation" and must be produced. Third, Judge Snow rejected Defendants' attempt to limit their production to two "cherry picked" false statements containing the word "recusal," finding that "Defendants' position regarding Erbey's false statement is far too restrictive and the information sought by Plaintiffs is relevant and proportional to the needs of this case." Fourth, Judge Snow agreed with Plaintiffs that documents concerning Erbey's forced resignation from Altisource, Ocwen, and three other companies were relevant and should be produced. Fifth, Judge Snow sided with Plaintiffs and ordered Defendants to produce documents pertaining to the IT infrastructure between Altisource and Ocwen, as well as the individual Defendants' daily planners, personnel files, securities-ownership records, and performance reviews. Finally, Judge Snow ordered that the time period applicable to Defendants' production must precede the start of the Class Period and date back to January 1, 2012. Judge Snow applied these findings to the scope of the Ocwen document subpoena.

67.     In the July 27, 2016 Order, Magistrate Judge Snow allowed Defendants 14 days to complete their document production to Plaintiffs. However, on August 8, 2016, Defendants moved for partial relief from that 14-day deadline pending a ruling on Defendants' anticipated Limited Objection to the Magistrate Judge's July 27, 2016 Order. DE 154. Judge Snow granted that motion. DE 155.

68.     On August 10, 2016, Defendants filed a limited Objection to the July 27, 2016 discovery Order. DE 156 & 157. In their Objection, Defendants asked the Court to overturn the portion of the July 27, 2016 Order directing Defendants to produce documents concerning the

company's transactions involving SWBC on the grounds that the Order was clearly erroneous because the SWBC FPI transaction was not a related-party transaction.

69.     On August 29, 2016, Lead Plaintiffs filed their opposition to Defendants' limited Objection. DE 171. Lead Plaintiffs argued that the July 27, 2016 Order was consistent with the Court's December 21, 2015 Order sustaining the Recusal Claims, and that the Court should overrule Defendants' Objection in its entirety. Defendants filed their reply brief in support of their Objection on September 9, 2016. DE 175.

70.     On September 13, 2016, the Court overruled Defendants' Objection, finding that the July 27, 2016 Order "is not contrary to the law of this case or any other controlling law." DE 177. Defendants were ordered to produce the remainder of their production within 14 days.

71.     ***The October 12, 2016 Motion to Compel Ocwen's Responses.*** As noted above, while dismissed as a Defendant in this Action, Ocwen remains an interested third party in this Action and is, along with Erbey, a defendant in the related *Ocwen* action. However, following Magistrate Judge Snow's July 27, 2016 Order finding that Lead Plaintiffs' document subpoena to Ocwen was legitimate and sought relevant documents, Ocwen had still not produced a single document by the start of October 2016. In summary, Ocwen took the position that it should not have to undertake any burden in complying with Lead Plaintiffs' subpoena independent of its discovery obligations in the *Ocwen* action, and wanted Plaintiffs in this Action to blindly agree to accept production of the documents already produced in that action.

72.     Lead Plaintiffs met and conferred with Ocwen over the course of several weeks, offering to reduce the number of proposed custodians and search terms to be applied in an effort to reach a compromise and obtain Ocwen's critical documents as quickly as possible. Ocwen refused to accept Lead Plaintiffs' offers of compromise, refused to commit to producing to Lead

Plaintiffs all documents produced in the related *Ocwen* action, and insisted that Ocwen be reimbursed for any costs associated with Ocwen's production.

73.     On October 12, 2016, Lead Plaintiffs filed a motion to compel Ocwen to search for and produce documents in response to Lead Plaintiffs' subpoena. DE 184. Ocwen responded to this motion on October 20, 2016, making many of the same arguments it had made during the course of the meet and confers. DE 186.

74.     On November 3, 2016, Magistrate Judge Snow held a hearing on Lead Plaintiffs' motion to compel. This hearing, which followed a hearing on a similar motion to compel documents from Ocwen filed by the plaintiffs in the related *Ocwen* action, resulted in some clarity regarding Ocwen's ongoing production in this Action. During the course of the hearing in this Action, Lead Plaintiffs and Ocwen were able to reach a compromise on Ocwen's discovery obligations, with Judge Snow's assistance. On November 10, 2016, Judge Snow ruled that Ocwen would bear its own costs of production, would produce to Lead Plaintiffs all documents produced in response to document requests in the related *Ocwen* action, and would provide Lead Plaintiffs with a list of search terms and custodians, and that Lead Plaintiffs would have the right to seek additional search terms and custodians from Ocwen. DE 194.

75.     ***The November 11, 2016 Motion to Compel Altisource's Search Protocols.*** Following Magistrate Judge Snow's July 27, 2016 Discovery Order and the Court's September 13, 2016 Order overruling of Defendants' Objection to Judge Snow's Order, Altisource made several productions of documents. In order to ascertain whether Defendants had satisfied their discovery obligations, Plaintiffs requested that Defendants provide the search terms used, custodians searched, volume of documents reviewed following application of the search terms, and technology-assisted review parameters, if any, employed by Defendants in responding to

Plaintiffs' document requests and the Court's discovery orders. The relevance of this information became clear as Plaintiffs identified deficiencies in Defendants' production, which Defendants continued to correct on an ongoing, ad hoc basis.

76.     After the parties unsuccessfully met and conferred over the production of Defendants' search protocols, Lead Plaintiffs filed a motion to compel Defendants to provide their search protocols. DE 195. On December 6, 2016, Magistrate Judge Snow held a hearing on this motion. The next day, on December 7, 2016, Judge Snow denied Lead Plaintiffs' motion to the extent it sought Defendants' prior search protocols. DE 217. However, Judge Snow observed that Defendants should have met and conferred with Plaintiffs over the search terms, and she directed Defendants to confer with Plaintiffs and agree upon search terms in advance of any future production. Defendants also agreed to correct ongoing deficiencies identified by Lead Plaintiffs.

77.     ***The November 15, 2016 Motion to Compel the Production of Documents Concerning the SEC and NY DFS Investigations.*** Magistrate Judge Snow determined, following an in camera review, that the scope of the SEC subpoena to Altisource overlapped with relevant issues in this Action and, contrary to Defendants' position, sought documents "directly relevant to the subject matter of this litigation." DE 151 at 5. Nonetheless, in numerous communications between September 16, 2016 and November 11, 2016, and during a meet and confer on October 28, 2016, Defendants refused to produce the SEC Subpoena, Defendants' responses to that Subpoena, communications between Altisource and the SEC or NY DFS concerning those entities' investigations, or internal Altisource communications discussing those investigations, stating that they "d[id] not believe that [this material was] relevant and proportional to the needs of this case or that the production of such materials is called for by the July 27 Order."

78.     On November 15, 2016, Lead Plaintiffs filed a motion to compel the production of documents concerning the SEC and NY DFS Investigations, to the extent those documents contain relevant information. DE 197. On November 23, 2016, Defendants opposed that motion, arguing that the documents may not be relevant and that producing them would be burdensome. DE 206.

79.     On December 6, 2016, Magistrate Judge Snow held a hearing on Lead Plaintiffs' motion to compel the investigation-related documents. The next day, Judge Snow denied Lead Plaintiffs' motion in part, but ordered Defendants to identify by Bates number the documents that were produced both to Plaintiffs and to the SEC. DE 217.

### 3.     Lead Plaintiffs' Interrogatories to Defendants

80.     In addition to conducting the extensive document discovery summarized above, Lead Plaintiffs served interrogatories on Defendants. Specifically, on September 22, 2016, Lead Plaintiffs served Defendants with Plaintiffs' First Set of Interrogatories, which included four narrowly tailored requests for basic factual information directly related to the core claims and defenses at issue in the Action. On October 28, 2016, Altisource responded to Plaintiffs' interrogatories.

### 4.     Defendants' Discovery to Plaintiffs

81.     While Lead Counsel were engaging in the discovery summarized above, they were also responding to numerous discovery requests by Defendants concerning both merits issues and class certification. For example, on April 13, 2016, Defendants served 21 wide-ranging document requests on Lead Plaintiffs seeking, among other things, all documents from April 25, 2013 through the present concerning Lead Plaintiffs' investment managers, Lead Plaintiffs' investments in Altisource securities, and Lead Plaintiffs' oversight of this Action and of Lead Counsel. On August 17, 2016, Defendants served similar document requests on proposed Class Representative West Palm Beach Firefighters.

33

82.     In response to these requests, Lead Plaintiffs and West Palm Beach Firefighters gathered, reviewed, and produced thousands of pages of documents, including, among other things, all documents concerning their transactions in Altisource common stock and other documents regarding Altisource.

83.     On July 22, 2016, Defendants served 12 interrogatories on Lead Plaintiffs, and Defendants served similar interrogatories on West Palm Beach Firefighters on August 22, 2016. Lead Plaintiffs replied on August 22, 2016, and West Palm Beach Firefighters replied on September 16, 2016.

84.     Although Lead Plaintiffs were able to resolve the vast majority of disputes with Defendants concerning Plaintiffs' documents through the meet-and-confer process, they were not able to resolve one dispute, which ultimately resulted in Defendants filing a motion to compel against Lead Plaintiffs.

85.     On August 26, 2016, Defendants moved to compel the production of documents concerning engagement letters and fee arrangements with counsel engaged to represent Plaintiffs in this lawsuit and portfolio-monitoring agreements under which law firms or their agents monitor the performance of securities owned by Plaintiffs. DE 166. Lead Plaintiffs objected to the production of certain of these documents that were not relevant to BLB&G's representation of the Painters Funds and the prosecution of this Action, and filed a brief in opposition to Defendants' motion to compel on September 6, 2016. DE 172.

86.     A hearing on Defendants' motion to compel was held before Magistrate Judge Snow on September 22, 2016, and an Order memorializing the Court's ruling from the bench was issued on September 23, 2016. DE 182. The Court denied Defendants' motion in its entirety, but

allowed for the possibility that Defendants could renew the motion later in the discovery process. Defendants never renewed the motion.

87.     Defendants also served document subpoenas on Lead Plaintiffs' and West Palm Beach Firefighters' investment managers that purchased Altisource common stock during the Class Period on behalf of the Painters Funds and West Palm Beach Firefighters. Those investment managers produced thousands of pages of documents, which were reviewed and analyzed by Lead Counsel in preparation for depositions and class-certification briefing.

### 5.     Lead Plaintiffs' Motion for Class Certification

88.     On August 12, 2016, while discovery was ongoing, Lead Plaintiffs filed their class-certification motion. In their motion, Lead Plaintiffs argued that the Action readily met all of the elements for class certification under Rule 23. In connection with this motion, Lead Counsel consulted with and submitted an expert report by Dr. Michael Hartzmark regarding the efficiency of the market for Altisource's common stock.

89.     Following the submission of Lead Plaintiffs' Motion for Class Certification, Lead Plaintiffs and West Palm Beach Firefighters completed their production of documents in response to Defendants' document requests. Representatives from Lead Plaintiffs and West Palm Beach Firefighters were deposed on October 27, 2016 and November 3, 2016, respectively, in connection with the class-certification motion. In addition, the investment managers that purchased Altisource securities on behalf of Lead Plaintiffs and West Palm Beach Firefighters were deposed on November 7, 2016 and November 16, 2016, in connection with the class-certification motion. On November 9, 2016, Lead Plaintiffs' market-efficiency expert was also deposed by Defendants in connection with the class certification motion.

90.     On November 25, 2016, Defendants filed their brief in opposition to Lead Plaintiffs' motion for class certification. Defendants argued that the class should not be certified for several reasons. Defendants argued that Lead Plaintiffs were not adequate and had not exercised the requisite oversight over Lead Counsel; that Lead Plaintiffs were atypical because they were subject to unique defenses concerning reliance; that the Class Period in this Action should not begin until December 3, 2013 (the date Defendants claim the first alleged recusal misrepresentation was made), at the earliest; that, as a result of shortening the Class Period, Lead Plaintiffs were disqualified from serving as Class Representatives because they did not purchase shares during the correct Class Period; and that West Palm Beach Firefighters should be disqualified from serving as a Class Representative because the fund purchased Altisource common stock after the close of the Class Period. Finally, while Defendants did not challenge the efficiency of the market in which Altisource common stock traded, they argued that Lead Plaintiffs failed to present a Class-wide damages model consistent with Plaintiffs' theory of liability, which Defendants argued was required by *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). In support of this theory, Defendants submitted an expert report from Dr. Christopher M. James.

91.     On January 2, 2017, Lead Plaintiffs filed their reply brief in further support of their motion for class certification. DE 230 & 231. In the reply brief, Lead Plaintiffs responded to each of Defendants' arguments and argued that the Class should be certified for the entire Class Period proposed by Plaintiffs. Lead Plaintiffs argued that Defendants' arguments concerning the submission of a Class-wide damages model were premature and incorrect, as the damages model was the subject of expert discovery. In further response to Defendants' opposition and expert report, Lead Plaintiffs submitted a rebuttal expert report by Dr. Hartzmark.

92.     On January 10, 2017, Defendants filed a motion seeking leave to file a sur-reply to the motion for class certification. DE 243.

93.     Lead Plaintiffs' motion for class certification was pending when the parties agreed to settle the Action.

### 6.     Lead Plaintiffs' Efforts in Deposition Discovery

94.     Merits depositions in the Action were scheduled to begin in January 2015. At the time of the Settlement, Plaintiffs had noticed nine depositions, the first of which was to commence in Luxembourg on January 23, 2017. The witnesses to be deposed included Defendant Erbey, the Officer Defendants, and other senior Altisource and Ocwen executives. Lead Counsel did substantial work in preparation for these depositions of Defendants' witnesses before the parties agreed to settle the Action.

95.     In addition, Defendants conducted depositions of two witnesses from Lead Plaintiffs and West Palm Beach Firefighters on October 27, 2016 and November 3, 2016, respectively, and depositions of Lead Plaintiffs' and West Palm Beach Firefighters' investment managers on November 7, 2016 and November 16, 2016, respectively. Plaintiffs' Counsel extensively prepared for and defended or assisted in the defense of each of these depositions.

### 7.     Lead Plaintiffs' Fourth Amended Complaint and Defendants' Motion to Dismiss the Fourth Amended Complaint

96.     On December 2, 2016, the last day provided for amendments to the pleadings by Order of the Court, Lead Plaintiffs moved for leave to file a Fourth Amended Complaint to add allegations based on facts that were only recently developed through formal discovery in this Action and that bore directly upon Lead Plaintiffs' claims that this Court has already sustained. DE 212. Significantly, the Proposed Fourth Amended Complaint did not add any additional Defendants, assert any new causes of action, or modify the proposed Class Period. The new facts

alleged in the Fourth Amended Complaint sought to foreclose Defendants' argument that the Class Period should be shortened, which Defendants had raised most recently in their class-certification opposition.

97.     On December 19, 2016, the Court granted Lead Plaintiffs' motion for leave to file the Fourth Amended Complaint. DE 220. On December 28, 2016, Lead Plaintiffs filed the Fourth Amended Complaint. DE 224.

98.     On January 6, 2017, Defendants filed two motions against the Fourth Amended Complaint. First, Defendants moved to strike the Fourth Amended Complaint's allegations that Defendants contended had been dismissed in the December 21, 2015 Order. DE 237. While Lead Plaintiffs did not exclude certain now-dismissed allegations from the text of the Fourth Amended Complaint, the Fourth Amended Complaint specifically noted that these allegations were repeated only to protect the Class's interests and provide clarity for already-pending motions based on the Third Amended Complaint by maintaining the same paragraph numbering. Second, Defendants moved to partially dismiss the Fourth Amended Complaint to the extent it alleged false statements before December 3, 2013. DE 238. Defendants also renewed their attempt to dismiss Lead Plaintiffs' previously sustained scheme-liability claims against Altisource and Erbey. Lead Plaintiffs were preparing their opposition to Defendants' motion to dismiss when the parties agreed to settle the Action.

### 8.     Lead Plaintiffs' Expert Reports

99.     In accordance with the Court's Scheduling Orders, Lead Plaintiffs served Defendants with two expert reports, a damages and loss-causation report on December 30, 2016, and a report on Defendants' conflicts-of-interest misrepresentations on January 13, 2017. Lead Plaintiffs and their experts devoted substantial time, resources, and analysis to these detailed and well-supported reports.

100.    On December 30, 2016, Dr. Michael Hartzmark submitted a detailed 77-page Expert Damages Report. In this Report, Dr. Hartzmark opined on (i) the materiality of Defendants' alleged misrepresentations and omissions, (ii) whether investors' losses were proximately caused by Defendants' alleged misrepresentations and omissions, (iii) the quantification of the amount of losses attributable to the revelation of the allegedly misrepresented and omitted facts, (iv) the quantification of the inflation per share for Altisource common stock for each day of the Class Period attributable to the alleged misrepresentations and omissions, and (v) a model to quantify damages that could be applied to each Class Member.

101.    On January 13, 2017, Lead Plaintiffs' expert on related-party transactions—a nationally recognized expert on corporate governance—submitted a detailed and extensive 62-page Report. This expert opined, after reviewing the extensive discovery produced in this Action, as well as the detailed allegations in the Fourth Amended Complaint, based on his expertise in public companies' handling of related-party transactions, that Defendants' conduct violated Defendants' representations to investors that Defendant Erbey would recuse himself from all related-party transactions.

### G.    The Settlement Negotiation Process and the Proposed Settlement

102.    The Settlement was achieved through an arms'-length negotiation process. Serious settlement talks between Lead Counsel and Defendants did not begin until December 2016, after the parties had completed a significant amount of discovery, but while they were nevertheless still engaged in full-scale fact and expert discovery. Over the next month, Lead Counsel and Defendants engaged a respected mediator, former U.S. District Judge Layn Philips, to oversee numerous settlement discussions and the exchange of information regarding the parties' positions on liability and damages. The parties engaged in numerous telephonic mediation discussions with

Judge Philips, made ex parte written submissions to him to inform his discussions with both sides, and answered challenging questions posed by him to each side.

103.    On December 22, 2016, the parties jointly moved for a brief stay of all deadlines pertaining to class certification and fact and expert discovery so that the parties could focus their attention on the ongoing settlement discussions. DE 221. The Court denied that joint motion on December 23, 2106 (DE 222). As a result, the parties simultaneously engaged in settlement discussions and completed class-certification briefing, the submission of Plaintiffs' expert reports, Lead Plaintiffs' filing of the Fourth Amended Complaint, and Defendants' filing of motions to dismiss the Fourth Amended Complaint and to strike certain allegations from the Fourth Amended Complaint.

104.    On January 18, 2017, Lead Plaintiffs reached an agreement in principle with Defendants to settle all claims. As discussed above, at the time this agreement in principle was reached, a substantial amount of fact and expert discovery had been completed.

105.    The parties jointly moved on January 19, 2017, to adjourn the briefing schedule in order to finalize the proposed settlement and submit the preliminary-approval papers to the Court. DE 246. The parties also requested that the Court cancel all then-pending case deadlines, including the deadlines for briefing on Defendants' Motion to Strike Matter from the Fourth Amended Complaint and Defendants' Motion to Dismiss New Claims asserted in the Fourth Amended Complaint. The Court granted the joint motion to adjourn the schedule on January 19, 2017. DE 249.

106.    Following the execution of a settlement Term Sheet, the parties negotiated the terms of the Stipulation, which they executed on February 8, 2017. In accordance with the Stipulation, in full and complete settlement of the Released Plaintiffs' Claims (as defined in paragraph 1(ll) of

the Stipulation) against the Defendants, Altisource has paid into escrow $32 million in cash. As Altisource disclosed in a press release that it issued and filed with the SEC on February 16, 2017, the Settlement was funded with $4 million of proceeds from Altisource's insurance policies and $28 million from the Company's own funds.

107.    The Settlement Class is for settlement purposes only, and is defined as follows:

> All persons or entities who or which purchased or otherwise acquired Altisource common stock during the period from April 25, 2013 through December 21, 2014, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Settlement Class are the Defendants; the affiliates and subsidiaries of Altisource and Ocwen; members of the Immediate Family of each of the Individual Defendants; the Officers and directors of Altisource and Ocwen during the Class Period; the heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had during the Class Period a controlling interest. Also excluded from the Settlement Class are any persons or entities that exclude themselves by submitting a request for exclusion that is accepted by the Court as valid.

Stipulation ¶1(qq).

108.    On February 8, 2017, Lead Plaintiffs filed a motion for preliminary approval of the Settlement and certification of the Settlement Class for settlement purposes only. DE 250. On February 10, 2017, the Court entered an Order preliminarily approving the proposed Settlement. DE 251.

## III.    RISKS OF CONTINUED LITIGATION

109.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $32 million cash payment. The merits of the $32 million cash Settlement must be considered in the context of the serious risk that further litigation could lead to a significantly smaller recovery—or no recovery at all—for the Class. As explained below, Defendants had substantial defenses with respect to liability, loss causation, and damages in this Action. These arguments created a significant risk that, after years of protracted litigation, Lead Plaintiffs and the Settlement Class could achieve no recovery at all, or a lesser recovery than the Settlement Amount.

These risks were compounded by the fact that several claims in this Action had already been dismissed by the Court, and the Court had expressed some skepticism concerning the remaining claims. Moreover, the Court had established an aggressive discovery and trial schedule, with expert submissions due in January 2017, summary-judgment motions due in April 2017, and a trial scheduled at the beginning of July 2017. At the time the Settlement was reached, Defendants' pending motion to dismiss parts of the Fourth Amended Complaint, Plaintiffs' pending class-certification motion, and the motions for summary judgment to be filed soon after the parties agreed to the Settlement increased the possibility that, absent the Settlement, the Court could have further narrowed or eliminated Plaintiffs' claims or truncated the Class Period.

110.     To prevail in this Action, Plaintiffs had to prove each of the following six elements: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). Moreover, the Action was subject to the heightened pleading standards of the PSLRA, which requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To quality as "strong," the inference "must be more than merely plausible or reasonable—[it] must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

111.     As explained below, Defendants had already successfully moved to dismiss most of the Conflicts-of-Interest Allegations and all of the REALServicing Allegations from the Action, and had substantial defenses with respect to the Recusal Claims, which were the only Conflicts-of-Interest Allegations sustained by the Court at the pleadings stage. These arguments created a

significant risk that, after years of protracted litigation, Lead Plaintiffs and the Settlement Class could achieve no recovery at all, or a significantly smaller recovery than the Settlement Amount.

### A.      Risks to Proving Falsity and Materiality

112.    Even though Lead Plaintiffs prevailed in part at the motion-to-dismiss stage and were able to pursue their Recusal Claims, Lead Plaintiffs and the Class faced a substantial risk that the Court would find that they failed to establish liability or damages as a matter of law at summary judgment, or, if the Court were to permit the claims to proceed to trial, that a jury would find against Plaintiffs. Moreover, there was a substantial risk that the Court could conclude that certain of these claims failed as a matter of law in response to Defendants' pending motion to partially dismiss the Fourth Amended Complaint. If granted, that motion would have shortened the Class Period, leaving thousands of potential Class Members with no recovery. Although Lead Plaintiffs and Lead Counsel strongly believe that the claims asserted against Defendants have merit, they recognize that there would be substantial risks to establishing each of these allegations and prevailing on Lead Plaintiffs' claims on Defendants' motions for summary judgment, at trial, and on appeal. Indeed, Defendants raised numerous serious arguments in their motions to dismiss and would have repeated these arguments at summary judgment and trial, and Lead Plaintiffs would have faced significant risks proving their claims.

113.    Defendants vigorously contested their liability on falsity, materiality, and scienter grounds, among others. As detailed above, the core sustained allegations in this case were that Defendants misrepresented (a) that Erbey recused himself from related-party transactions, and (b) that Altisource's Board of Directors exercised independent oversight over Erbey's conflicts of interest. As to Defendants' alleged misrepresentations concerning Erbey's recusal from related-party transactions, Defendants have vigorously argued that Erbey, in his role as Altisource Chairman, did not vote to approve related-party transactions with Ocwen or any of the other related

companies and, as a result, their representations concerning his recusal were accurate and not false or misleading. Indeed, even the SEC noted in its action against Ocwen that Erbey did not vote on behalf of Altisource to approve the related-party transactions at issue in that action for which he voted on behalf of Ocwen. The definition of "recusal" would have been strongly contested. While Lead Plaintiffs and their corporate-governance expert strenuously argued that Erbey's participation in discussions and negotiations of these transactions violated Defendants' representations concerning recusal, Defendants would have argued that mere abstention from voting constituted recusal. And it is possible that a finder of fact would agree with Defendants that, absent an actual vote on a particular transaction, Defendants' statements concerning Erbey's recusal were not misleading. Moreover, Defendants would have argued that, even if the statements were misleading, scienter was lacking because Erbey and Altisource reasonably believed that Erbey recused himself from related-party transactions by abstaining from the formal vote.

114.    Defendants also argued once again in their pending motion to dismiss and opposition to class certification, and would have continued to argue at summary judgment, that the largest transaction that is the focus of the Fourth Amended Compliant—the FPI transaction between Altisource, Ocwen, and SWBC—is not a related-party transaction and, therefore, allegations and evidence concerning that transaction must be dismissed. The Court agreed with this argument in its initial dismissal Order on September 4, 2015, thereby creating a substantial risk that the Court could once again agree with this position.

115.    The Class Period was also at serious risk in this litigation, because Defendants might have succeeded in the arguments made in both their opposition to class certification and their motion to partially dismiss the Fourth Amended Complaint that the first allegedly false statement was not made until December 3, 2013 (as opposed to April 5, 2013), and that the Class

Period must therefore be shortened. Altisource did not specifically represent to investors that Erbey would "recuse" himself from related-party transactions until December 3, 2013. Before December 3, 2013, Defendants represented that Altisource "will also seek to manage [Erbey's] personal conflicts through . . . oversight by the independent members of our Board of Directors." Defendants argued that Lead Plaintiffs' claims based on this "oversight" statement had not been sustained by the Court and, in any event, that the statement was not false and misleading because the independent directors were involved in approving the related-party transactions. If the Court had accepted Defendants' arguments and shortened the Class Period to December 3, 2013 through December 21, 2014, thousands of Class Members who would have been included in the longer Class Period would instead have been excluded from recovering any of their losses.

116.   Defendants also placed significant weight on the fact that Altisource, in contrast to Ocwen and related company HLSS, was never the subject of an SEC or NY DFS enforcement action. While regulators' failure to prosecute is not determinative exculpatory evidence, a trier of fact could have weighed that non-prosecution heavily.

### B.   Risks of Establishing Loss Causation and Damages

117.   Even assuming that Lead Plaintiffs overcame each of the above risks and successfully established liability, they faced very serious risks in proving damages and loss causation. Indeed, these issues were a critical driver of the settlement value of this Action.

118.   This Action, to the extent Plaintiffs claims were sustained in December 2015, involved four alleged corrective partial events in 2014: February 26, August 4, November 11, and December 22. As the Court is aware, Lead Plaintiffs bear the burden of establishing "loss causation," i.e., that Altisource's false statements caused their alleged losses. *See Dura Pharm.*, 544 U.S. at 345-46. To establish loss causation, Plaintiffs must demonstrate a sufficient connection between the fraudulent conduct and the losses suffered. *See Meyer v. Greene*, 710 F.3d 1189, 1196-

97 (11th Cir. 2013). Defendants argued and would have continued to argue that Lead Plaintiffs could not satisfy the burden of showing that their losses were attributable to any of the four alleged partial corrective disclosures.

119.    A major consideration driving the calculation of a reasonable settlement amount was that the Defendants had credible arguments that the declines in Altisource's stock price were not caused by revelations of the true facts concerning Erbey's failure to recuse himself. For example, in opposing Plaintiffs' motion for class certification, Defendants argued that Plaintiffs' loss-causation analysis failed to properly account for the increase in regulatory scrutiny of Altisource and Ocwen at the time. Defendants also argued that Lead Plaintiffs' damages methodology did not disaggregate for statements about Altisource made by Ocwen, which Defendants argued had to be disaggregated because of Ocwen's dismissal from this Action.

120.    Defendants also argued that Lead Plaintiffs' damages methodology would not measure only those damages attributable to Plaintiffs' theory of liability, as required by *Comcast*, because Plaintiffs' financial expert supposedly failed to disaggregate confounding news. Defendants cited as one example the August 4, 2014 disclosure date, when they assert that new information about multiple alleged problems was disclosed. Lead Plaintiffs' claims based on some of those problems had been dismissed by the Court, and Defendants therefore argued that Plaintiffs were obligated to but could not disaggregate the portion of the stock drop in response to that day's news that was caused by the information related to the dismissed claims. Given that the Court had dismissed claims that were revealed as part of the DFS revelations on the February 26 and December 22, 2014 disclosure dates, Defendants would most certainly have made that disaggregation argument for these dates as well.

121.    If Defendants had succeeded on any of these substantial defenses, Plaintiffs and the Class would have recovered nothing at all or, at best, would likely have recovered far less than the Settlement Amount.  Indeed, if Defendants prevailed on their falsity or scienter arguments, there would have been no recovery for the Class.

122.    Had Lead Plaintiffs overcome all of the loss-causation and damages risks discussed above, the Settlement Class's estimated *maximum* recoverable damages at trial would have been in the range of approximately $400 million. However, if Defendants prevailed on their argument that the Class Period should be shortened, which as noted above was a real risk Lead Plaintiffs faced, maximum recoverable damages would have been reduced to approximately $300 million.

123.    Moreover, Plaintiffs' damages estimates would have been subject to substantial risk at trial, as they would be subject to a "battle of the experts." At trial, even the low end of the range could have been substantially reduced based on arguments about both the substance of the disclosures that purportedly dissipated the artificial inflation in the price of Altisource shares and the extent to which the regression analysis Lead Plaintiffs' expert would have presented accurately captured the amount of dissipation in Altisource's share price on each alleged date that it declined in response to the truth being revealed.

124.    Accordingly, in light of the substantial risks of establishing liability, loss causation, and damages here, Lead Plaintiffs and Lead Counsel believe that the recovery of $32 million, which represents more than 10% of the Settlement Class's likely maximum recoverable damages, is an excellent outcome for members of the Settlement Class. As discussed in the accompanying Memorandum of Law in support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation, this percentage recovery is well within the "range of

reasonableness," as courts often approve class settlements representing similar or lower percentages of recoverable damages.

### C.   Risk of Appeal

125.   Even if Lead Plaintiffs prevailed at summary judgment and at trial, Altisource would likely have appealed the judgment, leading to many additional months, if not years, of litigation. On appeal, Defendants would have renewed their host of arguments as to why Lead Plaintiffs had failed to establish liability and damages, thereby exposing Lead Plaintiffs to the risk of having any favorable judgment reversed or reduced below the Settlement Amount.

126.   Based on all the factors summarized above, Lead Plaintiffs and Lead Counsel respectfully submit that it was in the best interests of the Settlement Class to accept the immediate and extremely substantial benefit conferred by the Settlement, instead of incurring the significant risk that the Settlement Class could recover a smaller amount, or nothing at all, after several additional years of arduous litigation.

### D.   Defendants' Ability to Pay

127.   A further major risk in this Action was that Defendants might not have been able to pay any judgment that Lead Plaintiffs might have won due to Altisource's limitations on its ability to pay and the limited amount of available insurance

128.   Specifically, Altisource has been negatively affected by Ocwen's continuing regulatory and legal troubles. In addition, Defendants had provided Lead Plaintiffs with their D&O insurance policies and information about the remaining available coverage on a confidential basis. Based on that information, Lead Plaintiffs believed that the limited amount of available insurance was a further factor favoring the proposed Settlement. The wasting nature of the available insurance and the limits on Altisource's ability to pay underscore the difficulties Lead Plaintiffs would have faced in collecting any larger amount after trial.

129.     As noted above, Altisource has now disclosed publicly that the $32 million Settlement was funded with $4 million of insurance proceeds and $28 million of the Company's own money. In Lead Counsel's experience, most securities class-action settlements are funded primarily or entirely with insurance proceeds. Thus, Lead Plaintiffs' success in obtaining such a significant cash contribution to the Settlement Amount from the principal Defendant here is a significant achievement.

130.     For all these reasons, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and that it is in the best interests of the Settlement Class to accept the immediate and substantial benefit conferred by the Settlement, instead of incurring the significant risk that the Settlement Class might recover a smaller amount, or nothing at all, after protracted and arduous litigation.

## IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

131.     The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class. The Preliminary Approval Order also set a May 9, 2017 deadline for Class Members to submit objections to the Settlement, the Plan of Allocation, and the Fee and Expense Application, or to request exclusion from the Settlement Class, and set a final approval hearing date of May 30, 2017.

132.     In accordance with the Preliminary Approval Order, Lead Counsel instructed Garden City Group, LLC ("GCG"), the Court-approved Claims Administrator, to disseminate copies of the Notice and the Claim Form by mail and to publish the Summary Notice. The Notice

contains, among other things, (i) a description of the Action and the Settlement; (ii) the terms of the proposed Plan of Allocation; (iii) an explanation of Class Members' right to participate in the Settlement; and (iv) an explanation of Class Members' rights to object to the Settlement, the Plan of Allocation, and the Fee and Expense Application, or exclude themselves from the Settlement Class. The Notice also informs Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 22% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $1,200,000. To disseminate the Notice, GCG obtained information from the Company and from banks, brokers, and other nominees regarding the names and addresses of potential Class Members. *See* Declaration of Jose C. Fraga Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (the "Fraga Decl."), attached to this Declaration as Exhibit 1, at ¶¶2-9.

133. On March 10, 2017, GCG disseminated 1,967 copies of the Notice and Claim Form (together, the "Notice Packet") to potential Class Members and nominees by first-class mail. *See* Fraga Decl. ¶¶3, 5. As of April 24, 2017, GCG has disseminated 17,811 Notice Packets. *Id.* ¶9.

134. On March 23, 2017, in accordance with the Preliminary Approval Order, GCG caused the Summary Notice to be published in the *Wall Street Journal* and to be transmitted over the PR Newswire. *See* Fraga Decl. ¶10.

135. Lead Counsel also caused GCG to establish a dedicated Settlement website, www.AltisourceSecuritiesLitigation.com, to provide potential Class Members with information concerning the Action and the Settlement and access to downloadable copies of the Notice, Claim Form, Settlement Stipulation, Preliminary Approval Order, and Complaint. *See* Fraga Decl. ¶12.

136.    As noted above, the deadline for Class Members to file objections to the Settlement, the Plan of Allocation, and the Fee and Expense Application, or to request exclusion from the Settlement Class, is May 9, 2017. To date, no objections to the Settlement or Lead Counsel's application for attorneys' fees and expenses have been received, and no requests for exclusion have been received (*see* Fraga Decl. ¶13). Lead Counsel will file reply papers on or before May 23, 2017, after the deadline for submitting objections and requests for exclusion has passed, which will address any objections and requests for exclusion that may be received.

## V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

137.    In accordance with the Preliminary Approval Order, and as described in the Notice, all Class Members who want to participate in the distribution of the Net Settlement Fund (i.e., the Settlement Fund less (i) any Taxes, (ii) any Notice and Administration Costs, (iii) any Litigation Expenses awarded by the Court, and (iv) any attorneys' fees awarded by the Court) must submit valid Claim Forms with all required information postmarked no later than July 11, 2017. As described in the Notice, the Net Settlement Fund will be distributed among eligible Class Members according to the plan of allocation approved by the Court.

138.    Lead Plaintiffs' damages expert developed the proposed plan of allocation (the "Plan of Allocation") in consultation with Lead Counsel. Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among eligible Class Members.

139.    The Plan of Allocation is contained in ¶¶53-70 of the Notice. *See* Notice (Exhibit A to Fraga Decl.) at ¶¶53-70. As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, or indicative of, the amounts that Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants under the Settlement. Instead, the calculations under the plan are only a method to weigh the claims

51

of Class Members against one another for the purpose of making an equitable allocation of the Net Settlement Fund. *Id*. ¶53.

140.    Lead Plaintiffs' damages expert developed the Plan of Allocation based on an event study. In the event study, the damages expert analyzed those allegations in the Third Amended Complaint that remained in the Action after the Court's ruling on Defendants' second motion to dismiss. The damages expert then calculated how much artificial inflation was in the price of Altisource common stock during the Class Period as a result of Defendants' alleged materially false and misleading statements and omissions, and how much the stock price declined as a result of the disclosures that corrected those alleged misstatements and omissions.[4] In calculating this estimated alleged artificial inflation, Lead Plaintiffs' damages expert considered price changes in Altisource common stock in reaction to public disclosures that allegedly corrected the alleged misrepresentations and omissions, adjusting those price changes for factors that were attributable to market or industry forces, and for non-fraud-related Altisource-specific information. *Id*. ¶54.

141.    Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of Altisource common stock by an eligible Class Member during the Class Period. In general, the Recognized Loss Amount will be the difference between the estimated artificial inflation on the purchase date and the estimated artificial inflation on the sale date, or the difference between the actual purchase price and the sales price, whichever is less. *Id*. ¶58. Under the Plan of Allocation, claimants who purchased shares during the Class Period but did not hold those shares through at least one partial corrective disclosure will have no Recognized Loss Amount as to those transactions. *Id*. ¶55.

---

[4]    As discussed above, the Court's Second Omnibus Order, entered on December 21, 2015, dismissed claims as to certain alleged misrepresentations and omissions.

142.     The sum of a Claimant's Recognized Loss Amounts is the Claimant's "Recognized Claim" under the Plan of Allocation. The Net Settlement Fund will be allocated to Authorized Claimants pro rata based on the relative size of their Recognized Claims. *Id.* ¶¶61-62.

143.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among eligible Class Members based on the losses they suffered on transactions in Altisource common stock that were attributable to conduct alleged in the Action. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

144.     As noted above, as of April 24, 2017, 17,811 copies of the Notice, which contains the Plan of Allocation and advises Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Class Members and nominees. *See* Fraga Decl. ¶9. To date, no objection to the proposed Plan of Allocation has been received.

## VI.     THE FEE AND LITIGATION EXPENSE APPLICATION

145.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel BLB&G are applying to the Court for an award of attorneys' fees and reimbursement of Litigation Expenses on behalf of all Plaintiffs' Counsel.

146.     Specifically, Lead Counsel are applying for a fee award of 22% of the Settlement Fund, or $7,040,000, plus interest earned at the same rate as earned by the Settlement Fund, and for reimbursement of $988,206.72 in Plaintiffs' Counsel's Litigation Expenses. The amount of Plaintiffs' Counsel's incurred expenses for which Lead Counsel seek reimbursement is below the maximum expense amount of $1,200,000 stated in the Notice.

147.     Based on the factors discussed below, and on the legal authorities discussed in the accompanying the Fee Memorandum, we respectfully submit that Lead Counsel's motion for fees and expenses should be granted.

### A.      The Fee Application

148.      Lead Counsel BLB&G are applying for a fee award to be paid from the Settlement Fund on a percentage basis. As discussed in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery for common-fund cases in the Eleventh Circuit.

149.      Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved. As discussed in the Fee Memorandum, a 22% fee award is fair and reasonable for attorneys' fees in common-fund cases like this and is well within the range of percentages awarded in class actions in this District and Circuit for comparable settlements.

### 1.      Lead Plaintiffs Support the Fee Application

150.      The Painters Funds are sophisticated institutional investors that closely supervised and monitored the prosecution and the settlement of the Action. The Painters Funds have evaluated the Fee Application and believe it to be reasonable. As discussed in the declaration submitted by the Painters Funds, the Painters Funds believe that the requested fee is fair and reasonable in light of the work counsel performed and the risks of the litigation. *See* Declaration of William McDevitt, Administrator of the Pension Fund for the Painters and Allied Trades District Council 35 and the Annuity Fund for the Painters and Allied Trades District Council 35, in Support of: (A) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "McDevitt Decl."), attached to this Declaration as Exhibit 2, at ¶7. The Painters

Funds' endorsement of the requested fee demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.[5]

### 2.    The Time and Labor of Plaintiffs' Counsel

151.    The investigation, prosecution, and settlement of the claims asserted in this Action required extensive efforts on the part of Lead Counsel, given the complexity of the legal and factual issues raised by Lead Plaintiffs' claims and the vigorous defense mounted by Defendants. The many tasks undertaken by Lead Counsel in this case are detailed above (¶¶ 17-108). These tasks included, among other things:

(i)    conducting a comprehensive factual investigation of the claims at issue in the Action, which included, among other things, a review of all relevant public information, research of the applicable law, and identifying, locating, and interviewing numerous confidential witnesses;

(ii)    preparing and filing the detailed and particularized Amended Complaint based on Lead Counsel's factual investigation, as well as the subsequent Second, Third, and Fourth Amended Complaints;

(iii)    vigorously defending two rounds of motions to dismiss filed by Defendants;

(iv)    preparing and serving document requests on the Altisource Defendants, Ocwen, and other related third parties;

(v)    participating in extensive correspondence and numerous meet and confers between the parties concerning discovery disputes;

(vi)    researching, drafting, and filing several motions to compel the production of party and third-party documents;

(vii)    responding to two motions for protective orders and a motion to compel filed by Defendants;

(viii)    arguing at four hearings before Magistrate Judge Snow on discovery matters

---

[5]    The fee request also has the full support of named Plaintiff West Palm Beach Firefighters. *See* Declaration of David Merrell, Chairmen of the Board of Trustees of the West Palm Beach Firefighters' Pension Fund, in Support of: (A) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the " Merrell Decl."), attached to this Declaration as Exhibit 2, at ¶ 6.

and related motion practice;

(ix)    opposing Defendants' objection to one of Magistrate Judge Snow's discovery rulings;

(x)    reviewing and analyzing over one million pages of documents produced by the Altisource Defendants and third parties in discovery;

(xi)    preparing and serving interrogatories on the Altisource Defendants;

(xii)    coordinating the Painters Funds' and West Palm Beach Firefighters' responses to the Altisource Defendants' wide-ranging document requests and interrogatories;

(xiii)    preparing and filing a comprehensive brief in support of Plaintiffs' motion for class certification, which included an expert report submitted by Plaintiffs' financial analyst regarding market efficiency;

(xiv)    in connection with class certification, preparing for and defending five depositions of a witness from the Painters Funds, a witness from West Palm Beach Firefighters, the Painters Funds' investment manager, West Palm Beach Firefighters' investment manager, and Lead Plaintiffs' market-efficiency expert;

(xv)    preparing and serving the Altisource Defendants with two detailed export reports concerning (i) damages and loss causation, and (ii) Defendants' conflicts-of-interest misrepresentations; and

(xvi)    participating in extensive settlement negotiations with the assistance of the mediator, former Judge Philips, which included numerous telephonic settlement discussions, ex parte submissions to the mediator, and the exchange of information regarding the parties' positions on damages and liability.

152.    The substantial amount of time expended by Lead Counsel in researching, investigating, prosecuting, and ultimately settling the claims asserted in the Action is reflected in the supporting declaration submitted on behalf of Lead Counsel, which is attached to this Declaration as Exhibit 4A. Lead Counsel was assisted in the prosecution of the Action by: (i) Saxena White, P.A. ("Saxena White"), which represented named Plaintiff West Palm Beach Firefighters in the Action and served as Liaison Counsel for Lead Plaintiffs and the Settlement Class; and (ii) additional Plaintiffs' counsel Kahn Swick & Foti, LLC ("Kahn Swick"), which performed legal services in the Action at the direction and under the supervision of Lead Counsel.

Supporting declarations submitted on behalf of Saxena White and Kahn Swick are attached to this Declaration as Exhibits 4B and 4C, respectively.

153.     The first page of Exhibit 4 to this Declaration contains a summary chart of the hours expended and lodestar amounts for each Plaintiffs' Counsel firm, as well as a summary of each firm's Litigation Expenses.[6] Included within each supporting declaration is a schedule summarizing the hours and lodestar of each firm from the inception of the case through and including February 8, 2017 (the date when Lead Plaintiffs filed their motion for preliminary approval of the Settlement), a summary of Litigation Expenses by category, and a firm résumé. No time expended in preparing the application for fees and reimbursement of expenses has been included.

154.     As shown in Exhibit 4, Plaintiffs' Counsel collectively expended a total of 14,425.50 hours in investigating and prosecuting the Action from its inception through and including February 8, 2017, for a total lodestar of $7,443,434.25. The requested fee of 22% of the Settlement Fund represents $7,040,000 (plus interest), and therefore represents a negative lodestar multiplier of approximately 0.95. As discussed in further detail in the Fee Memorandum, given that large contingency multipliers are commonly awarded in complex class actions, the negative multiplier of approximately 0.95 requested here strongly confirms the reasonableness of the requested fee.

155.     As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action. I maintained control of and monitored the work performed by other lawyers at BLB&G and other Plaintiffs' Counsel on this case. While I personally devoted substantial time to this case, and personally reviewed and edited all pleadings, motions, and

---

[6]     Kahn Swick is not requesting reimbursement of Litigation Expenses.

correspondence prepared on behalf of Lead Plaintiffs, other experienced attorneys at my firm were involved in the litigation and settlement negotiations. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

### 3.    The Skill and Experience of Plaintiffs' Counsel

156.    As demonstrated by the firm résumé attached as Exhibit 3 to Exhibit 4A, BLB&G is among the most experienced and skilled law firms in the securities-litigation field, with a long and successful track record representing investors in cases of this kind. BLB&G is consistently ranked among the top plaintiffs' firms in the country. Further, BLB&G has taken complex cases like this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions. I believe that this willingness and ability to take complex cases to trial added valuable leverage in the settlement negotiations.[7]

### 4.    Standing and Caliber of Defendants' Counsel

157.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, the Altisource Defendants were represented by King & Spalding LLP, one of the country's most prestigious and experienced defense firms, which vigorously represented its clients. The Altisource Defendants were also represented during the latter part of the litigation by Jones Day, another of the country's top defense firms, as co-counsel with King & Spalding. The Ocwen Defendants were represented by

---

[7]    As demonstrated by their firm résumés submitted with this Declaration, Saxena White and Kahn Swick are also class-action law firms with significant experience in the securities-litigation field. *See* Exhibit 3 to Exhibit 4A (Saxena White firm résumé); Exhibit 2 to Exhibit 4C (Kahn Swick firm résumé).

Kramer Levin Naftalis & Frankel LLP, yet another of the country's top corporate defense firms, who vigorously defended the Action as to the Ocwen Defendants. In the face of this experienced, formidable, and well-financed opposition, Lead Counsel was nonetheless able to partially defeat Defendants' motions to dismiss, defeat their motion for reconsideration, and persuade them to settle the case on terms favorable to the Settlement Class.

> **5.** **The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

158.    This prosecution was undertaken by Lead Counsel entirely on a contingent-fee basis. The risks assumed by Lead Counsel in bringing these claims to a successful conclusion are described above. Those risks are also relevant to an award of attorneys' fees.

159.    From the outset, BLB&G understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and have collectively incurred over $988,000 in Litigation Expenses in prosecuting the Action for the benefit of the Settlement Class.

160.    Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this Action is never assured.

59

161.   Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

162.   Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. To carry out important public policy, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

163.   Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In these circumstances, and in consideration of the hard work performed and the excellent result achieved, I believe the requested fee is reasonable and should be approved.

### 6.   The Settlement Class's Reaction to the Fee Application

164.   As noted above, as of April 24, 2017, a total of 17,811 Notice Packets have been mailed to potential Class Members and nominees advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 22% of the Settlement Fund. *See* Fraga Decl. ¶9. In addition, the Court-approved Summary Notice has been published in the *Wall Street Journal* and transmitted over the PR Newswire. *Id.* ¶10. To date, no objection to the attorneys' fees stated in the Notice has been received. Should any objections be received, they will be

addressed in Lead Counsel's reply papers to be filed on or before May 23, 2017, after the deadline for submitting objections has passed.

165.   In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 22% is fair and reasonable and is supported by the fee awards courts have granted in comparable cases.

### B.   The Litigation Expense Application

166.   Lead Counsel also seek reimbursement from the Settlement Fund of $988,206.72 in Litigation Expenses that were reasonably incurred by Plaintiffs' Counsel in connection with commencing, litigating, and settling the claims asserted in the Action.

167.   From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until the Action might be successfully resolved. Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced to prosecute the Action. Accordingly, Plaintiffs' Counsel were motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

168.   As shown in Exhibit 4 to this Declaration, Plaintiffs' Counsel have incurred a total of $988,206.72 in unreimbursed Litigation Expenses in prosecuting the Action. The expenses are summarized in Exhibit 5, which was prepared based on the declarations submitted by each firm and identifies each category of expense, e.g., expert fees, on-line research, out-of-town travel,

mediation fees, photocopying, and postage expenses, and the amount incurred for each category. These expense items are billed separately by Plaintiffs' Counsel and are not duplicated in Plaintiffs' Counsel's billing rates.

169.    Of the total amount of expenses, $730,182.29, or approximately 74%, was incurred for the retention of consulting and testifying experts. As noted above, Lead Counsel consulted with Dr. Michael Hartzmark, an expert in the fields of market efficiency, loss causation, and damages, during counsel's investigation and the preparation of the complaints and class-certification motion, and consulted further with Dr. Hartzmark during the settlement negotiations and in connection with the development of the proposed Plan of Allocation. Dr. Hartzmark also prepared three expert reports that were served on Defendants. Lead Plaintiffs also consulted with a nationally recognized expert on corporate governance regarding Defendants' conflicts-of-interest misrepresentations, and this expert prepared a report that was served on Defendants.  In addition, Lead Plaintiffs consulted with an accounting expert who provided an analysis of the Company's financial statements in connection with Lead Counsel's investigation of the alleged fraud and preparation of the Amended Complaints.

170.    Another large component of the Litigation Expenses was for online legal and factual research, which was necessary to prepare the complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss and for reconsideration, move for class certification, and brief other motions in the case. The total charges for on-line legal and factual research amount to $144,392.61, or approximately 15% of the total amount of expenses.

171.    Lead Counsel have also incurred expenses totaling $22,400.00 for mediation fees charged by former Judge Phillips.

172.     In addition, Lead Counsel has reported charges of $22,066.80 for their electronic-discovery vendor, which provided data-storage services for the discovery documents produced in electronic form. The e-discovery vendor's platform also provided tools for electronically searching, reviewing, and analyzing the documents.

173.     The other expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, copying costs, long-distance telephone charges, and out-of-town travel costs (which, for this case, include expenses incurred for Lead Counsel's multiple trips to Fort Lauderdale, FL for Court hearings and trips to Boston, MA, Minneapolis, MN, Richmond, VA, and Fort Lauderdale for depositions, as well as trips by Lead Plaintiffs' financial expert and Saxena White to New York, NY for that expert's deposition).

174.     All of the Litigation Expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Plaintiffs. *See* McDevitt Decl. ¶8; Merrell Decl. ¶7.

175.     Additionally, in accordance with the PSLRA, the Painters Funds and West Palm Beach Firefighters seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Settlement Class, in the amount of $15,265.81 and $2,712.50, respectively, for a total of $17,978.31. *See* McDevitt Decl. ¶¶9-11; Merrell Decl. ¶¶8-10.

176.     The Notice informed potential Class Members that Lead Counsel would seek reimbursement of expenses in an amount not to exceed $1,200,000. The total amount requested, $1,006,185.03, which includes $988,206.72 in reimbursement of Litigation Expenses incurred by Plaintiffs' Counsel and $17,978.31 in reimbursement of costs and expenses incurred by Plaintiffs,

is significantly below the $1,200,000 that Class Members were notified could be sought. To date, no Class Member has objected to the maximum amount of expenses disclosed in the Notice. Lead Counsel will address any objections in their reply papers.

177.    The expenses incurred by Plaintiffs' Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

178.    Attached to this Declaration are true and correct copies of the following documents cited in the Fee Memorandum:

Exhibit 6:    *City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Celullose S.A., et al.*, Case No. 08-23317-C-LENARD (S.D. Fla. July 17, 2013);

Exhibit 7:    *Miller v. Dyadic Int'l, et al.*, Case No. 07-80948-CIV-DIMITROULEAS (S.D. Fla. July 28, 2010);

Exhibit 8:    *Mazur v. Lampert, et al.*, Case No. 04-61159-CIV-LENARD/GARBER (S.D. Fla. June 19, 2008);

Exhibit 9:    *In re HealthSouth Corp. Bondholder Litig.*, Case No. CV-03-BE-1500-S (N.D. Ala. July 26, 2010).

## VII.    CONCLUSION

179.    For all the reasons discussed above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of 22% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total litigation costs and expenses in the total amount of $1,006,185.03 should also be approved.

I declare, under penalty of perjury under the laws of the United States, that the foregoing

is true and correct

Date:   April 25, 2017
        New York, New York

_____
HANNAH G. ROSS

#1076918